# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **AMY VELEZ, SONIA KLINGER, PENNI ZELINKOFF, MINEL HIDER TOBERTGA, and MICHELLE WILLIAMS,** | ) ) ) ) ) | **CLASS ACTION COMPLAINT** |
| **Individually and on Behalf of Others Similarly Situated,** | ) ) ) | |
| **PLAINTIFFS,** | ) ) | **04-Civ.-09194 (GEL)** |
| **v.** | ) ) | |
| **NOVARTIS CORPORATION and NOVARTIS PHARMACEUTICAL CORPORATION,** | ) ) ) ) | **JURY TRIAL DEMANDED** |
| **DEFENDANTS.** | ) ) | |

## CLASS ACTION COMPLAINT

## I.    NATURE OF THIS ACTION

1.    Amy Velez, Sonia Klinger, Penni Zelinkoff, Minel Hider Tobertga and Michelle Williams ("Class Representatives") bring this action against Defendants Novartis Corporation and Novartis Pharmaceuticals Corporation (jointly "Novartis" or "Defendants") to redress gender discrimination in employment.  Specifically, the Class Representatives, all of whom are present or former employees of Novartis, bring this class action against Novartis on behalf of themselves and all other female employees of Novartis who are similarly situated pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), et seq., as amended ("Title VII").   The Class Representatives have worked and/or continue to work for Novartis throughout the United States, including the Washington, D.C. area; St. Louis and Kansas City, Missouri; Portland, Oregon;

Sacramento, California; and Chicago, Illinois.

2.    The Class Representatives seek to represent female employees of Novartis who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including, but not limited to: discriminatory policies, practices and/or procedures in selection, promotion and advancement; disparate pay; differential treatment; and gender hostility in the workplace.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

3.    The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal and punitive damages; and attorneys' fees, costs and expenses to redress Novartis' pervasive and discriminatory employment policies, practices and/or procedures.

## II.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), et seq., as amended ("Title VII") to redress and enjoin employment practices of Novartis in violation of these statutes.

5.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c) because Defendants Novartis Corporation and Novartis Pharmaceuticals Corporation are subject to personal jurisdiction, and thus reside in New York.

6.    The Southern District of New York is the most logical forum in which to litigate the claims of the Class Representatives and the proposed class in this case.  Novartis Corporation is headquartered in New York, New York and incorporated in the State of New York, with Registered Agents in California and New York.  Additionally, Novartis Pharmaceuticals Corporation has both a physical presence and a Registered Agent in New York.  Furthermore,

the Class Representatives and potential class members reside in all areas of the United States in which Novartis conducts business**.**

## III.    PROCEDURAL HISTORY

7.    Class Representative Amy Velez timely filed a Charge of Discrimination with the New Jersey Division on Civil Rights and the Equal Employment Opportunity Commission ("EEOC") on July 15, 2003.  Ms. Velez received her Notice of Right to Sue on August 24, 2004, and hereby timely files suit within ninety (90) days of receipt of her Notice of Right to Sue. Class Representatives Sonia Klinger, Minel Hider Tobertga, Penni Zelinkoff and Michelle Williams have filed charges of gender discrimination with the EEOC and are in the process of perfecting their Notices of Rights to Sue.

8.    The Class Representatives are relying on their own EEOC charges and/or those of other Class Representatives.

## IV.    PARTIES

### A.    Plaintiffs

9.    **Plaintiff Amy Velez** is a female citizen of the United States and a resident of Laurel in the State of Maryland.  Ms. Velez was employed by Novartis from approximately January 1997 to April 2004.

10.    **Plaintiff Sonia Klinger** is a female citizen of the United States and a resident of St. Louis in the State of Missouri.  Ms. Klinger has been continuously employed by Novartis since approximately June 2001.

11.    **Plaintiff Penni Zelinkoff** is a female citizen of the United States and a resident of Arvada in the State of Colorado.  Ms. Zelinkoff was employed by Novartis from approximately June 2001 to August 2004.

12.    **Plaintiff Minel Hider Tobertga** is a female citizen of the United States and a resident of Elk Grove in the State of California. Ms. Hider Tobertga was employed by Novartis from approximately April 2001 to September 2004.

13.    **Plaintiff Michelle Williams** is a female citizen of the United States and a resident of Plainfield in the State of Illinois. Ms. Williams has been continuously employed by Novartis since approximately April 2002.

**B.    Defendants**

14.    **Novartis Corporation** is the U.S. Headquarters for Novartis, AG, a Swiss company created in 1996 from the merger of the Swiss companies Ciba-Geigy and Sandoz. Novartis is a world leader in the research and development of health care products. Novartis' core businesses are in pharmaceuticals, consumer health, generics, eye-care, and animal health. Novartis Corporation is incorporated in the State of New York and physically located at 608 Fifth Avenue, New York, New York, 10020. Novartis Corporation has Registered Agents in New York and California.

15.    **Novartis Pharmaceuticals Corporation** is a division of Novartis Corporation specializing in the discovery, development, manufacture and marketing of prescription medicine. Novartis Pharmaceuticals Corporation is incorporated in Delaware and has office buildings in New Jersey and New York. Novartis Pharmaceuticals Corporation has Registered Agents in 32 states, including New York and California. During their employment with Novartis, the Class Representatives' paychecks were issued by Novartis Pharmaceuticals Corporation from East Hanover, New Jersey.

V.    **CLASS ACTION ALLEGATIONS**

    A.    **Class Definition**

16.    The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current and former Novartis employees.  Each of the Class Representatives is a member of the class.

17.    The class consists of all females who are, or have been, employed by Novartis and have experienced gender discrimination at any time during the applicable liability period.  All of the Class Representatives are proposed representatives of the class.  Upon information and belief, there are hundreds, if not thousands, of members of the proposed class.

    B.    **Efficiency of Class Prosecution of Common Claim**

18.    Certification of a class of female employees similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed class.  The individual claims of the Class Representatives require resolution of the common question of whether Novartis has engaged in a systemic pattern and/or practice of gender discrimination against female employees.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.  The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually, and on females generally.  In order to gain such relief for themselves, as well as for the putative class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues

would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed class, and Novartis.

19.    The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

### C.    Numerosity and Impracticability of Joinder

20.    The class which the Class Representatives seek to represent is too numerous to make joinder practicable.  The proposed class consists of hundreds, if not thousands, of current, former, and future female employees during the liability period.

### D.    Common Questions of Law and Fact

21.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the putative class they seek to represent.   The common questions of law include, *inter alia*, whether Novartis has engaged in unlawful, systemic gender discrimination in its selection, promotion, advancement, transfer, training, and discipline policies, practices and/or procedures, and in the general terms and conditions of work and employment; whether Novartis is liable for a continuing systemic violation of Title VII; and a determination of the proper standards for proving a pattern or practice of discrimination by Novartis against its female employees.  The common questions of fact would include, *inter alia*: whether Novartis has, through its policies,

practices and/or procedures, (a) denied or delayed the promotion of females; (b) precluded females from eligibility for promotions by denying them training which male employees are granted; (c) paid females at a disparate level; (d) subjected females to differential treatment, including but not limited to, less preferable work assignments, inequitable evaluations and stricter disciplinary policies, practices and/or procedures; and (e) subjected females to gender hostility and a sexually hostile work environment.

22.    The employment policies, practices and/or procedures to which the Plaintiffs and the class members are subject are set at Novartis' corporate level and apply universally to all class members throughout the country.  These employment policies, practices and/or procedures are not unique or limited to any department; rather, they apply to all departments, and thus, affect the Class Representatives and proposed class members in the same ways no matter in which district, in which division, or in which position they work.

23.    Throughout the liability period, a disproportionately large percentage of the managers and supervisors at Novartis have been male.

24.    Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all levels and all divisions of Novartis.  Selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male managers, supervisors, and subordinates rather than by merit or equality of opportunity.  As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than do female employees.

25.    Novartis' policies, practices and/or procedures have had an adverse impact on females seeking selection for, or advancement to, better and higher paying positions.  In general, the higher the level of the job classification, the lower the percentage of female employees

holding it.

###### E.    Typicality of Claims and Relief Sought

26.    The claims of the Class Representatives are typical of the claims of the proposed class.  The Class Representatives assert claims in each of the categories of claims they asserted on behalf of the proposed class.  The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed class.

27.    The Class Representatives are, like the members of the proposed class, all female employees who have worked for the Defendants during the liability period.

28.    Discrimination in selection, promotion, advancement, and training affects the compensation of the Class Representatives and all the employee class members in the same ways.

29.    Differential treatment between male and female employees occurs as a pattern and practice throughout all levels and departments of Novartis.  Novartis' predominantly male managers hold female employees, including both the Class Representatives and class members, to stricter standards than male employees, and thus, female employees often receive lower performance appraisals than males for performing at the same level.  Female employees are also disciplined, formally and informally, more frequently and severely than their male counterparts.  Additionally, male employees more often receive preferable work assignments and other forms of preferential treatment.

30.    Discrimination in the form of a hostile work environment occurs as a pattern and practice throughout all levels and departments of Novartis and affects the Class Representatives and the members of the class in the same ways.  Male supervisors and employees have made

sexually hostile comments and jokes, have harassed and intimidated female employees, have made it clear in various ways that they favor male employees, have denied female employees the full rights afforded to them by the Family and Medical Leave Act, and otherwise have created a working environment hostile to female employees.

31.    Several of the Class Representatives, and numerous other female employees, have complained to Novartis' management and Human Resources about gender discrimination and a sexually hostile work environment.  Company investigations into these complaints have been inadequate and/or superficial.  The Class Representatives and the class members have been affected in the same ways by Novartis' failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

32.    Novartis has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices and/or procedures referenced in this Complaint and has failed to discipline adequately its managers and other employees when they violate the anti-discrimination laws.  These failures have affected the Class Representatives and the class members in the same ways.

33.    The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the proposed class members in this case.  The Class Representatives seek the following relief for their individual claims and for those of the members of the proposed class: (a) a declaratory judgment that Novartis has engaged in systemic gender discrimination against female employees by limiting their ability to be promoted to better and higher paying positions, by limiting their employment opportunities to lower and less desirable classifications, by limiting their training and transfer opportunities, by exposing them to differential treatment, and by subjecting them to gender hostility at work; (b) a permanent

injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of Novartis' promotion, transfer, training, performance evaluation, compensation, work environment, and discipline policies, practices and/or procedures so that females will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) injunctive relief which effects a restructuring of the Novartis workforce so that females are promoted into higher and better paying classifications which they would have held in the absence of Novartis' past gender discrimination; (e) back pay, front pay, and other equitable remedies necessary to make the female employees whole from the Defendants' past discrimination; (f) compensatory damages; (g) punitive and nominal damages to prevent and deter Novartis from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs and expenses.

### F.    Adequacy of Representation

34.    The Class Representatives interests are co-extensive with those of the members of the proposed class which they seek to represent in this case.  The Class Representatives seek to remedy Novartis' discriminatory employment policies, practices and/or procedures so that females will no longer be prevented from advancing into higher paying and more desirable positions, will not receive disparate pay and differential treatment, and will not be subjected to gender hostility at work.  The Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their similar individual claims in this action. The Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests,

experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

### G.    Requirements of Rule 23(b)(2)

35.    Novartis has acted on grounds generally applicable to the Class Representatives and the proposed class by adopting and following systemic policies, practices and/or procedures which are discriminatory on the basis of gender.  Gender discrimination is Novartis' standard operating procedure rather than a sporadic occurrence.  Novartis has refused to act on grounds generally applicable to the class by, *inter alia*: (a) refusing to adopt and apply selection, promotion, training, performance evaluation, compensation and discipline policies, practices and/or procedures which do not have a disparate impact on, or otherwise systemically discriminate against, females; (b) refusing to provide equal terms and conditions of employment for females; and (c) refusing to provide a working environment which is free of gender hostility. Novartis' systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

36.    Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Novartis' individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Class Representatives' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female employees at Novartis.  Such relief is the factual and legal predicate for the Class

Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

### H.    Requirements of Rule 23(b)(3)

37.    The common issues of fact and law affecting the claims of the Class Representatives and proposed class members, including, but not limited to, the common issues identified in paragraphs 21-25 above, predominate over any issues affecting only individual claims.

38.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

39.    The cost of proving Novartis' pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to control the prosecution of their claims individually.

## VI.    CLASS CLAIMS

40.    The Class Representatives and the putative class they seek to represent have been subjected to a systemic pattern and practice of gender discrimination involving a battery of practices which have also had an unlawful disparate impact on them and their employment opportunities.  Such gender discrimination includes adhering to a policy and practice of restricting the promotion and advancement opportunities of female employees so that they remain in the lower classification and compensation levels.  Novartis in effect bars females from better and higher paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender stratification include, but are not limited to, Novartis' promotion, training and performance evaluation policies, practices and/or procedures.

41.    Novartis' promotion, advancement, training, and performance evaluation policies, practices and/or procedures incorporate the following discriminatory practices: (a) relying upon subjective judgments, procedures, and criteria which permit and encourage the incorporation of gender stereotypes and bias by Novartis' predominately male managerial and supervisory staff in making promotion, training, performance evaluation, and compensation decisions; (b) refusing or failing to provide equal training opportunities to females; (c) refusing or failing to provide females with opportunities to demonstrate their qualifications for advancement; (d) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional gender bias; (e) using informal, subjective selection methods which allow for rampant gender discrimination; (h) disqualifying female employees for vacancies by unfairly disciplining them; (i) discouraging applications and expressions of interest by females; (j) penalizing female employees for exercising the rights afforded to them by the Family and Medical Leave Act; and (k) subjecting females to gender hostility in the work environment.

42.    Novartis' promotion policies, practices and/or procedures have had a disparate impact on the Plaintiffs and the class members.  Such procedures are not valid, job-related, or justified by business necessity.  There are alternative objective and more valid selection procedures available to the Defendants which are more closely related to the actual responsibilities of the positions, which would have less of a disparate impact on females.  However, the Defendants have failed or refused to use such alternative procedures.

43.    The Defendants' promotion, training, performance evaluation, compensation, and transfer policies, practices and/or procedures are intended to have a disparate impact on the Class Representatives and the class they seek to represent.  Such practices form a part of the

Defendants' overall pattern and practice of keeping females in the lower classifications which have less desirable terms and conditions of employment.

44.    Because of the Defendants' systemic pattern and practice of gender discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay, and employment benefits.  This pattern and practice of gender discrimination includes: being denied promotions in favor of equally or less qualified male employees; being denied training opportunities provided to male employees; receiving lower performance appraisals for performing the same work at the same level as male employees; being disciplined more frequently and more severely than male employees as well being disciplined for engaging in behaviors for which male employees are not disciplined; and being subjected to a hostile work environment.

45.    The Class Representatives and the class they seek to represent have been subjected to gender hostility at work, both severe and pervasive, which affects the terms and conditions of their employment.  The Defendants actions and inactions encourage this behavior by its male employees.

46.    The individual Plaintiffs have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Plaintiffs are now suffering, and will continue to suffer, irreparable injury from Novartis' unlawful policies, practices and/or procedures as set forth herein unless those policies, practices and/or procedures are enjoined by this Court.

## VII.  ALLEGATIONS OF THE CLASS REPRESENTATIVES

### A.  AMY VELEZ

#### Background

47.  **Plaintiff Amy Velez** was hired by Novartis in approximately January 1997 as a Sales Representative in Novartis' Washington, D.C. sales district.  Ms Velez then became a Sales Consultant in approximately February 1998.  In approximately March 2000, Ms. Velez became a Senior Sales Consultant, and she held this position until her constructive discharge from Novartis in April 2004.

48.  Throughout her employment at Novartis, Ms. Velez has been adversely affected by the systemic pattern and practice of gender discrimination detailed in this Complaint, including Novartis' discriminatory promotion, transfer, performance evaluation, compensation, and discipline policies, practices and/or procedures which have prevented Ms. Velez from advancing into higher and better paying positions for which she is qualified.

#### Denials of Promotion

49.  Beginning in November 1997, Ms. Velez began winning numerous "Building from Strength" and "Show Me the Growth" sales contests.  In addition, several of her managers gave her "Recognition Reward" letters and gifts.

50.  In 1998, one of Ms. Velez's managers also sent her a thank-you note, commending Ms. Velez on her "commitment to excellence."  In 1999, Ms. Velez also won "Gain and Maintain" and "Miacalcin Blitz" contests for her high product sales numbers.

51.  In 1999, Ms. Velez applied and interviewed for an Institutional Hospital Specialty position, a promotional opportunity.  Ms. Velez's application was denied, and Craig Lafferty ("Lafferty"), a male, received the promotion instead.

52.     In 2000, Ms. Velez also applied and interviewed for promotional opportunities as a Senior Care Specialist and an Institutional Hospital Specialist.  Ms. Velez's application again was denied, and, Robert Rheingold ("Rheingold"), a male, was instead selected for the Institutional position.

53.     In May 2001, Ms. Velez told her coworkers she was pregnant with twins and would later be on Family and Medical Leave Act ("FMLA") leave after the twins were born. Because of pregnancy complications, Ms. Velez began a short-term disability leave in September 2001.  In May 2002, Ms. Velez's short-term disability was exhausted and she began her FMLA leave.

54.     On or about May 6, 2003, approximately nine months after returning to work from FMLA leave, Ms. Velez contacted Steve Webb ("Webb"), her Regional Director, and asked him to consider accepting her into a Management Development Program.

55.     Based on her past and present performance, Ms. Velez was a qualified candidate for the Management Development Program, especially because she had increased sales in all her products since returning from FMLA while working the Washington, D.C. territory without a partner for nearly seven months.

56.     In addition, as of May 2003, Ms. Velez had doubled her sales numbers for all her products.  Ms. Velez had a higher market share than the entire Baltimore District for the product "Elidel."  Ms. Velez's product growth rate for Elidel was higher than the national growth rate.

57.     Also in May 2003, Ms. Velez's growth rate for the product "Lamisil" was the highest in the region, and higher than the national growth rate.  Moreover, for approximately seven months, Ms. Velez's sales numbers for the product "Ritalin LA" were higher than those of four male employees.

58.     In response to Ms. Velez's May 2003 request to participate in the Management Development Program, Regional Director Webb stated that Ms. Velez would not be a candidate for participation, and that Webb did not expect Ms. Velez to become one in the future.

59.     On or about December 20, 2003, Ms. Velez contacted Regional Director Webb a second time requesting an opportunity to participate in the Management Development Program. On December 29, 2003, Webb again replied that he would not accept Ms. Velez's application to the program, nor did he expect to admit Ms. Velez into the program in the future.

## Disparate Pay

60.     Upon information and belief, Ms. Velez received a lower raise for the calendar year of 2001 than similarly situated male employees.

61.     Despite her exemplary sales record for the calendar year of 2001, Webb rated Ms. Velez "satisfactory" and gave her only a 3% raise.

## Differential Treatment

62.     On or about July 2001, in violation of the Novartis review policy, Ms. Velez did not receive a mid-year review.  Mid-year reviews are typically given to field sales employees in July for the first six months of the year.

63.     On or about March 2002, in further violation of the Novartis review policy, Ms. Velez did not receive a year-end review for the calendar year of 2001.  Novartis typically gives year-end reviews to field sales employees in March for the review period for the preceding year, because of a two-month delay in receiving sales data. Novartis uses mid-year and year-end reviews for evaluating an employee's sales performance, determining pay raises, and determining promotional opportunities.

64.     Before Ms. Velez returned from FMLA leave on our about July 29, 2002, the sales numbers for the Washington, D.C. territory, to which Ms. Velez was assigned, were low. In addition due to a change in drug promotions, Ms. Velez was assigned a largely new set of doctors with whom to establish relationships.

65.     After returning from FMLA leave, on or about July 29, 2002, Novartis failed to provide Ms. Velez with additional sales training for her new position working in the Washington, D.C. territory.

66.     The standard practice at Novartis was to assign two Respiratory/Dermatology Sales Consultants to a territory so they could both effectively market and sell the products. Working with a partner enabled both employees to maximize their sales opportunities, as they could concentrate their sales and marketing efforts on their joint territory. Ms. Velez's manager, Mike Cunneen ("Cunneen") advised Ms. Velez that she would have to work the Washington, D.C. territory alone.  Ms. Velez, worked the D.C. territory alone for approximately seven months.

67.     Because Ms. Velez had to work the Washington D.C. territory alone for seven months, her sales numbers and data were inequitably compared to those employees who worked with partners.

68.     Approximately seven months after Ms. Velez returned from FMLA leave, Cunneen assigned Brian Oliver ("Oliver") to be her partner.

69.     After returning from FMLA leave, Ms. Velez began increasing sales of Elidel, Ritalin and Lamisil throughout her territory, and she also had higher sales numbers than several male employees.  However, Cunneen put Ms. Velez on a "Coaching Plan" in February 2003, relying on only three months of sales data because she had been out on FMLA leave.

70.     Conversely, Oliver was not disciplined at all, even though Oliver and Ms. Velez were working as partners.

71.     On or about May 7, 2003, Ms. Velez was placed on a "Performance Improvement Plan" (a disciplinary action), approximately one day after contacting Regional Director Webb to inquire about getting into the Management Development Program.  Ms. Velez's partner, Oliver, was not placed on a Performance Improvement Plan.

72.     Bob Bailey ("Bailey"), a male sales representative, had lower sales numbers and growth rates than Ms. Velez, but was still promoted on or about July 9, 2003.  At the same time, Ms. Velez was working under a Performance Improvement Plan.

73.     Regional Director Webb notified Bailey of his promotion in May 2003 while at the same time notifying Ms. Velez that she was being placed on a Performance Improvement Plan.

74.     Ms. Velez was placed on another Performance Improvement Plan on or about January 2, 2004, approximately two weeks after contacting Regional Director Webb a second time about the Management Development Program.  Again, Oliver was not subjected to any disciplinary actions, even though he was responsible for the same territory as Ms. Velez.

75.     On information and belief, to date, Oliver has not been placed on a Coaching or Performance Improvement Plan by Novartis.

**<u>Gender Hostility</u>**

76.     After the birth of Ms. Velez's twins, while she was on FMLA leave, Manager Cunneen violated Novartis' policy by calling Ms. Velez at home on several occasions.

77.     During the telephone calls, Cunneen told Ms. Velez she would have to work harder than others to increase the product sales numbers for the Washington, D.C. territory.  He also told Ms. Velez that he wanted her to review product information and accept medical samples while she was on FMLA leave.

78.     On or about July 31, 2002, two days after Ms. Velez returned from work, Cunneen warned Ms. Velez that she would be "under the gun."

79.     On several occasions in September and October 2002, while riding along with Cunneen during sales calls, Ms. Velez heard Cunneen calling medical recruiters and asking them whether their candidates were married or had children.

80.     In approximately September 2002, approximately one month after Ms. Velez returned from FMLA leave, Cunneen made several sexually hostile comments during a Team Meeting in Atlanta, Georgia, at which Ms. Velez was present.

81.     In approximately December 2002, Mike Corvingo ("Corvingo"), a male sales representative, told Ms. Velez that Cunneen communicates better with men than women. Corvingo also told Ms. Velez that other female sales representatives were experiencing difficulties with Cunneen's frequent favoring of their male counterparts.

82.     In approximately May 2003, Ms. Velez went out on disability leave due to severe stress, emotional breakdowns, anxiety and depression.  Ms. Velez's psychologist and psychiatrist directly attributed her health problems to the discrimination and hostile work environment that she suffered at Novartis.

83.     On or about April 18, 2004, Ms. Velez resigned from Novartis because of the continued lack of promotional opportunities and enrollment in the Management Development Program, gender discrimination, hostile work environment and the health problems she suffered

while dealing with these issues.


### B.    SONIA KLINGER

#### Background

84.    **Plaintiff Sonia Klinger** ("Ms. Klinger") was hired by Novartis in approximately June 2001 as an Area Sales Manager in the Senior Care Department in Novartis' St. Louis/Kansas City district, a position she currently holds.

85.    Throughout her employment at Novartis, Ms. Klinger has been adversely affected by the systemic pattern and practice of gender discrimination detailed in this Complaint, including Novartis' discriminatory promotion, transfer, performance evaluation, compensation, and discipline policies, practices and/or procedures which have prevented Ms. Klinger from advancing into higher and better paying positions for which she is qualified.

#### Denials of Promotion

86.    In approximately May 2001, before being hired by Novartis as an Area Sales Manager, Ms. Klinger applied for the position of Regional Director, but she was told by Executive Director John Mandala ("Mandala") that she did not have sufficient experience for the position.

87.    However, Mandala hired an equally or less qualified male, Rick Brady ("Brady"), for the Regional Director position.

88.    When Ms. Klinger then interviewed for the position of Area Sales Manager in 2001, Mandala assured her that she would be promoted within a year so long as her division performed well.  The division did perform well; however, Ms. Klinger has remained an Area Sales Manager.

89.     In November 2003, Ms. Klinger applied for a Hospital Sales manager position, a promotional opportunity.  Despite her considerable hospital work experience, Ms. Klinger was denied the promotion and Paul Gearke, a male with no hospital work experience, was selected instead.

90.     In December 2003, Ms. Klinger applied and interviewed for a promotion to an Associate Director of Customer Accounts position, for which she was well qualified.  The position was then closed for a period of time.  Subsequently, Ms. Klinger learned that Wayne Morrow, a male employee whose sales numbers were equal to or lower than Ms. Klinger's, received the promotion.  Meanwhile, Ms. Klinger had not even been notified that the position was re-opened.

91.     In 2004, Ms. Klinger applied to an Oncology Manager position.  Ms. Klinger's application was denied, and a less experienced male employee, Dan Danitchek in Wichita, Kansas, was selected for the position instead.

### Differential Treatment

92.     In 2002, Ms. Klinger received an unfair negative performance appraisal from Regional Director Brady, which he told her was based solely on her sales numbers.  However, male employees with the same sales performance received higher reviews.

93.     For this performance appraisal, Brady reviewed Ms. Klinger's sales performance only from the last trimester, during which her sales had been unusually low, instead of considering her sales from the whole year.  At the beginning of the last trimester, Ms. Klinger had discussed with her supervisors several concerns regarding what she suspected was a problem with how they had retargeted the position.  At that time, Ms. Klinger even showed them supporting data for her concerns.

94.     Furthermore, Ms. Klinger's two least profitable territories during this time period had been vacant due to employees out on disability leave.  Because Brady had not approved Ms. Klinger's request to have these vacancies temporarily filled, sales for that trimester were lower than they could have been.

95.     Conversely, a male employee, Ravish Gandhi, placed a similar request for a vacancy in his area to be filled, and this request was approved by his region director.

96.     Human Resources has refused to reconsider the unfair negative performance appraisal which Brady gave to Ms. Klinger.  As a result, it remains on Ms. Klinger's record and has prevented her from being a competitive candidate for other promotions.

97.     Because of this negative performance appraisal, Ms. Klinger also did not receive a salary increase and was denied stock options in 2003.  All her male peers received salary increases that year.

98.     In addition, Ms. Klinger was placed on a Territory Coaching Plan as a result of Brady's performance appraisal, which made her job considerably more time-consuming.  On information and belief, no male employee was disciplined in this way, including Bill Fenton ("Fenton"), whose sales numbers were lower than those of Ms. Klinger.

99.     Although Ms. Klinger was told that she could not transfer to another position because her sales were too low, Fenton received a lateral transfer.

100.    High profile assignments, such as the coordination of large regional consulting meetings, are consistently assigned to Ms. Klinger's male coworkers.  Also, while Ms. Klinger routinely receives marketing assignments for minor products, her male coworkers are given more significant marketing experience.

101.    Ms. Klinger is also denied the awards and recognition which similarly situated male employees on her team receive.

## **Gender Hostility**

102.    In approximately the spring of 2003, Brady invited male employees on Ms. Klinger's team to Las Vegas, using the company's expense account.  The female employees were not invited on this trip, nor were they extended any comparable invitation.

103.    Additionally, Brady, Executive Director Mandala, another manager, Dan Teisler, and other male employees routinely made sexist, racist, homophobic, and otherwise offensive comments and jokes at work meetings.  When Ms. Klinger approached Mr. Brady about an offensive racial joke that a regional account manager had told in the presence of two African American customers, he ignored her complaint.

104.    Ms. Klinger has also reported offensive behavior and comments to Human Resources and higher supervisors.  To her knowledge, no disciplinary actions have been taken against Brady or the others.

105.    In 2002, a Sales Representative who reported to Ms. Klinger approached her because she was having difficulties getting into the Management Development Program.  The Sales Representative advised Ms. Klinger that Brady had informed her that she could not enter the program because she had no training experience at Novartis.

106.    However, another female employee was allowed to enter the program despite not having any training experience.  On information and belief, the Sales Representative advised Ms. Klinger that Brady was romantically involved with this woman and that the Sales Representative was being held to a different standard solely because she was not romantically involved with Brady.

C.    **PENNI ZELINKOFF**

### Background

107.    **Plaintiff Penni Zelinkoff** was hired by Novartis in approximately June 2001 as a Sales Consultant in Novartis' Portland, Oregon district, and she held this position until her constructive discharge from Novartis in or about August 2004.

108.    Throughout her employment at Novartis, Ms. Zelinkoff has been adversely affected by the systemic pattern and practice of gender discrimination detailed in this Complaint, including Novartis' discriminatory promotion, transfer, performance evaluation, compensation, and discipline policies, practices and/or procedures which have prevented Ms. Zelinkoff from advancing into higher and better paying positions for which she is qualified.

### Denials of Promotion

109.    In approximately October 2003, Ms. Zelinkoff signed up for a career-enhancing sales training program.  Even though Sales Representatives are permitted to attend two or three training classes per year, her request to attend was denied by the District Manager at the time, Patrick Jackle ("Jackle").

110.    In a phone conversation with Regional Manager Steve Martinez ("Martinez") in January 2004, Ms. Zelinkoff requested to be considered for the West Region training department. Martinez denied this request and informed Ms. Zelinkoff that unless she ranked in the top 35% of Novartis nationwide, she would not be considered for a promotion.

111.    However, Ms. Zelinkoff knows of several male employees from the Northwest Region who were not in the top 35% of Novartis yet who received promotions.

112.    Jackle left his position in approximately December 2003, and in approximately February 2004, Robb Fairbairn ("Fairbairn") was hired as District Manager.

113.    In February 2004, Ms. Zelinkoff requested Fairbairn to consider her for the Management Development Program, which is necessary to advance into management positions. Fairbairn denied her request at that time, and on numerous occasions over the course of 2004, by stating that she would not be considered for the program.

## Differential Treatment

114.    On or about February 10, 2004, Ms. Zelinkoff attended a Portland East Team Meeting.   At the meeting, supervisors asked for a volunteer to coordinate the Novartis Consulting Network (NCN).  Nobody volunteered for this assignment at the meeting.

115.    The following day, Ms. Zelinkoff called District Manager Joey Colonnello ("Colonnello") to volunteer for NCN coordinator.  This opportunity would have allowed Ms. Zelinkoff to demonstrate leadership skills and would help with future promotional opportunities. Colonnello declined her offer and told her that the coordinator had to be from Steve Wright's district.

116.    On or about March 9, 2004, at another Team Meeting, the NCN coordinator was announced.  Neither the lead coordinator nor the backup was from Steve Wright's district.

117.    Ms. Zelinkoff frequently received minor assignments while her male coworkers were selected for high priority projects, such as a test pilot or the roll out of a new product.

118.    Additionally, during meetings, high level executives and managers socialized with male employees far more frequently than female employees.

## Gender Hostility

119.    From June 2001 through approximately December 2003, when Ms. Zelinkoff was

working under the supervision of District Manager Jackle, Jackle constantly intimidated and harassed Ms. Zelinkoff by threatening to terminate her job, writing her for inconsequential matters, and unfairly evaluating her performance in both formal reviews as well as daily interactions.

120.    Several other female employees who worked under Jackle experienced similar poor and disparate treatment.

### D.    MINEL HIDER TOBERTGA

#### Background

121.    **Plaintiff Minel Hider Tobertga** was hired by Novartis in approximately April 2001 as a Sales Consultant in Novartis' Sacramento district, and she held this position until her constructive discharge from Novartis in or about September 2004.

122.    Throughout her employment at Novartis, Ms. Hider Tobertga has been adversely affected by the systemic pattern and practice of gender discrimination detailed in this Complaint, including Novartis' discriminatory promotion, transfer, performance evaluation, compensation, and discipline policies, practices and/or procedures which have prevented Ms. Hider Tobertga from advancing into higher and better paying positions for which she is qualified.

#### Denials of Promotions

123.    In 2002, Ms. Hider Tobertga was selected as one of Novartis' top 50 salespersons in the nation and was given company stock as a reward. In addition, Ms. Tobertga's sales performance consistently ranked among the top in the region for a variety of products throughout 2002 and 2003.

124.    In an e-mail dated January 5, 2004, Ms. Hider Tobertga informed her supervisor

Mark Gunning ("Gunning") that she wanted to be considered for the Management Development Program, which is necessary to advance into management positions.  On or about January 30, 2004, when Gunning finally met with Ms. Hider Tobertga, he informed her that she would not be considered for the program.

125.    Ms. Hider Tobertga confirmed this conversation by e-mail.  Gunning replied to Ms. Hider Tobertga's e-mail by stating that she required a stronger sales performance to be considered for management training.

126.    However, not only had Ms. Hider Tobertga ranked among Novartis' top 50 salespersons, she also consistently ranked among the top in the region for a variety of products throughout 2002 and 2003.

127.    Furthermore, less qualified male employees were routinely selected for the Management Development Program, including George Lopez ("Lopez"), Ms. Hider Tobertga's former counterpart, who is currently enrolled.  Not only were Lopez's sales numbers equal to or lower than Ms. Hider Tobertga's, but he did not have nearly as much industry experience as she did, nor, to her knowledge, has he ever ranked among the top 50 salespersons in the nation.

### Differential Treatment

128.    When Ms. Hider Tobertga organized events for Novartis under Gunning's supervision, Gunning required that she report to him daily and run all decisions by him for approval.  Conversely, Gunning granted her counterpart Lopez a much greater degree of autonomy.

### Gender Hostility

129.    In November 2003, Ms. Hider Tobertga was hospitalized because of an emergency medical condition.  As a result, she was on leave for two weeks.

130.    Because of her poor medical condition, Ms. Hider Tobertga's doctor did not authorize her release to travel to and attend the launching meeting in Las Vegas.  However, Gunning accused her of trying to get out of the meeting and pressured her to attend.

131.    Because of the pressure from Gunning, Ms. Hider Tobertga convinced her doctor to permit her to attend the meeting under the restriction that she would rest in her hotel room as much as possible.  Throughout the trip, Ms. Hider Tobertga had to take painkillers and nausea medication due to the great pain and discomfort she was experiencing.

132.    In February 2004, Ms. Hider Tobertga began to suffer from severe migraine headaches, causing her to miss one day of work.  Ms. Hider Tobertga provided Gunning with a note from her doctor confirming her illness in accordance with company policy.  Nevertheless, Gunning objected to Ms. Hider Tobertga's leave, accused her of falsifying the note, and asked Ms. Hider Tobertga whether she had a doctor who was writing illegitimate notes for her.

133.    In approximately March 2004, Ms. Hider Tobertga complained to Human Resources about Gunning's inappropriate, offensive and harassing behavior, but to her knowledge, no action was taken.


**E.    MICHELLE WILLIAMS**

**Background**

134.    **Plaintiff Michelle Williams** was hired by Novartis in approximately April 2002 as a Sales Representative in Novartis' Chicago South district.  In approximately August 2002, she became a Sales consultant, a position she currently holds.

135.    Throughout her employment at Novartis, Ms. Williams has been adversely affected by the systemic pattern and practice of gender discrimination detailed in this Complaint,

including Novartis' discriminatory promotion, transfer, performance evaluation, compensation, and discipline policies, practices and/or procedures which have prevented Ms. Williams from advancing into higher and better paying positions for which she is qualified.

### Denials of Promotion

136.    When Ms. Williams began her career with Novartis, she worked under the supervision of a female supervisor, Joanne Pence ("Pence"), who helped her qualify for acceptance to the Management Development Program by completing a 12-step checklist.  Ms. Williams then completed the first of three classes for the program.

137.    In May 2003, Pence left her position and Regional Manager Joe Stein appointed Ms. Williams to serve as interim District Manager for a period of approximately two months while he searched for a replacement for Pence.

138.    Ms. Williams requested the opportunity to apply for the position at that time, but was told she did not qualify because she had not completed the Management Development Program.

139.    In July 2003, Antonio Parker ("Parker"), a male, became the new District Manager.

140.    In an extensive conversation with Parker regarding her career goals, Ms. Williams informed Parker of her intention to complete the Management development Program.  Parker told Ms. Williams that when he was hired as District Manager, he was informed that she was to be promoted by the end of 2003.  He also told her she was enrolled in the second management training class in December 2003.

141.    Also in July, Ms. Williams let Parker know that she was pregnant.  After that, she never received any additional information about the December 2003 class.

142.    Ms. Williams went on maternity leave from December 2003 to April 2004.  While she was on maternity leave, Ms. Williams also spoke to Parker on the telephone about a management training class in June that she wanted to attend, and he repeatedly assured her that she would be enrolled.  When she returned from leave, however, she was not enrolled in the class.

143.    When Ms. Williams discussed the issue with Parker, he told her that his supervisor, Joe Stein ("Stein"), had advised him that Ms. Williams may have changed her mind about the Management Development Program since having a child, and that they should wait to ensure that she was still interested in the opportunity.  Parker also told Ms. Williams that it was not her place to contact Stein about the matter.

144.    Ms. Williams confirmed that she was still interested in management training, and Parker then assured her that she would complete the second class in August.  As August approached, however, she asked Parker for more information about the class, and he admitted to her that the class was actually in October.

145.    Parker then told Ms. Williams that there was a class during the week of October 4, in which she was enrolled.  Even though she had already scheduled vacation days for that week, she altered her vacation plans in order to attend the class upon Parker's recommendation.

146.    Several days before the October class was supposedly scheduled, Parker told her that there was no class in October, and denied ever telling her that there was an October class.

147.    Meanwhile, employees who attended the first class of the Management Development Program with Ms. Williams are now interviewing for management positions.

## **Differential Treatment**

148.    During the time Ms. Williams was on maternity leave, Parker conducted her

annual review without any consent or input from her. The raise Parker gave her was the lowest she had ever received at Novartis and was lower than her colleagues' raises. Without her knowledge or her signature, Parker submitted Ms. Williams' review on January 19.

149.    Standard practice at Novartis is to meet with an employee to discuss his or her review before submitting it.

150.    When she returned to work in April 2004, Parker told Ms. Williams he needed her backdated signature, because without it, he would lose his job. Ms. Williams refused to do this, because she would not have agreed to the proposed pay raise. He then proceeded to submit her raise without her approval and signature, which is against company policy.

## **Gender Hostility**

151.    Even though Parker denied Ms. Williams the opportunity to become a manager, and in fact suggested that she apply for specialty representative positions instead, Parker has had to consult Ms. Williams numerous times for advice on how to do his duties.

152.    While she was on maternity leave, Parker violated Novartis' policy by calling her on her cell phone numerous times to ask her questions regarding his duties.

## VIII.   PLAINTIFFS' CLAIMS

### COUNT ONE

### Classwide Claims Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), et seq., as amended

153.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

154.    Novartis has discriminated against the Class Representatives and all members of the proposed class by treating them differently from and less preferably than similarly situated male employees and subjecting them to discriminatory denials of promotions, discriminatory

denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate terms and conditions of employment, harassment, hostile work environments and other forms of discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), et seq., as amended ("Title VII").

155.    Novartis's conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class.

156.    Novartis' policies and practices have produced a disparate impact against the Class Representatives and the class members with respect to the terms and conditions of employment.

157.    By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

158.    By reason of the discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Class Representatives, on behalf of themselves and the members of the class whom they seek to represent, request the following relief:

A.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff class, and designation of the Plaintiffs as representatives of these class and their counsel of record as class

counsel;

B.      Declaratory judgment that Novartis' employment policies, practices and/or procedures challenged herein are illegal and in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000(e)-5(f), et seq., as amended ("Title VII");

C.      A permanent injunction against Novartis and their partners, officers, owners, agents, successors, employees and representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, gender discrimination by the Defendants as set forth herein;

D.      An Order requiring Novartis to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

E.      An Order requiring the Defendants to initiate and implement systems of assigning, training, transferring, compensating, and promoting female employees in a non-discriminatory manner;

F.      An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (b) through (e) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (b) through (e), above;

G.     An Order placing or restoring the Class Representatives and the class members into those jobs they would now be occupying, but for Novartis' discriminatory policies, practices and/or procedures;

H.     An Order directing Novartis to adjust the wage rates and benefits for the Class Representatives and the class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures;

I.     An award of back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits suffered by the Class Representatives and the class members to be determined at trial;

J.     Any other appropriate equitable relief to the Class Representatives and proposed class members;

K.     An award of compensatory, nominal and punitive damages to Plaintiffs and the class in an amount not less than 100 million dollars;

L.     An award of litigation costs and expenses, including reasonable attorneys' fees, to the Plaintiffs and class members;

M.     Pre-judgment interest;

N.     Such other and further relief as the Court may deem just and proper; and

O.     Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and is determined to be in full compliance with the law.

## X.    DEMAND FOR JURY

159.    The Plaintiffs demand trial by jury of all issues triable of right to a jury.


Respectfully submitted this 19th day of November, 2004


_____

Jeremy Heisler, (JH-0145)
Steven Wittels, (SLW-8110)
**SANFORD, WITTELS & HEISLER, LLP**
545 5th Avenue
Suite 960
New York, NY 10017
Telephone: (646) 456-5695

David W. Sanford, D.C. Bar No. 457933
Lisa Goldblatt, D.C. Bar No. 456187
Dale Graddon, BBO No. 658840
**SANFORD, WITTELS & HEISLER, LLP**
2121 K Street, N.W.
Suite 700
Washington, D.C. 20037
Telephone: (202) 942-9124
Facsimile:  (202) 628-8189

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
2121 K Street, N.W.
Suite 700
Washington, D.C. 20037
Telephone: (202) 661-3510
Facsimile:  (202) 628-8189

Attorneys for Plaintiffs