| | | |
|---|---|---|
| **AMY VELEZ, PENNI ZELINKOFF,** | ) | |
| **MINEL HIDER TOBERTGA,** | ) | **FOURTH AMENDED** |
| **MICHELLE WILLIAMS, JENNIFER** | ) | |
| **WAXMAN-RECHT, KAREN LIGGINS,** | ) | **CLASS ACTION COMPLAINT** |
| **LORI HORTON, HOLLY WATERS,** | ) | |
| **WENDY PINSON, ROBERTA** | ) | |
| **VONLINTEL, ASHLEY NARMOUR,** | ) | |
| **CATHERINE WHITE, KELLY** | ) | |
| **CORBETT, SUE EARL, JAMIE** | ) | **04 Civ. 09194 (GEL)** |
| **HOLLAND, JOAN DURKIN, SIMONA** | ) | |
| **LOPES, MARYANNE JACOBY** | ) | |
| **and MARTA DEYNE,** | ) | |
| | ) | |
| **Individually and on Behalf of Others** | ) | **JURY TRIAL DEMANDED** |
| **Similarly Situated,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NOVARTIS CORPORATION,** | ) | |
| **NOVARTIS PHARMACEUTICALS** | ) | |
| **CORPORATION, and THOMAS** | ) | |
| **EBELING,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| | ) | |

**FOURTH AMENDED CLASS ACTION COMPLAINT**

## I.     NATURE OF THIS ACTION

1.     Nineteen (19) women who work or have worked for Novartis in New York and sixteen (16) other states, as well as Washington, D.C., bring this action against Corporate Defendants Novartis Corporation and Novartis Pharmaceuticals Corporation (jointly "Novartis" or "Corporate Defendants") and against Defendant Thomas Ebeling ("Ebeling") (collectively "Defendants") to redress gender discrimination in employment.  Specifically, Amy Velez, Penni

Zelinkoff, Minel Hider Tobertga, Michelle Williams, Jennifer Waxman-Recht, Karen Liggins, Lori Horton, Holly Waters, Wendy Pinson, Roberta VonLintel, Ashley Narmour, Catherine White, Kelly Corbett, Sue Earl, Jamie Holland, Joan Durkin, Simona Lopes, Maryanne Jacoby and Marta Deyne, the Class Representatives ("Class Representatives"), all of whom are present or former employees of Novartis, bring this amended class action against Novartis on behalf of themselves and all other female employees of Novartis who are similarly situated pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq*., as amended ("Title VII").

2.      The Class Representatives have worked and/or continue to work for Novartis throughout the United States in sixteen (16) states: Alabama, Arkansas, California, Connecticut, Delaware, Illinois, Kansas, Maryland, Missouri, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Virginia, Washington, and in Washington, D.C.  Three Plaintiffs, Sue Earl, Simona Lopes and Marta Deyne, worked and/or continue to work for Novartis in New York.

3.      The Class Representatives seek to represent female employees of Novartis who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including, but not limited to: (a) discriminatory policies, practices and/or procedures in selection, promotion and advancement; (b) disparate pay; (c) differential treatment; (d) gender hostility; (e) hostile work environment; (f) pregnancy discrimination; (g) sexual harassment; and (h) retaliation in the workplace.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

4.      The Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal

and punitive damages; and attorneys' fees, costs and expenses to redress Novartis' pervasive and discriminatory employment policies, practices and/or procedures.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to Title VII to redress and enjoin employment practices of Novartis in violation of this statute.

6.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c) because Defendants are subject to personal jurisdiction and reside in New York.

7.     The Southern District of New York is the most logical forum in which to litigate the claims of the Class Representatives and the proposed class in this case.  Novartis Corporation is headquartered in New York, New York and incorporated in the State of New York, with Registered Agents in New York.  Additionally, Novartis Pharmaceuticals Corporation has both a physical presence and a Registered Agent in New York.  Further, Class Representative Simona Lopes ("Lopes") resides in New York and Lopes and other Class Representatives worked for Novartis in New York.  Finally, the Class Representatives and potential class members reside in all areas of the United States in which Novartis conducts business.

## III.    PROCEDURAL HISTORY

8.     Class Representative Amy Velez timely filed a Charge of Discrimination with the New Jersey Division on Civil Rights and the Equal Employment Opportunity Commission ("EEOC") on or about July 15, 2003.  Ms. Velez received her Notice of Right to Sue on August 24, 2004, and on November 19, 2004, timely filed suit within ninety (90) days of receipt of her Notice of Right to Sue.  Class Representatives Penni Zelinkoff, Karen Liggins, Lori Horton, Holly Waters and Roberta VonLintel also filed Charges with the EEOC and have each received

Notices of Right to Sue.  Class Representatives Minel Hider Tobertga, Michelle Williams, Jennifer Waxman-Recht, Wendy Pinson, Ashley Narmour, Catherine White, Kelly Corbett, Sue Earl, Jamie Holland, Joan Durkin, Simona Lopes and Marta Deyne have filed charges of gender discrimination with the EEOC and are in the process of perfecting their Notices of Right to Sue.

9.      The Class Representatives are relying on their own EEO charges and/or those of other Class Representatives.

## IV.   PARTIES

### A.    Plaintiffs

10.     **Plaintiff Amy Velez** is a female citizen of the United States and a resident of Laurel in the State of Maryland.  Ms. Velez was employed by Novartis from approximately January 1997 to April 2004 in Novartis' Washington, D.C. sales district.   Throughout that time, Ms. Velez worked as a sales representative, sales consultant, and senior sales consultant, a position she held until her constructive discharge from Novartis in April 2004.

11.     **Plaintiff Penni Zelinkoff** is a female citizen of the United States and a resident of Arvada in the State of Colorado.  Ms. Zelinkoff was employed by Novartis from approximately June 2001 to August 2004 as a sales consultant in Novartis' Portland, Oregon district, and she held this position until her constructive discharge from Novartis in approximately August 2004.

12.     **Plaintiff Minel Hider Tobertga** is a female citizen of the United States and a resident of Elk Grove in the State of California.  Ms. Hider Tobertga was employed by Novartis from approximately April 2001 to September 2004 as a sales consultant in Novartis' Sacramento, California district.   She held this position until her constructive discharge from Novartis in approximately September 2004.

13.     **Plaintiff Michelle Williams** is a female citizen of the United States and a resident of Plainfield in the State of Illinois.  Ms. Williams has been continuously employed by Novartis since approximately April 2002.  Ms. Williams was hired by Novartis as a sales representative in Novartis' Chicago, Illinois South district.  In approximately August 2002, she became a sales consultant, a position she currently holds.

14.     **Plaintiff Jennifer Waxman-Recht** is a female citizen of the United States and a resident of Hohokus in the State of New Jersey.  Ms. Waxman-Recht has been continuously employed by Novartis since approximately June 1997 as a sales representative in Novartis' Northeast New York sales territory.

15.     **Plaintiff Karen Liggins** is a female citizen of the United States and a resident of Florissant in the State of Missouri.  Ms. Liggins has been continuously employed by Novartis since approximately September 2000 as a sales specialist and a sales representative in Novartis' Central sales district.

16.     **Plaintiff Lori Horton** is a female citizen of the United States and a resident of Richmond in the State of Virginia.  Ms. Horton was employed by Novartis from approximately March 2002 to April 2005 as a sales representative in Novartis' Richmond, Virginia sales district.

17.     **Plaintiff Holly Waters** is a female citizen of the United States and a resident of Riva in the State of Maryland.  Ms. Waters was employed by Novartis from approximately April 2002 through approximately early 2003 as a sales representative.  From approximately early 2003 through approximately November 2004, Ms. Waters was employed by Novartis as a sales consultant in Novartis' Maryland/Washington, D.C. sales territory.

18.      **Plaintiff Wendy Pinson** is a female citizen of the United States and a resident of Dothan in the State of Alabama.  Ms. Pinson has been continuously employed by Novartis as a sales representative in Novartis' Montgomery, Alabama district since approximately November 1999.

19.      **Plaintiff Roberta VonLintel** is a female citizen of the United States and a resident of Hays in the State of Kansas.  Ms. VonLintel was employed by Novartis from approximately late 1998 to July 2004 as a sales representative in Novartis' Kansas City West sales region.

20.      **Plaintiff Ashley Narmour** is a female citizen of the United States and a resident of Montgomery in the State of Alabama.  Ms. Narmour was employed by Novartis from approximately June 2002 to February 2005 as an account manager in Novartis' Georgia Market and Southeast Market.

21.      **Plaintiff Catherine White** is a female citizen of the United States and a resident of Las Vegas in the State of Nevada.  Ms. White was employed by Novartis from approximately March 2001 to June 2004 in Los Angeles, California.  During that time, Ms. White held the positions of sales representative and sales consultant.

22.      **Plaintiff Kelly Corbett** is a female citizen of the United States and a resident of Fairfax in the State of California.  Ms. Corbett was employed by Novartis from approximately May 2002 to March 2005 as a district manager in California.

23.      **Plaintiff Sue Earl** is a female citizen of the United States and a resident of Sparta in the State of New Jersey.  Mrs. Earl was employed by Novartis in New Jersey, New York and Pennsylvania from approximately July 1991 to March 2005.  During that time, Mrs. Earl held the

positions of Long-term Care sales representative and Adult Care accounts manager, and served as a field sales trainer and a member of the Market Advisory Board.

24.      **Plaintiff Jamie Holland** is a female citizen of the United States and a resident of Salisbury in the State of Maryland.  Ms. Holland was employed by Novartis in Baltimore, Maryland, Washington, D.C. and Delaware from approximately April 2000 to August 2004. During that time, Ms. Holland held the positions of senior sales consultant and executive sales consultant.

25.      **Plaintiff Joan Durkin** is a female citizen of the United States and a resident of Darien in the State of Illinois.  Ms. Durkin was employed by Novartis in Illinois from approximately 1997 to February 2005.  During that time, Ms. Durkin held the positions of sales representative, sales consultant, senior sales consultant, in-house trainer and worked in Executive Sales.

26.      **Plaintiff Simona Lopes** is a female citizen of the United States and a resident of Rego Park in the State of New York.  Ms. Lopes worked for Novartis in New York as a contract employee from June 2001 to April 2002.  In April 2002, Ms. Lopes became a Novartis sales representative, and she continued to hold this position until her resignation from Novartis in April 2005.

27.      **Plaintiff Maryanne Jacoby** is a female citizen of the United States and a resident of Vancouver in the State of Washington.  Ms. Jacoby was employed by Novartis in California, Oregon and Washington from approximately January 1996 to February 2004.  During that time, Ms. Jacoby held the positions of sales representative, sales consultant, senior sales consultant and Respiratory/Dermatology specialty senior sales consultant.

28. **Plaintiff Marta Deyne** is a female citizen of the United States and a resident of Lincroft in the State of New Jersey. Ms. Deyne has been continuously employed by Novartis in New York and New Jersey from approximately September 2000 to the present. During this time, she has held the positions of Gastrointestinal specialty sales representative, Respiratory/Dermatology specialty sales representative, Hospital Associate and Hospital Specialist. Ms. Deyne currently holds the position of Hospital Specialist in New York, New York.

### B. Corporate Defendants

29. **Corporate Defendant Novartis Corporation** is the U.S. Headquarters for Novartis, AG, a Swiss company created in 1996 by the merger of the Swiss companies Ciba-Geigy and Sandoz. Novartis is a world leader in the research and development of health care products. Novartis' core businesses are in pharmaceuticals, consumer health, generics, eye-care, and animal health. Novartis Corporation is incorporated in the State of New York and physically located at 608 Fifth Avenue, New York, New York, 10020. Novartis Corporation has Registered Agents in New York and California.

30. **Corporate Defendant Novartis Pharmaceuticals Corporation** is a division of Novartis Corporation specializing in the discovery, development, manufacture and marketing of prescription medicine. Novartis Pharmaceuticals Corporation is incorporated in Delaware and has office buildings in New York. Novartis Pharmaceuticals Corporation has Registered Agents in thirty-two (32) states, including New York.

### C.    Individual Defendant Thomas Ebeling

31.    **Defendant Thomas Ebeling** is Chief Executive Officer of Novartis Pharma AG and Head of the worldwide Pharmaceuticals Division.  He is also a member of the Executive Committee of Novartis.

32.    Upon information and belief, Novartis AG, a Swiss holding company, owns directly or indirectly, all companies worldwide belonging to the Novartis Group.

33.    Upon information and belief, Novartis Group is divided operationally into two divisions: "Pharmaceuticals" and "Consumer Health."

34.    Upon information and belief, Ebeling is Chief Executive Officer of Novartis Pharma AG and Head of the worldwide Pharmaceuticals Division.  He is also a member of the Executive Committee of Novartis.

35.    Upon information and belief, during all or part of the class period, Ebeling was a member of Defendant Novartis Pharmaceuticals Corporation's Board of Directors and also chaired the Innovation Management Board operating within Novartis Pharma AG.

36.    Upon information and belief, Ebeling represents Novartis Pharmaceuticals Corporation managerially and delegates the day-to-day implementation of Novartis AG's directives to Novartis Pharmaceuticals Corporation.

37.    Upon information and belief, in his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling possesses knowledge, control and decision-making authority about the employment policies, procedures and practices of the Corporate Defendants.

38.     Upon information and belief, Ebeling controls and influences the Corporate Defendants' policies, procedures and practices related to gender discrimination, pregnancy discrimination, sexual harassment, hostile work environment and retaliation against their female employees.

39.     Upon information and belief, Ebeling knew of and could have prevented and/or alleviated the gender discrimination, pregnancy discrimination, sexual harassment, hostile work environment and retaliation directed against Class Representatives and the proposed class described in this amended complaint.

40.     On a Novartis internal web page, Ebeling publicly stated that "We [Novartis] simply don't have as many women or minorities in high levels of management as we could or should." (http://www.pharma.novartis.intra/news/ask_ebeling/answers/2003-12-17_diversity).

41.     Upon information and belief, Ebeling has aided and abetted the discrimination that is prevalent in the divisions, districts, regions, territories, areas, markets and offices of the Corporate Defendants and has failed to rectify the discriminatory policies, procedures and practices.

42.     Upon information and belief, Ebeling aided and abetted the discriminatory conduct against Novartis' female employees by allowing and encouraging a climate of abuse, harassment and hostility.

43.     Upon information and belief, gender discrimination permeates the corporate culture of Novartis AG and its Swiss-based headquarters and its European subsidiaries.  Ebeling, in his role as Head of worldwide Pharmaceuticals Division, has sanctioned and nurtured this environment.

44.     Although he professes to support a work place free from discrimination, Ebeling has approved policies, procedures and practices that have permitted the Corporate Defendants to engage in gender discrimination, pregnancy discrimination, sexual harassment, hostile work environment, retaliation and other forms of discrimination against Class Representatives and the proposed class.

## V.     CLASS CLAIMS

45.     The Class Representatives and the proposed class they seek to represent have been subjected to a systemic pattern and practice of gender discrimination involving a battery of practices which have also had an unlawful disparate impact on them and their employment opportunities.  This gender discrimination includes policies and/or practices of restricting the promotion and advancement opportunities of female employees so that they remain in lower classification and compensation levels.  Novartis in effect bars females from better and higher paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender stratification include, but are not limited to, Novartis' promotion, advancement, training and performance evaluation policies, practices and/or procedures.

46.     Novartis' promotion, advancement, training and performance evaluation policies, practices and/or procedures incorporate the following discriminatory practices: (a) relying upon subjective judgments, procedures and criteria which permit and encourage the incorporation of gender stereotypes and bias by Novartis' predominately male managerial and supervisory staff in making promotion, training, performance evaluation and compensation decisions; (b) refusing or failing to provide equal training opportunities to females; (c) refusing or failing to provide female employees with opportunities to demonstrate their qualifications for advancement; (d) refusing or failing to establish and/or follow policies, practices, procedures or criteria that reduce

or eliminate disparate impact and/or intentional gender bias; (e) using informal, subjective selection methods which allow for gender discrimination; (f) disqualifying female employees for vacancies by unfairly disciplining them; (g) discouraging applications and expressions of interest by females; (h) subjecting pregnant employees or female employees with children to adverse treatment and denying them opportunities to advance their careers; and (i) subjecting female employees to sexual harassment and/or a hostile work environment.

47.     Novartis' promotion policies, practices and/or procedures have had a disparate impact on the Class Representatives and the class members. Such policies, practices and/or procedures are not valid, job-related, or justified by business necessity. There are alternative objective and more valid selection procedures available to the Defendants that are more closely related to the actual responsibilities of the positions and that would have less of a disparate impact on females. However, the Defendants have failed or refused to use such alternative procedures.

48.     The Defendants' promotion, training, performance evaluation, compensation and transfer policies, practices and/or procedures are intended to have a disparate impact on the Class Representatives and the class they seek to represent. Such practices form a part of the Defendants' overall pattern and practice of keeping females in the lower classifications with less desirable terms and conditions of employment.

49.     Because of the Defendants' systemic pattern and practice of gender discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including loss of compensation, wages, back pay, and employment benefits. This pattern and practice of gender discrimination includes: being denied promotions in favor of equally or less qualified male employees; being denied training

opportunities provided to male employees; receiving lower performance appraisals for performing the same work at the same level as male employees; being disciplined more frequently and more severely than male employees, including but not limited to, being disciplined for engaging in behaviors for which male employees are not disciplined; and being subjected to a hostile work environment, sexual harassment and retaliation.

50.     The Class Representatives and the class they seek to represent have been subjected to gender hostility at work, both severe and pervasive, which affects the terms and conditions of their employment.  The Defendants' actions and inactions encourage this behavior by its male employees.

51.     The Class Representatives and class members have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and class members are now suffering irreparable injury from Novartis' unlawful policies, practices and/or procedures as set forth herein, and will continue to suffer unless those policies, practices and/or procedures are enjoined by this Court.

## VI.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

52.     The Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current and former Novartis employees.  Each of the Class Representatives is a member of the class.

53.     The class consists of all female citizens of the United States who are, or have been, employed by Novartis in the United States and have experienced gender discrimination at any time during the applicable liability period.  All of the Class Representatives are proposed representatives of the class.  Upon information and belief, there are hundreds, if not thousands, of members of the proposed class.

**B.      Efficiency of Class Prosecution of Common Claim**

54.     Certification of a class of female employees similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed class.  The individual claims of the Class Representatives require resolution of the common question of whether Novartis has engaged in a systemic pattern and/or practice of gender discrimination against female employees.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers and working conditions and in the lives, careers and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.  The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on females generally.  In order to gain such relief for themselves, as well as for the proposed class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females who have been affected by these common questions of law and fact is the most efficient

and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed class and Novartis.

55.     The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

### C.    Numerosity and Impracticability of Joinder

56.     The class which the Class Representatives seek to represent is too numerous to make joinder practicable. The proposed class consists of hundreds, if not thousands, of current, former, and future female employees during the liability period.

### D.    Common Questions of Law and Fact

57.     The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the proposed class they seek to represent.  The common questions of law include, *inter alia*: (a) whether Novartis has engaged in unlawful, systemic gender discrimination in its selection, promotion, advancement, transfer, training and discipline policies, practices and/or procedures, and in the general terms and conditions of work and employment; (b) whether Novartis has engaged in unlawful, systemic sexual harassment; (c) whether Novartis has unlawfully discriminated against female employees based on their pregnancies; (d) whether Novartis has unlawfully retaliated against female employees for complaining about gender discrimination; and (e) whether Novartis is liable for a continuing systemic violation of Title VII; and (f) a determination of the proper standards for proving a pattern and/or practice of discrimination by Novartis against its female employees.

58.     The common questions of fact would include, *inter alia*: whether, through its policies, practices and/or procedures: (a) Novartis has denied or delayed the promotion of females; (b) Novartis has precluded females from eligibility for promotions by denying them training that male employees are afforded; (c) Novartis has paid females less than comparable situated male employees; (d) Novartis has subjected females to differential treatment, including, but not limited to, less preferable work assignments, inequitable evaluations and stricter discipline; (e) Novartis has maintained a hostile work environment based on gender; (f) Novartis has subjected females to disparate treatment based on pregnancy; (g) Novartis' policies and procedures have had a disparate impact on pregnant female employees; (h) Novartis has subjected female employees to sexual harassment and/or a sexually hostile work environment; (i) Novartis has retaliated against women for complaining about the gender discrimination described in (a) through (h) above; and (j) Novartis has engaged in a pattern and practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace.

59.     The employment policies, practices and/or procedures to which the Class Representatives and the class members are subject are set at Novartis' corporate level and apply universally to all class members throughout the country.  These employment policies, practices and/or procedures are not unique or limited to any department; rather, they apply to all departments, and, thus, affect the Class Representatives and proposed class members no matter the district, division or position in which they work.

60.     Throughout the liability period, a disproportionately large percentage of the managers and supervisors at Novartis have been male.

61.     Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all levels and all divisions of Novartis.  Selection, promotion, and

advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male managers, supervisors, and subordinates rather than by merit or equality of opportunity. As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than female employees.

62. Novartis' policies, practices and/or procedures have had an adverse impact on females seeking selection for, or advancement to, better and higher paying positions. In general, a higher level of job classification correlates with a lower percentage of female employees holding those positions.

**E.      Typicality of Claims and Relief Sought**

63. The claims of the Class Representatives are typical of the claims of the proposed class. The Class Representatives assert claims in each of the categories of claims they assert on behalf of the proposed class. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed class.

64. The Class Representatives are, like the members of the proposed class, all female employees who have worked for the Defendants during the liability period.

65. Discrimination in selection, promotion, advancement and training affects the compensation of the Class Representatives and all the class members in similar ways.

66. Differential treatment between male and female employees occurs as a pattern and practice throughout all levels and departments of Novartis. Novartis' predominantly male managers hold female employees, including both the Class Representatives and class members, to stricter standards than male employees, and thus, female employees often receive lower performance appraisals than males for performing at the same level. Female employees are also

disciplined, formally and informally, more frequently and severely than their male counterparts. Additionally, male employees more often receive preferable work assignments and other preferential treatment.

67. Discrimination in the form of a hostile work environment occurs as a pattern and practice throughout all levels and departments of Novartis and affects the Class Representatives and the members of the class in the same ways. Male supervisors and employees have made hostile comments and jokes; harassed and intimidated female employees; made it clear in various ways that they favor male employees; and otherwise have created a working environment hostile to female employees.

68. Discrimination in the form of hostility towards pregnant female employees occurs as a pattern and practice throughout all levels and departments of Novartis and affects the Class Representatives and the members of the class in the same ways. Male supervisors have denied promotions and promotional opportunities to pregnant female employees; denied equal compensation to pregnant female employees; subjected pregnant female employees to stricter scrutiny; made hostile comments to pregnant female employees; unreasonably disciplined female employees after they return from maternity leave; and subjected female employees to adverse employment actions after they return from maternity leave.

69. Sexual harassment occurs as a pattern and practice throughout all levels and departments of Novartis and affects the Class Representatives and the members of the class in similar ways. Male supervisors and employees hold sexually explicit conversations; make sexually hostile jokes and remarks; comment on female employees' bodies; inappropriately touch female employees; make unwelcome sexual advances on female employees; and practice other forms of sexual harassment.

70.     Several of the Class Representatives, and numerous other female employees, have complained to Novartis' management and Human Resources about gender discrimination and a sexually hostile work environment.  Company investigations into these complaints have been inadequate and/or superficial.  The Class Representatives and the class members have been affected in the same ways by Novartis' failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

71.     Several of the Class Representatives, and numerous other female employees, have experienced retaliation from managers after complaining about gender discrimination, contacting Human Resources or filing EEO Charges of Discrimination.

72.     Novartis has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices and/or procedures referenced in this Complaint and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws.  These failures have affected the Class Representatives and the class members in similar ways.

73.     The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the proposed class members in this case.  The Class Representatives seek the following relief for their individual claims and for those of the members of the proposed class: (a) a declaratory judgment that Novartis has engaged in systemic gender discrimination against female employees by limiting their ability to be promoted to better and higher paying positions, limiting their employment opportunities to lower and less desirable classifications, limiting their training and transfer opportunities, exposing them to differential treatment, subjecting them to gender hostility at work, subjecting them to sexual harassment and a sexually hostile work environment, and retaliating against them for complaining about the

gender discrimination to which they are subjected; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of Novartis' promotion, transfer, training, performance evaluation, compensation, work environment and discipline policies, practices and/or procedures so that females will be able to compete fairly in the future for promotions, transfers and assignments to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) equitable relief which effects a restructuring of the Novartis workforce so that females are promoted into higher and better paying classifications that they would have held in the absence of Novartis' past gender discrimination; (e) back pay, front pay, and other equitable remedies necessary to make female employees whole from the Defendants' past discrimination; (f) compensatory damages; (g) punitive and nominal damages to prevent and deter Novartis from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs and expenses.

### F. Adequacy of Representation

74. The Class Representatives interests are co-extensive with those of the members of the proposed class that they seek to represent in this case. The Class Representatives seek to remedy Novartis' discriminatory employment policies, practices and/or procedures so that females will no longer be prevented from advancing into higher paying and more desirable positions, will not receive disparate pay and differential treatment, will not be subjected to gender hostility and sexual harassment at work, and will not be retaliated against for speaking out against gender discrimination and harassment. The Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their similar individual claims in this action. The Class Representatives have retained counsel who are qualified, experienced and able to conduct this litigation and to meet the time and fiscal demands required

to litigate an employment discrimination class action of this size and complexity. The combined interests, experience and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

### G.     Requirements of Rule 23(b)(2)

75.     Novartis has acted on grounds generally applicable to the Class Representatives and the proposed class by adopting and following systemic policies, practices and/or procedures which are discriminatory on the basis of gender. Gender discrimination is Novartis' standard operating procedure rather than a sporadic occurrence. Novartis has refused to act on grounds generally applicable to the class by, *inter alia*: (a) refusing to adopt and apply selection, promotion, training, performance evaluation, compensation and discipline policies, practices and/or procedures which do not have a disparate impact on, or otherwise systemically discriminate against, females and/or pregnant employees; (b) refusing to provide equal terms and conditions of employment for female and/or pregnant employees; and (c) refusing to provide a working environment which is free of gender hostility and sexual harassment. Novartis' systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

76.     Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Novartis' individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Class Representatives' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial. Declaratory and injunctive relief flow directly and automatically from proof of the common

questions of law and fact regarding the existence of systemic gender discrimination against female employees at Novartis. Declaratory and injunctive relief are the factual and legal predicates for the Class Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

**H.     Requirements of Rule 23(b)(3)**

77.     The common issues of fact and law affecting the claims of the Class Representatives and proposed class members, including, but not limited to, the common issues identified in paragraphs 46-50 above, predominate over any issues affecting only individual claims.

78.     A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

79.     The cost of proving Novartis' pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to pursue their claims individually.

**VII.    ALLEGATIONS OF THE CLASS REPRESENTATIVES**

**A.     AMY VELEZ**

<u>**Background**</u>

80.     **Plaintiff Amy Velez** ("Ms. Velez") was hired by Novartis in approximately January 1997 as a sales representative in Novartis' Washington, D.C. sales district. Ms. Velez became a Sales Consultant in approximately February 1998. In approximately March 2000, Ms. Velez became a Senior Sales Consultant. She held this position until her constructive discharge

from Novartis in April 2004.  Ms. Velez filed an EEO Charge on or about July 15, 2003, in which she complained about the gender discrimination she experienced at Novartis.

<u>**Denials of Promotion**</u>

81.    Beginning in November 1997, Ms. Velez began winning numerous "Building from Strength" and "Show Me the Growth" sales contests.  In addition, several of her managers gave her "Recognition Reward" letters and gifts.

82.    In 1998, one of Ms. Velez's managers sent her a thank-you note, commending Ms. Velez on her "commitment to excellence."   In 1999, Ms. Velez also won "Gain and Maintain" and "Miacalcin Blitz" contests for her high product sales numbers.

83.    In 1999, Ms. Velez applied and interviewed for an Institutional Hospital Specialty position, a promotional opportunity.  Ms. Velez's application was denied, and Craig Lafferty ("Lafferty"), a male, received the promotion instead.

84.    In 2000, Ms. Velez also applied and interviewed for promotional opportunities as a Senior Care Specialist and an Institutional Hospital Specialist.  Ms. Velez's applications again were denied, and Robert Rheingold, a male, was instead selected for the Institutional position.

85.    In May 2001, Ms. Velez told her coworkers she was pregnant with twins and would later be on Family and Medical Leave Act ("FMLA") leave after the twins were born. Because of pregnancy complications, Ms. Velez began a short-term disability leave in September 2001.  In May 2002, Ms. Velez's short-term disability was exhausted and she began her FMLA leave.

86.    On or about May 6, 2003, approximately nine months after returning to work from FMLA leave, Ms. Velez contacted Steve Webb ("Webb"), her Regional Director, and asked him to consider accepting her into a Management Development Program.

87.     Based on her past and present performance, Ms. Velez was a qualified candidate for the Management Development Program.  This was especially true because, since returning from FMLA, Ms. Velez had increased sales in all her products while working the Washington, D.C. territory without a partner for nearly seven months.

88.     In addition, as of May 2003, Ms. Velez had doubled her sales numbers for all her products.  Ms. Velez had a higher market share than the entire Baltimore District for the product "Elidel."  In fact, Ms. Velez's product growth rate for Elidel was higher than the national growth rate.

89.     Also in May 2003, Ms. Velez's growth rate for the product "Lamisil" was the highest in the region, and higher than the national growth rate.  Moreover, for approximately seven months, Ms. Velez's sales numbers for the product "Ritalin LA" were higher than those of four male employees.

90.     In response to Ms. Velez's May 2003 request to participate in the Management Development Program, Regional Director Webb stated that Ms. Velez would not be a candidate for participation and that Regional Director Webb did not expect Ms. Velez to become a candidate in the future.

91.     On or about December 20, 2003, Ms. Velez contacted Regional Director Webb a second time requesting an opportunity to participate in the Management Development Program.  On December 29, 2003, Regional Director Webb again replied that he would not accept Ms. Velez's application to the program, nor did he expect to admit Ms. Velez into the program in the future.

**Disparate Pay**

92.     Upon information and belief, Ms. Velez received a lower raise for the calendar year of 2001 than similarly situated male employees and, in general, made less money than similarly situated male employees.

93.     Despite her exemplary sales record for the calendar year of 2001, Regional Director Webb rated Ms. Velez "satisfactory" and gave her only a 3% raise.

94.     Upon information and belief, Ms. Velez received less compensation than similarly situated male employees.

**Differential Treatment and Hostile Work Environment**

95.     On or about July 2001, in violation of the Novartis review policy, Ms. Velez did not receive a mid-year review.  Mid-year reviews are typically given to field sales employees in July for the first six months of the year.

96.     On or about March 2002, in further violation of the Novartis review policy, Ms. Velez did not receive a year-end review for the calendar year of 2001.  Due to a two-month delay in receiving sales data, Novartis typically gives year-end reviews to field sales employees in March for the review period for the preceding year.  Novartis uses mid-year and year-end reviews for evaluating an employee's sales performance, determining pay raises and determining promotional opportunities.

97.     Before Ms. Velez returned from FMLA leave on or about July 29, 2002, the sales numbers for the Washington, D.C. territory, to which Ms. Velez was assigned, were low.  In addition, due to a change in drug promotions, Ms. Velez was assigned a largely new set of doctors with whom to establish relationships.

98.     After returning from FMLA leave, on or about July 29, 2002, Novartis failed to provide Ms. Velez with additional sales training for her new position working in the Washington, D.C. territory.

99.     The standard practice at Novartis was to assign two Respiratory/Dermatology Sales Consultants to a territory so they could both effectively market and sell the products. Working with a partner enabled both employees to maximize their sales opportunities, because they could concentrate their sales and marketing efforts on their joint territory.  Ms. Velez's District Manager, Mike Cunneen ("Cunneen"), advised Ms. Velez that she would have to work the Washington, D.C. territory alone.   Ms. Velez worked the D.C. territory alone for approximately seven months.

100.     Because Ms. Velez had to work the Washington, D.C. territory alone for seven months, her sales numbers and data were inequitably compared to those employees who worked with partners.

101.     Approximately seven months after Ms. Velez returned from FMLA leave, District Manager Cunneen assigned Brian Oliver ("Oliver") to be her partner.

102.     After returning from FMLA leave, Ms. Velez began increasing sales of Elidel, Ritalin and Lamisil throughout her territory. In fact, Ms. Velez had higher sales numbers than several male employees.  However, District Manager Cunneen put Ms. Velez on a "Coaching Plan" in February 2003, because he relied on only three months of sales data during which Ms. Velez had been out on FMLA leave.

103.     Conversely, Oliver was not disciplined at all, even though Oliver and Ms. Velez were working as partners.

104. On or about May 7, 2003, Ms. Velez was placed on a "Performance Improvement Plan" (a disciplinary action), approximately one day after contacting Regional Director Webb to inquire about getting into the Management Development Program. Ms. Velez's partner, Oliver, was not placed on a Performance Improvement Plan.

105. Bob Bailey ("Bailey"), a male sales representative, had lower sales numbers and growth rates than Ms. Velez, but was still promoted on or about July 9, 2003. At the same time, Ms. Velez was working under a Performance Improvement Plan.

106. Regional Director Webb notified Bailey of his promotion in May 2003 while, at the same time, notifying Ms. Velez that she was being placed on a Performance Improvement Plan.

107. Ms. Velez was placed on another Performance Improvement Plan on or about January 2, 2004, approximately two weeks after contacting Regional Director Webb a second time about the Management Development Program. Again, Oliver was not subjected to any disciplinary actions, even though he was responsible for the same territory as Ms. Velez.

108. Upon information and belief, to date, Oliver has not been placed on a Coaching or Performance Improvement Plan by Novartis.

109. After Ms. Velez gave birth to twins and while she was still on FMLA leave, District Manager Cunneen violated Novartis' policy by calling Ms. Velez at home about work related matters on several occasions.

110. During the telephone calls, District Manager Cunneen told Ms. Velez she would have to work harder than others to increase the product sales numbers for the Washington, D.C. territory. He also told Ms. Velez that he wanted her to review product information and accept medical samples while she was on FMLA leave.

111.     On or about July 31, 2002, two days after Ms. Velez returned from work, District Manager Cunneen warned Ms. Velez that she would be "under the gun."

112.     On several occasions in September and October 2002, while riding along with District Manager Cunneen during sales calls, Ms. Velez heard District Manager Cunneen calling medical recruiters and asking them whether their candidates were married or had children.

113.     In approximately September 2002, approximately one month after Ms. Velez returned from FMLA leave, District Manager Cunneen made several sexually hostile comments during a Team Meeting in Atlanta, Georgia, at which Ms. Velez was present.

114.     In approximately December 2002, Mike Corvigno ("Corvigno"), a male sales representative, told Ms. Velez that District Manager Cunneen communicates better with men than women.  Corvigno also told Ms. Velez that other female sales representatives were experiencing difficulties with District Manager Cunneen's frequent favoring of their male counterparts.

115.     In approximately May 2003, Ms. Velez went out on disability leave due to severe stress, emotional breakdowns, anxiety and depression.  Ms. Velez's psychologist and psychiatrist directly attributed her health problems to the discrimination and hostile work environment that she suffered at Novartis.

116.     On or about April 18, 2004, Ms. Velez resigned from Novartis because of the continued lack of promotional opportunities and denial of entry to the Management Development Program, gender discrimination, hostile work environment and the health problems she suffered while dealing with these issues.

## B.    PENNI ZELINKOFF

### Background

117.    **Plaintiff Penni Zelinkoff** ("Ms. Zelinkoff") was hired by Novartis in approximately June 2001 as a Sales Consultant in Novartis' Portland, Oregon district. She held this position until her constructive discharge from Novartis in or about August 2004. Ms. Zelinkoff filed an EEO Charge in approximately November 2004, in which she complained about the gender discrimination she experienced at Novartis.

### Denials of Promotion

118.    In approximately October 2003, Ms. Zelinkoff signed up for a career-enhancing sales training program. Even though sales representatives are permitted to attend two or three training classes per year, her request to attend was denied by the then District Manager, Patrick Jackle ("Jackle").

119.    In a telephone conversation with Regional Manager Steve Martinez ("Martinez") in January 2004, Ms. Zelinkoff requested to be considered for the West Region training department. Regional Manager Martinez denied this request and informed Ms. Zelinkoff that unless she ranked in the top 35% of Novartis nationwide, she would not be considered for a promotion.

120.    However, Ms. Zelinkoff knows about several male employees from the Northwest Region who were not in the top 35% of Novartis yet received promotions.

121.    District Manager Jackle left his position in approximately December 2003, and in approximately February 2004, Robb Fairbairn ("Fairbairn") was hired as District Manager.

122.    In February 2004, Ms. Zelinkoff requested that District Manager Fairbairn consider her for the Management Development Program, which is necessary to advance into

management positions. District Manager Fairbairn denied her request at that time, and on numerous subsequent occasions throughout 2004, by stating that she would not be considered for the program.

**Disparate Pay**

123. Upon information and belief, Ms. Zelinkoff received less compensation than similarly situated male employees.

**Differential Treatment and Hostile Work Environment**

124. From June 2001 through approximately December 2003, when Ms. Zelinkoff was working under the supervision of District Manager Jackle, Jackle constantly intimidated and harassed Ms. Zelinkoff by threatening to terminate her job, writing her up for inconsequential matters, and unfairly evaluating her performance in both formal reviews and daily interactions.

125. Several other female employees who worked under District Manager Jackle experienced similar poor and disparate treatment while their male coworkers were treated more favorably than they were.

126. On or about February 10, 2004, Ms. Zelinkoff attended a Portland East Team Meeting. At the meeting, supervisors asked for a volunteer to coordinate the Novartis Consulting Network (NCN). Nobody volunteered for this assignment at the meeting.

127. The following day, Ms. Zelinkoff called District Manager Joey Colonnello ("Colonnello") to volunteer for NCN coordinator. This opportunity would have allowed Ms. Zelinkoff to demonstrate leadership skills and would have helped with future promotional opportunities. District Manager Colonnello declined her offer and told her that the coordinator had to be from Steve Wright's district.

128.     On or about March 9, 2004, at another Team Meeting, the NCN coordinator was announced.  Neither the lead coordinator nor the backup was from Steve Wright's district.

129.     Ms. Zelinkoff frequently received minor assignments while her male coworkers were selected for high priority projects, such as test pilots or roll-outs of new products.

130.     Additionally, during meetings, high level executives and managers socialized with male employees far more frequently than female employees.

### C.     MINEL HIDER TOBERTGA

#### Background

131.     **Plaintiff Minel Hider Tobertga** ("Ms. Hider Tobertga") was hired by Novartis in approximately April 2001 as a Sales Consultant in Novartis' Sacramento district.  She held this position until her constructive discharge from Novartis in or about September 2004.  Ms. Hider Tobertga filed an EEO Charge in approximately November 2004, in which she complained about the gender discrimination she experienced at Novartis.

#### Denials of Promotions

132.     In 2002, Ms. Hider Tobertga was selected as one of Novartis' top 50 salespersons in the nation and was given company stock as a reward. In addition, Ms. Tobertga's sales performance consistently ranked among the top in the region for a variety of products throughout 2002 and 2003.

133.     In an e-mail dated January 5, 2004, Ms. Hider Tobertga informed her supervisor Mark Gunning ("Gunning") that she wanted to be considered for the Management Development Program, which is necessary to advance into management positions.  On or about January 30, 2004, when Manager Gunning finally met with Ms. Hider Tobertga, he informed her that she would not be considered for the program.

134.    Ms. Hider Tobertga confirmed this conversation by e-mail.  Manager Gunning replied to Ms. Hider Tobertga's e-mail by stating that she required a stronger sales performance to be considered for management training.

135.    However, not only did Ms. Hider Tobertga rank among Novartis' top 50 salespersons, she also consistently ranked among the top salespersons in the region for a variety of products throughout 2002 and 2003.

136.    Furthermore, less qualified male employees were routinely selected for the Management Development Program, including George Lopez ("Lopez"), Ms. Hider Tobertga's former counterpart, who is currently enrolled in the program.  Not only were Lopez's sales numbers equal to or lower than Ms. Hider Tobertga's, but he did not have nearly as much industry experience as she did, nor, to her knowledge, has Lopez ever ranked among the top 50 salespersons in the nation.

### Disparate Pay

137.    Upon information and belief, Ms. Hider Tobertga received less compensation than similarly situated male employees.

### Differential Treatment and Hostile Work Environment

138.    When Ms. Hider Tobertga organized events for Novartis under Manager Gunning's supervision, Manager Gunning required that she report to him daily and run all decisions by him for approval.  Conversely, Manager Gunning granted Lopez, her counterpart, a much greater degree of autonomy.

139.    In November 2003, Ms. Hider Tobertga was hospitalized because of an emergency medical condition.  As a result, she was on leave for two weeks.

140.    Because of her poor medical condition, Ms. Hider Tobertga's doctor did not authorize her release to travel to and attend a launching meeting in Los Angeles. However, Manager Gunning accused Ms. Hider Tobertga of trying to get out of the meeting and pressured her to attend.

141.    Because of the pressure from Manager Gunning, Ms. Hider Tobertga convinced her doctor to permit her to attend the meeting under the restriction that she would rest in her hotel room as much as possible. Throughout the trip, Ms. Hider Tobertga had to take painkillers and nausea medication due to the great pain and discomfort she was experiencing.

142.    In February 2004, Ms. Hider Tobertga began to suffer from severe migraine headaches, causing her to miss one day of work. Ms. Hider Tobertga provided Manager Gunning with a note from her doctor confirming her illness in accordance with company policy. Nevertheless, Manager Gunning objected to Ms. Hider Tobertga's leave, accused her of falsifying the note, and asked Ms. Hider Tobertga whether she had a doctor who was writing illegitimate notes for her.

143.    In approximately March 2004, Ms. Hider Tobertga complained to Human Resources about Manager Gunning's inappropriate, offensive and harassing behavior, but, to her knowledge, no action was taken.

144.    In April 2004, Ms. Hider Tobertga's physician wrote her a note requesting six weeks of maternity leave, which would allow Ms. Hider Tobertga to bond with her recently adopted daughter. However, Human Resources denied Ms. Hider Tobertga's request for leave and informed Ms. Hider Tobertga that maternity leave was only for women who had given birth and that she would have to take unpaid leave.

145.     Ms. Hider Tobertga then inquired about Novartis' "job share" program.  Novartis purports to offer the "job share" option to recent mothers and other employees who wish to work part time.  However, Manager Gunning informed Ms. Hider Tobertga that only President's Club winners were eligible to participate in job share.  However, Ms. Hider Tobertga knows female sales representatives with other managers who have been approved for job share despite not qualifying for President's Club.

### D.     MICHELLE WILLIAMS

#### Background

146.     **Plaintiff Michelle Williams** ("Ms. Williams") was hired by Novartis in approximately April 2002 as a sales representative in Novartis' Chicago South district.   In approximately August 2002, she became a sales consultant, a position she currently holds.  Ms. Velez filed an EEO Charge in approximately November 2004, in which she complained about the gender discrimination she experienced at Novartis.

#### Denials of Promotion

147.     When Ms. Williams began her career with Novartis, she worked under the supervision of a female supervisor, Joanne Pence ("Pence"), who helped her qualify for acceptance to the Management Development Program by completing a 12-step checklist.  Ms. Williams then completed the first of three classes for the program.

148.     In May 2003, Pence left her position.  Regional Manager Joe Stein appointed Ms. Williams to serve as interim District Manager for a period of approximately two months while he searched for a replacement for Pence.

149.     Ms. Williams requested the opportunity to apply for the position at that time, but was told she did not qualify because she had not completed the Management Development Program.

150.     In July 2003, Antonio Parker ("Parker"), a male, became the new District Manager.

151.     In an extensive conversation with District Manager Parker regarding her career goals, Ms. Williams informed District Manager Parker of her intention to complete the Management Development Program.  District Manager Parker told Ms. Williams that when he was hired as District Manager, he was informed that she was to be promoted by the end of 2003. He also told her she was enrolled in the second management training class in December 2003.

152.     Also in July, Ms. Williams let District Manager Parker know that she was pregnant.  After informing District Manager Parker of her pregnancy, she never received any additional information about the December 2003 class.

153.     Ms. Williams went on maternity leave from December 2003 to April 2004.  While she was on maternity leave, Ms. Williams also spoke to District Manager Parker on the telephone about a management training class in June that she wanted to attend. District Manager Parker repeatedly assured Ms. Williams that she would be enrolled.  When she returned from leave, however, she was not enrolled in the class.

154.     When Ms. Williams discussed the issue with District Manager Parker, he told her that his supervisor, Joe Stein ("Stein"), had advised him that Ms. Williams may have changed her mind about the Management Development Program since having a child and that they should wait to ensure that she was still interested in the opportunity.  District Manager Parker also told Ms. Williams that it was not her place to contact Stein about the matter.

155.     Ms. Williams confirmed that she was still interested in management training, and District Manager Parker then assured her that she would complete the second class in August. As August approached, however, she asked District Manager Parker for more information about the class, and he admitted to her that the class was actually in October.

156.     District Manager Parker then told Ms. Williams that she was enrolled in a class during the week of October 4. Even though Ms. Williams had already scheduled vacation days for that week, she altered her vacation plans, upon District Manager Parker's recommendation, in order to attend the class.

157.     Several days before the October class was supposedly scheduled, District Manager Parker told her that there was no class in October and denied ever telling her that there was an October class.

158.     Meanwhile, employees who attended the first class of the Management Development Program with Ms. Williams began interviewing for management positions.

**Disparate Pay**

159.     Upon information and belief, Ms. Williams received less compensation than similarly situated male employees.

**Differential Treatment and Hostile Work Environment**

160.     During the time Ms. Williams was on maternity leave, District Manager Parker conducted her annual review without any consent or input from her. The raise that District Manager Parker gave her was the lowest she had ever received at Novartis and was lower than her colleagues' raises. Without Ms. Williams' knowledge or her signature, District Manager Parker submitted Ms. Williams' review on January 19, 2003. Standard practice at Novartis is to meet with an employee to discuss his or her review before submitting it.

161.     When Ms. Williams returned to work in April 2004, District Manager Parker told her that he needed her backdated signature, because he would lose his job without it.   Ms. Williams refused to do this, because she would not have agreed to the proposed pay raise. District Manager Parker then proceeded to submit her raise without her approval and signature, violating company policy.

162.     Even though District Manager Parker denied Ms. Williams the opportunity to become a manager, and, in fact, suggested that she apply for specialty representative positions instead, District Manager Parker has had to consult Ms. Williams numerous times for advice on how to perform his duties.

163.     While she was on maternity leave, District Manager Parker violated Novartis' policy by calling Ms. Williams on her cell phone numerous times to ask her questions regarding his duties.

**E.     JENNIFER WAXMAN-RECHT**

**Background**

164.     **Plaintiff Jennifer Waxman-Recht** ("Ms. Waxman-Recht") was hired by Ciba Vision, a Novartis subsidiary, in approximately June 1997 as an Ophthalmic sales representative in Connecticut**.**   On or about November 1999, Ms. Waxman-Recht was invited to interview for a senior-level specialty sales representative position for the product Visudyne.   Ms. Waxman-Recht then became one of approximately 20 Visudyne representatives.   In 2002, Novartis management took over the Ophthalmic division.  In 2004, Ms. Waxman-Recht was demoted to a non-specialty sales representative position, which she continues to hold.   Ms. Waxman-Recht filed an EEO Charge in approximately January 2005, in which she complained about the gender discrimination she experienced at Novartis.

## Denials of Promotion

165.     In 2004, Novartis announced a realignment that cut the number of Visudyne specialty sales representatives to eleven.   While eight months pregnant, Ms. Waxman-Recht interviewed for the position of specialty sales representative in August 2004.   Despite being the highest ranking Visudyne sales representative in the country in 2004, Ms. Waxman-Recht was denied the promotion.   Instead, less qualified male employees were selected, including Fred Richards, who was ranked 19 out of 21 at the time of the interviews.

166.     Ms. Waxman-Recht was informed by her manager, Bill Forrest, that Vice President of Sales Perry Sternberg ("Sternberg") had pre-selected employees for the Visudyne sales representative positions before the interview process had even commenced and had announced his choices for the positions in a manager's meeting.   Almost all of the candidates whom Vice President Sternberg had pre-selected ultimately received the promotion.

167.     After the realignment, Ms. Waxman-Recht was demoted to a non-specialty sales representative position with less income potential.

## Disparate Pay

168.     In approximately 2002, shortly before Novartis management took over her division, Ms. Waxman-Recht learned that her salary was lower than almost all of her male counterparts by as much as $30,000.

169.     Soon after, management agreed to raise Ms. Waxman-Recht's salary to the level her coworkers were earning.   However, before the raise went into effect, Novartis took over the Ophthalmic division and replaced the old management.   While Vice President Sternberg initially agreed to grant the raise, after several months he reneged on this agreement and informed Ms. Waxman-Recht that she would not be receiving a raise.

170.     Ms. Waxman-Recht reported her pay situation to Kevin Graham ("Graham") in Novartis' Human Resources department.  At the time of her report, however, Vice President Sternberg had already contacted Graham (a former colleague of his) and told him that Ms. Waxman-Recht did not deserve the raise.  Despite the fact that Ms. Waxman-Recht was a top performer, Graham dismissed her complaint, relying on Vice President Sternberg's unsupported assertion.

171.     To date, Ms. Waxman-Recht continues to receive a lower salary than her male coworkers, even though she was the highest ranking Visudyne sales representative in the country and qualified for President's Club in 2004.  Conversely, equally or less-qualified male Visudyne representatives have received raises even though their salaries were already higher than Ms. Waxman-Recht's.

### Differential Treatment and Hostile Work Environment

172.     Ms. Waxman-Recht has been held to stricter standards than her male coworkers. Novartis management sets sales quotas for employees without providing any explanation as to how they arrived at those numbers.  Each representative is given a percentage by which they are expected to increase their sales over the trimester.  Ms. Waxman-Recht's sales quotas are often much higher than those given to male coworkers and than the national quotas.  For example in the second trimester of 2004, Ms. Waxman-Recht's quota was 36%, while the national average was only 12%.

173.     Ms. Waxman-Recht's manager, Patrick Sullivan ("Sullivan"), repeatedly sent her work-related e-mails and voice mails during her maternity leave, even though Ms. Waxman-Recht requested that Manager Sullivan refrain from doing so while she was still out on maternity

leave. In one e-mail, Manager Sullivan asked Ms. Waxman-Recht to complete a project before returning to work.

## F.     KAREN LIGGINS

### Background

174.    **Plaintiff Karen Liggins** ("Ms. Liggins") was hired by Ciba Vision, a subsidiary of Novartis, in approximately September 2000 as a Retina Sales Specialist for the product Visudyne in its Ophthalmic division in St. Louis, Missouri. In 2004, Ms. Liggins became a Ophthalmic Sales Specialist, a position that she continues to hold. Ms. Liggins has worked for Novartis in Missouri, Arkansas, Kansas, Illinois and Tennessee. Ms. Liggins filed an EEO Charge in approximately January 2005, in which she complained about the gender discrimination she experienced at Novartis.

### Denials of Promotion

175.    When Ms. Liggins was hired, she was told she would be promoted to management within one year due to her eleven (11) years of managed care experience and master's degree in management. To date, she has been prevented from advancing into management.

176.    In October 2003, Ms. Liggins expressed her interest in a vacant District Manager position to both Vice President of Sales Perry Sternberg ("Sternberg") and Regional Director Kathy Kobe ("Kobe"). Vice President Sternberg advised Ms. Liggins that she would have to move from St. Louis to Chicago to be considered for the position because he wanted all the managers living in the city. Because relocation was not an option for Ms. Liggins, she did not pursue the District Manager position. However, Larry Karner, a male employee, was given this position without being required to relocate to Chicago from his residence in Minneapolis.

177. In 2003, Ms. Liggins interviewed for an Oncology sales specialist position. Ms. Liggins received very positive feedback from the manager and the other Oncology sales representatives, but after the Oncology manager contacted District Manager Larry Karner ("Karner") and other Ophthalmic senior managers about her application, she was denied the position in favor of a male employee.

178. After returning from disability leave in approximately August 2004, Ms. Liggins requested that District Manager Karner consider her for the Management Development Program. Despite her strong performance, eleven (11) years of account management experience, and the fact that she had been told when she was hired by Novartis that she could advance to management after one year, District Manager Karner denied Ms. Liggins' request.

179. Ms. Liggins then sent District Manager Karner an e-mail confirming their conversation and asking for guidelines to get into management. However, District Manager Karner never responded to this e-mail.

180. On or about August 2004, Novartis announced a realignment that cut the number of Senior Retina Sales Specialists to eleven. After interviewing for one of those positions, which represented a promotion for Ms. Liggins, Ms. Liggins' application was denied, and Rob Goldschmidt ("Goldschmidt"), a male candidate from outside Novartis with significantly less experience than Ms. Liggins, received the promotion. Further, because Goldschmidt was less qualified for the position than Ms. Liggins, he has frequently had to ask for her assistance in performing his job duties.

181. In addition, at least two less-qualified male employees, Tom Scott and Fred Richards, who had been Ms. Liggins' Retina Sales Specialist coworkers and had lower numbers

than Ms. Liggins, were selected for the positions. Meanwhile, Ms. Liggins was demoted to a core representative position as an Ophthalmic Sales Specialist.

## Disparate Pay

182.   Upon information and belief, Ms. Liggins receives and has received less compensation than similarly situated male employees.

## Differential Treatment and Hostile Work Environment

183.   Throughout 2000 and 2001, management consistently set overly aggressive sales forecasts for Ms. Liggins, which she was expected to meet. As a result of these unrealistically high forecasts, Ms. Liggins did not meet the goals established for her and was given a low ranking. Ms. Liggins was given this low ranking even though her sales numbers were among the highest in volume and her total contribution of sales, in dollar value, was fourth in the country. Conversely, when male employees had difficulties meeting sales forecasts, their managers excused them by acknowledging the aggressiveness of the forecasts.

184.   In January 2003, District Manager Karner was to select one of his sales representatives to receive the President's Award. Novartis grants the President's Award to top achievers each January based on the previous year's sales numbers and objectives. Although Ms. Liggins was District Manager Karner's top performing sales representative and she met all the requirements for the award, District Manager Karner selected Dick Post, a male employee with lower sales numbers than Ms. Liggins, for the President's Award.

185.   District Manager Karner was extremely hostile and negative to Ms. Liggins throughout the time he was her direct manager. For example, during their first ride-along in September 2001, District Manager Karner made numerous negative and harassing comments about Ms. Liggins' performance.

186. District Manager Karner also falsely claimed that a doctor in Kansas City had complained that Ms. Liggins did not call on his office frequently enough. When the doctor in question was made aware of District Manager Karner's assertion, he was extremely displeased and wrote a letter commending Ms. Liggins' work.

187. In April 2004, Ms. Liggins went on disability leave after undergoing an emergency surgery. While she was out, Ms. Liggins was contacted numerous times by District Manager Karner, who required her to do work for Novartis while on leave.

**Retaliation**

188. Ms. Liggins filed her EEO Charge on or about January 28, 2005, in which she complained about the gender discrimination she experienced at Novartis.

189. On February 17, 2005, the Amended Class Action Complaint was filed, in which Ms. Liggins was named as a Class Representative.

190. In February and March 2005, Ms. Liggins began to experience increased hostility and scrutiny. For example, Goldschmidt told Ms. Liggins that other sales representatives, including Paul Binner, were speaking negatively about Ms. Liggins' job performance. Even though Ms. Liggins told District Manager Karner that another sales representative, Binner, should not be permitted to evaluate her performance, District Manager Karner ignored Ms. Liggins' complaints and allowed Binner's conduct to continue.

191. Further, Goldschmidt scheduled lunch sessions with key accounts without informing Ms. Liggins. This unfairly disadvantaged Ms. Liggins because it prevented her from interacting with important doctors during those lunches. Ms. Liggins had to ask Goldschmidt to keep her in the loop.

192.    In March 2005, Goldschmidt also informed Ms. Liggins that Kathy, the administrative head at Ms. Liggins' most valuable account, sent an e-mail stating her belief that Goldschmidt would be replacing Ms. Liggins as the sales representative for that clinic.  Ms. Liggins had received no prior indication that she was being replaced and had certainly not communicated that to any of her accounts.   When Ms. Liggins spoke with Kathy, Kathy informed her that a doctor at the clinic, Dr. Shah, had told Kathy that Goldschmidt was replacing Ms. Liggins.   Upon information and belief, Goldschmidt, who had interacted with Dr. Shah earlier in the week, led Dr. Shah to believe that he was replacing Ms. Liggins.

193.    The same week, another doctor with whom Ms. Liggins worked also asked her whether she was still the sales representative for his office or whether Novartis was trying to push her out of that role.  Again, Ms. Liggins had not been aware that Novartis was considering replacing her in that office.

194.    Ms. Liggins called District Manager Karner and Regional Director Kathy Kobe to request that they inform her if she was being replaced in her accounts.

195.    However, each time that Ms. Liggins approached either District Manager Karner or Regional Director Kobe with an issue, they responded in an extremely belittling manner.  For example, when Ms. Liggins contacted Regional Director Kobe about the rumors that Ms. Liggins was going to be replaced in her most important account, Kobe left a voicemail message for Ms. Liggins in which she stated in a condescending manner that Ms. Liggins did not embrace the team concept and that they needed to have a team building meeting.

196.    At the end of March 2005, due to the stress Ms. Liggins was experiencing in her position at Novartis, her physician requested that she be permitted to go on medical leave.

197.     In approximately March 2005, Ms. Liggins began short term disability leave.  To date, Ms. Liggins continues to be on short term disability leave.

**G.     LORI HORTON**

## Background

198.     **Plaintiff Lori Horton** ("Ms. Horton") was hired by Novartis in approximately March 2002 as a sales representative in Novartis' Richmond North District in Virginia, a position which she held until her resignation in April 2005.  Ms. Horton filed an EEO Charge of Discrimination in approximately February 15, 2005, in which she complained about the gender discrimination she experienced at Novartis.

## Denials of Promotion

199.     In June 2004, Ms. Horton applied for a promotion to an Oncology Specialist position.  Ms. Horton was denied the opportunity to interview for this position, which was awarded to a less qualified male applicant, Russell Emerson.

200.     In August 2004, Ms. Horton requested that Novartis District Manager Mike Cunneen ("Cunneen") consider her for enrollment in the Manager Development Program.  District Manager Cunneen indicated that he would not consider Ms. Horton at that time.  District Manager Cunneen never recommended Ms. Horton for the program.

201.     However, less-qualified male employees with lower performance numbers than Ms. Horton are routinely granted entrance to the Manager Development Program, including Steve Goodwin, Chris Sims, Neal Levy and Drayton Wise.

## Disparate Pay

202.     In March 2004, Ms. Horton received a lower performance review than her male partner, Russell Emerson ("Emerson"), even though his performance was the same or worse than

hers. Ms. Horton also received a less favorable review than another male coworker in her District, Mike Corvigno ("Corvigno"), whose numbers were far lower than hers. As a result, Emerson and Corvigno both received stock options and higher raises than Ms. Horton. Additionally, Emerson received an award of $500, which Ms. Horton was denied.

203. Upon information and belief, Ms. Horton received less compensation than similarly situated male employees.

## Differential Treatment

204. Approximately three months after Ms. Horton began working for Novartis, District Manager Cunneen informed Ms. Horton and her partner, Emerson, that Cunneen was disappointed with the state of their territory. District Manager Cunneen gave them two months to improve their numbers. While Emerson had been working in the territory with another partner for approximately one year at that time, Ms. Horton, who had only recently started, was held responsible for, and unfairly pressured as a result of, Emerson's and his previous partner's performance.

205. When their numbers began to rise due to Ms. Horton's efforts, District Manager Cunneen rewarded her male partner, Emerson, by encouraging him to apply for promotional opportunities. Conversely, Ms. Horton received no acknowledgement whatsoever from District Manager Cunneen.

## Retaliation

206. On February 20, 2005, shortly after Ms. Horton filed her EEO Charge of Discrimination, District Manager Cunneen sent an e-mail to the district outlining district members' individual accomplishments in 2004 and requesting people to vote for the district's

Most Valuable Player ("MVP"). The MVP award is an important national recognition given to recipients at a national Novartis meeting.

207. District Manager Cunneen's e-mail showed that Ms. Horton finished first in the district in sales performance at 102% of her 2004 targeted payout. Counterparts Maria Monti ("Monti") and Michael Corvigno ("Corvigno") were the next highest performers after Ms. Horton, finishing at 95% of their 2004 targeted payout. Moreover, Ms. Horton had the highest regional and national rankings among her district coworkers, finishing the year ranked 26 out of 54 in the region and 91 out of 246 in the nation. Again, counterparts Monti and Corvigno were the next highest ranking district members after Ms. Horton, with a regional ranking of 33 out of 54 and a national ranking of 117 out of 246.

208. On February 28, 2005, approximately two weeks after Ms. Horton filed her EEO Charge, District Manager Cunneen sent out another e-mail to the district members. He also left a voice-mail which directed their attention to his e-mail. In the e-mail, District Manager Cunneen stated that, based on the selection criteria for the MVP, there were two candidates for the District MVP Award, Monti and Corvigno.

209. The e-mail also stated that position transfers after March 15, 2004 and before October 15, 2004, including transferring from the Respiratory Dermatology 1 group ("RD1") to the Respiratory Dermatology 2 group ("RD2"), would render an employee ineligible for the award. Because Ms. Horton had transferred from RD2 to RD1 in July 2004, she was ineligible for the award.

210. However, Ms. Horton had never heard of this policy before District Manager Cunneen's February 28, 2005 e-mail. No mention of the policy was made to Ms. Horton upon

her transfer in July 2004.  Moreover, as an RD1 and an RD2, Ms. Horton had the same products, the same physicians, the same manager and the same geographical territory.

211.    On March 1, 2005, Ms. Horton discussed the issue with District Manager Cunneen.  District Manager Cunneen told Ms. Horton that he and Regional Manager Steve Webb had attempted to appeal the policy but were unsuccessful.  However, upon information and belief, Regional Manager Webb was on medical leave until approximately February 21, 2005.

212.    Further, the two sales representatives whom District Manager Cunneen had designated as the only MVP candidates, Corvigno and Monti, informed Ms. Horton that they abstained from voting because it was clear that Ms. Horton was the only representative deserving of the award.  Numerous other sales representatives also informed Ms. Horton that they had already submitted their votes in her favor when they received District Manager Cunneen's February 28, 2005 e-mail and that they were very upset about having to change their votes because they felt Ms. Horton deserved the award.

213.    Ms. Horton also began to be subjected to close scrutiny by her managers after the filing of her EEO Charge.  For example, she began to receive numerous critical e-mails from District Manager Cunneen and other managers.  In addition, when Ms. Horton was tardy in submitting sample signature forms, which occurs commonly among Novartis employees, District Manager Cunneen required her to write an explanation for her tardiness.  She had never been required to do so before filing her EEO Charge.  Upon information and belief, other employees were not subjected to similar strict requirements.

214.    Because of the hostile work environment and discrimination she experienced at Novartis, Ms. Horton resigned in April 2005.

### H.      HOLLY WATERS

#### Background

215.     **Plaintiff Holly Waters** ("Ms. Waters") was hired by Novartis in approximately April 2002 as a sales representative in Novartis' Maryland/District of Columbia territory. In early 2003, Ms. Waters became a Sales Consultant. On or about November 22, 2004, Ms. Waters was terminated from Novartis. Ms. Waters filed an EEO Charge in approximately February 2005, in which she complained about the gender discrimination she experienced at Novartis.

#### Denials of Promotion

216.     In approximately May 2004, Ms. Waters became interested in applying for a promotion in specialty sales that had opened up in the District of Columbia. Ms. Waters was well-qualified for this position because her sales numbers were among the highest in her territory. Ms. Waters e-mailed District Manager Mike Cunneen ("Cunneen") regarding her interest in the position. In order to apply, Ms. Waters had to notify District Manager Brian Campbell ("Campbell"). When Ms. Waters informed District Manager Campbell of her intention to apply for the promotion, Campbell discouraged Ms. Waters from applying and told her that he did not think she would be happy in the position.

217.     Ms. Waters was later informed by a coworker, Brian Oliver, that District Manager Campbell had contacted District Manager Cunneen and told him that Ms. Waters was not qualified for the position and should not be considered. Upon learning this fact, Ms. Waters knew that District Manager Campbell had effectively precluded her from receiving the promotion, and, thus, she decided not to apply. A male employee received the Respiratory Dermatology promotion.

**Disparate Pay**

218.    Upon information and belief, Ms. Waters received less compensation than similarly situated male employees.

**Hostile Work Environment**

219.    After District Manager Campbell became Ms. Waters' direct supervisor in approximately October 2003, Campbell favored the male employees and was extremely hostile towards Ms. Waters. Further, District Manager Campbell failed to recognize Ms. Waters for her sales success, while equally or less qualified male employees were recognized.

220.    During a national sales meeting in Las Vegas, Nevada, Ms. Waters became ill and had to see the Novartis physician. When Ms. Waters requested to lie down for an hour, District Manager Campbell interrogated her regarding her medical condition and diagnosis.

221.    In May 2004, Ms. Waters learned that District Manager Campbell had told another District Manager, Kim Marsh, that Ms. Waters had been sick at the meeting because she had been drinking too much alcohol and was hung over. Also in May 2004, District Manager Campbell told Ms. Waters that she became sick at the meeting because she drank too much alcohol. Ms. Waters responded that that was not true and that she truly had a medical condition that was none of his business.

**Pregnancy Discrimination**

222.    In approximately June 2004, Ms. Waters informed District Manager Campbell that she was pregnant. Also in June 2004, Ms. Waters began experiencing difficulties with her pregnancy and took four sick days.

223.    In July 2004, District Manager Campbell met with Ms. Waters after a ride-along. District Manager Campbell informed Ms. Waters that she had been nationally chosen, not by

him, to receive a salary increase for her high performance, leadership and customer focus. During the same meeting, District Manager Campbell accused Ms. Waters of incorrectly communicating with him regarding her days off in June, even though she had submitted documentation from her physician and sent an updated Vacation Tracker to him. District Manager Campbell claimed that policy required her to inform him of her days off via voice mail rather than e-mail. However, Ms. Waters had never before been informed of this policy.

224. During the meeting, District Manager Campbell became extremely hostile towards Ms. Waters, berated her and threatened that her job was on the line. For example, he commanded several times in a harsh manner, "Look at me when I'm talking to you!"

225. District Manager Campbell then wrote a code of conduct letter to Human Resources regarding the days that Ms. Waters had missed in June 2004. District Manager Campbell's letter contained several inaccurate statements and, moreover, made no mention of Ms. Waters' pregnancy difficulties as the reason for her missed days.

226. Further, Ms. Waters' QTQ report for June 2004 revealed that, despite taking four sick days, Ms. Waters achieved the highest daily number of doctors' calls in the district.

227. In July 2004, Ms. Waters filed a Human Resources complaint against District Manager Campbell. Carol Robinson in Human Resources informed Ms. Waters that, contrary to District Manager Campbell's assertion, there was no Novartis policy that sick days had to be communicated by voice mail. However, Human Resources dismissed Ms. Waters' complaint, advising her that she and District Manager Campbell should work their problems out amongst themselves.

228. In July 2004, Ms. Waters submitted a letter to Human Resources documenting the discussion she had had with Human Resources and correcting information that District Manager

Campbell had written in his letter of conduct. Ms. Waters also sent the letter to District Manager Campbell and Regional Manager Joe Shupp.

229. In addition to continued difficulties with her pregnancy, Ms. Waters was experiencing a great deal of stress and migraine headaches and lost a significant amount of weight. Upon her doctor's advice, Ms. Waters went on disability leave from approximately July 27, 2004 to approximately September 12, 2004.

230. When Ms. Waters returned in September 2004, District Manager Campbell's hostility towards her continued. For example, when Ms. Waters attended a three day meeting in Baltimore in September 2004, District Manager Campbell spoke with other sales representatives but would not speak to Ms. Waters.

231. Further, even though her sales numbers were in the top 12% of the company, District Manager Campbell failed to acknowledge Ms. Waters' strong performance. Ms. Waters did not receive the positive feedback that other male sales representatives were given. For example, in a Weekly Spotlight in September 2004, District Manager Campbell recognized a male employee for having the highest weekly market share for the product Diovan when Ms. Waters actually had the highest market share for that product.

232. In October 2004, District Manager Campbell conducted Ms. Waters' mid-year review. Because of her high numbers, Ms. Waters received a positive review.

233. On October 25, 2004, District Manager Campbell rode along with Ms. Waters during her sales calls. During a doctor's visit, in the course of the ride-along, Ms. Waters signed her doctor up for samples for the product Lamisil and scheduled a dinner.

234.     On or about November 22, 2004, Ms. Waters was abruptly terminated.  District Manager Campbell accused Ms. Waters of falsifying the October 25, 2004 doctor's visit as a sales call.

235.     Ms. Waters was approximately seven months pregnant at the time of her termination.

236.     Ms. Waters did not have low rankings or sales numbers.  In fact, she was the highest-ranking sales representative in the district for all of her products and was the highest-ranking sales representative in the district and the region for her number one product, Diovan.  In addition, Ms. Waters was ranked 13 out of 56 sales representatives in the region and 59 out of 456 in the nation.

237.     Further, Ms. Waters had never been placed on a Coaching Plan or Performance Improvement Plan.   District Manager Campbell had never mentioned to her any issues with her physicians' calls, neither during the ride-along for which she was being terminated, nor subsequently.

### Differential Treatment

238.     Further, male employees were not held to such stringent standards.  A male employee, Brian Oliver ("Oliver"), was also terminated in November 2004.  However, Oliver had been placed on a PIP six weeks prior to his termination for his low sales numbers and was offered 10 weeks severance.  Ms. Waters was not offered a severance.  Further, while Ms. Waters was denied her bonus payment for the last trimester of 2004, which would have been her highest bonus ever at Novartis, upon information and belief, Mr. Oliver received his bonus for that trimester.

239.     District Manager Campbell clearly favored Ms. Waters' male coworkers, including Eric Karlson ("Karlson") and Bob Rudd ("Rudd"), even though Ms. Waters was among Campbell's top performers.  For example, District Manager Campbell frequently commented that Karlson, one of his new sales representatives, is "on his way to management." Moreover, upon information and belief, Rudd frequently intentionally falsified physicians' calls and instructed other sales representatives at meetings on techniques for falsifying calls.

240.     Upon information and belief, Karlson was admitted into the Management Development Program ("MDP") in January 2005.  To be admitted into the MDP, a candidate is required to have at least two years with Novartis and rank in the top 20% of the company. Karlson did not meet either of these requirements but, nonetheless, District Manager Campbell allowed him to enter the MDP.

241.     In December 2004, District Manager Campbell left a voicemail to his district members informing them that if they spoke with Ms. Waters or gave her any documents, they would be terminated as well.

## I.     WENDY PINSON

### Background

242.     **Plaintiff Wendy Pinson** ("Ms. Pinson") was hired by Novartis in approximately November 1999 as a sales representative in the Montgomery, Alabama sales district. Ms. Pinson continues to work as a sales representative for Novartis.  Ms. Pinson filed an EEO Charge in approximately February 2005, in which she complained about the gender discrimination she experienced at Novartis.

## Denials of Promotion

243.    In approximately late 2002, Ms. Pinson asked District Manager Larry Greer ("Greer") about promotional opportunities.  District Manager Greer told her that she could not be promoted because of her low numbers, even though he knew that all of the sales representatives in her territory had low numbers.  District Manager Greer also knew that the low numbers were possibly attributable to factors outside of the sales force's control, such as the existence of three separate Canadian mail order pharmacies in the Dothan Territory.  In addition, District Manager Greer assigned Ms. Pinson a partner with no sales experience, leaving her with little chance of boosting her sales numbers.

244.    On approximately February 9, 2005, Ms. Pinson asked District Manager Greer to consider her for the Management Development Program. Again, District Manager Greer told Ms. Pinson that she would not be considered because of her low numbers.

## Disparate Pay

245.    Upon knowledge and belief, Ms. Pinson was only given a small salary increase in 2004 while her male co-workers, who performed at the same or lower levels than she did, received much greater salary increases.

246.    Upon information and belief, Ms. Pinson received less compensation than similarly situated male employees.

## Differential Treatment and Hostile Work Environment

247.    District Manager Greer advised Ms. Pinson that she did not qualify to receive reimbursement from Novartis for her MBA expenses because she was not among the highest ranking performers in the company.  However, after checking with the Novartis benefits department, Ms. Pinson discovered that all Novartis salespeople are eligible for reimbursement,

regardless of performance. When Ms. Pinson told District Manager Greer what she had discovered, Greer reluctantly signed her reimbursement paperwork.

248. Novartis' district managers hold Ms. Pinson and other females to a higher standard than their male co-workers. For example, District Manager Spencer Davidson placed Krista Botop ("Botop") on a Performance Improvement Plan ("PIP") and then terminated her in approximately October 2004. Botop's male partner, Chris Hudson, whose numbers were approximately the same, if not worse, than Botop's, was not terminated or ever placed on a PIP.

249. In approximately March 2003, Ms. Pinson was berated by District Manager Greer because a doctor she was dating was not prescribing her brand of drugs in a high enough proportion to other brands. Ms. Pinson explained that the doctor considered it a conflict of interest to switch his patients who had already been prescribed other medications to a new drug because of his romantic relationship with Ms. Pinson. District Manager Greer told Ms. Pinson that other female sales representatives would have used the romantic relationship more successfully and that she should try harder.

250. On approximately August 21, 2003, Ms. Pinson called District Manager Greer and told him that she had a broken leg and had to take time off from work for surgery and recovery starting the next day. District Manager Greer's response was hostile, and while Greer acknowledged that he did not have a choice in the matter, he advised Ms. Pinson that she really needed to be in the field.

251. Despite her recent surgery, Ms. Pinson attended a meeting in Montgomery on or about August 23, 2003. At the meeting, District Manager Greer saw that Ms. Pinson was on crutches and unable to perform sales calls. Nonetheless, later that day District Manager Greer left Ms. Pinson a voicemail advising her that Matt McNamara, the Regional Director, would be

working with her on or about August 27, 2003. Ms. Pinson had to request a three week leave of absence to recover from her broken leg in order to avoid further work assignments from District Manager Greer that she obviously could not perform in her condition.

252. On or about January 24, 2005, District Manager Greer advised Ms. Pinson that he would be riding with her the next day. Ms. Pinson told District Manager Greer to call her when he was getting close to the city of Enterprise so they could arrange to meet. Instead, District Manager Greer proceeded directly to the Enterprise Medical Clinic. When District Manager Greer arrived at the clinic, he called Ms. Pinson and chastised her for not being there, even though they had not set a specific time to meet nor had he called Ms. Pinson ahead of time as she had requested.

253. When Ms. Pinson arrived at the clinic, District Manager Greer proceeded to criticize Ms. Pinson's character and intelligence and told her that she was not motivated to succeed because she had married a doctor.

## J. ROBERTA VONLINTEL

### Background

254. **Plaintiff Roberta VonLintel** ("Ms. VonLintel") was hired by Novartis in approximately late 1998 as a sales representative in the Kansas City West region. In 2001, Ms. VonLintel was promoted to senior sales representative. Ms. VonLintel was terminated by Novartis in approximately July 2003. Ms. VonLintel filed an EEO Charge in approximately February 2005, in which she complained about the gender discrimination she experienced at Novartis.

**Disparate Pay**

255.    During her employment with Novartis, Ms. VonLintel discovered that her husband, a male Novartis coworker, was making a salary that was approximately $14,932.00 more than hers.  Ms. VonLintel was paid a significantly lower salary despite the fact that she had 10 years more experience and higher performance evaluations than her male coworker.

256.    Upon information and belief, Ms. VonLintel received less compensation than other similarly situated male employees.

**Differential Treatment and Hostile Work Environment**

257.    Throughout her employment with Novartis, male employees were given more prestigious tasks and responsibilities than female employees.  For example, male employees ran most of the sales meetings Ms. VonLintel attended and gave almost all of the presentations, while female employees were denied such opportunities.

258.    Ms. VonLintel's District Manager, Steve Papas ("Papas"), told her that Regional Director Ted Raad ("Raad") had instructed Papas to falsify documents so that he could terminate Marlis Hiltgen and Natalie McDougal, two female sales representatives.  District Manager Papas refused to falsify the documents and subsequently resigned from Novartis.

**K**.    **ASHLEY NARMOUR**

**Background**

259.    **Plaintiff Ashley Narmour** ("Ms. Narmour") was hired by Novartis in approximately June 2002 as an Account Manager in the Georgia market, which includes territories in Georgia, Alabama and Florida.  In January 2005, she began working as an Account Manager in Novartis' Southeast Market, which includes territories in Alabama, Georgia, South Carolina and Florida.  She was constructively discharged from her position in February 2005.

Ms. Narmour filed an EEO Charge in approximately April 2005, in which she complained about the gender discrimination she experienced at Novartis.

### Differential Treatment and Hostile Work Environment

260.     In 2004, Ms. Narmour began to be subjected to unreasonable scrutiny and invasive questioning when her supervisors, Ralph Booker ("Booker") and Teri Hefner ("Hefner"), learned that she was getting a divorce and would be a single mother.

261.     In November 2004, Managers Booker and Hefner made Ms. Narmour travel to Atlanta, Georgia to meet with them.  During the meeting, they interrogated Ms. Narmour about her personal life, such as whether her extended family would be able to assist her with child care and whether her husband would be making child support payments after their divorce.

262.     In January 2005, Ms. Narmour was asked to travel to Atlanta, Georgia and meet with Managers Booker and Hefner for the second time, where they again subjected her to the same invasive questions about her divorce and childcare arrangements.

263.     In January 2005, Manager Hefner became Ms. Narmour's direct supervisor. During a meeting, Manager Hefner again inquired about Ms. Narmour's childcare arrangements and the status of Ms. Narmour's divorce.

264.     After that meeting, Manager Hefner placed Ms. Narmour on a Performance Improvement Plan, despite the fact that Ms. Narmour had received a rating of "exceeded expectations" from Booker on her Annual Performance Review on January 6, 2005.  Further, Ms. Narmour's sales numbers had consistently ranked in the top three out of the ten Account Managers in her territory.

265.     Throughout January and February 2005, Manager Hefner continued to question Ms. Narmour's ability to remain committed to her career given her new status as a single mother.

Hefner also told Ms. Narmour that she would be closely watching her performance. Accordingly, Manager Hefner began to make excessive demands of Ms. Narmour, for example, requiring that she initiate the planning of extra programs on top of her regular duties, as well as submit to Manager Hefner weekly expense reports, weekly call reports, a sixty-day calendar, and then a ninety-day calendar. Further, Manager Hefner threatened to withhold Ms. Narmour's expense reimbursements if any of these extra tasks were not completed.

266.     Male employees' personal lives and their childcare arrangements and responsibilities were not subjected to scrutiny by managers.

267.     During a National Sales Meeting in Hollywood, California, Manager Hefner made hostile and offensive comments about Ms. Narmour's appearance and intelligence, for example, commenting that she must be an "airhead" because she is blonde.

268.     In February 2005, Ms. Narmour attempted to speak with Manager Hefner about her constant negative feedback and hostile treatment. When Ms. Narmour asked Hefner to stop pressuring her, Manager Hefner refused and, instead, once again commented on Ms. Narmour's status as a single mother and expressed doubt abut Ms. Narmour's ability to do her job.

269.     On or about February 24, 2005, Manager Hefner met with Ms. Narmour in her territory. During the meeting, Manager Hefner stated that she did not believe Ms. Narmour could continue to perform her job duties because she was a single mother of three children who was going through a divorce. Even though Ms. Narmour had not violated any policies and her performance remained strong, Manager Hefner told her it would be better for Novartis if Ms. Narmour resigned from her position. Manager Hefner then suggested that Ms. Narmour seek employment that would not interfere with her family obligations. Because of this pressure from Hefner, Ms. Narmour resigned from Novartis in February 2005.

## Sexual Harassment

270.    At a Nutrition National Sales Meeting in Chicago, Illinois, Market Director Jim Smith ("Smith") asked Ms. Narmour to accompany him to his hotel room.  When Ms. Narmour informed him that she was married, Market Director Smith responded that he too was married and that he did not mind if she did not mind.

271.    On another occasion, at a National Sales Meeting in Palm Springs, California, a male employee asked Ms. Narmour whether she had any form of sexual protection with her.  She later learned that his comment to her was an ongoing joke among male managers at Novartis.

## L.    CATHERINE WHITE

### Background

272.    **Plaintiff Catherine White** ("Ms. White") was hired by Novartis in approximately March 2001 as a Sales Representative in Los Angeles, California.  She became a Sales Consultant in approximately February 2003 and held that position until her constructive discharge from Novartis in June 2004.  Ms. White filed an EEO Charge in approximately March 2005, in which she complained about the gender discrimination she experienced at Novartis.

### Denials of Promotion

273.    In May 2004, Ms. White applied for a promotion to a Cardiovascular Specialty Sales position in the Southern California territory.  Even though Ms. White was highly qualified for the position, the male district manager denied her application and selected a less qualified male sales representative instead.  The male employee who received the promotion had previously left Novartis and, further, had lower sales numbers than Ms. White.

274. In 2004, Ms. White also applied for Specialty Sales promotions in Washington, D.C. and in Houston, Texas. Each time, Ms. White's applications were rejected with no explanation.

275. In 2002, after she qualified for President's Club and was awarded the prestigious International Sales Award because her sales numbers ranked in the top .5% of all sales representatives in the United States, Ms. White approached District Manager David Moatazedi ("Moatazedi") to request that he consider her for the Management Development Program ("MDP"). Completion of this program is necessary to advance into management positions at Novartis. However, District Manager Moatazedi informed Ms. White that he would not admit her into the MDP or support her interest in management training.

276. Ms. White later discovered that District Manager Moatazedi encouraged, and even pressured, less qualified male sales representatives into the MDP. Some of these male employees had not even expressed an interest in management training.

## Differential Treatment and Hostile Work Environment

277. In 2002, Ms. White's sales numbers were the highest in her district. Managers Mark Gunning ("Gunning") and Moatazedi lowered the standards for the MVP sales award in order to give it to a less qualified male sales representative who had lower sales numbers than Ms. White.

278. Manager Gunning also frequently gave credit to Ms. White's male counterpart, Dave Donner ("Donner"), for projects that Ms. White and Donner successfully completed as a team. Manager Gunning's favorable treatment of Donner was also reflected in his performance reviews, in which Manager Gunning gave Donner positive feedback for those projects. Even

though Ms. White was Donner's counterpart and had contributed equally to the projects, Manager Gunning did not include the same positive feedback in her performance reviews.

## M. KELLY CORBETT

279.    **Plaintiff Kelly Corbett** ("Ms. Corbett") was hired by Novartis in approximately May 2002 as a District Sales Manager in California. She held this position until her resignation in approximately March 2005. Ms. Corbett filed an EEO Charge in approximately April 2005, in which she complained about the gender discrimination she experienced at Novartis.

## Disparate Pay

280.    In 2004, Ms. Corbett finished the year ranked eighth out of ten district managers in her region, while two male employees, District Manager Perry Bongiani ("Bongiani") and District Manager Joseph Colonello ("Colonello"), ranked below her in the ninth and tenth spots, respectively. Ms. Kelly was also the only district manager in her region who had two sales representatives promoted to specialty positions.

281.    However, on their 2004 performance reviews, Regional Manager Dan Duhart ("Duhart") gave District Managers Bongiani and Colonello a rating of 2-2 or higher, at least 3-5% salary increases and stock options. Despite performing better than these two male employees in 2004, Ms. Corbett received a lower rating of 1-2 from Regional Manager Duhart and was denied a salary increase and stock options.

282.    Before the 2004 performance review, Ms. Corbett was never given any indication that her performance was less than satisfactory. In fact, her quarterly reviews and field reports indicated that her performance was excellent. Also, in previous years, Ms. Corbett had never received a rating below a solid 2-2.

**Differential Treatment**

283.    Because Ms. Corbett had evidence that lower performing male employees were unfairly given more favorable ratings and salary increases than she was, she put together a PowerPoint presentation to challenge her review.    Ms. Corbett then approached her new Regional Manager, Gustavo Torres ("Torres"), with the presentation.    Regional Manager Torres informed Ms. Corbett that it would take her two years to fully recover her career after the poor performance evaluation.    Conversely, when male District Manager Jim Hanson received a 1-2 rating for two consecutive years, Regional Manager Torres offered to transfer him to the better-performing Stockton District.

284.    Regional Manager Torres also told Ms. Corbett that he had taken her presentation to Pam Harris ("Harris"), the Vice President of the sales division, and to Human Resources. Novartis never adequately addressed the disparity between Ms. Corbett's 2004 performance evaluation and the evaluations of her male coworkers, and instead, Ms. Corbett was told that Vice President Harris would consider changing her rating only if she was able to improve the sales numbers in 2005 in the new geography to which she had recently been assigned.

285.    However, in addition to the fact that Ms. Corbett was new to the geography, six of her ten sales representatives were new to the division, district and/or the geography, making it nearly impossible for her to improve the district's sales numbers in a short time span.    Further, the rating that Ms. Corbett was contending as unfair should have been based on the sales numbers for 2004, not 2005.

286.    Ms. Corbett subsequently did rise in district ranking to seventh out of ten district managers in January 2005.    Even though she had been told that her rating could be changed if

her numbers improved in 2005, Ms. Corbett was never offered a change in rating. Meanwhile, District Manager Colonello remained the lowest ranking district manager in the region.

287.    In March 2005, Ms. Corbett resigned from Novartis due to the unfair treatment she received in her performance review. After she notified Regional Manager Torres of her resignation, Ms. Corbett learned from his Administrative Assistant, Lovita Brewer ("Brewer"), that Regional Manager Torres had told Brewer he was expecting Ms. Corbett's resignation.

### Sexual Harassment

288.    Regional Manager Dan Duhart ("Duhart") frequently made sexually inappropriate comments about Ms. Corbett's breasts. For example, at a meeting in January 2005, Regional Manager Duhart discussed her breasts in the presence of approximately five Novartis employees, including Ms. Corbett's sales representative, Lino Cortina. Also in January 2005, Regional Manager Duhart told Ms. Corbett that her breasts looked great in front of other Novartis employees, including another one of her sales representatives, Marina Edler ("Edler").

289.    Regional Manager Duhart also subjected other female employees to sexual harassment. For example, sales representative Edler attended a specialty division business dinner during which Regional Manager Duhart subjected her to extremely inappropriate treatment by speaking in sexually explicit terms. After this incident, Ms. Edler stated that she was not willing to attend anymore dinner functions with Regional Manager Duhart. Ms. Corbett became aware of this incident when Regional Manager Duhart was preparing to leave Novartis for a position with another company.

290.    Further, Ms. Corbett witnessed the sexually charged atmosphere at Novartis when Regional Manager Duhart gave Edler a higher raise than other employees with better performances. Even though Ms. Corbett gave Edler a 2-2 performance evaluation and

recommended an approximately 2% salary increase for her, Regional Manager Duhart retroactively increased her raise to 5.5%. It is extremely unusual for Regional Managers to change a sales representative's salary increase by such a high margin. Meanwhile, two of Ms. Corbett's other employees who had received 2-3 performance evaluations were not awarded such high raises. Because of the inappropriate manner in which Regional Manager Duhart treated Edler, Ms. Corbett believed that he determined Edler's raise based on his sexual attraction to her.

291.    Regional Manager Duhart also informed Ms. Corbett and other District Managers, in a joking manner, that a female manager with whom he had previously worked at another pharmaceutical company had filed a sexual harassment complaint against him. Upon information and belief, Regional Manager Duhart has also had a female manager at his new company complain about his unfair employment practices.

292.    Another female sales representative, Jessica Ellers, who was formerly a member of Ms. Corbett's district and later transferred to District Manager Mike Ruberio's team, was subjected to sexual harassment by District Manager Ruberio. During a ride-along with Ms. Ellers, District Manager Ruberio informed her that he had a vasectomy and, therefore, it would be safe for them to have a sexual relationship. Ms. Corbett learned of this incident only after Ms. Ellers resigned from her position at Novartis. District Manager Ruberio also left Novartis with Regional Manager Duhart and, upon information and belief, they currently work together at another company.

**N.    SUE EARL**

<u>**Background**</u>

293.    **Plaintiff Sue Earl** ("Mrs. Earl") was hired by Novartis in approximately July 1991 as a Long-term Care sales representative. She subsequently became an Acute Care

Account Manager and also served in the roles of Field Sales Trainer and member of the Market Advisory Board. Mrs. Earl worked for Novartis in New York, New Jersey and Pennsylvania. She was constructively discharged from Novartis in March 2005. Mrs. Earl filed an EEO Charge in approximately May 2005, in which she complained about the gender discrimination she experienced at Novartis.

### Denials of Promotion

294. In approximately 2002, while Mrs. Earl was working in Acute Care, Novartis created an Acute Care "Associate Director" position, in which Mrs. Earl was extremely interested. Her manager, Ken Notaro ("Notaro"), considered Mrs. Earl his leading candidate for the position. However, when Mrs. Earl interviewed with Eastern Regional Account Manager John Hawkins ("Hawkins"), he told her that he was hesitant to promote her because she was in the Pennsylvania district, which was not performing well. Mrs. Earl explained that she had been transferred to the Pennsylvania district only several months before the interview, having previously worked very successfully in the high-performing New York district. Regional Manager Hawkins nonetheless continued to object to Mrs. Earl's promotion.

295. That evening, Regional Manager Hawkins left Mrs. Earl a voicemail message stating that they had reached a decision and he had good news to share with her. When Mrs. Earl spoke with Regional Manager Hawkins, however, he informed her that a male employee, Dan Cullman ("Cullman"), received the promotion. Cullman worked in Corporate Accounts and did not have relevant experience for the position. When Mrs. Earl pointed out that Cullman lacked Acute Care knowledge, as Regional Manager Hawkins was well aware, Regional Manager Hawkins told her that he was counting on her to train Mr. Cullman in his new position.

296.     At a meeting shortly afterwards, numerous other employees joked that Mrs. Earl did not receive the promotion because she did not "have a penis."  Following this denial of promotion in 2002, Mrs. Earl continued to excel in her new district and, in fact, was ranked the top sales representative in the country in 2003.

297.     Mrs. Earl complained to Human Resources about being denied the Acute Care Associate Director promotion, but to her knowledge, Human Resources took no action in response to her complaint.

298.     In addition, when Mrs. Earl expressed her interest in a position in the Home Care division to Regional Manager Hawkins, he pointed out that the position required a great deal of travel and commented that the travel would not suit Mrs. Earl well because she had four children. Upon information and belief, managers did not prevent male employees from advancing their careers with Novartis because they had children.

**Disparate Pay**

299.     In 2002, Mrs. Earl was one of approximately four employees who received the Career Achievement Award for being an "advanced" performer who had ten or more years with the company.  At the meeting during which Mrs. Earl collected this award, Vice President Rob Harrington ("Harrington") asked her whether she noticed that she was the only female on stage.

300.     Further, at the end of 2002, Mrs. Earl's performance was rated "solid," even though she had received the Career Achievement Award for her advanced performance.  Sales representatives received ratings of "needs improvement," "solid," "advanced," or "exceptional." Had Mrs. Earl received the "advanced" rating that she clearly deserved, she would have been entitled to an additional $30,000 in commission.  However, because she was rated "solid," Mrs. Earl was denied the $30,000 commission.

301.     In 2003, Mrs. Earl was ranked the number one sales representative in the country. However, Regional Manager John Hawkins selected a lower ranking male employee as the "exceptional" performer.  As a result, this male employee received an additional $10,000 that Mrs. Earl was denied.

## Pregnancy Discrimination

302.     In approximately 1997, Mrs. Earl became pregnant.  Before her pregnancy, Mrs. Earl served the role of Field Sales Trainer.  As a Field Sales Trainer, she had greater responsibilities, including training other sales representatives, and was supposedly being groomed for management positions.  Even though the Field Sales Trainer role was supposed to be a two year rotation, Mrs. Earl was removed from the role after only one year when she became pregnant.  Mrs. Earl was prematurely removed from the role because she was going to be taking maternity leave.

303.     During Mrs. Earl's pregnancy, Vice President Harrington rode along with her. While Mrs. Earl was ready to begin working at approximately 7:30 a.m., Vice President Harrington did not arrive until approximately 8:30 a.m., at which time they began the day. During the ride along, Mrs. Earl mentioned to Vice President Harrington that she was pregnant. Harrington ended the ride along in the early afternoon, telling Mrs. Earl that he had to end the day early in order to catch a flight.  However, after the ride along, Vice President Harrington wrote a memo to management stating that he was trying to analyze why employees were not able to make five calls per day and that, after riding along with a sales representative, he determined it was because employees were starting their days late and ending early.  Because other managers inquired as to which sales representative was being referenced in Vice President Harrington's memo, Mrs. Earl's reputation was unfairly tarnished.

## Differential Treatment and Hostile Work Environment

304.     After Dan Cullman received the Acute Care Associate Director promotion that Mrs. Earl was denied, he favored male employees and subjected female employees to harsher treatment.  For example, Cullman harassed Mrs. Earl for being approximately one minute late to a meeting, even though he had shown up one and a half hours late to a meeting on another occasion.

305.     Further, because of his lack of relevant experience, Cullman was unable to competently perform his job as Acute Care Associate Director. Upon information and belief, several female employees attempted to get Cullman removed from his position due to his incompetence.

306.     In March 2005, a female candidate for a position at Novartis confided in Mrs. Earl that the male manager with whom she had interviewed inappropriately interrogated her about her personal life, for example, asking her when she planned on having children.

307.     Mrs. Earl contacted Human Resources on several occasions to complain about the discrimination she was experiencing.  After the first time she contacted Human Resources, in approximately 2002, it became common knowledge among her coworkers and managers that she had complained.  Mrs. Earl believed that she was singled out by Regional Manager Hawkins as a result of her complaint to Human Resources.  Regional Manager Hawkins made threatening comments, such as telling Mrs. Earl that she could go to Human Resources, but that Human Resources works for him.

308.     In addition, many of Mrs. Earl's female coworkers confided in her that Regional Manager Hawkins frequently touched them in a way that made them uncomfortable, including touching their hair and putting his arm around them.

### O.    JAMIE HOLLAND

<b><u>Background</u></b>

309.    **Plaintiff Jamie Holland** ("Ms. Holland") was hired by Novartis in April 2000 as a Senior Sales Consultant in Baltimore, Maryland and Washington, D.C.  In September 2001, Ms. Holland was transferred to Wilmington, Delaware to work as an Executive Sales Consultant and she continued to hold that position until her resignation in August 2004.  Ms. Holland filed an EEO Charge in approximately June 2005, in which she complained about the gender discrimination she experienced at Novartis.

<b><u>Denials of Promotion</u></b>

310.    In May 2004, Ms. Holland was denied entry into the Management Development Workshop ("MD1"), which is necessary to advance into management positions at Novartis.  Ms. Holland was told that she could not enter the June 2004 MD1 training course because of her current sales numbers.  However, her enrollment in the training had previously been based on sales numbers from 2003, during which Ms. Holland was in the top 50% of the company and received a "superior" performance rating.

311.    Upon information and belief, male sales representatives who had lower sales numbers than Ms. Holland and who did not consistently perform within the top 50% of the company were admitted into management development training.  For example, Nick Fineman, whose sales numbers were in the bottom 20% of Novartis in 2004, was allowed entry into the Management Development Program ("MDP").

312.    At a December 2003 training session in Tampa, Florida, a female sales representative, Becky Maher ("Maher"), who was attempting to complete the MDP, told Ms. Holland that she would likely not be admitted into the MDP because she had young children.

71

Maher, who also had young children, was experiencing extreme resistance from her managers about completing the MDP.

313.    In June 2004, Ms. Holland applied for a specialty sales position in Oncology, but her application was denied.    However, Adrian Hawkins, a male employee with a similar performance record to Ms. Holland, was promoted to an Oncology specialty sales position in 2004.

## Sexual Harassment

314.    Ms. Holland was routinely subjected to offensive, sexually explicit comments about women, including female employees in the district, by District Manager Brian Aiello ("Aiello").    For example, at a meeting, District Manager Aiello made sexual jokes and referenced drug use.

315.    In January 2003, District Manager Aiello discussed a recently hired female sales representative and described her physical attributes as a factor which helped in her hiring for the job at Novartis.

316.    Also, on numerous occasions, District Manager Aiello showed Ms. Holland sexually offensive material on his computer.

317.    In August 2004, Ms. Holland submitted a complaint about District Manager Aiello's conduct to Human Resources.    However, the Senior Care Human Resources Representative told Ms. Holland that no disciplinary action would be taken against District Manager Aiello unless he was physically threatening or had physically harmed Ms. Holland. Because of these requirements, Ms. Holland was unable to pursue her complaint.

## Hostile Work Environment

318.   District Manager Aiello routinely treated Ms. Holland in a degrading manner, including making hurtful comments about her weight in front of other employees.  On one occasion, District Manager Aiello joked that Ms. Holland looked as though she were nine months pregnant, even though he knew that she was not pregnant.

319.   When District Manager Aiello became angry with Ms. Holland, he made threatening comments to imply that she could lose her job with Novartis.  District Manager Aiello also made comments to Ms. Holland's customers, including doctors and their staff, about firing Ms. Holland

320.   Additionally, District Manager Aiello often bragged about terminating all of the minority employees on his sales team during his two years as the Area Sales Manager.  Moreover, he openly discussed the reasons why he fired them, for example, commenting on their stupidity.  After firing one African American female employee, District Manager Aiello told other sales representatives that the African American female employee was disgusting and black and that "her car was full of chicken bones."

321.   District Manager Aiello also complained about receiving applications from "diversity" candidates and often refused to grant them interviews.

### P.   JOAN DURKIN

## Background

322.   **Plaintiff Joan Durkin** ("Ms. Durkin") was hired by Novartis in approximately 1997 as a sales representative in North Illinois.  Ms. Durkin subsequently became a Sales Consultant, a Senior Sales Consultant, an in-house Trainer and worked in Executive Sales.  She resigned from Novartis in February 2005.  Ms. Durkin filed an EEO Charge in approximately

May 2005, in which she complained about the gender discrimination she experienced at Novartis.

### Pregnancy Discrimination

323.    Ms. Durkin took maternity leave in 2001 and 2003.  Upon returning from her maternity leave on both occasions, Ms. Durkin's supervisors harassed her about how her sales numbers had dropped while she was on leave, informed her that she was responsible for her sales numbers and stated that it did not matter that she had been out on Family Medical Leave.

324.    Upon information and belief, another female sales representative who returned from maternity leave in December 2003, at approximately the same time as Ms. Durkin, was also harassed about her sales numbers immediately upon returning.

325.    In July 2003, shortly before Ms. Durkin went out on leave for the birth of her second child, District Manager Matthew Gilke ("Gilke") began assigning her additional tasks.  In addition, in September 2003, Ms. Durkin learned that District Manager Gilke had criticized her sales performance and made inaccurate statements about her sales calls to other sales representatives during a meeting.

326.    Another female employee who had worked for District Manager Gilke, Barb Ziols ("Ziols"), informed Ms. Durkin that when Ziols was in the Management Development Program, District Manager Gilke had given her instructions on how to manage sales representatives who were planning to take maternity leave.  Specifically, District Manager Gilke explained to Ziols that the Novartis maternity leave policy is a "good deal" and that managers should put pressure on sales representatives before they go out on maternity leave to prevent them from becoming "lazy."

327.     Also in 2003, Ms. Durkin attended a meeting held by male Regional Director Conrad McCrary ("McCrary"), to which he invited a guest "motivational speaker" to speak to the sales representatives in Ms. Durkin's region about job performance and increasing sales. However, throughout his speech, Regional Director McCrary's speaker made offensive and degrading comments about women and "one night stands."  No disciplinary action was ever taken against Regional Director McCrary for this situation.

328.     From December 2003 to April 2004, Ms. Durkin worked a part-time schedule of two days per week while remaining on Family Medical Leave.  In February 2004, Ms. Durkin was asked to meet with Regional Director McCrary.  At the meeting, Regional Director McCrary pressured Ms. Durkin to return to work full-time asked her whether she remained committed to her job with Novartis.

329.     Ms. Durkin later learned that on that same day two other sales representatives, who had recently returned from maternity leave, were also asked to attend similar meetings with Regional Director McCrary in which he inquired about their commitment to their jobs.

330.     In March 2004, Ms. Durkin's new District Manager, Danielle Schneider-Falk ("Schneider-Falk"), constantly inquired about Ms. Durkin's child care arrangements.

331.     When District Manager Schneider-Falk rode along with Ms. Durkin on sales calls, her demeanor was critical, hostile, and intimidating.

332.     District Manager Schneider-Falk also demanded that Ms. Durkin attend a week-long training session in New Jersey in March 2004 and a week-long sales meeting in Las Vegas, Nevada in April 2004 even though she was still on Family Medical Leave and working a part-time schedule at that time.

333.     In May 2004, Ms. Durkin sought therapy because she was suffering from migraine headaches and anxiety as a result of the stress she was experiencing at work.

334.     In approximately June 2004, District Manager Schneider-Falk put Ms. Durkin and another female employee with children on Performance Coaching Plans, which required them to report to her on a monthly basis.

335.     Ms. Durkin's counterpart, Michelle Kintner ("Kintner"), had not taken maternity leave at Novartis, had lower sales numbers than Ms. Durkin did and, further, had not received the numerous awards and recognitions that Ms. Durkin had received.  However, upon information and belief, Kintner was never placed on a Performance Coaching Plan.

336.     In approximately January 2005, Ms. Durkin was "mis-aligned" into the Chicago North territory, which is a one and a half hour commute from her home.  Her supervisors informed her that they would not transfer her to a closer territory, and explained that if a position became available, she could then apply to be transferred.

337.     Subsequently, Ms. Durkin attempted to transfer out of the Chicago North District but was denied that opportunity.  In February 2005, Ms. Durkin resigned her position with Novartis.

### Q.     SIMONA LOPES

#### Background

338.     **Plaintiff Simona Lopes** ("Ms. Lopes") began working for Novartis in New York in approximately June 2001 as a contract employee with the company Innovex.  In April 2002, the contract between Innovex and Novartis ended and the highest-performing Innovex employees were rolled over to Novartis.  Because of her strong sales performance, Ms. Lopes became a Novartis sales representative.  She then became a sales consultant in March 2003.  Ms.

Lopes resigned from Novartis in April 2004. Ms. Lopes filed an EEO Charge in approximately May 2005, in which she complained about the gender discrimination she experienced at Novartis.

**Denials of Promotion**

339. In the summer of 2002, Ms. Lopes expressed her interest in advancing to a specialty sales position to her manager, Adrienne Savino ("Savino"), who encouraged Ms. Lopes to apply for specialty positions online.

340. Towards the end of the summer of 2002, Ms. Lopes applied for a Cardiovascular specialty sales promotion in Brooklyn, New York. Ms. Lopes was denied the promotion, even though she was already experienced in selling cardiovascular drugs, Lotrel and Diovan. Further, in 2002, Ms. Lopes had achieved constant growth, risen to the top 10% of sales representatives nationwide, and received the division's MVP award.

341. Timothy Waters ("Waters"), a male employee with fewer years of sales experience and sales numbers that were equal to or worse than Ms. Lopes' numbers, received the Cardiovascular promotion in Brooklyn. Further, Ms. Lopes was told that she was not eligible for the promotion because she had not worked for Novartis for two years. However, Waters had been rolled over to Novartis from Innovex at the same time that Ms. Lopes had, yet this time constraint did not prevent Waters from being promoted.

342. In the fall of 2002, Ms. Lopes ran into Waters at a doctor's office during a call. When she asked him how he was promoted to the Cardiovascular position even though he had also come to Novartis from Innovex in April 2002, Waters told her that Novartis had made an "exception" for him and that Regional Director Dominick DeCindio told him not to discuss the matter with anybody.

343.     In approximately August 2003, Ms. Lopes applied again for a Cardiovascular specialty sales position, and once again, she was told that she was not eligible for the promotion because of the two-year rule, even though Novartis had made an exception to this rule for a less qualified male employee.  Further, Novartis had already made Ms. Lopes a sales consultant in March 2003, which is a change in rank that is awarded to Novartis employees after they have been working for the company for two years.

344.     In approximately January 2004, Ms. Lopes applied and interviewed with a male manager, Theodore Prokou, for a Gastroenterology specialty sales position but was again denied the promotion and was told that her denial was based on the two-year rule.  A male employee, Patrick McDermott, was promoted to that position.

345.     In approximately July 2004, Ms. Lopes applied for another Cardiovascular Specialty Sales opening in the Manhattan South territory.   In August 2004, Ms. Lopes interviewed with a male manager, James Clemons ("Clemons"), for the promotion.  Not only had she officially worked for Novartis for more than two years at that time, but she also knew the territory and the cardiovascular products very well.  However, Manager Clemons rejected Ms. Lopes' application for the Cardiovascular promotion and told her that he had selected a male candidate from outside the company who was "more appropriate" for the position.

346.     After being denied this promotion, Ms. Lopes continued to excel in her sales numbers.  In November 2004, Ms. Lopes was ranked number 8 out of 126 sales representatives in the area and 111 out of 522 in the nation.

347.     In November 2004, while making business-related calls during working hours, Ms. Lopes was in a car accident in which another driver rear-ended her car.  Ms. Lopes suffered

a back injury in the accident, had to undergo surgery in December 2004, and went on disability leave until January 2005. She did not receive worker's compensation for the injury.

348. While Ms. Lopes was on leave in December 2004, she learned that Novartis underwent a realignment and that she was assigned to a new division, a new territory, a new manager and new products. While Ms. Lopes was on disability, she had to perform work-related duties, for example, taking tests to evaluate her knowledge for two of her new products.

349. In January 2005, Ms. Lopes learned that a position was open in her old division and territory. She requested to transfer to that position, because she was already familiar with the products and had relationships with the doctors, but her transfer request was denied.

350. When Ms. Lopes returned to work in January 2005, she spoke with her new manager, Andy Surtz ("Surtz"), at a district planning meeting regarding her interest in advancing to a specialty position. Although Manager Surtz initially said he would support Ms. Lopes, when she requested that Manager Surtz work with her to develop a written plan for her development, he began to treat her in a rude manner and told her that she should focus on her new products.

351. Ms. Lopes also attempted to discuss with Manager Surtz her upcoming leveling to the senior sales consultant rank, which was supposed to occur in September 2005. Even though Ms. Lopes had finished 2004 in the top 10% of all sales representatives in the nation, Manager Surtz told her that the leveling depended not only on her sales performance, but also on administrative duties, and that they would discuss it further at the end of the year.

352. In approximately February 2005, Ms. Lopes learned that the Metabolic/Bone specialty division was going to be expanded in May and would have several openings for specialty positions. Ms. Lopes submitted her resume to Executive Director Sharon Larrison ("Larrison"), Andrea Waterhouse, and Dennis Taipina and informed all of her managers,

including Manager Surtz, that she had applied. Ms. Lopes then received a voicemail message from Manager Surtz stating that he needed to speak with her. When Ms. Lopes returned Manager Surtz' phone call, he was extremely upset with her for submitting her resume and listing his name as a reference on her application without speaking with him first. Further, Manager Surtz told Ms. Lopes that she should stop seeking a promotion and focus on her current job instead. However, only one month earlier, Ms. Lopes had clearly expressed her interest in specialty sales to Manager Surtz and he had stated that he would support her.

353. Ultimately, Executive Director Larrison e-mailed Ms. Lopes and informed her that, although Larrison had put Ms. Lopes' resume on file, Novartis was seeking candidates with institutional experience for the Metabolic/Bone positions. Because Ms. Lopes' efforts to be promoted to specialty positions at Novartis had consistently been denied, she did not have institutional experience.

## Disparate Pay

354. Ms. Lopes received a lower salary than less qualified male employees. For example, she learned from a male colleague, Syed Tehsin, who had only been working in pharmaceutical sales approximately two years, that he was making a salary of approximately $63,500. In contrast, after Ms. Lopes had worked for Novartis for five years, her salary at the time that she left was only $61,200.

## Hostile Work Environment

355. In April 2003, Ms. Lopes began suffering from personal and medical problems, for which she had to go to the hospital. Her medical problems included severe depression, which was instigated by the numerous obstacles she was facing in advancing her professional career with Novartis. Ms. Lopes was on disability leave for a total of approximately 12 or 13 weeks in

2003.  Despite her time out of territory, her numbers remained strong and constant throughout the year.

356.     However, in early 2004, when Ms. Lopes met with her supervisor, Adrienne Savino ("Savino"), for her 2003 annual performance review, she only received a rating of "Meets Expectations."   Prior to that, in 2002, she had received a rating of "Exceeds Expectations." Manager Savino told Ms. Lopes that her rating was low because she had been on leave.

357.     Manager Savino also wrote in Ms. Lopes' review that she needed to notify Savino when she planned on taking a sick leave.  Ms. Lopes informed Manager Savino that she had not planned on taking leave, but rather, had to go to the emergency room due to a medical emergency.  Further, while Ms. Lopes was on leave, she had made an effort to keep Manager Savino updated on her situation.

358.     Manager Savino continued to be extremely critical of Ms. Lopes when riding along with her in the field.  On one occasion when Ms. Lopes asked Manager Savino whether she was trying to fire her, Manager Savino told Ms. Lopes that she was not, but that she was also trying to be promoted and thus had to follow her boss's directions.  Upon information and belief, Manager Savino was being pressured by and receiving directions from male Regional Director Dominick DeCindio and male Vice President Frank Arena.

359.     Ms. Lopes' new manager after the November 2004 reorganization, Manager Surtz, was also extremely critical of Ms. Lopes during ride alongs.  He constantly criticized her sales skills, assigned her "home work," and treated her as if she was a beginner in the sales industry.   Conversely, Manager Surtz was good friends with the male employees, including Paulo Nolasco and Frank Manolios, and did not treat them in such a critical manner.  Both these male employees were admitted into management development training.

360.     Further, Manager Surtz tried to pressure Ms. Lopes into breaking Novartis policy by giving samples to a doctor who was not officially part of her territory. Although this doctor wrote a lot of prescriptions for the company, he only worked in Ms. Lopes' territory one day each week, and thus, he did not appear on her computer as a doctor she could call on. Ms. Lopes refused to give in to Manager Surtz' demands because she believed that he was asking her to violate Novartis policy for which she could be fired.

361.     Because it was clear that Novartis would not allow Ms. Lopes to advance her career, she decided to search for a specialty position outside of the company. After having secured a specialty position with another pharmaceutical company, Ms. Lopes resigned from Novartis. When she was returning her company car and some other Novartis materials to Manager Surtz, he began to search through her personal belongings and bags. Manager Surtz then asked Ms. Lopes what she was stealing from Novartis. Ms. Lopes was extremely embarrassed by his rude behavior and lack of professionalism.

## R.     MARYANNE JACOBY

### Background

362.     **Plaintiff Maryanne Jacoby** ("Ms. Jacoby") was hired by Sandoz as a sales representative in San Francisco, California in approximately January 1996. Shortly after Ms. Jacoby was hired, Sandoz merged with Ciba-Geigy to become Novartis. In September 1997, Ms. Jacoby began working in Oregon and Washington. Ms. Jacoby then became a sales consultant in 1998 and a senior sales consultant in 2000. In 2001, Ms. Jacoby became a Respiratory/Dermatology specialty senior sales consultant and she continued to hold this position until her resignation from Novartis in February 2004.

## Denials of Promotional Opportunities

363.     In 2002, Ms. Jacoby requested to be considered for the Management Development Program (MDP).  The MDP training is necessary to advance into management positions at Novartis.  However, Ms. Jacoby was denied entry into the MDP and was given a variety of reasons for this denial, including that her sales numbers were not high enough and that she was not visiting enough doctors.

364.     Ms. Jacoby also often expressed to her district manager, George Bretz ("Bretz"), her interest in receiving training to prepare and lead sales meeting presentations.  These presentations are intended to help sales representatives cultivate relationships with physicians and increase their sales numbers.  However, District Manager Bretz repeatedly told Ms. Jacoby that he did not want to burden her with this training or that she did not need this experience as much as other sales representatives.  Instead, District Manager Bretz consistently chose male sales representatives to lead sales meetings and presentations.

## Disparate Pay

365.     In 2003, District Manager Bretz denied Ms. Jacoby a merit increase because he claimed that her sales numbers were low.  However, the 2002 year-end data reflected that Ms. Jacoby had an overall total year-to-date sales achievement of 126%, for which she was given a commission check.  Further, Ms. Jacoby's male counterpart, Howard Bee ("Bee"), was awarded a merit increase even though his sales numbers were comparable to Ms. Jacoby's.

## Hostile Work Environment

366.     While Ms. Jacoby was working for Bretz from 2002 until 2004, District Manager Bretz also constantly threatened and intimidated her and subjected her to hostile treatment when he rode along with her during sales calls.

367. During a telephone conference in October 2002, Ms. Jacoby complained about District Manager Bretz' behavior to his manager, Rich Burns, and to Carol Zimmerman and Chris Esposito of the Human Resources Department. However, no corrective action was taken and Ms. Jacoby continued working for District Manager Bretz.

368. In late August 2003, District Manager Bretz was physically violent, verbally abusive, and threatening towards Ms. Jacoby while riding with her in her company vehicle. District Manager Bretz' conduct traumatized Ms. Jacoby to such an extent that her physicians diagnosed her with Acute Stress Disorder, and on August 25, 2003, she went out on disability leave.

369. After this incident, Ms. Jacoby filed written documentation and had many phone conversations with Carol Zimmerman and Catherine Betts-Doherty in Human Resources, the Novartis company doctor, and District Manager Bretz's direct supervisor, John Hjorth.

370. Even though Ms. Jacoby's physicians noted that working under District Manager Bretz was a permanent restriction, Novartis refused to transfer her to another district and demanded that she continue working for Bretz.

371. District Manager Bretz routinely treated Ms. Jacoby's male coworkers favorably. Ms. Jacoby's counterpart, Howard Bee, was never subjected to the hostility and criticism to which she was subjected by District Manager Bretz. Further, in June 2002, District Manager Bretz allowed Bee, who had only been with Novartis for approximately three months, to ride along with a high ranking Xolair brand manager and to speak with him about Elidel, a drug that Ms. Jacoby was specializing in. District Manager Bretz also requested that Bee meet with one of Ms. Jacoby's clients, Dr. Baker, upon whom she had been calling for approximately one and a half years.

372.     In addition, District Manager Bretz constantly ordered Ms. Jacoby to "pick up the slack" and told her that it was not fair to make her male team members, such as Bee, Quinn Higgins, and Lloyd George, work late-night and weekend sales programs that kept them from their families.

373.     Moreover, District Manager Bretz would rarely recognize Ms. Jacoby for her sales accomplishments, and instead, often rewarded Bee and other male employees for their performance.  Specifically, District Manager Bretz consistently gave gift card awards to the male employees during sales meetings.

374.     District Manager Bretz also often asked Lloyd George ("George"), a male employee, to run meetings and presentations on the drug Lamisil, for which Ms. Jacoby was also a designated expert.  Even though Ms. Jacoby had started working for Novartis approximately six to eight months before George and they were both President's Club winners in 1997 and were both considered "Lamisil experts," District Manager Bretz always praised George for his overall job performance and considered him the sole expert for Lamisil.

375.     George was also given extra perks that Ms. Jacoby was denied.  For example, Bretz, former district manager Brad Walton and regional manager Rich Burns ("Burns") allowed George to upgrade his company car with leather seats.  District Manager Bretz also sent George and his wife to San Francisco, California for a sales convention, even after Novartis had communicated to the sales representatives that they were not allowed to work at exhibits or programs out of their territories or even out of state.

**Retaliation**

376.     Following Ms. Jacoby's initial complaint about Bretz and his behavior on the teleconference call with Regional Manager Burns and Human Resources in 2002, Ms. Jacoby

was harassed, intimidated with constant threats of being fired and subjected to degrading and demeaning comments and verbal abuse. Moreover, after her complaint, Bretz never recognized Ms. Jacoby for her work and instead regularly threatened to place her on a Performance Improvement Plan.

377. In addition, Ms. Jacoby believed that Novartis' Human Resources was wholly unsupportive and failed to take remedial action regarding her complaints.

### Sexual Harassment

378. During a teleconference, District Manager Bretz and another male employee, Quinn Higgins, made offensive remarks about a female doctor whom they had met at a physician's office, for example, discussing how they had offered to pay the doctor $5.00 to watch her turn her shirt around because she had been wearing it inside out.

### S. MARTA DEYNE

### Background

379. **Plaintiff Marta Deyne** ("Ms. Deyne") was hired by Novartis in approximately September 2000 as a Gastrointestinal specialty sales representative in New Jersey. In June 2001, Ms. Deyne was transferred to the position of Respiratory/Dermatology specialty sales representative in New Jersey. In August 2002, she was then transferred back to her previous position of Gastrointestinal specialty sales representative. In August 2004, Ms. Deyne was transferred to the Novartis Hospital Division in New York, New York as a Hospital Associate, and in September 2004, she became a Hospital Specialist in the Hospital Division in New York, New York, which is the position that she continues to hold to the present. Ms. Deyne filed an EEO Charge in approximately June 2005, in which she complained about the gender discrimination she experienced at Novartis.

## Denials of Promotions

380.     When Ms. Deyne was hired by Novartis in 2000, she told Cindy Patton ("Patton"), her manager in the Gastrointestinal Department, that she eventually wanted to become a manager at Novartis.   When Patton told Ms. Deyne that organizing district sales meetings would be a good start to begin preparing to become a manager, Ms. Deyne successfully organized a meeting in Newark, New Jersey without any assistance from her co-workers.

381.     When the Gastrointestinal team dissolved and Ms. Deyne was transferred to the Respiratory/Dermatology division in June 2001, Patton told Ms. Deyne that she would tell Ms. Deyne's new manager to place her on the management track because of her interest and determination to become a manager.

382.     Despite Ms. Deyne's success in the Gastrointestinal department, and even though she had expressed interest in management development, her new manager, Noah Puckowitz ("Puckowitz"), told Ms. Deyne that he would not be placing her in the Management Development Program ("MDP") and would not allow her to begin meeting the requirements to enroll in the MDP because she was new to his team and had yet to prove herself to him in her current position of Specialty Sales Representative.

383.     Ms. Deyne worked with Manager Puckowitz for over one year.   During that time, she achieved the number one ranking in nationwide sales for Foradil in 2001 and the number one ranking in nationwide sales for Elidel in 2002 and won several contests for her products, including the Foradil Aerolizer "Need to Grow" contest and the Foradil Launch contest in 2001. Despite her achievements, Manager Puckowitz never placed Ms. Deyne in the MDP while she was on his team.

384.    Conversely, Manager Puckowitz placed three male sales representatives in management positions.  Only one of these males had sales numbers comparable to Ms. Deyne's.  The other sales representatives had lower sales than Ms. Deyne had.

385.    In 2003, Ms. Deyne applied and interviewed for the position of Training Manager in the Sales Training department.  Despite receiving feedback from the interviewer that she did extremely well on the interview, Ms. Deyne was not offered the position.  However, two male sales representatives in Mr. Puckowitz's team were promoted into this department, one of whom had lower sales numbers than Ms. Deyne.

386.    After returning from FMLA leave in June 2003, Ms. Deyne asked her manager, Theodore Prokou ("Prokou"), whether she would be eligible for a career leveling promotion when she met the eligibility requirements during a training session in Tampa, Florida.  To be eligible for career leveling, a sales representative must possess two out of three years of strong sales and meet certain competency standards.  Ms. Deyne was about to meet these eligibility requirements.  Further, she had received numerous awards in 2002, including the President's Club and Area of the Year awards.  However, Manager Prokou responded to Ms. Deyne's inquiry by pulling Ms. Deyne out of a class and telling her that she had "some nerve" speaking to him about career development and leveling after taking Family Medical Leave.

**Disparate Pay**

387.    In 2003, after taking Family Medical Leave, Ms. Deyne received a 3% raise after being number three in nationwide sales for Zelnorm for the previous year.  However, Manager Prokou gave larger raises to the males in her division, who consistently performed at a lower level than Ms. Deyne did.

388.     Upon information and belief, Ms. Deyne also received less compensation than other similarly situated male employees.

**Pregnancy Discrimination**

389.     In June 2002, Ms. Deyne gave birth to her second child.  While she was pregnant during the spring of 2002, Manager Puckowitz instructed his entire team to be at a meeting at 7:50 a.m.  Because of morning sickness related to Ms. Deyne's pregnancy, she arrived at 7:58 a.m.  The meeting did not begin until 8:00 a.m., but everyone was told to arrive ten minutes early.  The meeting planners denied Ms. Deyne access to the meeting because she arrived eight minutes late.  Eventually, Ms. Deyne was allowed to enter the meeting room, but she had to stand up for 30 minutes because all the chairs were taken.

390.     Because Ms. Deyne still felt ill, she had to leave the meeting a few times to use the restroom.  Later that day, Manager Puckowitz pulled her out of the meeting and yelled at her. He demanded that Ms. Deyne apologize to the Regional Director of Sales, Rob Tallman, and to the Vice President, Vince Ippolito, who had been directing the meeting.

**Differential Treatment and Hostile Work Environment**

391.     Manager Prokou then did a very rude imitation of the way Ms. Deyne spoke and stood, which she found very offensive.  He then told Ms. Deyne that she needed to demonstrate that she could manage her life before she could think about career or management development. Manager Prokou told Ms. Deyne this even though, in August 2002, he had told her that he would continue to prepare her for management by helping her to meet the requirements for enrollment in the MDP.

392.     In approximately July 2003, Manager Prokou also humiliated Ms. Deyne during a training session with her team.  In confidence, Ms. Deyne had told Manager Prokou that she was

in the midst of a divorce. During a role playing session where Ms. Deyne was playing the doctor and her male co-worker was playing the role of a sales representative, Manager Prokou instructed her co-worker that he should have used the strategy of telling Ms. Deyne that she was looking good and that it looked as if she had lost a lot of weight and asking her on a date because she recently had become single. Before Manager Prokou's disclosure, some of Ms. Deyne's co-workers were unaware that she was divorcing her husband. Further, during his instruction, Manager Prokou again imitated Ms. Deyne by placing his hands on his hips and shaking his body in front of her entire team.

393. Manager Prokou frequently imitated Ms. Deyne in this manner which was extremely insulting.

394. Also in 2003, Mr. Prokou selected Ms. Deyne as the best Gastrointestinal specialty sales representative to represent the task force in a ride along with Thomas Ebeling ("Ebeling"), the Chief Executive Officer of Novartis Pharma AG and Head of the worldwide Pharmaceuticals Division. While in a physician's waiting room, CEO Ebeling commented that the females in the Zelnorm visual aid were unattractive and that the Novartis brand team could have "done better." Ms. Deyne was offended by this comment. After the ride along, Manager Prokou congratulated Ms. Deyne for her successful visit with CEO Ebeling.

395. In February 2004, Manager Prokou arranged for Ms. Deyne to complete the final requirement to be placed into the Management Development Program (MDP), which was a field ride with Executive Director John Mandella ("Mandella"). Executive Director Mandella wrote a positive evaluation of Ms. Deyne's performance during the ride along.

396. Soon after this positive evaluation, Manager Prokou subjected Ms. Deyne to sharper criticism than male coworkers in her team. He also required that she submit a weekly

summary of the work that she accomplished each week and threatened that he would place her on a Performance Improvement Plan (PIP).

397.    In April 2004, Manager Prokou accompanied Ms. Deyne on a ride along to the office of one of her clients, Dr. Port.  At Dr. Port's office, a new staff member, whom Ms. Deyne did not know, greeted them.  She told Ms. Deyne that she could meet with Dr. Port in a few minutes.  While Manager Prokou and Ms. Deyne were waiting, Manager Prokou yelled at her and told her that she did not know Dr. Port or this office, accused her of falsifying her summaries and called her a liar.  In fact, Ms. Deyne had a good relationship with Dr. Port's staff and had successfully initiated Dr. Port's training as a physician in the Speakers Bureau for Zelnorm.  As a result of Manager Prokou's outburst, Ms. Deyne and Manager Prokou left the office without meeting with Dr. Port.

## COUNT I
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-5(f), *et seq.*, AS AMENDED

### GENDER DISCRIMINATION
### (Against the Corporate Defendants)

398.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

399.    Novartis has discriminated against the Class Representatives and all members of the proposed class by treating them differently from and less preferably than similarly situated male employees and by subjecting them to discriminatory denials of promotions, discriminatory denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate pay, disparate terms and conditions of employment, harassment, hostile work environments and other forms of discrimination in violation of Title VII.

400. Novartis' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class.

401. As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

402. Novartis' policies, practices and/or procedures have produced a disparate impact against the Class Representatives and the class members with respect to their terms and conditions of employment.

403. By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

404. By reason of the discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

<u>COUNT II</u>
**VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000(e)** *et seq.*

**SEXUAL HARASSMENT**
**(Against the Corporate Defendants)**

405. Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

406. Novartis has discriminated against Class Representatives and all the members of the proposed class by permitting an ongoing, severe and pervasive pattern and practice of sexual harassment against a class of female employees by creating and maintaining a sexually hostile work environment, in violation of Title VII.

407. Novartis' sexual harassment altered the Class Representatives' and class members' conditions of employment by creating an abusive working environment for them.

408. Novartis' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class.

409. As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

410. By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

411. By reason of the sexual harassment suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

## COUNT III
## VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e(k) *et seq.*

### PREGNANCY DISCRIMINATION
### (Against the Corporate Defendants)

412.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

413.     Novartis discriminated against the Class Representatives and the members of the proposed class because of or on the basis of pregnancy, childbirth, or related medical conditions.

414.     The Class Representatives and the members of the proposed class were not treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

415.     Novartis' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class.

416.     As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

417.     By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

418.     By reason of the pregnancy discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to legal and equitable remedies available under Title VII.

**COUNT IV**
**VIOLATIONS OF TITLE VII, 28 U.S.C. § 2000e(k)**

**RETALIATION**
**(Against the Corporate Defendants)**

419.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

420.     Novartis retaliated against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sexual harassment, gender discrimination and pregnancy discrimination and also because they complained about sexual harassment, gender discrimination and pregnancy discrimination.

421.     Novartis retaliated against the Class Representatives and the members of the proposed class by subjecting them to adverse employment actions, including but not limited to, denying them promotions for which they were qualified and subjecting them to disparate terms and conditions of employment, gender discrimination, sexual harassment, a hostile work environment and/or other forms of discrimination in violation of Title VII.

422.     Novartis' actions were intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of causing harm to the Class Representatives and the members of the proposed class.

423.     As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

424.     By reason of the retaliation suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

## COUNT V
## VIOLATIONS OF N.Y. EXEC. LAW § 296

### GENDER DISCRIMINATION
### (Against the Corporate Defendants)

425.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

426.    Because of their gender, Novartis discriminated against the Class Representatives and the members of the proposed class in compensation or in the terms, conditions or privileges of their employment, in violation of New York Executive Law § 296.

427.    Because of their gender, Novartis also denied or withheld from the Class Representatives and the members of the proposed class their right to be admitted to or participate in an on-the-job training program, executive training program and/or management training program in violation of New York Executive Law § 296.

428.    Novartis further discriminated against the Class Representatives and the members of the proposed class in their pursuit of such programs and discriminated against them in the terms, conditions or privileges of such programs because of gender, in violation of New York Executive Law § 296.

429.    As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

430.    By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and the members of the proposed class are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

431.     By reason of the gender discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

**COUNT VI**
**VIOLATIONS OF N.Y. EXEC. LAW § 296**

**SEXUAL HARASSMENT**
**(Against the Corporate Defendants)**

432.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

433.     Novartis discriminated against the Class Representatives and the members of the proposed class by permitting an ongoing and pervasive pattern and practice of sexual harassment against Plaintiff by creating and maintaining a sexually hostile work environment, in violation of New York Executive Law § 296.

434.     Novartis' sexual harassment altered the Class Representatives' and class members' conditions of employment by creating an abusive working environment for them.

435.     As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

436.     By reason of the sexual harassment suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

## COUNT VII
## VIOLATIONS OF N.Y. EXEC. LAW § 296

### RETALIATION
### (Against the Corporate Defendants)

437.     Class Representatives re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

438.     In violation of New York Executive Law § 296, Novartis discharged, expelled and otherwise discriminated against the Class Representatives and the members of the proposed class because they opposed practices forbidden by New York Executive Law § 296 or because they filed a complaint, testified or assisted in a proceeding under New York Executive Law § 296.

439.     As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

440.     By reason of the sexual harassment suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

### COUNT VIII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against the Corporate Defendants)

441.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

442.     While employed at Novartis, the Class Representatives and the members of the proposed class suffered intentional infliction of emotional distress at the hands of Defendants.

443. Novartis' actions constitute conduct so extreme and outrageous in degree and character as to go beyond all possible bounds of decency.

444. Novartis' actions can be regarded as atrocious and utterly intolerable in a civilized community.

445. As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

446. By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

447. By reason of the gender discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to legal and equitable remedies.

## <u>COUNT IX</u>
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (Against the Corporate Defendants)

448. Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

449. Novartis' negligence caused the Class Representatives and the members of the proposed class to suffer emotional distress.

450. Novartis owed a duty to the Class Representatives and the members of the proposed class.

451. Novartis breached this duty and either unreasonably endangered the physical safety of the Class Representatives and the members of the proposed class, or caused the Class Representatives and the members of the proposed class to fear for their own safety.

452. Novartis' actions constitute conduct so extreme and outrageous in degree and character as to go beyond all possible bounds of decency.

453. Novartis' actions can be regarded as atrocious and utterly intolerable in a civilized community.

454. As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

455. By reason of the continuous nature of Novartis' discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

456. By reason of the gender discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to legal and equitable remedies.

### COUNT X
### NEGLIGENT HIRING, RETENTION, AND SUPERVISION
#### (Against the Corporate Defendants)

457. Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

458. As a result of direct negligence on the part of Novartis, the Class Representatives and the members of the proposed class experienced emotional distress.

459. Novartis placed its employees in a position to cause foreseeable harm, harm which the Class Representatives and the members of the proposed class most probably would have been spared had Novartis taken reasonable care in making its decision concerning the hiring and retention of the employee.

460. Novartis knew, or should have known, of its employees' propensity for the sort of conduct which caused the injuries of the Class Representatives and the members of the proposed class.

461. As a direct and proximate result of Novartis' aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

462. By reason of the gender discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to legal and equitable remedies.

<u>COUNT XI</u>
**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-5(f),** *et seq.*, **AS AMENDED**

**GENDER DISCRIMINATION**
**(Against Thomas Ebeling)**

463. Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

464. In his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling has discriminated against the Class Representatives and all members of the proposed class by treating them differently from and less preferably than similarly situated male employees. Ebeling has aided and abetted discriminatory denials of

promotions, discriminatory denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate pay, disparate terms and conditions of employment, harassment, hostile work environments and other forms of discrimination in violation of Title VII.

465.     In his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling's implementation of policies, practices and/or procedures has produced a disparate impact against the Class Representatives and the class members with respect to their terms and conditions of employment.

466.     As a direct and proximate result of Ebeling's aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

467.     By reason of the continuous nature of Ebeling's discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

468.     By reason of the discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

**VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000(e)** *et seq.*

**SEXUAL HARASSMENT**
**(Against Thomas Ebeling)**

469.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

470.     In his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling has discriminated against Class Representatives and all the members of the proposed class by permitting an ongoing, severe and pervasive pattern and practice of sexual harassment against a class of female employees and by permitting a sexually hostile work environment, in violation of Title VII.

471.     As a direct and proximate result of Ebeling's aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

472.     By reason of the continuous nature of Ebeling's discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

473.     By reason of the sexual harassment suffered at Novartis, Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

## COUNT XIII
## VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e(k) *et seq.*

## PREGNANCY DISCRIMINATION
### (Against Thomas Ebeling)

474.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

475.    In his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling discriminated against the Class Representatives and the members of the proposed class because of or on the basis of pregnancy, childbirth, or related medical conditions.

476.    Ebeling knew or should have known that the Corporate Defendants were discriminating against pregnant female employees; denying such employees pay, promotions and bonuses; and retaliating against Novartis' pregnant employees.  Ebeling did nothing and/or encouraged the oppressive conduct to continue by taking no action.

477.    As a direct and proximate result of Ebeling's aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

478.    By reason of the pregnancy discrimination suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to legal and equitable remedies available under Title VII.

<strong><u>COUNT XIV</u></strong>
<strong>VIOLATIONS OF 28 U.S.C. § 2000e(k)</strong>

<strong>RETALIATION</strong>
<strong>(Against Thomas Ebeling)</strong>

479.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

480.     In his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling aided and abetted the corporate defendants' retaliation against the Class Representatives and the members of the proposed class because they insisted upon a work environment free of sexual harassment, gender discrimination and pregnancy discrimination and also because they complained about sexual harassment, gender discrimination and pregnancy discrimination.

481.     In his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling permitted and/or encouraged retaliation against the Class Representatives and the members of the proposed class by subjecting them to adverse employment actions, including but not limited to, denying them promotions for which they were qualified and subjecting them to disparate terms and conditions of employment, gender discrimination, sexual harassment, a hostile work environment, and/or other forms of discrimination in violation of Title VII.

482.     As a direct and proximate result of Ebeling's aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

483. By reason of the retaliation suffered at Novartis, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

**COUNT XV**
**VIOLATIONS OF N.Y. EXEC. LAW § 296, SUBDIVISION 6**

**GENDER DISCRIMINATION**
**(Aiding and Abetting Liability Against Thomas Ebeling)**

484. Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

485. Because of their sex, Novartis discriminated against the Class Representatives and the members of the proposed class in compensation or in the terms, conditions or privileges of their employment, in violation of New York Executive Law § 296.

486. Because of their sex, Novartis also denied or withheld from the Class Representatives and the members of the proposed class their right to be admitted to or participate in an on-the-job training program or executive training program, in violation of New York Executive Law § 296.

487. Novartis further discriminated against the Class Representatives and the members of the proposed class in their pursuit of such programs and discriminated against them in the terms, conditions or privileges of such programs because of sex, in violation of New York Executive Law § 296.

488. As previously described, in his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling possesses knowledge, control and decision-making authority regarding the employment practices of Corporate Defendants Novartis

Corporation and Novartis Pharmaceuticals Corporation. Ebeling controls and influences whether the two Corporate Defendants engage in gender-discrimination, sexual harassment and retaliation against their female employees.

489.     Far from preventing or rectifying gender discrimination committed by the U.S. Corporate defendants, Ebeling aided, abetted and encouraged such discriminatory conduct.

490.     As a direct and proximate result of Ebeling's aiding and abetting conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

491.     By reason of the continuous nature of Ebeling's discriminatory conduct, persistent throughout the employment of the Class Representatives and class members, the Class Representatives and the members of the proposed class are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

492.     By reason of the gender discrimination which Ebeling aided and abetted, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

<u>**COUNT XVI**</u>
**VIOLATIONS OF N.Y. EXEC. LAW § 296, SUBDIVISION 6**

**SEXUAL HARASSMENT**
**(Aiding and Abetting Liability Against Thomas Ebeling)**

493.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

494.     Novartis discriminated against the Class Representatives and the members of the proposed class by permitting an ongoing and pervasive pattern and practice of sexual harassment

against Plaintiff by creating and maintaining a sexually hostile work environment, in violation of New York Executive Law § 296.

495.    Novartis' sexual harassment altered the Class Representatives' and class members' conditions of employment by creating an abusive working environment for them.

496.    As previously described, in his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling possesses knowledge, control and decision-making authority regarding the employment practices of Corporate Defendants Novartis Corporation and Novartis Pharmaceuticals Corporation. Ebeling controls and influences whether the two Corporate Defendants engage in gender-discrimination, sexual harassment and retaliation against their female employees.

497.    As a direct and proximate result of Ebeling's aiding and abetting aforementioned conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

498.    By reason of the sexual harassment suffered at Novartis, which Ebeling aided and abetted, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

## COUNT XVII
## VIOLATIONS OF N.Y. EXEC. LAW § 296, SUBDIVISION 6

### RETALIATION
### (Aiding and Abetting Liability Against Thomas Ebeling)

499.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

500.     In violation of New York Executive Law § 296, Novartis discharged, expelled and otherwise discriminated against the Class Representatives and the members of the proposed class because they opposed practices forbidden by New York Executive Law § 296 or because they filed a complaint, testified or assisted in a proceeding under New York Executive Law § 296.

501.     As previously described, in his capacities as Head of worldwide Pharmaceuticals Division, member of the Executive Committee of Novartis and member of the Board of Directors of Novartis Pharmaceuticals Corporation, Ebeling possesses knowledge, control and decision-making authority regarding the employment practices of Corporate Defendants Novartis Corporation and Novartis Pharmaceuticals Corporation. Ebeling controls and influences whether the two Corporate Defendants engage in gender-discrimination, sexual harassment and retaliation against their female employees.

502.     Ebeling was aware of, or should have known that the U.S. corporate defendants were retaliating against women employees who were exercising their rights and complaining about gender discrimination at Novartis' United States facilities.

503.     As a direct and proximate result of Ebeling's aiding and abetting conduct, the Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

504.     By reason of the sexual harassment suffered at Novartis which Ebeling aided and abetted, the Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

# PRAYER FOR RELIEF

WHEREFORE, the Class Representatives, on behalf of themselves and the members of the class whom they seek to represent, request the following relief:

A.      Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), on behalf of the proposed plaintiff class, and designation of the proposed Class Representatives as representatives of this class and their counsel of record as class counsel;

B.      Declaratory judgment that Novartis' employment policies, practices and/or procedures challenged herein are illegal and in violation of Title VII;

C.      A permanent injunction against Novartis and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination by the Defendants as set forth herein;

D.      An Order requiring Novartis to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

E.      An Order requiring Novartis to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner;

F.      An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (D) through (E) above, which would provide for (i)

monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (D) through (E) above;

G.    An Order placing or restoring the Class Representatives and the class members into those jobs they would now be occupying but for Novartis' discriminatory policies, practices and/or procedures;

H.    An Order directing Novartis to adjust the wage rates and benefits for the Class Representatives and the class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures;

I.    An award of back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits suffered by the Class Representatives and the class members to be determined at trial;

J.    Any other appropriate equitable relief to which the Class Representatives and proposed class members are entitled;

K.    An award of compensatory, nominal and punitive damages to Class Representatives and the class in an amount not less than 200 million dollars;

L.    An award of litigation costs and expenses, including reasonable attorneys' fees, to the Class Representatives and class members;

M.    Pre-judgment interest;

N.    Such other and further relief as the Court may deem just and proper; and

O.    Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendants have remedied the practices, policies and/or procedures complained of herein and are determined to be in full compliance with the law.

## DEMAND FOR JURY

Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 10th day of March, 2006

_Lisa Goldblatt_

Jeremy Heisler, (JH-0145)
Steven Wittels, (SLW-8110)
**SANFORD, WITTELS & HEISLER, LLP**
545 Fifth Avenue
Suite 960
New York, NY 10017
Telephone: (646) 456-5695
Facsimile: (646) 723-2948

David Sanford, D.C. Bar No. 457933
Lisa Goldblatt, D.C. Bar No. 456187
**SANFORD, WITTELS & HEISLER, LLP**
2121 K Street, N.W.
Suite 700
Washington, D.C. 20037
Telephone: (202) 942-9124
Facsimile:  (202) 628-8189

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
2121 K Street, N.W.
Suite 700
Washington, D.C. 20037
Telephone: (202) 661-3510
Facsimile:  (202) 628-8189

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by facsimile and electronic means on this 10th day of March, 2006 upon the following counsel of record:

Mr. Dick Schnadig, Esq.
**VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.**
222 North LaSalle Street
Chicago, IL 60601

Mr. Jonathan A. Wexler, Esq.
**VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.**
805 Third Avenue
Suite 2200
New York, NY 10022

Mr. Vincent R. Fitzpatrick, Jr., Esq.
Ms. Heather K. McDevitt, Esq.
Mr. Jack E. Pace, Esq.
**WHITE & CASE, LLP**
1155 Avenue of the Americas
New York, NY 10036

Lisa A. Goldblatt