UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___2|25|10___
```

———————————————————————x

AMY VELEZ, et al., Individually and on Behalf
of Others Similarly Situated,

        Plaintiffs,

    -against-

NOVARTIS PHARMACEUTICALS
CORPORATION,

        Defendant.

———————————————————————x

04 Civ. 9194 (CM)

## RULINGS ON MOTIONS IN LIMINE

McMahon, J.:

    The Court, for its rulings on the motions in limine:

**Plaintiffs' Motions**

    1.  Plaintiffs' motion to preclude defendant from offering evidence or argument about witnesses' involvement in unrelated lawsuits is GRANTED insofar as it relates to witnesses Stark and Corbett (as to them the motion is unopposed), and is GRANTED IN PART AND DENIED IN PART as to witness Salame. Salame argued to defendant during her employment that losing a lawsuit was one reason why she suffered from certain performance problems during the first four months of 2002. The May 29, 2002 email in which Salame discussed the lawsuit has been designated as a plaintiffs' trial exhibit (PX 526). It is perfectly acceptable for defendant to ask her about the email. The Court reserves the right to circumscribe questioning about the lawsuit if it goes on too long or becomes too detailed. The only relevant issue is why the lawsuit impacted Salame's performance—not what the lawsuit was about.

    2.  Plaintiffs' motion to preclude defendant from offering after-acquired evidence about several plaintiffs' admitted violations of company policy—violations of which Novartis was unaware until after these plaintiffs were fired—is GRANTED on the condition that plaintiffs stipulate that these class members are only entitled to back pay from the date they left the company to the date Novartis discovered their violations, and that these class members are not entitled to front pay. If plaintiffs so stipulate, either in writing or on the record, no questions may be asked about after-acquired evidence for any purpose whatsoever. Defendant need not consent to the stipulation required by this ruling for it to be effective.

3.  Plaintiffs' motion to preclude evidence about class member Terri Kelly's family and medical history is DENIED. For reasons best known to them, plaintiffs' counsel have refused to provide the Court with the evidence they seek to preclude—even for *in camera* inspection—so the Court cannot evaluate the evidence and determine whether or not it is admissible. It was incumbent on plaintiffs' counsel to explain to the Court precisely what evidence and questioning they sought to preclude. The suggestion that defendant should provide the Court with its proposed impeachment evidence so that the Court can inspect that evidence *in camera* is absurd; this is plaintiffs' motion, and it is not defendant's burden to produce its impeachment evidence so plaintiffs can decide whether or not they wish to challenge it. Nor is the Court required to accept plaintiffs' representation that any and all evidence about Ms. Kelly's family or medical history is irrelevant to the case simply because she is no longer seeking damages for emotional distress. It is entirely possible that there is some relevance to some or all of this evidence. By failing to provide the evidence they seek to preclude, plaintiffs have forfeited the opportunity to obtain a ruling in limine on this subject.

4.  Plaintiffs' motion to preclude defendant from offering evidence or making argument about statements made to prospective employers is DENIED.

5.  Plaintiffs' motion to preclude the testimony of Dr. Kevin Murphy is DENIED. Although defendant's counsel should have brought its situation to the Court's attention much sooner, plaintiffs' intransigence, given the circumstances, is about the most unprofessional behavior the Court has ever had the displeasure to witness.

After I took over this case from Judge Lynch, I did indeed make it perfectly clear, not once but twice, that any expert witness in rebuttal to plaintiffs' belatedly designated expert, Dr. Outtz, had to be identified, and had to submit an expert report, no later than December 31, 2009. Novartis retained a rebuttal expert (Dr. Landy) in December 2009 and timely advised plaintiffs' counsel who that expert would be. However, Novartis did not submit an expert report when it designated the expert. It had an understanding that Dr. Landy would create such a report prior to the end of 2009. Counsel contacted Dr. Landy looking for the report as late as December 28, and Dr. Landy promised that the report would be ready by the end of the year. It was never delivered.

It was not until January 4 that Dr. Landy advised defendant's counsel that he was dying and could not complete his assignment. Dr. Landy recommended that Dr. Kevin Murphy be substituted in his stead. Dr. Landy has since died.

I appreciate that defendant's counsel tried to work out this completely unforeseeable mess with plaintiffs' counsel rather than coming immediately to the Court. That was the *professional* thing to do. Plaintiffs' counsel's response to this situation was to try to take advantage of something that could not possibly have been the fault of defendant's counsel. Their conduct would be the antithesis of *professional* in any circumstance, but I find it particularly troubling in light of the fact that this Court was under no obligation to bend the rules and accept *plaintiffs'* belated designation of an expert. Having been shown mercy by the Court (over defendant's strenuous objection), it would seem that plaintiffs' counsel might extend some consideration to their opponents (who are also their professional colleagues), who found themselves in a difficult situation through no fault of their own. Not only did plaintiffs' counsel

*not* offer the mercy that they were shown by the Court, they compounded their unprofessional behavior by submitting a motion seeking to sanction defendant for failing to provide an expert report on time! This is the height of chutzpah as far as I am concerned.[1]

As I said, I do wish defendant's counsel had contacted me earlier about this issue, but now that I am aware of it, I excuse Novartis from compliance with the December 31, 2009 deadline for submission of expert reports, due to circumstances that were entirely beyond its control.

Dr. Murphy's testimony is not excludable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), for the reasons cited in defendant's brief in opposition to the motion. As long as Dr. Outtz testifies, Dr. Murphy will be allowed to testify.

While it is tempting to express my displeasure by denying plaintiffs a deposition of Dr. Murphy, I will not do that. Instead, Dr. Murphy may submit a supplemental report within two weeks. Defendant's counsel were so eager to move quickly once Dr. Landy bowed out that Dr. Murphy cannot possibly have had time to do his job to his personal and professional satisfaction. Plaintiffs may then depose Dr. Murphy at any time prior to trial that proves convenient for Dr. Murphy. No matter the result of this case after trial, plaintiffs' counsel will bear their own costs for this deposition.

6.  Plaintiffs' motion to preclude a "missing witness" argument or charge if plaintiffs do not call every class member or class representative is GRANTED. This ruling is undergirded by a combination of time limits set by the Court, a desire to avoid cumulative testimony and the ability of defendant to use its own time to call (by subpoena or by deposition) whatever class members it desires—an opportunity I am sure defendant would take advantage of if it actually had a good-faith basis to believe these so-called "missing witnesses" would testify in a manner helpful to it. The purportedly "fair" comment that defendant seeks to make would actually be manifestly unfair, given the trial rules set by the Court. Indeed, if defendant made its "missing witness" argument, I would have to explain to the jury that, because I set time limits on the parties' presentations, the inference defendant had asked them to draw was utterly unwarranted.

7.  Plaintiffs' motion to preclude evidence or argument about the internal investigations of Barbara Stark and Terri Kelly is GRANTED IN PART AND DENIED IN PART.

Because Novartis' own investigation failed to substantiate claims that Stark had made certain comments (set forth at the bottom of the first page of defendant's brief in opposition to plaintiffs' motion), Novartis may not make reference to these comments or to the fact that it investigated Stark—unless plaintiffs argue that Novartis fails to examine complaints of

---

[1] When I read the briefs on this motion, I was reminded of a story, although I did not immediately recall its source. In the story, a rich man had an employee who owed him a lot of money. The employee begged for a little extra time and got much more—the rich man forgave the debt! The next day, the duly forgiven employee went out to collect some debts owed to him. When those folks pleaded for a little extra time, he not only refused to extend their deadlines, but had them thrown into debtors' prison! It did seem an aptly parallel story, and I thought I should give credit to the author. A little research revealed that the story is the so-called Parable of the Unjust Servant, found in the Gospel of Matthew, chapter 18, verses 21-35. I commend it to the attention of plaintiffs' counsel; like the best of Aesop's fables, it is a small literary gem with a punch line that punches.

discrimination. If they do, Novartis may ask Stark whether she herself was accused of potentially discriminatory or harassing conduct in 2007 and 2008 (without identifying the conduct), whether Novartis investigated that accusation, and what the result of that investigation was (the accusation was not substantiated; no discipline occurred). That is relevant to any claim that Novartis routinely turned a blind eye to complaints about sexually harassing behavior. Otherwise, the subject is off limits.

The second investigation into Stark's conduct, which is described at the top of page 2 of defendant's brief, and which resulted in a substantiation of several of the claims asserted against her and a decision to fire her (which was not implemented because Stark quit), is clearly relevant to the issues in this litigation and can be the subject of inquiry. Whether Stark knew that Novartis had substantiated claims made against her and decided to fire her is irrelevant; nor is the issue strictly one of Stark's credibility, as defendant incorrectly argues. It is whether the evidence admits of inferences that this particular female plaintiff was not offended by sexually suggestive comments, such that she would find such conduct to qualify as "sexual harassment."

Plaintiffs' motion insofar as it relates to Terri Kelly is granted on consent, but only on the condition that Kelly does not offer *any* testimony about her employment after the departure of Maurice Oswell as her supervisor as of August 2007. I agree with Novartis that plaintiffs cannot "cherry pick" which evidence about post-class period conduct she may offer. If Kelly testifies about that period, Novartis may offer evidence and argument about the various 2009 and 2010 incidents that are the subject of this motion.

Plaintiffs may not add any exhibits to their exhibit list, good cause having not been shown for adding these exhibits to the list. Indeed, I did not understand plaintiffs to have moved for permission to add exhibits to their list.

8.  Plaintiffs' motion to preclude cross-examination or argument about any claims that class representative Kelly Corbett thought about bringing but never brought is GRANTED. However, the motion is DENIED insofar as it seeks to preclude questioning about claims that Corbett originally asserted and later dropped. Class representative Corbett brought a claim of sexual harassment by her supervisor, Roland Duhart; the charge appears both in her EEOC charge and in the Fourth Amended Complaint, and Corbett testified about it at her deposition. Dropping a claim once asserted gives rise to classic credibility cross-examination and the Court will not preclude it—as to Corbett, or as to any witness who fails to follow through on a charge that was originally asserted in the complaints to the EEOC and to this Court.

It should not be necessary to call witnesses to rebut the accusations of sexual harassment if Corbett testifies that she is not pursuing those accusations. However, if Corbett continues to tie her claim of pay discrimination to alleged harassment by Duhart, the witnesses may be called to rebut the claim.

9.  Plaintiffs' motion to preclude defendant from offering evidence or making arguments about "irrelevant personal information" solicited by Novartis during deposition testimony of plaintiffs' witnesses has not been opposed. The instances of such testimony cited at page 2 of plaintiffs' brief in support of their motion are certainly irrelevant, with one exception: Jamie

4

Holland's internet postings about this lawsuit are a fair subject for questioning and comment. Indeed, the Court needs to know whether there are any other blogs or internet postings out there relating to this case, because of the need to head off juror "research" into the case on the internet.

10. Plaintiffs' motion to preclude the introduction of unverified interrogatory responses, which is (properly) unopposed, is GRANTED.

## Defendant's Motions

1. Defendant's motion to exclude evidence and testimony about events that allegedly occurred after the close of the class period is DENIED, for the reasons set forth in plaintiffs' brief in opposition.

2. Defendant's motion to exclude evidence regarding discrimination claims by non-class members against Simmons and Duhart, and concerning an assault claim lodged against Joe Colonello, is moot, in view of plaintiffs' representation that they do not intend to introduce such testimony.

3. Defendant's motion to exclude evidence concerning alleged harassment by one Bob Lloyd is DENIED. See Ostrowski v. Atl. Mut. Ins. Cos., 968 F. 2d 171, 182 (2d Cir. 1992).

4. Defendant's motion to exclude evidence regarding the sexual assault perpetrated on Marjorie Salame by Dr. Edwin Colon after a company golf outing is DENIED. The gravamen of Salame's claim is that she was removed from consideration for a management position after she was assaulted—an incident she reported to Novartis management, whereupon she was accused of "bringing the assault on herself." Her claim would be meaningless if she were not allowed to testify about the incident, since her claim is that her career advancement derailed after the assault, and that nothing else occurred to cause Novartis to change its opinion of her. However, there is no need for Ms. Salame to go into a great deal of detail about what happened during the assault; it is sufficient for her to testify that Dr. Colon touched her offensively and exposed himself to her. The graphic details of the sexual assault do NOT implicate the credibility of proposed witness Simmons.

5. Defendant's motion to exclude "unfounded" evidence regarding the response of the Novartis Human Resources Department to complaints is DENIED. The evidence to which defendant refers is admissible for the limited purpose of proving the witnesses' state of mind. A limiting instruction is all that is needed to explain to the jury why the evidence is being introduced; the jurors will be told that the evidence is offered only to prove the plaintiffs' state of mind, and that it is specifically not any evidence of how Novartis actually responded to complaints.

6. Defendant's motion to exclude evidence of alleged discrimination other than certified class claims is GRANTED. This case is complicated enough—and lengthy enough—without adding evidence about collateral forms of discrimination to which the members of the class were not subjected. The Court has to draw the line somewhere. Evidence relating to gender discrimination can be introduced. Evidence relating to other forms of discrimination cannot. The

culture that must be proved is a culture of gender discrimination. However, if a plaintiff is both a female and an African American (to take one example), evidence about what happened to her may be admitted even if it exposes discrimination other than gender-based discrimination. With regard to the issue of management's response (or lack of response) to complaints about discrimination generally, plaintiffs can ask questions designed to elicit general answers about management's reputation for failing to respond to complaints without eliciting details about complaints that do not relate to gender discrimination.

7. Defendant's motion to exclude evidence concerning internal complaints of discrimination, harassment or hostile work environment made by non-testifying witnesses is DENIED. In limine motions are not an appropriate vehicle to obtain rulings on particular pieces of evidence that may be admissible for limited purposes or that are exceptions to the hearsay rule. That is why we are having a final pre-trial conference. All objections to exhibits will be thrashed out at that time (which is why the Court has allowed two days for the conference). The parties should be prepared to explain why challenged exhibits are admissible as business records. The purpose of this exercise is to assist the parties in complying with the time limits set by the Court. The parties should be prepared to argue any challenge to the admissibility of a document at the final pre-trial conference.

8. Defendant's motion to exclude hearsay and evidence lacking in foundation is yet another example of the improper use of in limine motions and is DENIED. If a witness is asked for hearsay testimony, an attorney representing Novartis should stand up and object, and the Court will rule. I remind the parties that they are on the clock, and every time they get up to object the clock will run.

9. Defendant's motion to exclude evidence of defendant's financial condition or size is DENIED. The Court has already ruled that the trial will not be bifurcated. However, the Court has heard no evidence, so no decision has been made about whether the Court will submit the issue of punitive damages to the jury. Only after a decision is reached on this issue will evidence about Novartis' net worth be admitted.

10. Defendant has moved to exclude plaintiffs' experts from testifying. The motions are disposed of below.

(a) OUTTZ: Defendant's motion to preclude the testimony of Dr. James L. Outtz is DENIED. Dr. Outtz is an Industrial-Organizational Psychologist, with a specialization in "selection" (the manner in which organizations hire, retain, develop, evaluate and promote employees). His credentials and his experience as a consultant retained to develop or evaluate selection devices and/or procedures are impressive. He has been retained as an expert by both plaintiffs and defendants in litigation involving human resource policies. Among the plaintiffs who have used Dr. Outtz's services are the NAACP Legal Defense Fund, The Lawyers' Committee for Civil Rights Under Law and the Civil Rights Division of the United States Department of Justice. There can be no question that Dr. Outtz is qualified to testify as an expert in the field of employment practices and procedures relating to hiring, development, evaluation and promotion of employees.

In his report, Dr. Outtz describes Novartis' performance appraisal and pay system and points to certain features of that system that, in his opinion, make the system more susceptible to being influenced by discrimination on the part of the evaluator. He concludes that the system of evaluation is excessively subjective, and supports this opinion with references to recognized professional literature. He also uses professional literature to support his conclusion that an excessively subjective performance evaluation system is a flawed system and not consistent with good human resources policy. And he opines that excessive subjectivity in an evaluation system creates a likelihood that there will be discriminatory exercises of discretion.

Dr. Outtz may give testimony consistent with his report. His conclusions about the flaws inherent in a subjective ratings system are supported by peer-reviewed literature in his field. He is not placing any "junk science" before the jury. There is nothing in his testimony that offends Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); the testimony is relevant (for the reason explained below) and Dr. Outtz's credentials suggest that he can be viewed as a reliable witness (subject, of course, to cross-examination).

Nor does anything in Dr. Outtz's report suggest that he plans to give testimony that would arrogate the jury's function to find the ultimate facts in this case. Nothing in Dr. Outtz's report suggests that he will testify that any member of the class, or that the class generally, was in fact the victim of discrimination. And while plaintiffs will obviously argue to the jury that the "flawed" subjective decision-making framework operated in a discriminatory manner because there existed a "culture of discrimination" (as plaintiffs put it) at Novartis, Dr. Outtz's testimony is not relied on to establish the existence of such a culture. Evidence giving rise to that inference will come from Novartis employees. All Dr. Outtz will do is opine that, if managers are biased, the type of evaluation process used at Novartis is not likely to filter out their bias. Given plaintiffs' theory of the case, his testimony is perfectly acceptable.

(b) MARTIN: Defendant's motion to preclude the testimony of Dr. David C. Martin is DENIED. Dr. Martin holds a Ph.D. in Business and Management and a Masters of Business Administration. He is a professor of Management and Human Resources Management at the Kogod School of Business at American University in Washington, D.C. He, too, has consulted widely in the fields of human resources management and performance appraisal, for corporations, associations, federal and municipal government agencies and the military. He has also published widely. And he has testified as an expert witness in prior employment law cases. His credentials, like Dr.Outtz's, are beyond reproach. He is obviously qualified to be an expert witness in this employment discrimination case.

Dr. Martin's testimony is not dissimilar from Dr. Outtz's; he examined Novartis' performance management and compensation systems to see whether "these or any of their parts are vulnerable to bias in decision making." (Martin Rpt. at 1.) Note that Dr. Martin was not retained to assess whether there actually WAS bias in human resources decisions at Novartis— only to say whether the performance evaluation system was "vulnerable" to bias in decision-making. Dr. Martin's credentials and experience, and his familiarity with the professional literature relevant to his charge, make him eminently qualified to express an opinion about whether Novartis' decision-making system was "vulnerable to bias." It will be for other

witnesses to establish, if they can, that there was bias present at Novartis—bias that a fundamentally flawed performance assessment structure could fail to restrain.

(c) LANIER: Defendant's motion to preclude the testimony of Dr. Louis R. Lanier is DEINED. Dr. Lanier is a managing economist at Nathan Associates Inc., an economic consulting firm. His work involves litigation consulting in the fields of, inter alia, employment discrimination. In his report, Dr. Lanier evaluates whether there is a statistically significant difference in the average performance rankings of men and women at Novartis. By training and experience, Dr. Lanier is perfectly competent to perform the requisite statistical analysis and make the comparisons he makes. To the extent that defendant believes Dr. Lanier's analysis to be flawed mathematically, Dr. Lanier can be cross-examined. In the portions of his revised report that are attached to the motion in limine, Dr. Lanier does not attempt to link the discrepancies in rankings that he perceives to the economic impacts on the class.

Dr. Lanier's testimony is both relevant and reliable. It is the sort seen all the time in employment discrimination litigation. Dr. Lanier's work cannot be categorized as "junk science." Indeed, Dr. Lanier and Dr. Welch (Novartis' expert) will engage in a classic "battle of the experts," jousting about judgments about Novartis' data that were made by the opponent's champion, with the jury determining the winner.

(d) RHODE: Defendant's motion to preclude the testimony of Dr. Deborah L. Rhode is GRANTED.

Professor Rhode is on the faculty of Stanford Law School, which causes the Court to give special scrutiny to this motion, since no expert will be testifying about the law and the law appears to be Professor Rhode's field of expertise. And Professor Rhode plans to opine that Novartis has a corporate culture pervaded by bias—which is, of course, both the ultimate issue in the case, and one that we routinely ask juries to assess in employment discrimination cases, without any expert telling them the answer.

The professor has submitted a 31-page report, which even includes a pie chart, giving it an aura of science. Professor Rhode's "findings," about which she intends to testify, are found on pages 24-25 of her report. The Court quotes them in full:

### In Group Favoritism

*The record reflects repeated exclusion of women from career development opportunities and the persistence of "old boys" networks that disadvantage female employees.*

### Sexualized Treatment of Women Workers

*The record reflects strikingly overt forms of gender harassment including degrading comments on women's appearance, offensive jokes that devalue women's competence, and opportunities offered in exchange for sexual favors. Complaints of such treatment were repeatedly dismissed or discouraged.*

### Discriminatory Treatment of Pregnant Women and Working Mothers

*Motherhood penalties are widely experienced and openly tolerated by Novartis management. Pregnant women and working mothers are disadvantaged in career opportunities, pressured into working while on leaves, and disadvantaged in performance evaluations and compensation.*

### Gender Differences in Workplace Opportunities and Recognition

*The record reveals repeated examples of gender based differences in performance evaluations, management training, and awards. Women are treated less favorably than similarly situated male employees in ratings, discipline, and access to the Management Development Program.*

### Inadequate Accountability for Biased Treatment

*The record reveals a lack of responsiveness and even handedness by Human Resources personnel concerning complaints of bias. Many women feel that their concerns would treated fairly [sic] and that they would be subject to retaliation; experiences of other women suggests [sic] that those concerns are not misplaced.*

### Inadequate Leadership and Gender Equity Initiatives

*The major initiative that the company developed to respond to gender equity concerns, the Women in Leadership program, is demonstrably inadequate to the task. Although some participants felt that it was well intentioned or beneficial in a general way by facilitating women's networking, most identified no concrete advantages, and even those responsible acknowledged that it was not designed to implement changes or respond to concerns about its effectiveness.*

### Inadequate Training, Supervision, and Tracking on Gender Equity Issues

*Those responsible for the development and enforcement of equal opportunity policy show a striking lack of familiarity with basic legal requirements and the content and effectiveness of company own [sic] policies. Those subject to training do not experience the benefits it [sic] an effective program would be designed to achieve. No significant efforts are made to monitor the company's progress on gender issues.*

### Summary

*Taken as a whole, the record demonstrates a corporate culture that has tolerated and condoned pervasive gender bias. Management has been at best indifferent and at worst openly resistant to women's equal employment opportunities. Female employees have paid a substantial price and fundamental changes will be necessary to achieve an equal playing field for women.*

The Court cannot imagine a more effective summation for plaintiffs. Counsel for plaintiffs are indeed fortunate that a person of Professor Rhode's academic stature has looked at the record or portions of the record (I have no intention of involving myself in the dispute over how much of the record she has or has not reviewed) and outlined in succinct form exactly what points they should make in their closing argument to the jury. However, in my courtroom, no law professor will make that argument for counsel in the guise of "expert testimony."

Experts, as we routinely advise juries, are allowed to testify about matters with which juries are not ordinarily familiar, or that are beyond their ken, in order to help them make determinations of fact that are difficult to make or that are informed by matters not known to the average person. No expert is needed to help the jurors draw the ultimate conclusions in a case like this one. I venture to suggest that, on any given day, there is at least one employment discrimination case on trial in this Courthouse, and often more than one. Few issues are as routinely submitted to a lay jury's assessment as the issue of discrimination on the basis of a prohibited factor. This Court alone has empanelled over 100 juries to try issues of employment discrimination during my time on the bench—indeed, at the time I write this opinion, I am presiding over just such a case. Jurors routinely look at the very thing Professor Rhode looked at—the testimony of witnesses and documents and other exhibits—and draw conclusions about whether that evidence proves that a plaintiff, or multiple plaintiffs, was/were subject to discrimination. Never once in all of the trials over which this Court has presided has it been necessary to put an "expert" on the stand to explain to the jurors why the evidence shows what the plaintiff claims it shows. Nor has it been necessary to have—as plaintiffs put it—someone with "specialized knowledge . . . contextualize and evaluate the significant anecdotal evidence" presented by witnesses under oath. "Contextualiz[ing] and evaluat[ing] the . . . anecdotal evidence" is what the jurors are supposed to do, and they do it all the time in cases far more complex than this one.

Having read Professor Rhode's report from start to finish, I categorically reject plaintiffs' counsel's claim that what Professor Rhode will "explain" to the jury is something that a jury needs expert assistance to understand. Her "findings" are nothing more than a summary of plaintiffs' ultimate arguments, delivered by someone whose stellar credentials and career achievements are calculated to cause a jury to give her extra credence. Professor Rhode's proposed testimony is not evidence, it is argument; and it will not be delivered from the witness stand.

**Conclusion**

This disposes of all pending in limine motions. The Clerk of the Court is directed to mark the following motions "decided" and remove them from the Court's docket: Docket Nos. 193, 197, 199, 201, 203, 206, 208, 210, 212, 213, 217, 219, 223, 227, 229, 231, 233, 235, 237, 239 and 241.

Dated: February 25, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL