# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMY VELEZ, PENNI ZELINKOFF, MINEL HIDER TOBERTGA, MICHELLE WILLIAMS, JENNIFER WAXMAN-RECHT, KAREN LIGGINS, LORI HORTON, HOLLY WATERS, WENDY PINSON, ROBERTA VONLINTEL, ASHLEY NARMOUR, CATHERINE WHITE, KELLY CORBETT, SUE EARL, JAMIE HOLLAND, JOAN DURKIN, SIMONA LOPES, MARYANNE JACOBY and MARTA DEYNE,

Individually and on Behalf of Others Similarly Situated,

          Plaintiffs,

v.

NOVARTIS PHARMACEUTICALS CORPORATION,

          Defendant.

04 Civ. 09194 (CM)

---

## APPENDIX IN SUPPORT OF NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW

| DOCUMENT[1] | EXHIBIT |
|---|---|
| Trial transcript dated April 14, 2010 | 1 |
| Trial transcript dated April 15, 2010 | 2 |
| Trial transcript dated April 19, 2010 | 3 |
| Trial transcript dated April 20, 2010 | 4 |

---

[1] Relevant pages only.

Trial transcript dated April 21, 2010 .................................................................5

NOVARTIS PHARMACEUTICALS
CORPORATION

By: /s/ Richard H. Schnadig
                One of Its Attorneys

Richard H. Schnadig
Thomas G. Abram
Aaron R. Gelb
Elizabeth N. Hall
Vedder Price P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601-1003
312-609-7500
312-609-5005 (facsimile)

Amy L. Bess
Vedder Price P.C.
875 15th Street NW
Suite 725
Washington, D.C. 20005
202.312.3320
202.312.3322 (facsimile)

Jonathan A. Wexler
Vedder Price P.C.
1633 Broadway
47th Floor
New York, New York  10019
Telephone:  (212) 407-7700
Fax:  (212) 407-7799

Dated:  April 27, 2010

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a true and correct copy of the foregoing APPENDIX IN SUPPORT OF NOVARTIS PHARMACEUTICALS CORPORATION'S NOTICE OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW was filed electronically and served on the following by depositing same in the United States mail, with proper first-class postage prepaid, before 5:00 p.m. on April 27, 2010:

David Sanford
Katherine Kimpel
Katherine Leong
Felicia Medina
Sharon Eubanks
**SANFORD, WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 310
Washington, DC 20009

Steven Wittels
Jeremy Heisler
**SANFORD, WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10022

Grant Morris
**LAW OFFICES OF GRANT E. MORRIS, ESQ.**
1666 Connecticut Avenue, N.W., Suite 310
Washington D.C. 20009

_____/s/ Richard H. Schnadig_____
Richard H. Schnadig

# EXHIBIT 1

```
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 3    AMY VELEZ, et al.,
 3    Individually and on Behalf of
 4    Others Similarly Situated,
 4
 5                     Plaintiffs,
 5
 6         v.                            04 Civ. 9194
 6
 7    NOVARTIS PHARMACEUTICALS
 7    CORPORATION,
 8
 8                     Defendant.
 9
 9    ------------------------------x
10
10                                     April 14, 2010
11                                     9:30 a.m.
11
12    Before:
12
13                 HON. COLLEEN MCMAHON
13
14                                     District Judge
14
15                     APPEARANCES
15
16    SANFORD WITTELS & HEISLER LLP
16         Attorneys for Plaintiffs
17    BY:  DAVID SANFORD
17         KATHERINE KIMPEL
18         SHARON EUBANKS
18         FELICIA MEDINA
19         KATHERINE LEONG
19
20    VEDDER PRICE
20         Attorneys for Defendant
21    BY:  RICHARD H. SCHNADIG
21         THOMAS ABRAM
22         ELIZABETH HALL
22         AARON GELB
23         AMY BESS
23
24    ASHLEY MARSH PERTSEMLIDIS
24         Novartis in-house counsel
25
25
```

 1    (Trial continuing)

 2    (Jury not present)

 3    THE CLERK:  Come to order.

 4    THE COURT:  Good morning.  Have a seat.

 5    I'm laboring under a handicap.  I followed my

 6    dermatologist's advice and put sunscreen on this morning, and

 7    now it's in my eyes.  Don't mind me, I'll be going like this.

 8    Okay, what's up?  Are we ready to go?

 9    Front table, then back table.

10    MS. KIMPEL:  We provided to opposing counsel copies of

11    the demonstrative slides that Mr. Outtz plans on using to

12    educate the jury today.

13    They have indicated they agree to all but one.  I have

14    a copy of the slide in question for you, along with the notes

15    in the report where he talks about the issue in question.

16    Can I provide it?

17    THE COURT:  You may.

18    What's the problem with the slide?

19    MR. ABRAM:  Your Honor, the slide, which we received

20    at 1:30 this morning --

21    THE COURT:  Oh, please, I don't care.

22    MR. ABRAM:  Yes, your Honor.

23    THE COURT:  No whining.

24    MR. ABRAM:  I will not.

25    The demonstrative in question relates to a merit

 1    increase guideline used for determining merit pay increases.

 2    Mr. Outtz, in his report, does not opine on this merit pay

 3    guideline, nor the compensation system in general.  It is

 4    exclusively his report, and all of the opinions expressed at

 5    his deposition went exclusively to the performance evaluation

 6    system.

 7    We have no objections to the other demonstratives.

 8    But as to this one, Rule 26 clearly requires both the

 9    disclosure of all opinions that the expert is to render in

10    court, and Rule 26E requires a supplementation of those

11    opinions, as well as any other supplementation.

12    So we would ask that this demonstrative not be used,

13    and that Dr. Outtz be directed not to testify with regard to

14    the merit increase pay guidelines, or the compensation system.

15    THE COURT:  Yes?

16    MS. KIMPEL:  Your Honor, if you look at the report

17    copy I provided to you, he discusses, in some detail, the

18    compensation system including --

19    THE COURT:  Pages?

20    MS. KIMPEL:  7, 8, 24 and 25.

21    THE COURT:  Thank you.

22    Excuse me for one minute.

23    The demonstrative is in.

24    Okay.  Next?

25    MS. KIMPEL:  The only other matter I had for you, your

 1    Honor, was that Dr. Outtz, in preparing the slides which have

 2    all been approved by opposing counsel would like to have a hard

 3    copy of his demonstratives with him at the stand.

 4    Can I provide it to him --

 5    THE COURT:  Why is that a problem?

 6    MR. KIMPEL:  Okay.  That's it.

 7    MR. GELB:  We have one other brief preliminary matter

 8    regarding the presentation of deposition designations.

 9    The parties were not clear as to whether if plaintiffs

10    have designated 6, 8, and 10, and we have designated 7 and 9,

11    are they presented together?

12    THE COURT:  They really ought to be presented

13    together.  They really ought to be presented together.

14    MR. GELB:  That is that we had intended, your Honor.

15    THE COURT:  Okay.

16    How are we doing with the jurors?

17    Who is up first this morning?

18    MR. SANFORD:  Ms. Kelly Corbett.

19    THE COURT:  Get her in here, please.

20    THE CLERK:  Jury entering.

21    (Jury present)

22    THE COURT:  Good morning.

23    Good to see, you have a seat.

24    ALL:  Good morning.

25    THE COURT:  Mr. Sanford, call your next witness,

**Page 161 (left column)**

1  Q. Well, I'll be more --

2  A. -- verifies what I testified to. That's all I am asking.

3  Q. That's fine. Let's get a copy of your report, and I will

4  show you to what I'm referring.

5      MR. ABRAM: Ms. Kimpel, page 23.

6      If I may, your Honor?

7      THE COURT: Yes.

8  Q. Begins there. But I'm quoting from the discussion on

9  page 23.

10  A. This does not correspond to the question you asked me.

11  Q. Okay.

12  A. You asked me a question about what I testified to this

13  morning.

14  Q. There is no question.

15      THE COURT: Sir, excuse me. Excuse me --

16      THE WITNESS: Sorry.

17      THE COURT: -- please.

18      Thank you. Just let him ask the question.

19  Q. Okay. I will quote.

20      "The second step is for the employee to successfully

21  complete a checklist of tasks designed to prepare him or her to

22  enter formal management training."

23      Did you not identify that as the second step in your

24  report. On page 23, sir. First paragraph.

25  A. Page 23, the first paragraph?

**Page 163 (right column)**

1  A. I'm saying it is a form with tasks on it.

2  Q. Which they check off as they complete?

3  A. Which they would check off, it's my understanding, as they

4  feel they have completed it.

5  Q. And is it your understanding that the District Manager

6  grades them on those tasks?

7  A. It's my understanding that that document would be submitted

8  to the District Manager for an assessment of what they have

9  done.

10  Q. Is it your understanding that it is the District Manager's

11  decision to approve participation of an individual employee in

12  the management training program?

13  A. It's my understanding that the District Manager does, in

14  fact, make decisions as to whether they enter the management

15  development program at some point.

16  Q. That was not my question, with all due respect.

17  A. Sorry.

18  Q. Is it did District Manager's decision whether or not an

19  employee is admitted into the management development program?

20  A. It is, in part. That's my understanding.

21  Q. In part?

22  A. Correct.

23  Q. And the third factor that you identified is, "The employee

24  must complete the three phases of management training and

25  management developments, MDP 1, 2, and 3."

**Page 162 (left column)**

1  Q. Yes. One, two, third sentence.

2  A. Yes. I see that.

3  Q. Okay. And that's what you wrote?

4  A. Yes.

5  Q. And that, you understood, was the second step that a

6  employee must complete before he or she is eligible to

7  participate in the management training program; is that right?

8  A. The second -- it says here the second step is a completed

9  checklist.

10  Q. Right. And who fills out the checklist; do you know?

11  A. I don't understand your question.

12  Q. Well, is it the employee him or herself that fills it out,

13  or is it the manager that fills it out?

14  A. The checklist is a predetermined series of tasks that are

15  given to the employee. The employee doesn't fill out the

16  checklist. The checklist is something given to the employee.

17  Q. So it's your understanding that the employee does not

18  physically fill out, to keep track, his or her progress through

19  the checklist?

20  A. It's my understanding that they do what you just said, but

21  they don't fill out a checklist. The checklist is already in

22  existence.

23  Q. If you're saying that the checklist is a form with

24  standardized tasks for them to perform, is that what you're

25  saying?

**Page 164 (right column)**

1      Correct?

2  A. Correct.

3  Q. And after completing that, then they are eligible for

4  promotion?

5  A. Correct.

6  Q. Okay. On the same page, you also identified three

7  requirements for entry into the management development program.

8      The first is, "Successful performance at the

9  employee's current position."

10      That's your understanding?

11  A. Yes.

12  Q. The second is, "Three to four years of pharmaceutical

13  experience."

14      That's all your understanding?

15  A. Yes.

16  Q. And third is, "Achievement of annual learning

17  requirements."

18      That's, likewise, your understanding of the

19  prerequisites for being eligible for entry into the management

20  development program?

21  A. Yes. Taken from a document of Novartis.

22  Q. Right. Plus, of course, the completion of the checklist

23  that we have just talked about?

24  A. Correct.

25  Q. So there are actually four prerequisites?

# EXHIBIT 2

```
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     2
3    AMY VELEZ, et al.,
3    Individually and on Behalf of
4    Others Similarly Situated,
     4
5                    Plaintiffs,
     5
6         v.                            04 Civ. 9194
     6
7    NOVARTIS PHARMACEUTICALS
7    CORPORATION,
8
8                    Defendant.
9
9    ------------------------------x
10                                   April 15, 2010
11                                   10:02 a.m.
     11
12   Before:
     12
13                   HON. COLLEEN MCMAHON
     13
14                                   District Judge
     14
15                   APPEARANCES
     15
16   SANFORD WITTELS & HEISLER LLP
16        Attorneys for Plaintiffs
17   BY:  DAVID SANFORD
17        KATHERINE KIMPEL
18        SHARON EUBANKS
18        FELICIA MEDINA
19        KATHERINE LEONG
19        STEVEN LANCE WITTELS
20
20   VEDDER PRICE
21        Attorneys for Defendant
21   BY:  RICHARD H. SCHNADIG
22        THOMAS ABRAM
22        ELIZABETH HALL
23        AARON GELB
23        AMY BESS
24
24   ASHLEY MARSH PERTSEMLIDIS
25        Novartis in-house counsel
25
```

                                   1

```
1         (Trial resumed; jury not present)
2         THE COURT:  Good morning.  So who is up first?
3         MR. SANFORD:  Dave Moatazedi by deposition
4    designations.
5         THE COURT:  Okay.  Bring in the jury.
6         MR. SCHNADIG:  Your Honor, we worked this out so that
7    plaintiffs are going to read and respond to all of it.
8         THE COURT:  Okay.  Somehow I knew you would.
9         Who is going to read the witness?
10        MR. SANFORD:  Roy Futterman.
11        (Continued on next page)
```

                                   2

```
1         (Jury present)
2         THE COURT:  Good morning.  Have a seat everybody.  I
3    told you, Ladies and Gentlemen, we're going to have some
4    testimony by deposition.
5         And Mr. Sanford would you, or whoever is going to be
6    doing it, introduce both the witness and the reader.
7         MS. LEONG:  Good morning, everyone.  My name is
8    Katherine Leong, one of the attorneys for the plaintiffs.  The
9    witness today is David Moatazedi.
10        THE COURT:  And the gentleman here, his name is.
11        MS. LEONG:  Is Roy Futterman.
12        Would you like me to identify page and line as well?
13        THE COURT:  No.  That's fine.  Both sides have had an
14   opportunity to designate testimony from the deposition that
15   they want you to hear.  So you are hearing the direct and the
16   cross-examination as it would have unfolded here in the
17   courtroom.  You should know that Mr. Moatazedi was, in fact,
18   sworn at the beginning of the deposition, took an oath just
19   like all of the witnesses have take, swore to tell the truth,
20   the whole truth, and nothing but the truth.
21        Please begin.
22   BY MS. LEONG:
23   Q.  What is your full name for the record?
24   A.  David Moatazedi.
25   Q.  And how do you spell your last name?
```

                                   3

```
1    A.  M-O-A-T-A-Z-E-D-I.
2    Q.  Did you go to college?
3    A.  Yes, I did.  I went to Cal State Long Beach.  Graduated in
4    2000 with a degree in chemistry.  Also went to business school.
5    Graduated from Pepperdine University in 2005.
6    Q.  When did you start with Novartis?
7    A.  I believe it was February of 2000.
8         Well, I started earlier.  I wasn't sure if it was '99
9    or 2000.  Now that we're doing the math, it is, because I was
10   at Novartis just under six years.  So I started in February of
11   2000.
12   Q.  So you started in February 2000 and you entered the
13   management development program in, approximately two years
14   later?
15   A.  Right.
16   Q.  So then you were a sales representative for two years and
17   then you entered the MDP?
18   A.  That's correct.
19   Q.  And then what happened after?  How long were you in the
20   MDP?
21   A.  I don't know exactly how soon after I enrolled in the MDP
22   program that I became a manager.  I want to say it was around
23   the six-month timeframe.
24   Q.  So you were in the MDP for about six months?
25   A.  I believe so.
```

                                   4

1    BY MS. MEDINA:
2    Q.   Just one last question.
3         The 2.2 standard with respect to just a base level
4    where a representative can get into management, that policy
5    changed after this lawsuit was filed and after you were
6    deposed, correct?
7    A.   I couldn't tell you exactly when the lawsuit was filed.
8    Q.   Okay.  So after your deposition, correct?  That policy
9    changed?
10   A.   No.  I think it was in place when I first was deposed.
11   Q.   Okay.  Well, let's look at your testimony.  Okay.
12   *Q.  Are there any formal policies relating to the hiring of
13   current Novartis employees for managerial positions?  In other
14   words, are there any formal criteria that are applied to
15   employees who are interested in becoming managers?
16   *A.  For the most part, those individuals that want to become
17   managers receive, initiate; and they, obviously, have to be
18   good solid performers, which would mean that they would have to
19   be ranked at a 2.2 level.*
20        So is it your testimony that this 2.2 was not in place
21   during your deposition?  There's other parts, references to the
22   2.2.  I can --
23        THE COURT:  Please.
24   Q.   So is it your testimony --
25   A.   With the old process, it was 2.2.  With the new process,

1    it's a 2.3.
2         THE COURT:  The question is:  When did that change
3    take place?  That's the question.  When did that change take
4    place?
5         THE WITNESS:  I think it was in place when I was first
6    deposed, but I think we were talking about the older process at
7    that time.
8         MS. MEDINA:  Well, we'll try to get the date.  Thanks.
9    CROSS-EXAMINATION
10   BY MR. ABRAM:
11   Q.   Good morning, Mr. DiCindio.
12   A.   Good morning.
13   Q.   You've testified that you were an RD for, I believe the
14   question was asked, at Morristown field force?
15   A.   Yes.
16   Q.   And was that a new field force?
17   A.   Yes, it was.
18   Q.   Were you responsible for selecting the district managers --
19   A.   Yes, I was.
20   Q.   -- for that field force?
21   A.   Yes.
22   Q.   Approximately how many managers did you have to select?
23   A.   Ten district managers.
24   Q.   Did you select any women?
25   A.   Yes, I did.

1    Q.   How many?
2    A.   Approximately five.
3    Q.   You were asked also about the process for going into
4    management development?
5    A.   Yes.
6    Q.   Was there -- did an employee have to do anything to ask to
7    start the developmental checklist?
8    A.   No.  They could do that on their own.
9    Q.   As an RD, was part of your responsibility to evaluate the
10   DMs?
11   A.   Yes.
12   Q.   And so you conducted performance evaluations of them?
13   A.   Yes, I did.
14   Q.   Did one of the elements of that performance evaluation
15   concern development?
16        MS. MEDINA:  Objection.
17        THE COURT:  Let's try a nonleading question.
18        What did you take into account in evaluating the DMs?
19        THE WITNESS:  Sales performance, leadership,
20   collaboration across their teammates.  Development of the
21   individuals on their team was a tremendous part of everything
22   that we did.
23        It was a regular conversation that I would have on a
24   quarterly basis with each district manager on my team.
25        Who on your team is interested in being a district

1    manager?  Who is looking to move into specialty?  What are the
2    development plans that are put in place at the beginning of the
3    year with that individual?
4         I expected all my district managers to have
5    developmental plans in place for their team.  As a matter of
6    fact, it was part of their mid-year and year-end performance
7    review.
8    Q.   Do you know who Bernice Dezelan is?
9    A.   Yes, I do.
10   Q.   Did you supervise her?
11   A.   She was on my regional team and -- yes.  She was one of the
12   148 representatives on the team.
13   Q.   Do you know who her district manager was?
14   A.   Yes.
15   Q.   Who?
16   A.   Dee Brown.
17   Q.   And did she report to you?
18   A.   Dee Brown reported to me.
19   Q.   Did you ever go on a ride-along with Ms. Dezelan?
20   A.   Yes, I did.
21   Q.   Do you recall when?
22   A.   Roughly -- approximately 2005.
23   Q.   And was that ride-along in her territory?
24   A.   Yes.
25   Q.   And her territory was what?

# EXHIBIT 3

**Page 1**

```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     2
 3   AMY VELEZ, et al.,
     3   Individually and on Behalf of
 4   Others Similarly Situated,
     4
 5               Plaintiffs,
     5
 6        v.                          04 Civ. 9194
     6
 7   NOVARTIS PHARMACEUTICALS
     CORPORATION,
 8
     8            Defendant.
 9
     9   ------------------------------x
10
10                              April 19, 2010
                                9:53 a.m.
11
11
12   Before:
12
13              HON. COLLEEN MCMAHON
13
14                              District Judge
14
15              APPEARANCES
15
16   SANFORD WITTELS & HEISLER LLP
16        Attorneys for Plaintiffs
17   BY:  DAVID SANFORD
17        KATHERINE KIMPEL
18        SHARON EUBANKS
18        FELICIA MEDINA
19        KATHERINE LEONG
19
20   VEDDER PRICE
20        Attorneys for Defendant
21   BY:  RICHARD H. SCHNADIG
21        THOMAS ABRAM
22        ELIZABETH HALL
22        AARON GELB
23        AMY BESS
23
24   ASHLEY MARSH PERTSEMLIDIS
24        Novartis in-house counsel
25
25
```

**Page 2**

```
 1        MR. SANFORD:  Good morning, Mr. Sanford.
 2        Good morning, your Honor.
 3        Just a note about scheduling.  I know the Court asked
 4   last week about scheduling.  I think we have nailed it down.
 5   And we anticipated resting on Thursday of this week.
 6        THE COURT:  Wonderful if it happens.
 7        Okay.  So who do we have on today?
 8        MR. SANFORD:  Dr. xxx is Lanier is first up.  And we
 9   anticipate that he will last most or all of the morning.  And
10   then two class members in the afternoon.
11        THE COURT:  Yes, sir.
12        MR. ABRAM:  One preliminary matter.  That is, we have
13   reviewed the demonstratives that plaintiffs have proffered for
14   Dr. Lanier.  We have two that we have objections to.
15        If I may, approach and I can give you copies.
16        THE COURT:  Please.
17        MR. ABRAM:  Your Honor, what I have given you was four
18   pages, because plaintiffs were kind enough to anticipate the
19   ones I would object to.  So I made two parallel ones; one with
20   the objecting material the other without.
21        First is what was the data set.  Our objection is the
22   third column, showing the female representation of sales
23   directors for the ostensible purpose of showing that that is
24   not included in Dr. Lanier's analysis which, indeed, is it not.
25   He didn't do any analysis, including that, and it is not part
```

**Page 3**

```
 1   of this case.  And we believe that the representation of -- the
 2   female representation in the level above District Manager would
 3   be prejudicial.
 4        MR. SANFORD:  Your Honor, this pie chart is actually
 5   representative of part of the data set that was given to Dr.
 6   Lanier.  Dr. Lanier wound up doing an analysis that included
 7   about 11,000 individuals.  But he had to exclude some people.
 8   Some of those people he excluded are represented in the pie
 9   chart.  We don't want there to be any inference that the jury
10   draws that he didn't exclude some people impermissibly.
11        And this helps explain why.
12        THE COURT:  See this one?  This is the one that we'll
13   use, the one that deals with his analysis, okay.
14        MR. ABRAM:  Second, your Honor, is the two table 8
15   alternatives.  Our objection to page 20, table eight, is the
16   graph in the lower right side that comes from Dr. Lanier's
17   damage report.  It shows what he estimates for purposes of his
18   damage calculation, estimated promotions that should have gone
19   to the women, had they been promoted, at the same rate as men.
20   And he uses that in his damages report to estimate damages for
21   the alleged discrimination with regard to promotion to manager.
22        Since that is to be brought to your Honor, and tried
23   before your Honor separately, we would ask that the alternative
24   table 8 be used.
25        MR. SANFORD:  Your Honor, all this graph shows on the
```

**Page 4**

```
 1   right is what would be the case if the ratio of the percent
 2   promoted in table 8 were one to one.  So it is the natural
 3   inference of what happens --
 4        THE COURT:  It is contextual, it has contextual
 5   relevance to disparate treatment by analysis to this jury, even
 6   though it is more directly relevant to me.
 7        So the table 8 that contains, in the lower right-hand
 8   corner, number of employees that should have been promoted will
 9   be used, and the alternative one will not.
10        I have written *yes* and *no* on top of these so that
11   you know exactly.  Both sides can look at that, and you can
12   know exactly what we're going to use, all right?
13        (Jury present)
14        THE COURT:  Good morning.  Have a seat.  Hope
15   everybody had a great weekend.
16        And we're ready to go.  Mr. Sanford, call your next
17   witness.
18        MR. SANFORD:  Thank you, your Honor.
19        Plaintiffs call Dr. Louis Lanier.
20   LOUIS RAYMOND LANIER,
21        called as a witness by the Plaintiff,
22        having been duly sworn, testified as follows:
23   DIRECT EXAMINATION
24   BY MR. SANFORD:
25        THE COURT:  Please be seated.
```

**Page 25**

1   So the confidence levels go up very quickly beyond, as
2   you move up the scale of standard deviations.
3   Q.  So to go back to our hypothetical example of the classroom,
4   in looking at slide 17, what does this suggest, hypothetically,
5   about that classroom.
6   A.  So, I would run the regression.  The regression output
7   would be a piece of paper that had all kind of statistics on
8   it.  But, basically, it would tell me, we assume in this case,
9   say it told me that girls scored higher than boys, even after
10  taking into account what grades the students were in, and how
11  proficient they were with the English language.  And it tells
12  me that, in addition to there being this relationship, that
13  relationship has standard deviations of 2.0, and so we would
14  call that a statistically significant relationship which would
15  mean we were at least 95 percent confident that it was a true
16  relationship, as opposed to, again, something that occurred by
17  random chance.  And the odds that the result is due to just
18  random chance here, another way of putting this whole
19  confidence level concept, is the odds that this particular
20  relationship could have been measured simply by random chance
21  are 1 in 22, for standard deviations of 2.0.
22  Q.  All right.  Thank you.  If we can look at the next slide
23  18.  Let's talk a bit about this case.
24     Can you describe a little bit about what this slide
25  means in the context of what you just described hypothetically?

**Page 26**

1   A.  Yes.  Well, again, in carrying out my assignment in this
2   case of determining, in particular, with respect to management
3   promotions, I first looked at a descriptive picture of the
4   workforce.  And this should look familiar.  We see the 50/50
5   split, approximately, in the nonmanagement sales force.  And we
6   see that about 25 to 26 percent of the sales managers are
7   female, that indicates to me, as I said before, a further look,
8   further inferential look into the possibility that there could
9   be a promotion issue with respect to promotions to management
10  is indicated.
11  Q.  Okay.  You mentioned promotions.  Let's move to promotions,
12  slide 20.
13     How did you approach your promotion analysis?
14  A.  Well, the first thing I did, was I took the personnel data
15  set which is, again, this large data set I described to you.
16  It has all of these personnel events in them.  And among those
17  events are promotions to management.  And I, of course,
18  determined what question it was I was going to ask with my
19  analysis, and that question of course is is there a gender
20  disparity in promotions to management.  And so this is a
21  picture of the data set.
22  Q.  Okay.  Let's look at the next slide.
23  A.  Among the data, I determined, based on looking at Novartis'
24  policy documents, and looking at the data itself, as to who was
25  promoted and what the characteristics were of the people who

**Page 27**

1   were promoted from the sales force into management, I
2   determined certain minimum eligibility requirements for
3   promotion to management.  Those requirements are, I observed,
4   that basically everyone was at least 27 years of age.  That's
5   consistent with the idea that these people are likely to have
6   about five years of post college labor force experience.  The
7   Novartis policy documents say, generally, 3 to 4 years of
8   pharmaceutical sales experience.  So that seemed logically
9   consistent to require about five years.  Another requirement
10  was that they have at least one year of company tenure.  The
11  idea, there again, it's based largely on the data, in that I
12  didn't see very many people getting promoted who had less than
13  one year company tenure.  Also based on the idea if you're not
14  hired in as a sales manager then, presumably, you will be with
15  the company for at least some minimum period of time before
16  they do promote you to manager.  And one year seemed logical
17  based on the idea that it's a cycle, so to speak, a performance
18  evaluation cycle, or however you want to think about it.  The
19  third requirement was you had to not be in an entry level job
20  group within a market segment.
21     So within the market segments in the sales force,
22  which are -- you may have heard this before, the mass market
23  sales reps, the select market sales reps, and specialty market
24  sales reps.  There are job groups within those that represent
25  different levels of seniority, basically, within those market

**Page 28**

1   segments.  And the lowest entry level job, so to speak, within
2   each of those market segments, I noticed that there were very
3   few, if any, promotions to management from those.  And so I
4   also eliminated those entry level job groups from the analysis.
5   Q.  Okay.  And how did you -- go ahead.
6   A.  Well, once I had done that, so basically I termed that
7   eligible and noneligible.  So once I eliminated the noneligible
8   again, to get closer and closer to apples to apples, you then
9   decide, basically, how to model the regression; that is, what
10  explanatory factors are likely to explain a person's chances of
11  getting promoted to management.  And the explanatory factors
12  that I included were the job group, again, say for example,
13  within the mass market set, you have your sales reps, then you
14  have your sales consultants, and your executive reps, and so on
15  and so forth.  You have different levels within those market
16  sets.  So those are the job groups I'm talking about.
17     So I separated them into job groups.  And I also
18  controlled for job tenure, amount of time in a particular job,
19  the amount of time they have been with the company -- which I
20  referred to as company tenure.  And total labor force
21  experience, again, as approximated by their age which means,
22  I'm assuming that a 27 year old, for example, would have
23  approximately five years of labor force experience after
24  college.
25  Q.  And did you do anything else to refine the comparison?

1  A.  Well, yes.  Actually, this is a little bit of a
2  simplification.  I allowed the information in the explanatory
3  factors to interact.  And what that means, is I allowed there
4  to be different tenure and experience effects for different job
5  groups.  So, for example, I allowed, or assumed, that it was
6  possible that if you had 3 years of job tenure in the mass
7  market, you know, sales consultant job, that that might not
8  have the same effect on your chances for a promotion to
9  management, as having 3 years of job tenure in a specialty
10  position.  So I allowed there to be different tenure and
11  experience effects across the different job groupings in the
12  data.  This interaction, again, ensures that -- further ensures
13  that you have more than apples to apples comparison in the
14  analysis.
15  Q.  Can you describe this slide for the ladies and gentlemen of
16  the jury?
17  A.  After I had stepped through the first three steps of
18  building this particular regression that we just discussed, I
19  ran the regression again.  I let the regression do what it
20  does, which is to take into account all this information, take
21  into account the explanatory factors, the characteristics of
22  the employees.  Determine what the relationships are between
23  the explanatory factors, and the employee's chances of being
24  promoted.  And in doing so determining if, after taking into
25  account all of these explanatory factors, or again what we

1  would call control variables, after controlling for the various
2  things we would expect to affect management promotions, the
3  regression tells me whether there is any leftover difference in
4  promotion to management that is related to gender only.  And,
5  in this case, again, we found statistically significant
6  difference between the chances of a male and female getting
7  promoted to management.
8      MR. SANFORD:  Okay.  Next slide, Ray, please.
9  Q.  And this is table 9.  So what does this table signify?
10  A.  So table 9 is just a table showing the results that I just
11  referred to.  It shows the relative predicted probabilities of
12  promotion to management.  And, more importantly, it shows that
13  the ratio of the male chance of probability of promotion to the
14  female chance is 4.3.  Males have 4.3 times the likelihood of
15  being promoted than their similarly-situated female
16  counterparts in the same job groups.
17      That result is statistically significant as 7.3
18  standard deviations.
19  Q.  Okay.  We're covering a lot of concepts again, and dealing
20  with a lot of numbers.
21      Just to back up a bit, can you describe again, please,
22  the ratio of male to female promotion rate, and the standard
23  deviations; what are they, and what is the difference between
24  the two?
25  A.  Well, basically, the ratio between the rates of promotion,

1  being 4.3 tells you that for every female who is waiting, who
2  is qualified and waiting to be promoted to management, there
3  are going to be approximately four males who get promoted to
4  management before she does, or in conjunction with her.
5      The 7.3 standard deviations is a very highly
6  statistically significant result that tells us that we can be
7  pretty darn sure that this is a relationship that did not just
8  occur by random chance.  The probability of that being, of us
9  measuring this 4.3 to 1 difference, is very -- is very low if,
10  in fact, it is due just to pure random chance.
11  Q.  So, specifically, what does the 4.3 ratio mean for female
12  employees at Novartis?
13  A.  Well, like I said, for every one who -- for every female
14  who is waiting for a promotion to management who is qualified,
15  there is going to tend to be approximately four males who are
16  promoted for every one female who gets promoted.
17      THE COURT:  Could you take down the enlarged 4.3 and
18  7.3, so that we can see the note.  Because I would like an
19  explanation of the -- the footnote there.  "Note."
20      THE WITNESS:  Absolutely.  Absolutely.  This just goes
21  into some of what I would explain in terms of building the
22  regression.
23      So I'll read it here.  Predicted probabilities of
24  promotion are for the average mail and female among all of the
25  sales employees in the promotion pool which consists of, again.

1  I required you had to be at least 27 years of age; is that
2  kind of experience cut, so to speak.  You had to have at least
3  one year of company tenure.  And you had to be in a sales
4  related job group, except for -- and these are those entry
5  level, those entry level job groups that I was talking about
6  within each market set.  So the mass market sales
7  representative, the specialty sales rep, the associate, the
8  select market sales consultants.  And, of course, the District
9  Manager, since that is the position you are being promoted to,
10  they are obviously not going to be in the pool.
11  Q.  Now, you noted that there are 7.3 standard deviations.  If
12  we could look --
13      MR. SANFORD:  -- Ray, at the next slide, please.
14  Q.  Were your calculations regarding the promotion rates of men
15  versus women in the standard deviations that you found to be at
16  7.3, were those calculation statistically significant?
17  A.  Yes.  Yes, as I mentioned, 7.3 standard deviations is
18  statistically significant.  It is well above the 1.96 threshold
19  that we talked about earlier.
20      If we look at the bottom, basically the bottom of that
21  chart, we looked at earlier, we see the 7.3 standard deviations
22  correspond to a very high confidence level over here.  It is
23  99.99, et cetera, percent confidence level.  We put it in terms
24  of the odds that this relationship could of occurred by random
25  chance, it is one in approximately -- it is greater than one in

Case 1:04-cv-09194-CM    Document 287-2    Filed 04/27/2010    Page 14 of 33
4/19/2010 TEMPORARY FOR BRIEF (4/19/2010 trial transcript)
4/19/2010 TEMPORARY FOR BRIEF (4/19/2010 trial transcript)

**Page 33**

```
 1   3 trillion.  So it's highly, highly unlikely that the measured
 2   relationship occurred by random chance.  Or, in other words, we
 3   can be we can be very confident that this represents a true
 4   relationship between gender and the management promotion
 5   outcome.
 6   Q.  Again, just to be clear, the odds of one occurring by
 7   chance would be one in three trillion?
 8   A.  The measured relationship, that is we have measured a
 9   relationship between gender and the management outcome.  If
10   everything were gender neutral so that there was no -- so that,
11   on average, you would expect that one female would get promoted
12   for every male, or that the rates of promotion would be the
13   same, then, compared to that situation -- if that were actually
14   the situation, then the chance that we could have actually
15   measured the gender disparity that we did measure, is one in
16   three trillion.  So if there is, in fact, a gender neutral
17   system under there, then that chance is only one in three
18   trillion given the measured result.
19   Q.  Okay.  And, again, what does that mean for the average
20   employee at Novartis?
21   A.  It just means that females are less likely to be promoted
22   to management than their similarly situated male counterparts
23   in the same job groups within the sales force.
24   Q.  Do you believe a Management Promotion Analysis must control
25   for employee's interest in a relocation in this case?
```

**Page 34**

```
 1   A.  Well, in a perfect world --
 2        MR. ABRAM:  Objection, your Honor, that is --
 3        THE COURT:  Overruled.
 4   A.  In a perfect world, where I had that kind of information,
 5   then I certainly would take it into account.  However, we don't
 6   have any kind of information on the relocation interest of
 7   women with regard to a management promotion.
 8   Q.  Did you consider any other factors that may explain the
 9   gender differences that you did find?
10   A.  Yes.  I looked at what is called the Management Development
11   Program at Novartis.
12        MR. SANFORD:  And, Ray, if we can look at the next
13   slide, please.
14   A.  This is a table summarizing the results of that analysis.
15   The MDP, as it is called, is a prerequisite, to some extent, to
16   getting into -- to getting promoted to management.  And so I
17   looked at the selection rates of males and females into that
18   program.  And what I noticed was, among the sales force of
19   individuals who were 27 years or older had at least one year of
20   company tenure, that of those employees who I have kind of
21   labeled as eligible for MDP here, the ratio of selection of
22   male employees to female employees was 1.7 to 1 or 70 percent
23   higher than you would expect, again, in a gender neutral
24   selection process.
25        What does that mean?  Well, another way of looking at
```

**Page 35**

```
 1   it is that if you look across the number of eligible employees,
 2   there was approximately 15 percent more males in that pool,
 3   than there are females.  Whereas if you look at the ones who
 4   were actually promoted, if you go to the next slide, there is a
 5   49 percent difference in the number of males versus females
 6   among those who were actually in the MDP program.  Just another
 7   way of looking at that 1.7.
 8        THE COURT:  I take it the 2,209 is male employees, and
 9   1,887 is female employees --
10        THE WITNESS:  Yes, that's right.
11        THE COURT:  -- on the chart at the top?
12        THE WITNESS:  That is correct.
13        The two numbers on left are numbers of male and female
14   in the pool, and then male and female who are actually in the
15   program on the right.
16   Q.  Now, just again, the 1.7 refers to, what?
17   A.  It's the ratio of selection rates.  We don't have the
18   selection rates highlighted there.  But you can see the
19   selection rate is 15.2 percent, which is simply the 336 divided
20   by the 2209.  So of the males in the pool, 15.2 percent of them
21   were in the MDP.  Of the females in the pool, 9.7 of them were
22   in the pool, and 1.7 is the ratio between those two selection
23   rates.
24   Q.  And the standard deviations here, you note, are 6.0.
25        What does that mean.
```

**Page 36**

```
 1        MR. SANFORD:  And, Ray, if we can look at --
 2   A.  Again, it's a highly significant statistic result.  We look
 3   at six standard deviations well above the 1.96 threshold we
 4   talked about for 95 percent confidence.  Here we have,
 5   again, 99.999, et cetera confidence level that what we have
 6   measured is, in fact, a true relationship.  And, again, the
 7   odds that the relationship we measured, just simply our
 8   measurement of it was just a coincidence that it occurred by
 9   random chance, are 1 in about 506 million.
10        THE COURT:  Would you please go back a slide.
11        Could take you down in your little highlight, so I can
12   actually see the box on the chart.  Take down your little
13   red -- thank you.  You can put your chart on the bottom, I
14   don't care about that.
15        Okay, thank you.
16   Q.  Now, in addition, Dr. Lanier, to the management development
17   program, did you consider any other factors that may explain
18   the gender disparities that you found?
19   A.  Yes.  I also did an analysis of performance ratings.  In
20   particular, the performance rating is expressed as a two digit
21   number like a 3.2.  One portion is objective.  To some extent,
22   the other portion is a purely subjective portion of the rating.
23   The second portion being that subjective portion.  And I looked
24   at how those -- how females and males were rated with respect
25   to that subjective portion of the rating.
```

04J9VEL2                          Lanier - direct

1   approximately, less likely than their male counterparts within
2   the same job groups, again, similarly situated with respect to
3   job tenure, company tenure, and labor force experience, they
4   are four times less likely to be promoted to management than
5   their male peers. And that is a significant result, again, at
6   a very high level.
7         MR. SANFORD: All right, Dr. Lanier. Thank you very
8   very, much.
9         Your Honor, I have no further questions.
10        THE COURT: Thank you.
11  CROSS-EXAMINATION
12  BY MR. ABRAM:
13  Q. Good morning, Dr. Lanier.
14  A. Good morning.
15  Q. Good to see you again.
16  A. Thank you. Good to see you.
17  Q. The demonstratives that you discussed here today, they are
18  based upon the analyses that you did and reported in the
19  various reports to which you've just testified; isn't that
20  correct?
21  A. Yes. I believe so. Yes.
22  Q. So, I'd like to start with the promotion-to-manager
23  analysis that you've testified here today.
24        MR. ABRAM: If you'd pull up PX 955, please.
25        And if you could blow that up.

                                                                    57

1   Q. Now, this Dr. Lanier, if you'd help me, this particular
2   table 10 represents your analysis of promotion -- excuse me.
3   Movement into the MDP program, correct?
4   A. Yes. It's a comparison of males and females in the program
5   to males and females who I considered eligible to be in the
6   program.
7         MR. ABRAM: And if you would focus on footnote (b).
8   A. Okay.
9         MR. ABRAM: Mr. Turner.
10  Q. My understanding is that you drew the information that you
11  report in table 10 from that document; is that correct?
12  A. I believe so, yes.
13        MR. ABRAM: I ask Mr. Turner if you would call up then
14  Defendant's Exhibit 255.
15  Q. Do you recall using this document to prepare table 10?
16  A. Yes. I have a vague recollection of preparing table 10
17  based on that, yes.
18  Q. And I would direct your attention to the first line
19  entitled people in MDP.
20  A. Okay.
21  Q. Did you not take the information in comparing table 10 from
22  the columns of total males participating in MDP of September of
23  '05 and total females participating in MDP in September of '05;
24  is that correct?
25  A. Yes, I believe so.

                                                                    58

1         MR. ABRAM: Would you go back, if you would, please,
2   to Plaintiffs' Exhibit 955. Blow that up.
3   Q. So, that the information that you use in table 10 is based
4   upon data from September 2005; is that correct?
5   A. That is correct.
6   Q. And the promotion-to-manager analyses that you testified
7   to, with one exception that we'll get to, were based upon data
8   from September of 2005? Isn't that also correct?
9   A. The promotion regression analysis I testified about?
10  Q. No. With regard to movement into MDP, that is based upon
11  data from September of '05; isn't that correct?
12  A. Yes. The MDP analysis is from September of '05.
13  Q. Now, if I'm reading this right, if you look at the third
14  column, number of employees in MDP?
15  A. Okay.
16  Q. That totals male and females to 507. And I do have a
17  calculator for you if you'd like that.
18  A. That looks right.
19  Q. And that means that as of September 2005 there were
20  approximately 507 sales representatives participating in the
21  management development program?
22  A. Yes. That would be my understanding.
23  Q. And that was out of a sales workforce of how many,
24  approximately? Do you recall?
25  A. The sales workforce at any given time, in the neighborhood

                                                                    59

1   of five thousand, I think.
2   Q. Five to seven thousand? Would that sound about right?
3   A. I think that sounds about right, yes.
4         THE COURT: Excuse me. That's a big swing. Five to
5   seven thousand. Don't we have a better number than that?
6         MR. ABRAM: Temporally it did swing that much, your
7   Honor.
8         THE COURT: Okay.
9         MR. ABRAM: That's not a result of imprecision.
10        THE COURT: Okay.
11  Q. Now, so as of -- September of 2005, again, looking at your
12  table 10, as I read it, 171 out of the 507 participants in the
13  management development program were women, correct?
14  A. That's correct.
15  Q. And that would be approximately 34 percent?
16        Again, I have a calculator if you'd like to make that
17  calculation.
18  A. I'll take your word on it.
19  Q. So, as of September of 2005, 34 percent of the participants
20  in the MDP program were women?
21  A. Okay.
22  Q. That's what your own figures show; isn't that correct?
23  A. Yes. Yes 171 of 507 I believe we said. I believe that's,
24  yes, 34 percent.
25  Q. And you're aware that to become eligible for promotion to

                                                                    60

1  manager, first-line manager, district manager, area sales

2  manager, you had to successfully complete the management

3  development program, correct?

4  A.  I am aware of the existence of a policy to that effect,

5  yes.

6  Q.  So, it is your understanding that, indeed, you had to be

7  completing -- have completed the management program to be

8  eligible for promotion, correct?

9  A.  Well, it's not something I could check in the data.  So I

10 can't be sure based on any data or anything.

11    THE COURT:  You're saying that there's a policy but

12 you have no way of knowing whether the policy was complied

13 with?

14    THE WITNESS:  Correct.

15    MR. ABRAM:  Now, if you go back to the Defendant's

16 Exhibit 255.

17        This is a two-page document.

18 Q.  Do you recall that?

19    MR. ABRAM:  Mr. Turner, show the second page.

20 A.  Now that you put it up there, I certainly take your word

21 for it.  It's been a long time since I've looked at that

22 document.

23 Q.  I ask to draw your attention --

24    MR. ABRAM:  Mr. Turner, if you would highlight the

25 last line.

1  Q.  -- that indicates, does it not, Dr. Lanier, that as of

2  September 2005 there were 53 men and not 13 women in the MD3

3  completion pool?

4  A.  Yes.  That's what that says.  Yes.

5  Q.  Do you understand that, therefore, as of September 2005, 53

6  males and 13 women were in this pool of individuals who had

7  successfully completed the MDP program and were eligible for

8  promotion to first-line management, correct?

9  A.  I understand that there may be -- who had completed

10 the program, yes.

11 Q.  So, again, as of September 2005, 13 out of 66 sales

12 representatives who were in the eligible pool were women; is

13 that correct?

14 A.  Yes.  That's correct.

15 Q.  And that would be approximately 20 percent of the eligible

16 pool being women as of that date, correct?

17 A.  To the extent that, again, I haven't been able to verify --

18    THE COURT:  This is what I don't want.  I don't want

19 you jousting because you're using terms that are either

20 advantageous for you or not advantageous to you.  It's

21 argumentative and that's later.  He has already said he

22 understands that there was a policy.  He can't say policy was

23 complied with.

24        So his protest is against your use of the word

25 eligible, okay.  Eligible.

1        You can ask him fact-based questions on this and you

2  can make the argument that you want to make when your own

3  expert gets on the stand or when you're talking to the jury.

4    MR. ABRAM:  Yes, your Honor.

5    THE COURT:  I don't want the fencing back and forth.

6  It's distracting.

7    MR. ABRAM:  That was not my intention.

8    THE COURT:  I understand.  It's distracting.  It's not

9  helpful to me or to the jury in listening to this kind of

10 testimony, all right.

11    MR. ABRAM:  All right.

12    THE COURT:  He's being careful.  You're being careful.

13 Let's just, please.

14    MR. ABRAM:  Yes, your Honor.

15 Q.  Now, in your report --

16    MR. ABRAM:  If you pull up Exhibit -- Defendant's

17 Exhibit 253.

18        Blow that up, please.

19 Q.  You also included a table that shows the number of

20 employees promoted, correct?

21 A.  Yes, I did.  I think that's from an earlier report.

22 Q.  Yes.  That's from the same report, your revised report that

23 you prepared in October of 2006, correct?

24 A.  Okay.  Yes, it looks to be.  Yes.

25 Q.  And the number of employees promoted, that's from the sales

1  force to first-line management, correct?

2  A.  Yes, it is.

3  Q.  And that reports promotions from the first of January 2002

4  through June of 2005; isn't that correct?

5  A.  I believe that's correct, yes.

6  Q.  So, your table 8 reports that 98 males and 36 females were

7  promoted in that time frame to management, correct?

8  A.  Yes.  That's correct.

9  Q.  And so that's 134 promotions over that three-and-a-half

10 year period?  Yes?

11 A.  Yes, I -- yes.  That's right.

12 Q.  And that's out of a field force of -- your estimate is five

13 thousand?

14 A.  Yes.

15 Q.  Now, 36 of these 134 promotions went to women?  Yes?

16 A.  Yes.  That's correct.

17 Q.  That means that almost 28 percent of the promotions during

18 this time frame went to women; isn't that correct?

19 A.  I'll take your word on the math again.  Yes.

20 Q.  And that compares, based upon your own analysis, to the

21 fact that as of September 2005, if you looked at the pool of

22 those sales representatives who had successfully completed the

23 management development program, 20 percent of those were women,

24 correct?

25 A.  (No response).

Case 1:04-cv-09194-CM Document 287-2 Filed 04/27/2010 Page 17 of 33
4/19/2010 TEMPORARY FOR BRIEF (4/19/2010 trial transcript)
4/19/2010 TEMPORARY FOR BRIEF (4/19/2010 trial transcript)

1  Q. We --
2  A. I believe I recall that from the previous slide, yes.
3  Q. So, up until June of 2005 the promotion rate of women into
4  management was about 28 percent, correct?
5  A. Averaged over that whole time period, correct.
6  Q. And the participation of women into the management
7  development program who successfully completed it was
8  approximately 20 percent, right?
9  A. As of September '05, that was the number we had,
10  20 percent, yes.
11       MR. ABRAM: Now will you pull up Plaintiffs' Exhibit
12  961. Would you blow that up.
13  Q. Dr. Lanier, do you recognize that as an updated table 8
14  that you prepared using data through November 2007?
15  A. Yes, I do.
16  Q. And for that time period, you report the number of
17  employees promoted now from January 1, 2002 through November of
18  2007, correct?
19  A. Yes. That's correct.
20  Q. That's 185 males and 67 females; is that correct?
21  A. Yes, it is.
22  Q. So that for the entire time period, approximately
23  27 percent of the promotions to management were women, correct?
24  A. Again, I'll have to take your word on the math there.
25  Q. Well those are your numbers, aren't they?

1       also looked at what I believe you termed selection into the
2  management development program.
3       Is that one of the analyses you testified to this
4  morning?
5  A. Yes. I think the one we just kind of went over. Yes.
6  Q. Now, if you turn to Plaintiffs' Exhibit 955, table 10.
7       MR. ABRAM: Blow that up.
8  Q. And that is indeed -- table 10 represents that analysis,
9  correct?
10  A. Yes, it does.
11  Q. Now, table 10 does not actually look at or analyze
12  selection into MDP, does it?
13  A. Like I said, it compares the distribution of males and
14  females in it to the distribution of males and females in what
15  I term the eligible sales force, yes.
16       So it's not a measure of the flow, so to speak. It's
17  a comparison of the stock of people in to people who couldn't
18  be in.
19  Q. At a particular point in time, being September 2005,
20  correct?
21  A. Yes. I believe that I was able to use -- the numbers in
22  the first -- in the -- the 2209 and the 1887. I don't remember
23  if the 2005 data went all the way to September of '05. But
24  they went to sometime in mid '05. So it was as close as I
25  could get.

1  A. Those are my numbers, yes. But the 67 divided by what,
2  252.
3  Q. Again, would you like the calculator?
4  A. No. Like I said, I'll take your word. 252 totally. 67
5  divided by 252.
6  Q. Now, do you have any data about female participation in the
7  MDP program beyond September 2005?
8  A. I don't have any.
9  Q. Did you look at information about the percentage of females
10  in the pool of those people who had successfully completed MDP
11  for any period after September 2005?
12  A. No. I didn't have any of that information.
13  Q. By the way, you testified at some length today that you
14  excluded certain people who had worked less than a full year
15  from your compensation analysis, correct?
16  A. That's correct. Yes.
17  Q. You did not exclude them from your promotion-to-manager
18  analysis that you testified to here today, did you?
19  A. I required -- no. No, I did not.
20  Q. Now, you also testified this morning that in addition to
21  looking at promotion to manager, you looked -- so much for the
22  hand movement.
23       THE COURT: It happens.
24       MR. ABRAM: I will try to control myself.
25  Q. You -- in addition to looking at promotion to manager, you

1       MR. ABRAM: Now I'd like to highlight footnote (a) to
2  table 10, if you would, please, Mr. Turner.
3       Bring that up. And blow up table 10 so we all can see
4  it a little better, please.
5  Q. Now, focusing Dr. Lanier, on the column entitled total
6  employees eligible for MDP, you have the notation footnote (a)
7  there, correct?
8  A. Footnote (a), yes.
9  Q. And footnote (a) describes the factors that you used in
10  defining who, in table 10, you considered to be eligible for
11  MDP, correct?
12  A. Yes. Potentially eligible for MDP, yes.
13  Q. You say potentially eligible. The factors that are listed
14  in footnote (a), employees 27 years of age or older with at
15  least one year of company tenure in all sales-related job
16  groups except district manager 1.
17       Those are your eligibility assumptions, are they not?
18  A. They are, yes. They are meant to coincide, to some extent,
19  with the eligibility assumptions that I made for the promotions
20  analysis.
21  Q. And they are not taken from any Novartis policy setting out
22  eligible criteria for movement into MDP, are they?
23  A. They are not. I don't think I saw any documentation to
24  that effect.
25       MR. ABRAM: Your Honor.

1    THE COURT:  No, no.  They're not.  Okay.  They're not.
2  If he asks you a yes-or-no question, Dr. Lanier, it would be
3  helpful that you answer it yes or no.  Mr. Sanford will ask you
4  some sort of explanatory question.
5  Q.  Now, did you have a chance to read Dr. Outtz's report that
6  was prepared by him in connection with this litigation?
7  A.  No, I did not.
8  Q.  Did you review his trial testimony?
9  A.  No, I did not.
10  Q.  Well, let me ask you then.  Are you aware, is there any, as
11  far as you know, requirement before you become eligible to be
12  in the MDP program to be satisfactorily performing your current
13  position?
14  A.  Again, I'm unaware of the requirements to be in the MDP to
15  the extent there are specific requirements.
16  Q.  So you don't know whether or not, to be eligible to move
17  into the MDP, you have to have a certain minimum rating in your
18  performance evaluation?
19  A.  No, I don't know.
20  Q.  And do you know whether or not typically an employee to be
21  able to move into MDP has to have a certain amount of
22  pharmaceutical sales experience?
23  A.  No, I don't know.
24    MR. ABRAM:  Would you call up Defendant's Exhibit 254.
25  Blow that up, please.

69

1  Q.  Do you recall this as an e-mail from Angela Corridan to you
2  on October 2, 2006?
3  A.  Yes, I do.
4  Q.  Who is Angela Corridan?
5  A.  Angela Corridan is an attorney who was working on the case
6  at the time.
7  Q.  Did you read this e-mail?
8  A.  Yes, I did.
9  Q.  And it informs you that upon her examining the transcripts,
10  it appears that a person would generally need three or four
11  years of pharmaceutical sales experience before becoming a
12  manager.
13    Do you see that?
14  A.  Yes.  That's what the e-mail says.
15  Q.  Now, you did not, in fact, in defining --
16    MR. ABRAM:  You can bring that down and go back to
17  table 10.
18    MR. TURNER:  PX?
19    MR. ABRAM:  955.
20    Blow that up.
21  Q.  Now in defining your total employees eligible for MDP you
22  did not take into account whether or not anybody included in
23  your eligible pool had three or four years of pharmaceutical
24  sales experience, did you?
25  A.  Well, I attempted to.

70

1  Q.  Excuse me.  Did you, sir?
2  A.  I attempted to.
3  Q.  Did you or didn't you?
4    THE COURT:  Did you succeed?  Yes or no?
5    THE WITNESS:  I don't -- I can't answer that yes or no
6  because I don't know if I succeeded.  I attempted to.
7  Q.  Now, one of the factors that you used in defining your
8  eligible pool is that your required an employee to be 27 years
9  of age or older, correct?
10  A.  That's correct.
11  Q.  And as you testified this morning, you used that as -- and
12  I believe this was your term -- a proxy for potential prior
13  experience that an individual had before coming to Novartis.
14  Is that fair?
15  A.  That's fair, yes.
16  Q.  But the age 27 is a -- is taken as a snapshot of when this
17  data was produced, correct?
18  A.  Twenty-seven -- let me see.  When would that have been as
19  of.  I think it would have been as of the date -- the middle of
20  '05.
21  Q.  Right.  Exactly.  So, somebody could have come to Novartis
22  at age 22 and as of September of '05 had been at Novartis for
23  five years?  Would that satisfy your criterion there?
24  A.  Yes, it would, if they were 27, yes.
25  Q.  But it would also satisfy your criterion if somebody was

71

1  hired by Novartis and had only one year of experience -- excuse
2  me -- tenure at Novartis and was 27 as of September 2005, that
3  person also would be included; is that correct?
4  A.  Yes.  That's correct.
5  Q.  Now, you don't know what anybody was doing in terms of
6  whether they were working or not before they came to Novartis,
7  correct?
8  A.  Correct.
9  Q.  We could have one person who had graduated from college at
10  age 22 and went immediately to work for a pharmaceutical
11  company selling drugs, that would be -- and so long as the
12  person was age 27 as of September of '05, they would be
13  included in your eligible pool, correct?
14  A.  That's one possibility, yes.
15  Q.  Likewise, we could have somebody who graduated from college
16  at age 26 and came to Novartis and had one year of tenure and
17  is 27 on September of 2005; and likewise, that person would be
18  included in your eligible pool, correct?
19  A.  Yes.  As long as they're 27.
20  Q.  So, when you talked this morning about experience or labor
21  force experience, you, in fact, don't have any data on what
22  labor force experience, prior to Novartis, any sales rep in
23  your data pool had, in fact; is that correct?
24  A.  Right.  I don't have any specific knowledge of what their
25  experience was.

72

1  Q.  By the way, is it your understanding that before an
2  employee can participate in the management development program,
3  they have to complete a developmental checklist of certain
4  developmental activities?
5  A.  I have no understanding one way or the other with respect
6  to that.
7  Q.  And I take it, therefore, you did not define your eligible
8  pool here -- you did not restrict your eligible pool to only
9  those people who completed the developmental checklist?  Isn't
10  that fair?
11  A.  Yes.  And I'm not sure I would have been able to because --
12       MR. ABRAM:  Your Honor --
13       THE COURT:  Okay.  But you didn't?
14       THE WITNESS:  I didn't.
15  Q.  Dr. Lanier, in terms of who's included in your eligible
16  pool, the 2,209 employees who were male and the 1887 females,
17  as you said here today and as you were preparing this table,
18  you have no idea who in that pool may have had three to four
19  years of pharmaceutical sales experience, do you?
20  A.  That is correct.  I don't know the nature of their
21  experience.
22  Q.  And you don't know what their performance evaluations have
23  been in that year or prior years either, do you?
24  A.  I didn't take that into account in this analysis, no, I
25  didn't.

73

1  Q.  And you have no idea, as you sit here today or when you
2  prepared that table 10, what number of males or females in your
3  eligible pool may have been interested in pursuing a career as
4  a manager at Novartis, do you?
5  A.  Correct.  I have no information on that.
6  Q.  But in your table 10 and in your testimony this morning,
7  you assumed that all of the males and all of the females listed
8  in that eligible pool were equally qualified to move into the
9  management development program; isn't that correct?
10  A.  I think a less restrictive assumption -- only a less
11  restrictive assumption is required; and that is that, on
12  average, they are equally qualified.
13  Q.  And you assumed, on average, they were equally interested
14  in pursuing a management career, correct?
15  A.  Yes.  That is an assumption, yes.
16  Q.  But you really do not know for a fact who in that pool
17  really was interested in pursuing a management career, correct?
18  A.  Correct.  I don't have that information.
19  Q.  And the estimate of these standard deviations that you
20  testified this morning showing that, in your opinion, these
21  differences in the -- differences between the number
22  participating in MDP and the number of females in your eligible
23  pool showed that, the standard deviation of a large number,
24  that's dependent upon how you defined the eligible pool in the
25  first instance; isn't that correct?

74

1  A.  That's correct.  Standard deviations are within the
2  confines of this analysis, yes.
3  Q.  And if your eligible pool is not soundly estimated, neither
4  are your standard deviation calculations?  Isn't that also
5  correct?
6  A.  If it's not soundly estimated, then, yes, the rest of the
7  statistics you would want to question also.
8  Q.  Let's turn to your performance evaluations.
9       MR. ABRAM:  And if you call up Plaintiffs' Exhibit
10  956, please.
11       Mr. Turner, blow that up for us, please.
12  Q.  Now, this table 11 also is what was included in your report
13  and underlies your testimony about your analysis of performance
14  ratings received by men and women; isn't that correct?
15  A.  That is correct, yes.
16  Q.  And table 11 is based upon data looking at the time period
17  January 1, 2002 to approximately June 30, 2005; isn't that
18  correct?
19  A.  I believe so, yes.
20  Q.  You did not update your analysis of performance evaluations
21  received by males and females through November of 2007, did
22  you?
23  A.  I did not.  That's correct.
24  Q.  You had the data that would have enabled you to do so if
25  you had chosen to; isn't that correct?

75

1  A.  I believe so.
2  Q.  And you updated your compensation analysis through
3  November 2007, correct?
4  A.  I did.
5  Q.  And you updated your promotion-to-manager analysis through
6  November 2007, correct?
7  A.  That is correct.
8  Q.  But you didn't update your performance evaluation analysis?
9  A.  That's correct.
10  Q.  So, you cannot render an opinion as to whether or not
11  during the entire class period from January 2002 through
12  November 2007, whether or not, in fact, women received
13  proportionately fewer three ratings than did men in the values
14  and behaviors portion of the performance evaluation system;
15  isn't that correct?
16  A.  That is correct.  This is just through '05.
17  Q.  And, again, with respect to your analysis of performance
18  evaluations, you included people who worked less than a full
19  year; isn't that correct?
20  A.  I didn't actively exclude them.  So I assume there probably
21  are people in there who worked less than a full year.
22  Q.  Even though you excluded them from your compensation
23  analysis?
24  A.  Yes.  For a very specific reason.
25  Q.  Excuse me.  Yes or no.

76

1   A.  Yes.  Yes.

2   Q.  Now, in your work on this case, Dr. Lanier, did you analyze

3  the merit pay -- the annual merit pay increases received by men

4  compared to women?

5   A.  No, I did not isolate merit pay increases.

6   Q.  You did not.  Thank you.

7        So you cannot render an opinion as to whether or not

8  the annual percentage merit pay increases received by men was

9  more, less, or about the same than similarly situated women,

10  isn't that correct?

11   A.  That's correct.

12   Q.  And by the way, when we've been talking about similarly

13  situated, that -- just so we're all on the same page -- that

14  refers to only the explanatory variables, to use your phrase,

15  that you include in your analysis, correct?

16   A.  Yes.  That's correct.

17   Q.  So it doesn't include, for instance, those things such as

18  actual prior work experience before coming to Novartis,

19  correct?

20   A.  Correct.

21   Q.  And, as you testified this morning, you also don't include

22  in your analyses the pay or promotion to manager, the

23  performance evaluation of employees?  Isn't that also correct?

24   A.  That's correct.

25   Q.  So, because you did not perform any analysis of merit pay

1  increases given to men or women during the class period, you

2  are not in a position to render any opinion as to whether or

3  not your estimated differences in the rate at which men and

4  women received three ratings on values and behaviors through

5  June of 2005 have any effect on whether or not women received

6  the same, larger, or smaller merit increases than did men?

7  Isn't that also correct?

8   A.  Yes.  That's correct.

9   Q.  Which brings us, I guess, Dr. Lanier, to your compensation

10  analysis.

11        By the way, before I go there.  You do not know

12  whether or not an employee going on a leave of absence in a

13  year affects that employee's eligibility for receiving a merit

14  pay increase for that year, do you?

15   A.  I have seen documents to that effect, yes.

16   Q.  Dr. Lanier, we first got together for your deposition in

17  October of 2006, did we not?

18   A.  That sounds right.

19   Q.  And if I were to refer you to deposition page 62, lines 13

20  through 14 of that deposition.

21        Do you recall my asking:

22  "Q.  Do you know what effect on eligibility for receiving a

23  merit increase is if you were on a leave of absence during the

24  year?

25  "A.  I don't know.

1  "Q.  Do you know if it varies by the amount of time you were on

2  the leave?

3  "A.  I don't know.

4  "Q.  Or the type of leave you were on?

5  "A.  No, I don't know."

6        Did you give that testimony?

7   A.  Yes.  I mean I don't recall specifically that but it's

8  obviously in the transcript, yes.

9   Q.  Now, with regard to your pay analysis, you testified, I

10  believe this morning, that your measure of total compensation

11  included a number of other medical reimbursements, tuition

12  assistance, relocation allowances, and similar payments,

13  correct?

14   A.  Yes.  I'm not sure I itemized all of those, but yes.

15   Q.  But you recall that, indeed, that does include that?

16   A.  Yes.  About two-and-a-half percent are those other items.

17   Q.  Please, when I ask you a yes or no, confine your answer.

18        THE COURT:  It would be helpful, Dr. Lanier.  Thank

19  you.

20        THE WITNESS:  Sorry.

21   Q.  Now, in fact, even by your estimate now that these other

22  factors make up only two-and-a-half percent, you don't know

23  whether men or women receive different amounts of these types

24  of payments, correct?

25   A.  That's correct.

1   Q.  And you don't know what fraction, if any, of your estimated

2  difference between male and female total earnings is

3  attributable to differences in these other types of payments;

4  isn't that also correct?

5   A.  That's correct.

6   Q.  And you did not do any analysis looking at differences of

7  pay between males and females solely restricted to base salary,

8  did you?

9   A.  No, I did not.

10   Q.  Or same answer with regard to looking solely at incentive

11  pay?

12   A.  I didn't look solely at incentive pay either.

13   Q.  Or look at salary plus incentive pay only, correct?

14   A.  That's correct.

15   Q.  Now, in your testimony, you referred to a monthly

16  difference of $105.05.  That's the estimated difference that

17  you calculated for the -- within job pay difference for men and

18  women, correct?

19   A.  Yes.  That's correct.

20   Q.  And you aren't contending by showing us that figure that

21  all females in the class earned less than -- $105 less than all

22  males in the class; isn't that correct?

23   A.  That's correct.

24   Q.  To use your terminology, that $105.05 is just a

25  hypothetical representative female average, correct?

**Page 81**

1   A.  Yes.  I don't recall exactly that language, but that's
2   true.
3   Q.  You would agree with that, correct?
4   A.  Yes.  I would agree with that.
5   Q.  In fact, you don't know from your analysis that you
6   testified to here today whether or not the majority of women in
7   the class did or did not earn more than or the same as their
8   male counterparts in the same job; isn't that correct?
9   A.  That's correct.
10  Q.  Also, I think you testified this morning that you didn't
11  include all of the sales representatives for whom you received
12  data from Novartis, correct?
13  A.  In the compensation analysis?
14  Q.  Yes.  I'm sorry.  Yes.  Thank you.
15  A.  That's correct.
16  Q.  And did you -- do you know whether or not, for instance,
17  you included in your compensation analysis any of the witnesses
18  to be called here on behalf of plaintiffs today -- not today,
19  in this trial?
20  A.  No.  I don't know.
21  Q.  You don't know whether you did not include, for instance,
22  Kelly --
23          THE COURT:  Can we say you don't know whether you did
24  include?
25          MR. ABRAM:  Okay.  Yes.  Double negative.  Sorry.

**Page 82**

1           THE COURT:  You don't know whether you did not
2   include.  I can only deal with one.
3           MR. ABRAM:  Yes, your Honor.
4   Q.  Do you know whether you included the salary information of
5   Kelly Corbett?
6   A.  No, I didn't.
7   Q.  Or Raelene Ryan?
8   A.  I don't know.
9   Q.  Or Jennifer Recht?
10  A.  I don't know.
11  Q.  Or Amy Zschiesche?
12  A.  Again, same answer.  I don't know.
13  Q.  Do you know what fraction of the class members you excluded
14  completely from your compensation analysis?
15  A.  No, I don't know.
16  Q.  Would 25 to 30 percent sound about right?
17  A.  Like I said, I don't know.
18  Q.  Now, you testified this morning, if I understood you
19  correctly, sir, that you included these individuals that you
20  did exclude because you were measuring compensation in total
21  annual earnings, correct?
22  A.  That's -- I would call that a little bit of an
23  oversimplification.
24  Q.  But that was your primary reason, correct?
25  A.  That was the -- the fact that incentive compensation is

**Page 83**

1   part of total compensation.
2           MR. ABRAM:  No, no.
3           THE COURT:  Let him answer the question, please.  This
4   is not a yes-or-no question, at least not in my mind.  Please
5   explain.  I'm confused.
6           THE WITNESS:  Thank you.  The fact that I used total
7   compensation in my analysis, and total compensation includes
8   incentive compensation, and you can't analyze incentive
9   compensation because of the issues I discussed, the fact
10  that -- your question I think was something along the lines of
11  is the fact that I used total compensation related to the need
12  for the exclusions, something like that.
13          MR. ABRAM:  Yes.
14          THE WITNESS:  That's how it's related, through that.
15          THE COURT:  But I don't understand what you mean.  Is
16  that because you excluded people who worked part of the year?
17  Is that because you excluded people who didn't receive any
18  incentive compensation?  I don't understand what you're saying.
19  How does that relationship play out?
20          THE WITNESS:  Well, incentive compensation goes up or
21  down based on --
22          THE COURT:  We all know that.
23          THE WITNESS:  -- and if you have a person who worked
24  only a portion of the year, then they were only in the
25  territory for a portion of the year.  If you're going to

**Page 84**

1   analyze that person's incentive compensation, you have to
2   assume that they would continue to earn at the same rate for
3   the rest of the year that they were earning when they were
4   actually in the territory.
5           THE COURT:  So is what you're saying that you excluded
6   people who only worked part of the year?
7           THE WITNESS:  Correct.
8           THE COURT:  Okay.  And the reason why was that you
9   couldn't analyze their total compensation?
10          THE WITNESS:  That's correct.
11          THE COURT:  Very simply put.  Thank you so much.
12          THE WITNESS:  You're welcome.
13  Q.  Dr. Lanier, you're aware that incentive payments were paid
14  out on a trimester, that is three times a year, basis; isn't
15  that correct?
16  A.  Yes, I understand.
17  Q.  And that the incentive pay formula, if you will, was
18  restarted each trimester, correct?
19  A.  Yes.  That's consistent with my understanding, yes.
20  Q.  And with regard to calculating total pay, you could have,
21  instead of talking about annual total earnings, you could have
22  translated that into monthly or hourly earnings, could you not?
23  A.  (No response.)
24  Q.  As a pure mathematical matter?
25  A.  Yes as a pure mathematical matter, you can certainly take

1  wouldn't have affected the analysis to include them.  Still you
2  have to be concerned about the subjectivity.  But if there's
3  not a pattern, it's not likely to affect the analysis.
4  Q.  Are you an industrial psychologist by training?
5  A.  No, I'm not.
6  Q.  Did you review the Novartis performance evaluation system?
7  A.  I have seen a couple of documents about performance
8  evaluations.  I don't know if that counts as reviewing the
9  system.  But I have seen some information about basically what
10  they are.
11       THE COURT:  By "review" did you mean did you attempt
12  to do an evaluation of it or --
13       MR. ABRAM:  No, no.  I think he already testified.  I
14  asked review, and he's testified he saw a few documents.
15       THE COURT:  That -- Never mind.
16  Q.  Dr. Lanier, then you have no basis for forming an opinion,
17  an expert opinion as to whether or not Novartis' performance
18  evaluation system is subjective or not, do you?
19  A.  The documents that I have seen characterize that second
20  number as subjective.  So that's the primary thing that I'm
21  basing it on.
22  Q.  With all due respect, Doctor, do you hold yourself out as
23  an expert in evaluating performance evaluation systems?
24       MR. SANFORD:  Asked and answered, your Honor.
25       THE WITNESS:  No, I don't.

1       MR. ABRAM:  Thank you.
2       Ray, if you could call up table 2, please.  Page 41.
3       There was a different version that you had that did
4  not have the last column.  It was up this morning.
5       Thank you.
6  Q.  Dr. Lanier, I believe you testified this morning that this
7  table 2 reports your estimates of the difference between male
8  and female earnings within these various job categories.
9       Is that what we're looking at?
10  A.  Yes.  That's correct.
11  Q.  Now, in table 2 you do not report the standard deviation
12  significance of those reported differences within each
13  category, do you?
14  A.  No, I don't.
15  Q.  But you did in other of the tables with regard to your
16  compensation analysis, for instance?
17  A.  In table 1, yes.
18  Q.  Now, in looking at the various job groups that are listed
19  in table 2, not all of the differences that you list there are
20  statistically significant at the two standard deviation level,
21  are they?
22  A.  I don't think so.  I don't recall exactly, but I don't
23  think so.
24  Q.  Would you agree from your analysis that the select market
25  sales consultant job category, the difference that is

1  represented there, is not statistically significant at the two
2  standard deviation level?
3  A.  I don't know just offhand.
4       MR. ABRAM:  Your Honor, if I may approach?
5       THE COURT:  Yes.
6  Q.  Dr. Lanier, I've handed you a document that is labeled
7  Defendant's Exhibit 275.  It is also labeled Exhibit 4 to your
8  June 1, 2009 deposition.
9       Do you recognize the document?
10  A.  Yes, I do.
11  Q.  Do you recognize it as the statistical output that forms
12  the foundation of table 2?
13  A.  I believe that table is in here and probably other tables,
14  yes.
15  Q.  If you turn to page 12 of that document.
16  A.  Okay.
17  Q.  That reflects underlying regression analysis for the select
18  specialty markets sales representative?
19  A.  Yes, it does.
20  Q.  And if you look at the female coefficient, the value is not
21  statistically significant at the two standard deviation level,
22  is it?
23  A.  That's correct.
24  Q.  If you would turn to page 14.
25  A.  Okay.

1  Q.  On page 14 is the underlying regression information for the
2  select market sales consultant category?
3  A.  That's correct.
4  Q.  And, again, if I direct your attention to the female
5  coefficient.  The value estimated by your regression there is
6  not statistically significant at the two standard deviation
7  level, is it?
8  A.  That's correct.
9  Q.  Would you turn to page 16.  You may need to look at the top
10  of 17.
11       The regression output that is included on those two
12  pages is for the select market senior consultant job group,
13  correct?
14  A.  That's correct.
15  Q.  And that female coefficient shows that you estimated that
16  women in that category earn slightly more than that, correct?
17  A.  That's correct.
18  Q.  Turn to page 23, please.  Onto page 24.
19       That is the underlying regression output for the
20  specialty market specialist job group, correct?
21  A.  Yes.  That's correct.
22  Q.  And, again, the female coefficient shows that the
23  difference that you report is not statistically significant at
24  the two standard deviation level, correct?
25  A.  That's correct.

1   Q.  Finally, page 26.  Going onto page 27.

2          That's the regression output for the specialty market

3   senior specialist position, correct?

4   A.  Yes.  That's correct.

5   Q.  And, again, the reported female coefficient is not

6   statistically significant at the two standard deviation level,

7   correct?

8   A.  That's correct.

9   Q.  Now, all of the differences that you report in the

10  right-hand column of table 2 do not include the pay for those

11  individuals who you excluded from your compensation analysis;

12  is that correct?

13  A.  That's correct.

14  Q.  And just to make sure I understand, for any given year,

15  because you're comparing people's salaries on an annual basis,

16  given points in time, at the end of 2003, 2004, 2005, etc.,

17  correct?

18  A.  Yes.  That's correct.

19  Q.  And for the comparison, say, for 2004, you exclude anybody

20  hired in 2004, correct?

21  A.  Yes.  They didn't -- less than one year of company tenure.

22         THE COURT:  I'm sorry.  I can't hear.  You're dropping

23  your voice.

24         THE WITNESS:  I'm sorry.  They would have less than

25  one year of company tenure.

1          THE COURT:  Less than one year of company tenure.

2   Just keep your voice up.  Thank you.

3          THE WITNESS:  I'm sorry.

4          That was the wrong answer.  I was thinking about

5   promotion analysis.

6          Yes.  They would have less than a full year worked.

7   Q.  And, likewise, anybody who was on leave of absence, male or

8   female, in 2004, would be excluded from your analysis, correct?

9   Who was on leave in 2004, would be excluded from your analysis

10  of end-of-year pay for 2004?

11  A.  If they were on unpaid leave of absence, I believe, yes,

12  that's true.

13  Q.  Well, do you know whether or not people were on paid leave

14  were included in your analysis or not?

15  A.  I think there are people on paid leave in the analysis.  I

16  think the hours variable that's in the earnings file --

17  Q.  So some of them are included who are on paid leave, some of

18  them aren't?

19  A.  The ones who are on -- actually, I think the hours

20  variable -- the exclusions based on hours from the earnings

21  file.  And I think that the hours variable is, in fact, the

22  hours worked.  So, I'm wrong.  I'm sorry.

23         I don't think there's anyone in there -- or not many.

24  There's a possibility that there are people in there who took

25  some amount of both unpaid leave or paid leave because the

1   threshold for a full year worked was like 1950 hours.  So, if

2   some people worked quite a bit over that but still took some

3   amount of leave, they could still have met this threshold for

4   1950 hours.  So it's possible to have some people with leave in

5   there.  But, generally, I think people with leave were

6   excluded, yes.

7   Q.  But with regard to paid leave, do you know, one way or the

8   other, whether or not you excluded people who were on paid

9   leave because they were not credited with hours worked during

10  their leave period?

11  A.  I believe they were excluded.  I believe those hours were

12  hours worked.

13  Q.  Thank you.

14         Now, is it your testimony, Dr. Lanier, that it would

15  have been impossible for you to have constructed a pay analysis

16  with -- and still include the people that you excluded?

17  A.  A total compensation analysis or any pay analysis that

18  includes incentive compensation, yes.

19  Q.  Now, Dr. Lanier, you did not compare the starting salaries

20  received by new hires at Novartis, did you?

21  A.  No, I did not.

22  Q.  So you cannot render an opinion as to whether women

23  received the same starting salary as comparable men, correct?

24  A.  No, I can't.  You're correct.

25  Q.  And you didn't study the starting job that new hires at

1   Novartis received upon joining Novartis, did you?

2   A.  No, I didn't study assignments at hire.  No, I did not.

3   Q.  So you cannot render an opinion as to whether newly hired

4   women were placed in the same level of jobs as compared to

5   newly hired men, correct?

6   A.  That's correct.

7   Q.  And you didn't do an analysis of promotions that men and

8   women received from lower level sales representative positions

9   to higher nonmanagement sales representative positions, did

10  you?

11  A.  The level in promotions, no, I did not.

12  Q.  So you don't have a basis for a professional opinion as to

13  whether or not men -- excuse me, women received those types of

14  leveling promotions from a lower to a higher rating level job

15  at the same, at a greater, or a lesser rate than did comparable

16  men, do you?

17  A.  I don't know.  You're correct.

18         MR. ABRAM:  No further questions.

19         THE COURT:  Mr. Sanford.

20         MR. SANFORD:  Thank you, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. SANFORD:

23  Q.  Dr. Lanier, why didn't you report the results --

24         MR. SANFORD:  If we can go back to the earlier slide

25  showing the breakdown of job positions and salary differential,

# EXHIBIT 4

```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   AMY VELEZ, et al.,
 3   Individually and on Behalf of
 4   Others Similarly Situated,
 4
 5              Plaintiffs,
 5
 6        v.                          04 Civ. 9194
 6
 7   NOVARTIS PHARMACEUTICALS
 7   CORPORATION,
 8
 8              Defendant.
 9
 9   ------------------------------x
10
10                                   April 20, 2010
11                                   9:46 a.m.
11
12   Before:
12
13              HON. COLLEEN McMAHON
13
14                                   District Judge
14
15                   APPEARANCES
15
16   SANFORD WITTELS & HEISLER LLP
16        Attorneys for Plaintiffs
17   BY:  DAVID SANFORD
17        KATHERINE KIMPEL
18        SHARON EUBANKS
18        KATHERINE LEONG
19        STEVEN LANCE WITTELS
19
20   VEDDER PRICE
20        Attorneys for Defendant
21   BY:  RICHARD H. SCHNADIG
21        THOMAS ABRAM
22        ELIZABETH HALL
22        AARON GELB
23        AMY BESS
23
24   ASHLEY MARSH PERTSEMLIDIS
24        Novartis in-house counsel
25
25
```

1

```
 1        (Trial resumed; jury not present)
 2        THE COURT:  I need to speak to you before we begin
 3   this morning.
 4        I have become profoundly -- and I underscore the word
 5   profoundly -- disturbed by what I perceive as an emerging
 6   pattern of problematic behavior by plaintiffs' counsel.
 7        There are three instances now to which I can cite in
 8   which manifestly improper behavior, that I would not hesitate
 9   to characterize as dirty tricks, have been perpetrated in the
10   first two weeks of this trial.
11        The first incident, which was called to my attention
12   by my law clerk, was that a document that was supposed to be
13   redacted to remove certain references to types of
14   discrimination other than gender discrimination was shown to
15   the jury and was -- and questions were asked about it in an
16   unredacted form.  George called it to my attention.  I let it
17   pass.  I let it pass because I have tremendous sympathy for
18   lawyers who are under the gun, on trial -- I was one myself --
19   particular sympathy for the associates who are the people who
20   end up having to redact the documents.  And I assumed it was
21   simply an oversight and you would make sure that it was
22   corrected before any documents went back to the jury before
23   summations.
24        The second was the incident that we had last week,
25   which was the manifestly improper questioning of a witness
```

2

```
 1   about a verdict, that was so recent that I hadn't caught
 2   anything about it in the press yet, in another lawsuit brought
 3   by a member of this class, apparently now only a member of this
 4   class for injunctive relief purposes, involving her personal
 5   claim of pregnancy discrimination; questioning that was
 6   improper at so many levels that it took my breath away.
 7        And then there was yesterday.  The reason I have a
 8   final pretrial conference at which we go over exhibits is so
 9   that we can forestall the use of exhibits that are manifestly
10   improper, among other reasons.  And we had specific
11   conversation at that conference about exhibits that contained
12   double and triple hearsay.  And during the course of the
13   conference, plaintiffs' counsel withdrew a number of exhibits.
14   We have the transcript.  That's what was checked yesterday
15   before I brought this up.
16        One of the exhibits voluntarily withdrawn by
17   plaintiffs' counsel was Exhibit 426.  For good cause.  Because
18   if we had talked out Exhibit 426, it would never have been
19   admitted.  And yesterday Mr. Wittles examined the witness
20   extensively on Plaintiffs' Exhibit 426 and showed it to the
21   jury.
22        And I have to say I don't fault Mr. Schnadig here.
23        MR. SCHNADIG:  Good.
24        THE COURT:  Calm down, Mr. Schnadig.
25        MR. SCHNADIG:  I'm never calm, your Honor.
```

3

```
 1        THE COURT:  A lawyer has a right to assume that his
 2   opponent is following the rules.  A lawyer has a right to
 3   assume that his opponent is abiding by rulings.  And a lawyer
 4   has a right to assume that when his opponent withdraws an
 5   exhibit and knows it is not in evidence, that it will not be
 6   used.
 7        Unfortunately, it is now clear that Mr. Schnadig needs
 8   to devote a member of his trial team to the task of monitoring
 9   every single exhibit that's shown to the jury so that they can
10   jump up before it's shown to the jury and say no, no, no,
11   Judge, that one was withdrawn, which is not really the way that
12   the lawyers at the back table ought to be deployed.  But
13   apparently it's necessary.
14        The Sanford firm must show cause within 48 hours as to
15   why it should not be sanctioned for using that document.  And
16   I'm very serious about imposing sanctions.  And by the way,
17   it's not an excuse:  Mr. Wittles was not at the final pretrial
18   conference.
19        And the evidence will be stricken this morning with a
20   strong caution to the jury that they are to disregard it.
21        The people at the front table are reminded that there
22   are only so many strong cautions that I can give to a jury
23   during the course of a trial before I have to consider the
24   possibility of mistrial.  And if I should find myself in the
25   unhappy position of having to declare a mistrial in this
```

4

1  discriminated against you, didn't you?

2  A.  Right.

3  Q.  And you don't believe that he harassed you, right?

4  A.  Right.

5  Q.  And you also had a regional director named Bob Bullock,

6  right?

7  A.  Correct.

8  Q.  And you didn't tell Mr. Bullock that you believed that Bob

9  Lloyd was harassing you for your maternity leave, right?

10  A.  That is correct.

11  Q.  And you didn't tell Mr. Bullock that Bob Lloyd was sexually

12  harassing you, right?

13  A.  Right.

14  Q.  And that's something you didn't tell Gene Martin, either?

15  A.  Right.

16  Q.  And you never told HR about that either, did you?

17  A.  No, I did not.

18  Q.  And the first time you brought any of this conduct to the

19  company, by Bob Lloyd, is in your deposition, right?

20  A.  Right.

21  Q.  And your deposition was in December of 2009, correct?

22  A.  Correct.

23  Q.  So that's over nine years after you claim you first started

24  experiencing this behavior by Bob Lloyd, true?

25  A.  True.

1  Q.  Now, you admit, don't you, that you don't know whether your

2  manager ever heard any of the comments that Bob Lloyd made

3  about your maternity leave, right?

4  A.  No.

5  Q.  You don't admit that?

6  A.  No, he told me that -- that Bob was disappointed.

7  Q.  Okay.  Let's try again, Mrs. Kelly.

8        You admit that, as far as you know, your manager never

9  heard Bob making any comments to you about your maternity leave

10  that you considered to be harassing?

11  A.  No.

12  Q.  And you agree with me?

13  A.  I'm sorry.  I am agreeing.  He was never present when Bob

14  made those comments to me.

15  Q.  Okay.  And you know of only one time when any manager, over

16  the seven year period we're talking about, heard Mr. Lloyd make

17  any sexual comments, correct?

18  A.  Correct.  Only one time.

19  Q.  And in everything that you wrote in your documents about

20  Bob Lloyd, you were laudatory of him, weren't you?

21  A.  Yes, I was.

22  Q.  And you said in your 2001 review, that the two of you

23  worked well together, right?

24  A.  That's correct.

25  Q.  And you said, in your 2005 review, that things were going

1  well with Bob Lloyd, right?

2  A.  Right.

3  Q.  So what we have in paper, and what you gave in paper about

4  the company, suggested that you had a good relationship with

5  him, doesn't it?

6  A.  It suggests that.

7  Q.  Now, you testified that when you first came to the company,

8  Bob Lloyd made some comments regarding about the company's

9  hiring practices of bringing in pretty young girls, correct?

10  A.  Correct.

11  Q.  You didn't testify about that in your deposition, did you?

12  A.  No, I didn't.

13  Q.  And you were given numerous opportunities to do so, right?

14  A.  That is correct.

15  Q.  When I deposed you, I went through almost every year of

16  your employment, and said have you told me everything, up to

17  this point, that you believe is relevant to your claims, right?

18  A.  Right.

19  Q.  And you left this out?

20  A.  Objection.

21        THE COURT:  Overruled.

22  A.  Not purposefully, no.

23  Q.  So you just happened to remember something that occurred in

24  2000, after your deposition in 2009, and so that you can

25  testify about it today?

1  A.  Yes.

2  Q.  The other thing you didn't tell me about in your deposition

3  was the incident with the physician who you said grabbed you

4  and pressed up against you, right?

5  A.  Right.

6  Q.  And, again, I gave you multiple opportunities during your

7  deposition to tell me everything that you, personally, thought

8  was relevant to your claims, correct?

9  A.  Correct.

10  Q.  You left that out, as well?

11  A.  Not purposefully.

12  Q.  But you did, didn't you?

13  A.  Yes.

14  Q.  Now, Ms. Kelly, you claim that after you complained to

15  Human Resources, your relationship with Maurice Oswell was

16  strained, right?

17  A.  Right.

18  Q.  And you gave some testimony about your 2002 performance

19  review.  Do you remember that?

20  A.  Yes.

21  Q.  And you told us how, in that review, you received a values

22  and behaviors score that you thought you didn't deserve,

23  correct?

24  A.  Correct.

25  Q.  You don't know what anyone else received on their values

1  and behavior scores from your manager in 2002, right?

2  A.  Right.

3  Q.  You don't know if any woman, women -- any women received a

4  higher score than you, correct?

5  A.  Correct.

6  Q.  You don't know what any men got either, right?

7  A.  Right.

8  Q.  Now, you prepared -- I'm sorry.  You also received a 3.3

9  rating from Mr. Oswell in 2003?

10  A.  Yes.

11  Q.  And in 2004?

12  A.  Yes.

13  Q.  And in 2005?  Correct?

14  A.  Yes.

15  Q.  And you prepared a Multirater form for him in late 2005

16  which xxx Ms. Kimbel asked you about, right?

17  A.  Yes.

18  Q.  In that form, you were able to review Mr. Oswell on the

19  same values and behaviors you're reviewed on as a rep, right?

20  A.  Right.

21  Q.  Let's pull that up plaintiff's exhibit 261.

22       Now, you testified, Ms. Kelly --

23       MS. HALL:  If you can pull up the top e-mail, please

24  Ryan.

25  Q.  You testified that you sent this e-mail right before you

---

1  Q.  Now, I'm going to read to you the values and behaviors

2  lists in these three rows.  And I want you to tell me if I read

3  them correctly.

4       The first one is leadership, right?

5  A.  Right.

6  Q.  The second one is mutual respect, candor, trust, integrity,

7  and loyalty; right?

8  A.  Right.

9  Q.  And the third one is open communications, collaboration,

10  compassion, and candor; right?

11  A.  Right.

12  Q.  And you gave Maurice Oswell, your manager who you claim

13  discriminated against you, exceeded expectations in every

14  single one of these, correct?

15  A.  Correct.

16  Q.  And in this last row, the open communications row, you

17  wrote, and tell me if I'm reading this correctly, "Open

18  communication is a strong point within our group, mainly due to

19  Maurice encouraging it.  I feel I can communicate very openly

20  with him about work-related issues.

21       Do you see that?

22  A.  Yes, I do.

23  Q.  And you worked with Bob Lloyd, right?

24  A.  Right.

25  Q.  But you never communicated with Maurice Oswell about Bob

---

1  were going to get your 2005 performance review, correct?

2  A.  Right before he was -- Maurice was doing his part of it.

3  Q.  Okay.  Before he was going to do his part of it.

4  A.  Yes.

5  Q.  And can you confirm for me, Ms. Kelly, after you complained

6  to HR in 2001 about the comments, or in 2002 about the comments

7  Maurice made related to your maternity leave, he never said

8  anything to you again that you considered to be negative about

9  maternity leave, correct?

10  A.  Correct.

11  Q.  And you had just come back from a maternity leave when you

12  filled out this multirater, is that true?

13  A.  That's true.

14  Q.  And let's turn to the second page of this document, please.

15       You gave Mr. Oswell a meets, or fully met

16  expectations, or exceeded expectations in every single category

17  on this document, right?

18  A.  Right.

19  Q.  And you were able to add meritous statements to this

20  document, as well, right?

21  A.  Yes.  We were expected to.

22  Q.  Okay.

23       MS. HALL:  Brian, can you please pull up the

24  leadership row.  And the mutual respect role.   And the open

25  communications row.

---

1  Lloyd's alleged sexual harassment of you, correct?

2  A.  Right.

3  Q.  And as far as you knew, this form was going to be kept

4  confidential, isn't that true?

5  A.  That's what they said.

6  Q.  That's what your understanding was, correct?

7  A.  Correct.

8  Q.  And you knew that it was going to go to your regional

9  director, Bob Bullock, right?

10  A.  Right.

11  Q.  And you didn't write in here, anywhere, that you were

12  having any kind of problems with Bob Lloyd, right?

13  A.  Right.

14  Q.  And you didn't write in here, anywhere, that you were

15  having any kind of problems with Maurice Oswell, right?

16  A.  Right.

17  Q.  So, again, as far as it looks on paper, things are okay

18  with Mr. Oswell, don't you agree?

19  A.  Yes.

20  Q.  Now, you testified, Ms. Kelly, about your 2001 performance

21  evaluation, and the rating you received on that; do you

22  remember that?

23  A.  Yes.

24  Q.  And in 2002, you took maternity leave between January and

25  June, right?

1    A.   Right.

2    Q.   You were given a target list of doctors to call on,

3    correct?

4    A.   Correct.

5    Q.   And the most important doctors were in Tier 1, right?

6    A.   Right.

7    Q.   And this says you didn't reach your goals on calling on

8    those doctors, correct?

9    A.   Correct.

10   Q.   You don't know what rating your male counterpart received

11   on his 2001 review, do you?

12   A.   No.

13   Q.   And you don't know what merit increase, if any, he received

14   for that year, right?

15   A.   Right.

16   Q.   Now, after you received this review, you complained about

17   Maurice Oswell to your former manager, Warren Crane, right?

18   A.   Right.

19   Q.   And Warren is someone else that you don't accuse of

20   discrimination or harassment, correct?

21   A.   Correct.

22   Q.   And you never told Warren about Bob Lloyd's behavior,

23   right?

24   A.   Right.

25   Q.   And Mr. Crane was apologetic when you told him what

1    happened, wasn't he?

2    A.   Yes, he was.

3    Q.   And he told you to take your complaint to your regional

4    director, correct?

5    A.   Yes.

6    Q.   And you did so, didn't you?

7    A.   Yes.

8    Q.   Now you told us about an e-mail that you sent to your

9    regional director on June 24, 2002, correct?

10   A.   Correct.

11   Q.   And you testified that you had to wait a while to get a

12   response to that, right?

13   A.   Right.

14   Q.   But you understood the person you sent the e-mail to was

15   out of the country on vacation for two weeks, correct?

16   A.   I understood that after I talked to him and he told me,

17   yes.

18   Q.   So the delay was okay, because he was gone.

19   A.   Right.

20   Q.   Okay.  And your regional director told you to send your

21   complaint to Human Resources, right?

22   A.   Yes.

23   Q.   And you agreed that that was the appropriate thing to do,

24   didn't you?

25   A.   Yes.

1    Q.   And you did it?

2    A.   Yes.

3    Q.   And when you complained to Human Resources, you told Human

4    Resources that your manager harassed you because you took

5    maternity leave?

6    A.   Yes.

7    Q.   And you told Human Resources that you thought you didn't

8    get a pay increase because you took that leave, right?

9    A.   Right.

10   Q.   So you clearly understood, at that time, that harassment

11   was something you could tell HR about.

12   A.   For maternity leave, yes.

13   Q.   You thought there was a distinction between the kind of

14   harassment that you could complain about?

15   A.   No.  Not --

16   Q.   Okay.  That's all I needed to know.

17        And you understood that the behavior that you have

18   told us about, if Maurice Oswell engaged in it, was wrong

19   because you looked at Novartis' policies, right?

20   A.   Right.

21   Q.   And because you had gone to the EEOC's website, as well,

22   right?

23   A.   Right.

24   Q.   You never filed a charge of discrimination against

25   Novartis, did you?

1    A.   No.

2    Q.   In all of the 7 years that you claim that you were

3    experiencing this behavior, you didn't take that step?

4    A.   That's correct.

5    Q.   And after you sent your complaint to Human Resources, you

6    got a pay increase, right?

7    A.   Right.

8    Q.   And you told us that your regional director followed up

9    with you a couple of months later and asked you if everything

10   was okay, right?

11   A.   Right.

12   Q.   And you testified that he approached you in the middle of a

13   crowded hallway for that, right?

14   A.   Right.

15   Q.   You told me, in your deposition, he actually pulled you

16   aside, correct?

17   A.   Correct.

18   Q.   And he asked you, when he pulled you aside, outside of that

19   big group, if everything was okay, right?

20   A.   Right.

21   Q.   And if everything had calmed down, right?

22   A.   Right.

23   Q.   And you responded yes, didn't you?

24   A.   Yes.

25   Q.   Even though you say, now, it wasn't true, correct?

# EXHIBIT 5

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  AMY VELEZ, et al.,
3  Individually and on Behalf of
4  Others Similarly Situated,
5                    Plaintiffs,
5
6          v.                    04 Civ. 9194
6
7  NOVARTIS PHARMACEUTICALS
7  CORPORATION,
8
8                    Defendant.
9
9  ------------------------------x
10
10                             April 21, 2010
11                             9:30 a.m.
11
12  Before:
12
13              HON. COLLEEN MCMAHON
13
14                             District Judge
14
15              APPEARANCES
15
16  SANFORD WITTELS & HEISLER LLP
16       Attorneys for Plaintiffs
17  BY:  DAVID SANFORD
17       KATHERINE KIMPEL
18       SHARON EUBANKS
18       FELICIA MEDINA
19       KATHERINE LEONG
19       JANETTE WIPPER
20
20  VEDDER PRICE
21       Attorneys for Defendant
21  BY:  RICHARD H. SCHNADIG
22       THOMAS ABRAM
22       ELIZABETH HALL
23       AARON GELB
23       AMY BESS
24
24  ASHLEY MARSH PERTSEMLIDIS
25       Novartis in-house counsel
25

1

---

1          (Trial continuing)
2          THE COURT:  Okay.  Jurors are here.  So who's up?
3          MR. SANFORD:  Ms. Arlene Adoff, your Honor.
4          THE COURT:  Good morning.  Have a seat.
5          Mr. Sanford, call your next witness, please.
6          MR. SANFORD:  Thank you, your Honor.
7          Plaintiffs call Arlene Adoff as a hostile witness.
8          THE COURT:  Ms. Adoff, do you want to come up, please?
9          Good morning.
10  ARLENE ADOFF,
11       called as a witness by the Plaintiff,
12       having been duly sworn, testified as follows:
13  DIRECT EXAMINATION
14  BY MR. SANFORD:
15  Q.  Good morning, Ms. Adoff.  I'm David Sanford, counsel for
16  the plaintiffs in this matter.
17          Ms. Adoff, you began working at Novartis in 1997; is
18  that right?
19  A.  Yes.
20  Q.  And in approximately 2000, you became the executive
21  director of training development, correct?
22  A.  Correct.
23  Q.  As the executive director of training development, you were
24  responsible for managing the training and development of all
25  sales reps, district managers, and regional directors; isn't

3

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2

---

1  that right?
2  A.  Yes.
3  Q.  And after that, you became the vice president of training
4  and development, correct?
5  A.  Correct.
6  Q.  Now, as the vice president of training and development,
7  your responsibilities remain the same as when you were
8  executive director of that department, but you also became
9  responsible for training marketing personnel as well, correct?
10  A.  Correct.
11  Q.  Was that the last position you held at Novartis before you
12  retired?
13  A.  Yes.
14  Q.  And when did you retire?
15  A.  August 31st, 2009.
16  Q.  Back in July 2006, you gave testimony under oath at a
17  deposition in the matter, correct?
18  A.  Correct.
19  Q.  And you did so because Novartis asked you to speak on its
20  behalf, right?
21  A.  Yes.
22  Q.  And when you were deposed, you testified under oath as the
23  corporate designee for Novartis on certain topics, right?
24  A.  Yes.
25  Q.  And that means that you testified on behalf of Novartis,

4

1   Q. So you had a snapshot of exactly what the pool looked like
2   back in '05, correct?

3   A. Correct.  '04.

4   Q. And your department stopped tracking candidates once they
5   finished the MD3, isn't that right?

6   A. Yes.

7   Q. And your department didn't track them while they were in
8   the pool to become managers, isn't that right?

9   A. We took them out, once they became managers.

10  Q. No. My question, ma'am, is whether or not you tracked them
11  while they were in the pool to become managers?

12  A. Not -- we didn't track them, no.

13  Q. That's my question.

14       In fact, nobody monitors the applicants while they are
15  in the pool at Novartis, isn't that right?

16       THE COURT: Okay. What do you mean by "monitors?"

17  Q. You don't -- I mean --

18       THE COURT: I don't -- you are going to have to -- I
19  understand that you are keying your questions as to how you
20  asked them in the deposition, but I have to understand the
21  Question. What do you mean by "monitor." She just testified
22  that they take them out and they become managers. So,
23  obviously, they know something.

24       So what do you mean by "monitors?"

25  Q. I'm asking specifically whether they track them by gender;

21

1   whether you monitor them, figuring out who goes in by gender,
2   and who comes out by gender.

3       There is no tracking of that, correct?

4   A. Correct.

5   Q. All right. And there is no oversight by your department
6   with respect to employees who the district managers reject as
7   not having the qualifications to proceed in the management
8   development program, isn't that right?

9   A. Correct.

10  Q. All right.

11       There is no way a sales representative can be
12  nominated into the management development program without her
13  support of the district manager. You have testified to that,
14  right?

15       MR. ABRAM: Objection, your Honor. Asked and
16  answered.

17       THE COURT: Overruled.

18  Q. You may answer.

19  A. I'm sorry?

20  Q. Sure. There is no way a sales representative can be
21  nominated into the management development program without the
22  support of a district manager, correct?

23  A. Correct.

24  Q. All right. So, in other words, the support of the district
25  manager is a necessary requirement to proceed in the management

22

1   development process, right?

2   A. Yes.

3   Q. Okay. And a person can't become a manager at Novartis
4   without following the management development process steps that
5   we have outlined here today, correct?

6   A. Correct.

7   Q. All right.

8       If we can show plaintiff's 815, please, and look at
9   the top of the first page, I think it is. If we can go down --
10  we can go down. All right.

11      So this is an e-mail from John Svenson to Maria
12  Barone.

13      Who is Maria Barone?

14  A. Maria Barone worked in Human Resources.

15  Q. All right. And you're copied on that e-mail, correct?

16  A. Correct.

17  Q. If you could read the text there, that paragraph, please,
18  into the record, starting with "Hi, Maria."

19  A. "Hi, Maria, I wanted to respond to your e-mail, as I am the
20  process owner of the MDP within our department. It is our
21  recommendation that all candidates go through the entire MDP
22  prior to becoming a DM/ASM within our department.

23      The current process was first rolled out to the field
24  in early 2001. And the first MD1 workshop was held in December
25  of 2001. To the best of my knowledge, there have been five

23

1   individuals placed in the field as a DM or ASM without
2   completing the MDP. Three were from marketing in a
3   developmental assignment role. They are Eric Colwell, Sean
4   Larkin, and Jeff Baynes. John Harlow was from the incentive
5   department also placed in a developmental assignment role. And
6   the final candidate, Jeff Perlman, was also placed as an
7   oncology ASM without completing MD3 -- sorry, I'm ending a
8   cold. This was approved by his VP, Chuck Ziatkis, even though
9   we suggested that he complete the entire process.

10      MR. SANFORD: Ray, if you can just highlight, "to the
11  best of my knowledge there have been five individuals placed in
12  the field."

13      This line reads, "To the best of my knowledge, there
14  have been five individuals placed in the field as DM or ASM,
15  without completing the MDP.

16      Now DM stands for what?

17  A. District manager.

18  Q. And ASM stands for what?

19  A. Area sales manager.

20  Q. All right. And an area sales manager is, essentially, a
21  district manager for the specialty sales divisions, correct?

22  A. Correct.

23  Q. And then the e-mail names those individuals --

24      MR. SANFORD: If you can go further down, Ray.

25  Q. Eric Colwell, Sean Larkin, Jeff Baynes, John Harlow, and

24

04L9VEL2                    Adoff - redirect

1   A.  No.  Sixty-one.

2   Q.  I'm sorry.  Sixty-one out 76, correct?

3   A.  Correct.

4   Q.  And of the 61 that passed, 13 were women, correct?

5   A.  Correct.

6           MR. SANFORD:  No further questions.  Thank you.

7           THE COURT:  Can I ask a question.  What is the

8   management pool?  Are those people who have passed --

9           THE WITNESS:  Yes.

10          THE COURT:  -- the management development program?

11          THE WITNESS:  Yes.  They are eligible to interview.

12          THE COURT:  So what's the disparity -- 61 and 13 is

13  74.  Do you know why there's a disparity there?

14          THE WITNESS:  I'm sorry, your Honor, I don't.

15          THE COURT:  Okay.  Thank you.

16          MR. SANFORD:  No further questions, your Honor.

17          THE COURT:  Thank you.

18          MR. ABRAM:  Your Honor, before she's excused, could we

19  approach the bench about the exhibit you asked me to take down.

20          THE COURT:  Folks, I'm going to try to do this at a

21  sidebar.  We'll see if it works.

22          (Continued on next page)

23

24

25

1           (At the sidebar)

2           THE COURT:  I recognize this document.  And George

3   says it was used on Dr. Lanier's cross.  I'm not saying you

4   can't use it.  You have to do what you have to do to get it

5   into evidence.  And I don't have the document right here.  But

6   if you can get it into evidence, that's fine.

7           MR. ABRAM:  It was used as a rebuttal document.

8           THE COURT:  I don't care why it was used for

9   Dr. Lanier.  I want to know what it is.

10          Do you have an objection to its being introduced into

11  evidence?

12          MR. SANFORD:  I'd like to look at it, your Honor.  I'm

13  not even familiar with what it is.

14          MR. ABRAM:  But that's the --

15          THE COURT:  Excuse me.  Get him a copy.  Get me a

16  copy.

17          MR. ABRAM:  I will.

18          MR. SANFORD:  Your Honor, may I approach?

19          THE COURT:  You should both come up.  Okay.

20          MR. SANFORD:  I don't see any foundation for this,

21  your Honor.  I don't know if it's a document that was provided

22  in anticipation of litigation.

23          THE COURT:  That's the issue.  Look, is this a

24  document that you guys prepared?  Culled it out of the data?

25          MR. ABRAM:  Yes.

1           THE COURT:  I'm going to let it in.  It's going to

2   come in.  Okay.

3           MR. ABRAM:  Dr. Lanier cites it as --

4           THE COURT:  I'm not interested.

5           MR. SCHNADIG:  He uses --

6           THE COURT:  You just won.  Be quiet.  You just won.

7   When you win, you stop.

8           MR. ABRAM:  Okay.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Defendant's 255 is admitted.

3   RECROSS EXAMINATION

4   BY MR. ABRAM:

5   Q.  Ms. Adoff, do you recognize this document?

6   A.  I do.

7   Q.  Was it prepared by your department?

8   A.  It was.

9   Q.  At your request?

10  A.  Yes.

11  Q.  And why was this document prepared?

12  A.  It was a request from human resources.

13  Q.  How was it prepared?

14  A.  We went into the MD database and -- it's easy to sort by

15  sales associate.  But then we had to go in and map it against

16  PeopleSoft for gender because we don't keep the gender.

17  Q.  And PeopleSoft is what?  For the jury?

18  A.  It's our HR system they keep for payroll and timecards and

19  things like that.

20  Q.  I would direct your attention, Ms. Adoff, to the first

21  line.

22          Can you explain -- first, let me ask you:  Do you know

23  those counts of employees that's under the first line, people

24  in MDP, do you know what that represents?

25  A.  Yes.  It's total number of people in the pool.

04L9VEL2                    Adoff - recross

1   Q.  Do you know for what time periods or period that is shown

2   for this document?

3   A.  Looks like it's two different time periods, September '05

4   and November '05.

5   Q.  And if you please show the November '05 columns.

6           The third column, the fifth column, and the sixth

7   column, please.

8           For September '05, how many men were in the MDP,

9   according to this document?

10  A.  336.

11  Q.  And how many women?

12  A.  171.

13  Q.  If you go to the last line on the second page, please.

14          What do those figures represent?

15  A.  September '05, male 53 and women 13.

16  Q.  The far left column says "MDP completions (End of pool)."

17          What does that mean?

18  A.  Those people who have gone through the entire process and

19  completed MD1, MD2, MD3 and were assessed to be ready to

20  interview.

21  Q.  They would be eligible to be interviewed?

22  A.  To interview for a first-line manager job, yes.

23          MR. ABRAM:  Thank you.  No further questions.

24          MR. SANFORD:  No questions.

25          THE COURT:  Thank you, Ms. Adoff.  You may now step

04L9VEL2                    Adoff - recross

1   down.

2           (Witness excused)

3           THE COURT:  Call your next witness.

4           MR. SANFORD:  Plaintiffs call Ms. Holly Waters.

5   HOLLY JOY WATERS,

6       called as a witness by the Plaintiff,

7       having been duly sworn, testified as follows:

8   DIRECT EXAMINATION

9   BY MS. LEONG:

10  Q.  Good morning, everyone.  Good morning, Ms. Waters.

11  A.  Good morning.

12  Q.  Have you ever testified before a jury before today?

13  A.  No, I haven't.

14  Q.  Can you tell us where you're from.

15  A.  I live in an Annapolis, Maryland.

16  Q.  How long have you lived in Annapolis?

17  A.  For almost eight years.

18  Q.  Are you married?

19  A.  I am.  My husband is Joseph Waters.  He's with me today.

20  Q.  And do you have any children?

21  A.  I do.  Kendall Rose, who is five-and-a-half, who will be

22  attending kindergarten in August.  Just registered her last

23  week.

24  Q.  Did you go to college?

25  A.  I did.  Yes.  I went to Towson State University.

1   Q.  Did you earn a degree from them?

2   A.  Yes.  A Bachelor of Science Degree in mass communication

3   and concentration in advertising.

4   Q.  And what did you do after graduating from Towson?

5   A.  I worked for a few retail companies in their marketing

6   division.

7   Q.  And which retail companies were those?

8   A.  Levi Strauss & Company, Ralph Lauren Children's Wear, and

9   Haggar Clothing Company.

10  Q.  What did you do after your career in retail sales?

11  A.  I was hired by Novartis.

12  Q.  When did you begin working at Novartis?

13  A.  I started in April of 2001.

14  Q.  Are you still employed at Novartis?

15  A.  No, I'm not.

16  Q.  When did you leave?

17  A.  I was terminated in November of 2004 when I was

18  seven-and-a-half months pregnant.

19  Q.  And why were you terminated?

20  A.  I was accused of falsifying calls.

21  Q.  Did you falsify calls?

22  A.  Absolutely not.

23  Q.  Where have you worked since leaving Novartis?

24  A.  I work for Digene Corporation, Pfizer Animal Health, and I

25  currently work for Sequenom.

1   Q.  What do you do at Sequenom?

2   A.  I'm a business development manager and the company develops

3   non-invasive prenatal tests.

4   Q.  Have you been successful at Sequenom?

5   A.  Yes, I have.

6   Q.  Can you give me some examples of your success there?

7   A.  I've actually been there for a few months and I've opened

8   about fifteen accounts.

9   Q.  Going back to your time at Novartis, can you tell me what

10  position you had when you worked there?

11  A.  I was a sales representative.

12  Q.  What were your responsibilities as a sales representative?

13  A.  My responsibilities were to go into accounts, my targets,

14  which were physicians or practitioners, to market Novartis

15  products.

16  Q.  What was your territory while you were at Novartis?

17  A.  I had parts of Maryland.  P.G. County.  Southern Maryland.

18  Parts of D.C.  Southeast, Northwest D.C.

19  Q.  How would you describe your experiences at Novartis?

20  A.  They were good up until I got pregnant.

21  Q.  Who were your managers at Novartis?

22  A.  I had -- my first manager was Chuck Plumley.  My second

23  manager was Brian Pierro.  And my third and last manager was

24  Brian Campbell.

25  Q.  How did your managers rate you during your career at