# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY VELEZ, PENNI ZELINKOFF, MINEL HIDER TOBERTGA, MICHELLE WILLIAMS, JENNIFER WAXMAN-RECHT, KAREN LIGGINS, LORI HORTON, HOLLY WATERS, WENDY PINSON, ROBERTA VONLINTEL, CATHERINE WHITE, KELLY CORBETT, JAMIE HOLLAND, JOAN DURKIN, SIMONA LOPES, MARYANNE JACOBY, and MARTA DEYNE, **Individually and on Behalf of Others Similarly Situated,** PLAINTIFFS, v. NOVARTIS PHARMACEUTICALS CORPORATION, DEFENDANT. | 04 Civ. 09194 (CM) |

Plaintiffs respectfully submit the following Proposed Findings of Facts and Conclusions of Law regarding their disparate impact claims under Title VII.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  Plaintiffs brought this class action against Novartis Pharmaceuticals Corporation ("Novartis" or "the Company") on behalf of a certified class defined as:

> All women who are currently holding or have held, a sales-related job position with Novartis Pharmaceuticals Corporation during the time period July 15, 2002 through November 30, 2007. Those positions are Sales Representatives, Sales Consultants, Senior Sales Consultants, Executive Sales Consultants, Sales Associates, Sales Specialists, Senior Sales Specialists, and District Managers I (the "class" or "Plaintiffs").

2.     At trial, Plaintiffs alleged discrimination in pay, promotion to management, and pregnancy status in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*.  Plaintiffs' claims are based on both a disparate treatment and disparate impact theory.  The claims were tried before a jury from April 8, 2010 to May 6, 2010.

3.     The Court hereby enters its findings of fact and conclusions of law as to Plaintiffs' disparate impact claims under Title VII.  To the extent that any findings of fact are included under conclusions of law they shall be deemed findings of fact, and to the extent that any conclusions of law are included under findings of fact they shall be deemed conclusions of law.

## FINDINGS OF FACT

### I.     COMPENSATION

#### A.     Novartis' Compensation Policies

4.     Sales representatives and first level managers may receive five kinds of compensation: base salary, special situation compensation, incentive compensation, stock options, and perks and benefits.  Trial Tr. at 689:23-690:2; PX 822.

5.     Novartis' policies give sales managers discretionary authority to control each part of an employee's compensation at Novartis.  *See infra*.  That is, Novartis sales managers have discretionary authority and decision-making power over employees' base salaries, special situation compensation, incentive compensation, stock options or lack thereof, and perks and benefits.  *See infra*.

6.     As a result of policies that explicitly vest decision-making authority in sales management personnel, it is largely sales management that has authority to interpret

2

the various policies regarding different kinds of compensation and to make decisions regarding compensation where there is no policy. *See infra*.

7.      Novartis' first compensation decision regarding a new employee is two-fold: what starting salary to assign and whether to give a sign-on bonus to the new employee. This decision is entirely within the hands of sales management. There is no Novartis policy that governs how to determine a new employee's starting salary. Trial Tr. at 692:4-7, 731:12-18. There is no policy specifically prohibiting gender discrimination in the determination of starting salaries. *Id.* Similarly, managers have discretion regarding whether to award sign-on bonuses. Trial Tr. at 731:19-21. As a result, field sales management makes significantly discretionary decisions regarding starting salary and whether to award new-hire bonuses. *Id.* These decisions are made in a policy vacuum that carries no specific prohibition on gender discrimination in compensation. *Id.*

8.      Once a sales employee starts working in the field, she is eligible to receive incentive compensation. PX 1170. Novartis policy explicitly gives field sales management the sole authority to make final decisions regarding incentive compensation. PX 1170 ("Field management . . . reserves the right to adjust the amount of the bonus otherwise payable if management determines, in its sole discretion, that such an adjustment is appropriate to better reflect a representative's actual work performance.").

9.      If a manager feels that an employee should receive special compensation for work done in a given time period, sales management has the discretion to give the employee special situation funding. Trial Tr. at 913:16, 913:20-22; PX 436. Sales managers have the discretion to request special compensation and to grant it. *Id.*

10.    Once a sales employee begins work, she is also eligible to receive benefits. *See, e.g.*, PX 272.  In the absence of comprehensive policies, Novartis gives field sales management significant discretion regarding this third form of compensation, including whether and when employees will have access to certain benefits.  *See infra*.  For example, Novartis admits that it has no policy regarding the number of paid sick days its sales employees may take, and that it is up to the sole discretion of the manager to determine whether someone is taking an excessive number of paid sick days.  Campbell Trial Dep. Designations at 112:18-22, 134:10-11, 136:12-16, 159:21-24.

11.    Similarly, either by explicit policy or by defaults, managers control the perks an employee may receive as a result of her employment, including awards with monetary value.  *See infra*.  These monetary awards include the nationally recognized District MVP award, which is based on sales and a manager's "purely subjective" appraisal of an employee's "contribution" to the district.  Trial Tr. at 662:13-23.   They also include Tiger Awards, which came with an American Express gift card and were distributed at the discretion of individual managers.  Trial Tr. at 1087:8-15.

12.    In addition to endowing managers with discretionary authority over starting salaries, starting bonuses, incentive compensation, special situation funding, and perks and benefits, either by policy or by default, Novartis endows sales managers with significant discretion over sales employees' base salaries throughout those employees' time at Novartis.  *See infra*.

13.    After a manager uses his discretionary authority to set an employee's starting salary, that manager has the authority to raise the employee's base salary through merit increases ("merit increases" or "raises") as part of the yearly performance

evaluation cycle. *See infra*. In fact, Novartis policy specifically links the raise an employee should receive to the rating a manager assigns. *See, e.g.*, PX 819. Managerial discretion exists at every decision-making point in this performance evaluation and annual merit increase process. *See infra*.

14. Novartis policy dictates that managers rate employees on two metrics: 1) sales and 2) Values and Behaviors, also known as competencies. Trial Tr. at 339:24-340:12; PX 848. Managers assign an overall rating of a 1, 2, or 3 to each of the two metrics. *See infa.* Ultimately, the manager assigns the employee an overall rating comprised of two numbers, the first being for sales, the second for Values and Behaviors, so that there is an overall rating on both of the metrics such as a 2-2, 1-2, 3-2, 2-3, etc. Trial Tr. at 446:15-447:2. A 1 means "does not meet expectations" or "poor performer," a 2 signifies "meets expectations" or "good solid performer," and a 3 indicates that an employee "exceeds expectations" or is an "exceptional performer." *Id.* An overall 2-3 rating, for example, would signify that the employee met expectations with respect to sales and exceeded expectations with respect to Values and Behaviors. *See, e.g.*, PX 824; PX 825; PX 853; PX 860.

15. These ratings are always assigned in the context of a forced curve that dictates the apportionment of ratings and annual merit increases nationally. Trial Tr. at 699:24-700:1, 1511:22-25, 1521:7-12, 1522:3-8; PX 824, PX 825, PX 853, PX 860. To adhere to the forced curve, managers must, in some instances, downgrade the ratings they would otherwise assign to deserving employees. Trial Tr. at 2487:1-11, 2504:21-2505:3.

16. Novartis policy grants managers significant discretion in assigning sales performance ratings. *See infra*. While a sales rating is nominally based on sales results,

according to Novartis policy, approximately 30 percent of the sales rating is based on subjective factors.  Trial Tr. at 337:11-20, 339:2-8; JX 20.  There was, however, some confusion on this point among managers.  Trial Tr. at 666:8-18.

17.    As long as a manager's ratings fit within the forced curve, Novartis policy allows managers total discretion in assigning Values and Behaviors ratings.  Trial Tr. at 343:9-353:16, 734:4-7; PX 848.  While Novartis policies give nominal descriptions of how to rate employees, Dr. James L. Outtz, an expert in performance appraisal systems, has analyzed Novartis' policies and descriptors and found them to be fundamentally flawed and unclear, thus allowing for significant discretion on the part of managers. Trial Tr. at 528:5-10; *see also* PX 856.

18.    Once a manager has used his discretion to rate an employee within the bounds of Novartis' forced curve, the manager then decides whether to give the employee a raise and, if so, how much of a raise.  Trial Tr. at 701:1-6.  Novartis policies give managers certain guidelines on the percentage range of the raise appropriate for a given rating. Trial Tr. at 702:15-24.  However, managers have discretion within those guidelines, or, in the alternative, can simply ignore them.  Trial Tr. at 702:25-703:13, 732:22-733:21, 1523:22-24, 2713:9-11; PX 824; PX 825.

19.    Just as the rating a manager assigns has an effect on the policy contours of a manager's raise decision, the rating a manager assigns also affects an employee's eligibility for stock options.  Trial Tr. at 702:4-7.  Novartis policy generally requires that only employees with a 3 rating on either or both sides of a performance rating are eligible to receive stock options.  Trial Tr. at 702:4-7.

20.    Finally, if an employee is paid less than she should be in comparison to

the market average, her male peers, or anything else, a manager has the discretion to award the employee a mid-year or "off-cycle" adjustment.   Trial Tr. at 732:1-14, 1987:16-23; Campbell Trial Dep. Designations at 131:13-25.

**B.    Novartis' Compensation Practices**

21.    In practice, the overwhelming subjectivity inherent in Novartis' compensation policies combined with the exploitable gaps in those policies allow managers almost total discretion to discriminate against employees in compensation on the basis of their gender. *See infra*.   In addition to this excessive subjectivity, Novartis managers do not receive adequate training about nondiscrimination in the context of compensation decisions. Trial Tr. at 2059:20-2060:2.

22.    Novartis managers may assign hiring salaries of their choice and may also choose whether to assign a new-hire bonus.  *See infra*.  If a manager decides to award an employee a new-hire bonus, the manager also has discretion to decide the amount of that bonus.  *See supra* Part I.A.

23.    With respect to incentive compensation, Novartis managers have complete discretionary authority over incentive compensation and may use that discretion to discriminate against female employees.  *See, e.g.*, Trial Tr. at 1287:20-1289:24.

24.    In addition to allowing managers unfettered discretion over incentive payments, Novartis admits that its forecasting system, which determines incentive compensation, is "subjective and unexplained" in practice.  PX 424.  Indeed, Novartis' own head of human resources admitted that she did not understand how incentive goals were determined.  Trial Tr. at 333:17-19.

25.    Moreover, in the instances where an employee has complained of a

physician who subjects her to sexual harassment, Novartis may effectively punish an employee for being sexually harassed through Novartis' incentive compensation system. For example, Novartis may eventually allow a female representative to stop calling on the offending physician but fail to remove the physician from her incentive goals. Trial Tr. at 107:10-108:1. That failure may artificially depress the representative's incentive compensation. Trial Tr. at 2508:16-20.

26. Next, managers may request and grant special situation funding to employees at their discretion. Trial Tr. at 913:16, 913:20-22; PX 436.

27. In practice, managers may discriminate against female employees with respect to pay through a discriminatory distribution of perks and benefits. For example, a manager may choose to award the MVP award to a male employee for work that he did with a female employee but fail to recognize the female employee with an award. Trial Tr. at 620:10-21. Similarly, managers may subject pregnant employees to disciplinary action if those employees take what a manager deems to be an excessive number of paid sick days. Campbell Trial Dep. Designations at 112:18-22, 134:10-11, 136:12-16, 159:21-24.

28. In practice, the rating system that provided the basis for pay and promotion decisions was excessively subjective and fundamentally unfair. Trial Tr. at 528:5-10. Novartis' performance evaluation system failed to focus on observable behaviors rather than traits, did not provide specific written instructions on how to complete appraisals, did not include training for appraisers on how to appraise performance or how to conduct the appraisal, and was not within the control of the employee. Trial Tr. at 526:12-527:5, 528:5-10.

29.     Managers can rate individual employees in almost any way they choose, so long as the pool of ratings they assign to all the employees under their supervision fits within the forced distribution curve. Trial Tr. at 2054:15-24. This distribution curve governs both the objectives rating and the Values and Behavior rating. Trial Tr. at 2054:15-24.

30.     Sales numbers and rankings are supposed to determine the Objectives portion of a performance rating. Trial Tr. at 2097:23-2098:1, 2990:12-17. In practice, managers have significant discretion to raise or lower an Objectives rating according to his subjective appraisal of an employee's performance. Trial Tr. at 334:9-15, 2053:2-6, 2053:11-17, 3013:10-25, 3019:4-18, 3027:5-7, 3028:11-1.

31.     Managerial discretion is most visible in the assigning of the Values and Behaviors rating. Managers are provided with inadequate training regarding how to apply policies that are already unclear with respect to what a Value and Behavior actually is and how to evaluate the degree to which an employee shows it. Trial Tr. at 528:11-20, 528:22-529:12, 530:1-5. Managers have displayed ratings behavior that is contrary to the plain language of the performance criterion to be appraised. For example, District Manager Joseph Simmons rated Plaintiff Marjorie Salame lower for the core competency of "selling process" in 2002 than in 2001, even though her sales results improved significantly from 2001 to 2002 and even though she had won a significant sales award in 2002. Trial Tr. at 1949:8-13; PX 461; PX 467. Overall, the system allows for managers do different things in different ways, such that it is unknown what the outcome of the evaluations really signify. Trial Tr. at 529:13-25. Indeed, managers' authority is so great with respect to performance ratings that managers may base ratings for a given year on

performance from a different year, even though that is considered a policy violation. Trial Tr. at 482:3-5, 735:12-17, 1125:21-1126:3.

32.    Managers were considerably confused on how to assign Values and Behaviors ratings.  For example, they were confused regarding the relationship, if any, between the ratings assigned for individual Values and Behaviors versus the overall Values and Behaviors rating.   Trial Tr. at 1963:24-1964:13.   Similarly, there was confusion regarding the relationship, if any, between the objectives rating and the Values and Behaviors rating.  Trial Tr. at 1964:14-17.  Even when a manager believed there to be a relationship between the objectives rating and the Values and Behaviors rating, when rating a female employee whose sales had improved from the previous year, he assigned her a lower Values and Behaviors rating than he had for the previous year.  Trial Tr. at 1947:21-24; PX 467; PX 461.

33.    After using his discretion to assign a rating to an employee, if a manager has assigned too many high ratings, he must then use his discretion to decide whose rating he will downgrade so that the ratings he has assigned will, on the whole, fit within the forced distribution curve. Trial Tr. at 365:12-367:11, 2054:15-24.  There are only a limited number of 3 ratings that can be given each year.   Trial Tr. at 2053:18-20, 2054:10-11.  This limitation on high ratings can force managers to assign an employee a lower rating than the manager feels that the employee deserved.  Trial Tr. at 447:6-7, 1667:18-21.  When given a limited number of high ratings to assign, a manager may choose to award the available high ratings to males rather than to equally qualified female employees.  Trial Tr. at 1838:2-20.

34.    Managers are forced to come into compliance with the forced distribution

curve during so-called "calibration meetings," where ratings are adjusted retroactively based on the forced distribution curve. Trial Tr. at 2667:25-2668:20. Underscoring the subjectivity inherent in the ratings process, managers frequently disagree regarding what rating should be assigned to a given employee during these meetings, meaning that an employee's rating may frequently depend on her manager's willingness to fight for her, or lack thereof. Trial Tr. at 2665:18-2666:24. More often than not, employee ratings are adjusted down rather than up. Trial Tr. at 2667:21-2669:1. Managers have been forced to change the rating they would have given to female representatives from a 3 to a 2 or a 2 to a 1. Trial Tr. at 376:14-380:9, 447:6-7, 466:20-467:11, 471:11-12, 2055:16-23; PX 843.

35. Employees may appeal a rating, but the Human Resources department has no power to cure incorrect or discriminatory ratings. Even where Human Resources has evidence that a review is discriminatory, it does not change the rating. Trial Tr. at 328:2-5, 473:6-23, 483:12-484:17, 1712:2-3. Moreover, managerial training regarding discrimination is so inadequate that a female employee may register a complaint that her male coworker received a higher rating than she did without performing any better, but, if she uses a male name rather than saying "my male counterpart," the manager may not recognize her complaint as being one of gender discrimination. Trial Tr. at 2270:4-7, 2271:14-18. The complaint need not, therefore, be registered with HR. *Id.*

36. Once a final rating is assigned, a manager then has discretion in assigning merit raises that are within, below, or beyond the merit raise guidelines tied to given performance ratings. *See infra*. Managers may use their discretion to assign employees merit increases within the recommended guidelines for a given rating, or they may

choose to ignore the guidelines and give higher raises than those recommended or no raise at all.  Trial Tr. at 702:25-703:13, 732:22-733:21, 1523:22-24, 2713:9-11; PX 824; PX 825.  There was no "standardized" annual merit increase amount for all sales representatives with the same annual performance rating.  Duhart Trial Dep. Designations at 119:17-21; 120:12-121:7; 121:6-15.  It was an "art" for a Regional Director to take into account "subjective elements in deciding compensation.  There was no formal training for this process.  One manager simply testified that he just knew "what good looks like." Duhart Trial Dep. Designations at 120:22-23.  The same manager admitted "the perceptions of what you see could certainly differ" and that there is no "mathematical formula."  Duhart Trial Dep. Designations at 121:6-15.

37.    What a manager may not do is overstep his budget that is given to him as a set pool of money to be distributed as merit increases.  Trial Tr. at 2056:22-2058:4.  So managers may reduce one employee's raise if they wish to give a relatively high raise to another employee.  Trial Tr. at 359:25-362:9; PX 853.

38.    In practice, sales representatives and managers normally are eligible to receive stock options only if they receive a "3" rating on one or both performance rating metrics.  Trial Tr. at 702:4-7.  However, managers have the discretion to request that lower-rated performers also receive stock options.  PX 823.

39.    A manager may request and grant mid-year adjustments to employees for a number of reasons.  *See infra*.  However, Novartis gives managers inadequate training on when such adjustments might be appropriate or how to obtain them.  *See infra*.  As a result, both requesting and obtaining such adjustments largely falls within the discretion of Novartis management.  *See infra*.  Despite having the authority necessary to cure pay

disparities, managers frequently refused to do so.  As examples, one manager testified that if she had a representative who was an average performer but was underpaid, she would allow the observed pay disparity to continue rather than requesting an adjustment. Trial Tr. at 2058:23-2059:1.  When confronted with a significant pay disparity based on gender, another manager simply replied, "I can't make up that kind of difference."  Trial Tr. at 1381:5-16.  Yet another manager tried and failed to obtain a salary adjustment for a female employee who was paid less than her male colleagues.  Trial Tr. at 889:14-17, 914:4-6, 916:19-20; PX 425.  He failed to obtain the increase based on the refusal of his own supervisors, despite the fact that those supervisors knew or should have known that the employee in question was paid $15,000 less in base salary than two of her similarly situated but less tenured male coworkers. Trial Tr. at 2121:7-2124:18, 2145:20-2147:15; PX1122; PX1123.  Similarly, when a sales representative confronted yet another manager regarding a known gender-based pay disparity, the manager acknowledged that the representative should have been paid more but failed to obtain a raise for her.  Trial Tr. at 1147:4-1151:5.

40.     In summary, Novartis' practices with respect to compensation are based on 1) subjective performance evaluations and 2) empowering a primarily male managerial group with broad discretion to decide total compensation for the female sales force class.

41.     Novartis' subjective compensation system causes a disparate impact adverse to women in total compensation.  Dr. Lanier found a pay disparity in total compensation adverse to women at $105 per month for the totality of the class period. Trial Tr. at 808:19-809:6.  Dr. Lanier also found that pay disparity to 7.7 standard

deviations. Trial Tr. at 808:19-809:6. Dr. Finis Welch did not provide a numerical picture that is more accurate, valid, or reliable than Dr. Lanier's analysis.

### C.    Subjectivity & Discretion

42.    As detailed throughout, virtually all facets of Novartis' compensation policies and practices vest complete discretion to management to make compensation decisions. The following discussion summarizes expert testimony regarding compensation, Novartis' admissions regarding subjective decision-making in its compensation and performance management policies and practices, as well as anecdotal evidence of excessive subjectivity in compensation decisions.

### EXPERT EVIDENCE

Dr. James Outtz

43.    Dr. Outtz was not rebutted at trial.

44.    Dr. Outtz is an industrial organizational psychologist who has been in private practice in Washington, DC for 30 years. Trial Tr. at 517:19-22.

45.    Dr. Outtz has a master's and Ph.D. degree in industrial and organizational psychology from the University of Maryland. Trial Tr. at 518:19-22.

46.    As an industrial organizational psychologist, Dr. Outtz applies the theories and principles of psychology to the world of work. Trial Tr. at 517:23-518:1.

47.    Dr. Outtz develops and evaluates assessment systems (systems that organizations use to make organizational decisions), hiring decisions, promotion decisions, and performance appraisal decisions. Trial Tr. at 518:2-11.

48.    Dr. Outtz was on the Executive Board of the Society for Industrial and Organizational Psychologists. Trial Tr. at 518:23-519:15.

49.    The Society for Industrial and Organizational Psychologists asked Dr. Outtz to edit and publish a book on what is happening in industrial and organizational psychology, which was published in 2010.  Trial Tr. at 519:16-24.

50.    Dr. Outtz has published articles and chapters generally centered around the issue of fairness and employment.  Trial Tr. at 521:10-13.

51.    Dr. Outtz served on a committee that revised the most recent version of principles issued by the Society for Industrial and Organizational Psychologists for the validation and use of personnel selection procedures.  Trial Tr. at 520:14-23.

52.    Dr. Outtz has served on committees sponsored by the National Research Counsel of the National Science Foundation charged by Congress with assessing national employment issues or the amount of information technology jobs in existence in the United States, and what we need in the United States in terms of individuals who serve in those jobs.  Trial Tr. at 520:24-521:8.

53.    Dr. Outtz reviewed approximately 15,000 pages of documents from Novartis in preparation for his testimony and conclusions regarding the degree to which there is excessive subjectivity in Novartis' performance appraisal process.  He relied primarily on Novartis' 2003 Sales, Competencies, Values, Behaviors, and Profiles policy manual that is also called the "Butterfly Book" and is referred to as a resource in the performance appraisal.  Dr. Outtz also reviewed the transcripts of managers and their testimony describing how they evaluate employees, as well as 180 Novartis employees' actual performance reviews.  Trial Tr. at 521:22-25, 525:16-19, 542:15-543:16, 544:4-25.

54.    In order to assess Novartis' performance appraisal system, Dr. Outtz analyzed whether the system: focused on observable behaviors rather than traits;

provided specific written instructions on how to complete the appraisals; included training for appraisers on how to appraise performance and how to conduct the appraisal; and was within the control of the employee.  Trial Tr. at 526:12-527:5 (citing Malos, S., "Current Legal Issues in Performance Appraisal," *In Performance Appraisal: State of Art Practice*, Smither, J., ed., ch. 2 at 49-94 (1998); Grote, D. *The Complete Guide to Performance Appraisal* (1996)).

55.    Novartis' performance management system did not meet and does not meet these four criteria; the Novartis performance management system overall is *excessively* subjective and fundamentally unfair.  Trial Tr. at 528:5-10.

56.    With respect to whether the system focused on observable behavior rather than traits, half of the Novartis system focuses on Values and Behaviors.  Much of the Novartis system is dependent upon ill-defined general traits as opposed to actual behaviors.  Trial Tr. at 528:11-20.

57.    In the 15,000 pages of material that he reviewed, Dr. Outtz did not see sufficient written instruction to managers on how to complete the appraisals on necessary components of the reviews.  Trial Tr. at 528:22-529:12.

58.    One of the implications of having insufficient written guidance is that there will be inconsistency in the system where managers do different things in different ways, such that it is unknown what the outcome of the evaluations really signifies.  Trial Tr. at 529:13-25.

59.    Novartis did not provide sufficient training for appraisers on how to appraise performance and conduct the performance evaluation in the specific areas that are most critical in the process.  Trial Tr. at 530:1-5.

60.    Within the Novartis performance management system, there are elements of the review that are unacceptably outside of the employees' control.  Trial Tr. at 530:6-21.  This is particularly salient when considering the forced distribution curve that Novartis utilizes, whereby only a few employees can get an exemplary rating because comparisons are made.  *Id.*  Moreover, the employee has no way to compare herself to other employees because the manager is making the comparison in her absence with unknown comparative criteria. *Id.*

61.    Novartis' system calls for utilization of traits, and in many respects the traits are not defined in terms of behaviors; one supervisor may define a trait one way and another supervisor could define the trait in a different manner.  Trial Tr. at 534:13-535:10. In order for the system to work based on the requirements of the system, there needs to be clear differentiation between proficiency levels.  *Id.*

62.    "Leadership" is one of the Novartis Values and Behaviors.  Novartis provides the following descriptors of what constitutes leadership:  "Encourages others through own enthusiasm"; "motivates associates to achieve objectives"; "rallies teams around common vision"; and "energizes people across the whole organization."  Each of these descriptors is taken from the different levels that Novartis uses, from the fundamental level, to the intermediate level, to the advanced level, to "thought leader." Trial Tr. at 536:7-537:4.

63.    One could look at each of the descriptors for "Leadership" and question whether the definition in the system allows managers to evaluate people similarly or consistently, particularly in the context of using a forced distribution curve.  Trial Tr. at 537:5-20.

64.     Enthusiasm, motivation, or energy – all descriptors of "Leadership" – can be measured in different ways by different people, such as ending e-mails in a positive note, organizing extra dinners with doctors, or expressing agreement with Company initiatives.   Another manager might think hosting weekend events for co-workers demonstrates enthusiasm, motivation, or energy.  Trial Tr. at 538:17-539:8.

65.     These definitional inconsistencies and the final ratings affect Novartis' employees with respect to compensation.  Compensation is a serious evaluative process, one that requires greater specificity than exists in the Novartis system.  Trial Tr. at 539:9-19.

66.     The Novartis system is confusing with respect to rating employees on their "Commitment" in that it is unclear if managers were supposed to judge commitment on the frequency of delivering work-product ahead of schedule, which would provide concreteness.   This type of deficiency exists with respect to Novartis' Values and Behaviors on a whole.  Trial Tr. at 539:20-540:19.

67.     It is preferable to have a more concrete assessment of what the person actually does in a quantifiable way (e.g. employee delivers 50 percent of their administrative reports ahead of schedule) where possible or by using a concrete behavioral definition of a particular concept.  Trial Tr. at 540:20-541:17.

68.     There are descriptors in each one of Novartis' 13 Values and Behaviors that are ill-defined and not appropriate for use to answer the question Novartis wants answered: Who should be rated as the best employee, average employee, or poor employee.  Trial Tr. at 541:14-19.

69.     Descriptors such as "works sensitively with people of different backgrounds," "draws out of a range of perspectives when communicating with others," "proactively builds team spirit and positive teamworking relationships" are ill-defined and permit a supervisor to rate an employee in different ways, on different things, and basically in any way he chooses.  Trial Tr. at 542:7-14.

70.     Dr. Outtz reviewed 180 performance appraisals of plaintiffs and found inconsistencies across managers, which reflect insufficient instruction and training. There should be more specific instructions on what managers are supposed to do and consistency in how they conduct reviews.  Trial Tr. at 543:23-549:25.

71.     Sufficient written material regarding performance management of the type of information that goes into the reviews and the process needs to be monitored to get inconsistencies corrected and ensure consistent use of a format.  The irregularities and inconsistencies in the performance appraisals he evaluated were due to insufficient written instructional materials and training.  Trial Tr. at 549:1-20.

72.     Dr. Outtz reviewed testimony of managers where there was clear confusion as to whether they could give a 3-1 or 1-3 rating, which are possible ratings on the grid utilized by Novartis.  Trial Tr. at 549:21-551:9.

73.     Dr. Outtz also opined on the testimony of Ms. O'Hagan, former head of Human Resources, regarding the inconsistent outcomes with respect to ratings and the variation that can result even if a sales representative were to meet the descriptors outlined by Novartis.  One of the reasons for these inconsistencies is that supervisors can choose which descriptors they want to use and give a rating; not all the managers have to choose the same descriptor when assigning ratings.  This means that the supervisor has

considerable flexibility and discretion because the performance management system is excessively subjective.  Trial Tr. at 551:12-554:3.

74.     Distribution guidelines are in practice a forced distribution of ratings, and former VP of Human Resources O'Hagan and several Novartis managers have admitted that Novartis' practice was to enforce a distribution curve.  Trial Tr. at 556:20-560:7; PX 892.

75.     PX 898 demonstrates that performance management calibration at Novartis is meant to ensure that the distribution of ratings in a particular unit fit in the curve and managers are expected to follow this policy.  Trial Tr. at 560:8-22; PX 898.

76.     Novartis' prohibition against "blaming the system," in reference to the curve, requires managers to find another reason to give an employee other than the fact that they had only so many 3 ratings they could disperse. Trial Tr. at 560:23-562:15. This is problematic because there is no way for an employee to judge his performance from a comparative perspective because possession of that information is not within her purview.  *Id*.

77.     Considering that compensation builds directly on ratings, the compensation system at Novartis is excessively subjective.  Specifically, merit increases are awarded by the performance rating.  Trial Tr. at 562:18-564:25.  Each manager is given a percent range of merit increase to award per rating and is allowed to use discretion in awarding the final merit increase within the prescribed range.  *Id*.  Given the problems with the performance management system, there should be guidance and specific instructions as to how a manger decides which percent of merit increase to award employees with the same rating.  *Id*.

Dr. Louis Lanier

78.    Dr. Lanier built a pay regression analysis to determine the role of gender with respect to pay.  Trial Tr. at 804:13-806:17.  Dr. Lanier focused his inquiry on total compensation.  *Id.*  He further testified that he eliminated from the data set those employees that had less than a year of pay.  *Id.*  At Novartis, 97.5 percent of total earnings is base pay plus incentive compensation.  *Id.*  As such, he did not annualize the income of those who had been in the field for only three months, for example, because the incentive compensation varies too drastically.  *Id.*

79.    Dr. Lanier further disaggregated the pay data to the actual job titles in order to draw comparisons.   Trial Tr. at 807:23-808:9.   He further allowed the explanatory factors/variables to interact, meaning he tried to see if being a cardiometabolic specialist has a different effect on pay than being a cardiometabolic associate.  *Id.*

80.    Dr. Lanier ran the regression and found that women are paid less than males an average of $105 a month, which amounts to $1260 a year at 7.7 standard deviations.  Trial Tr. at 808:19-809:6.

81.    Dr. Lanier looked at total compensation because that is what people care about. Trial Tr. at 810:13-14.  The only other reason to eliminate any other component of pay is if that component was completely free of managerial discretion or any discretion on the part of Novartis, which did not accord with his understanding of Novartis' compensation schematic.  *Id.*

82.     Dr. Lanier included base pay in his analysis because his understanding was that base pay is affected by performance ratings and as a result has a subjective component to it that is at issue in this case.  Trial Tr. at 811:4-14.

83.     Dr. Lanier included incentive pay in his analysis because he understood this component was subject to some amount of discretion by managers. Trial Tr. at 811:24-812:17.  Dr. Lanier is aware that there was some formulary to setting sales goals; however, he also understood that discretion is employed with respect to drug weightings, in which field force a sales representative is, and to which territory a sales representative is assigned, among other discretionary factors.  *Id.*  Overall, this component of pay was included in the regression analysis because it is an issue in the litigation.  *Id.*

84.     Dr. Lanier found that in 11 of the 12 groups analyzed, there was a pay disparity to the detriment of the class in all of the years he examined as demonstrated in Table 3.  Trial Tr. at 815:15-816:22; PX 959; PX 960.

Dr. Finis Welch

85.     Dr. Welch offered two types of analysis in the case: (1) his rebuttal analysis of Plaintiffs' expert, Dr. Lanier, in which he reviewed the pay analysis of Dr. Lanier and commented on it; and (2) his affirmative analysis, in which he provided his own independent analysis of pay and performance ratings. Trial Tr. at 2895:9-11.  Dr. Welch offered no management promotions analysis in this case.

86.     In his affirmative analyses of pay disparities, Dr. Welch did not study total compensation like Dr. Lanier did.  Instead, he studied annual percentage increases in salary between men and women in the sales force during the class period. Trial Tr. at

2854:1-21.  He also studied starting salaries between men and women in the sales force during the class period.  Trial Tr. at 2764:1-2765:1.

87.    Dr. Welch testified that he did an analysis of starting salary and annual percentage increases because "a person's salary is the salary they started with plus the changes that they received.  What I was interested in is decisions that were made during the class period.  So, you look at people who were hired during the class period, their starting salaries." Trial Tr. at 2764: 1-12.   In these analyses, Dr. Welch concluded that there was no statistical evidence of any pay differences between women and men in the sales force.  *Id.*

88.    In addition to his affirmative pay analysis, Dr. Welch offered a rebuttal analysis of Dr. Lanier's compensation analysis in Welch Trial Slide 1.  Dr. Welch found that the estimated pay differential is $29 per month in favor of women.  Trial Tr. at 2762:10-13.  For the group Dr. Lanier excluded from his compensation analysis, Dr. Welch found women, on average, earned $288 per month more than men.  Trial Tr. at 2762:2-4.  Based on these results, Dr. Welch concluded that there are no systemic differences in total compensation across the entire class on the basis of gender.  Trial Tr. at 2762:16-19.

89.    Dr. Welch testified that his pay analysis relied upon an "hours worked" field in Novartis' data.  Trial Tr. at 2800:9-10, 2903:10-11; 2911:5-7.    He also acknowledged errors in how hours were recorded in the "hours worked" field.  One of the errors Dr. Welch acknowledged is how short-term disability leave is recorded.  Trial Tr. at 3141:3-6.  He testified that employees on short-term disability leave have hours recorded at zero in the data during their leave period.  TT 3130:20-22; 3141:3-6.  These

same employees, however, continue to receive earnings during their leave period. Trial Tr. at 3130:7-16. Nonetheless, Dr. Welch used these hours to calculate an hourly rate by dividing the employees' earnings by artificially low hours. As a result, he calculated an overstated hourly rate for employees on short-term disability leave. Trial Tr. at 2823:15-19, 2825:12-16, 2935:19-20, 2935:16-18.

90.     Dr. Welch acknowledged that overstated hourly rates for employees on short-term disability may have biased his results. Trial Tr. at 2919:5-11. When asked whether the overstated hourly rates would have had some impact on the validity of the results, Dr. Welch testified, "If the only exaggerations were for women, of course." Trial Tr. at 2919:5-11. He also testified that women are between 75 to 99 percent of the employees on short-term disability in his analysis. Trial Tr. at 3125:8-25, 3126:1-2; PX 1208. Dr. Welch therefore acknowledged that the erroneous hours in short-term disability leave may have systematically overstated hourly rates of women in his analysis. Trial Tr. at 2828:2-9.

91.     Another error in the "hours worked" field that Dr. Welch used is related to new hires. Dr. Welch testified that men who were new hire, part-year employees had overstated hourly rates. Trial Tr. at 3152:8-10, 3152:13-20. He also acknowledged that men and women are equally represented in the new hire employees in his analysis. PX 1208. New hires are 48 percent men and 51 percent women. PX 1208. Dr. Welch also testified that when errors are "balanced," "it has no effect." Trial Tr. at 2918:12-21. Dr. Welch therefore provided no testimony that any errors in hours reported for new hire, part-year employees systematically overstated hourly rates for men or women in his analysis. Trial Tr. at 3150:24-25, 3151:1-5.

92.     During trial, Dr. Welch also did an additional analysis in an attempt to trim the "outliers" or overstated hourly rates from his analysis that were raised at trial. Trial Tr. at 3098-3107.   By trimming the top and bottom five percent of earners from the analysis, Dr. Welch's trim analysis flipped the results of his previous analysis.   His previous analysis estimated a pay differential of $29 per month in favor of women, Trial Tr. at 2762:10-13, whereas his trim analysis shows men are paid $26 per month more than women to 1.88 standard deviations.   Trial Tr. at 3117:17-22.   Dr. Welch also acknowledged that his result of 1.88 standard deviations could have been a statistically significant pay disparity adverse to women without the errors in the data.   Trial Tr. at 3117:17-22, 3123:13-15.

93.     At the close of his testimony, Dr. Welch offered no opinion on whether his results were biased.   He testified:

> Q. Because you can't tell this jury that this isn't a systemic problem with this dataset, can you? A.  Well, I mean –
> Q. Can you tell this jury -- A.  **Not as I sit here**."  Trial Tr. at 2825:19-23.
>
> Q. So, after seeing this, you can't tell the jury today that women actually do make $288 more in the excluded group, can you?  Because you don't know?
> (No response).
> Q. You don't know, sir, do you?
> A. I think they do.
> Q. You don't know, sir, do you?
> A. I'm not a hundred percent sure."  Trial Tr. at 2828:2-9.
>
> Q. Now, Dr. Welch, as you sit here today, do you know to the extent that there are discrepancies between Dr. Lanier's figure of average monthly earnings and full-time equivalent hours, if you look at those discrepancies in the analysis that you performed after the five percent trim, do you have any idea whether there are more male or female discrepancies?
> THE WITNESS:  I don't recall. I'm sorry."  Trial Tr. at  3150:10-15, 3150:18.

> Q. Dr. Welch, based upon your trim analysis as well as the discussion here in court today, do you have a professional opinion as to whether or not any remaining discrepancies such as have been discussed here between Dr. Lanier's figures and the full-time equivalent figures would have any systematic effect on your results?
>
> **A. I don't have an opinion that they do."**  Trial Tr. at 3150:24-25, 3151:1-5 (emphasis added).

94.    Dr. Welch studied the performance ratings of employees who take leave at Novartis.  Trial Tr. at 2749:4-6.  He analyzed Novartis' subjective ratings called Values and Behaviors for employees who take leave, and he analyzed Novartis' objective ratings for employees who took leave.  Trial Tr. at 2838:4-10.

95.    In his performance ratings analysis, Dr. Welch controlled for an employee's time out of the territory for part of the year in a "yout" variable, which he defined as employees who were new hires or employees who are on leave.  Trial Tr. at 2838:4-10; Trial Ex. 1208.  Dr. Welch's "yout" variable shows that employees who took leave are much less likely than employees who do not take leave to receive the highest rating on their performance evaluations.  *Id.* His analysis shows a statistically significant result to 24 standard deviations for subjective ratings and a statistically significant result to 35 standard deviations for objective ratings.  Trial Tr. at 2839:3-4, 2840:10-15.

96.    Dr. Welch's "yout" variable shows that women on leave are less likely to receive the highest subjective and objective ratings.  Although the "yout" variable includes new hires, new hires are evenly distributed across men and women, and therefore have no gender effect on the results.  Trial Ex. 1208.  Dr. Welch testified that "balanced" factors have "no effect." Trial Tr. at 2918:12-21.  Leave employees, however, are disproportionately women.  Trial Ex. 1208.  Dr. Welch testified that factors in "one direction" do have an effect.  Trial Tr. at 2919:5-11. Thus, Dr. Welch's "yout" variable

acts as a proxy for women on leave in his analysis, which shows that women who took leave were much less likely to receive the highest rating than other employees.  Trial Tr. at 2838:24-35, 2839: 1-4, 2840:10-15.

97.    Dr. Welch also concluded that promotions to management are directly impacted by performance evaluation ratings.  Trial Tr. at 2754:18-25.  He testified, "It's my understanding that all of the leveling promotions as well as the promotion to management require a minimum of a 2.2 performance; that is, in sales objectives as well as in values and behaviors, that an individual must at least meet expectations in both of those criteria.  Empirically, a better performance, that is a three, would get you there sooner than a two."  Trial Tr. at 2754:25, 2755:1-5.  Dr. Welch also concluded that compensation is directly impacted by performance evaluation ratings.  Trial Tr. at 2754:10-11.

**NOVARTIS' ADMISSIONS REGARDING EXCESSIVE SUBJECTIVITY IN PAY**

Rona Anhalt

98.    Total compensation at Novartis includes base salary, sales incentives, stock options, and perks and benefits.  Trial Tr. at 689:23-690:2.

99.    In 2001, Novartis implemented a new compensation system known as the Market-Based Compensation Program that allowed managers more discretion in making pay decisions.  Trial Tr. at 690:3-23; PX 822 at NPCX 001816162.

100.    The Market-Based Compensation Program was also intended to ensure that similar jobs were similarly paid.  Trial Tr. at 690:24-691:1, 691:14-19; PX 822 at NPCX 001816162; PX 818 at NPCX 000014450.

101.    Sales representatives are not given any formal training or written materials that explain compensation policies and procedures.  Trial Tr. at 703:21-23, 704:25-705:2.

Instead, they are expected to become aware of such policies and procedures through their District Managers.  Trial Tr. at 705:3-6.

102.    District Managers have discretion to set the starting base salary of each sales representative that they hire.  Trial Tr. at 692:4-7.

103.    In determining a sales representative's starting base salary, a District Manager may consider the sales representative's prior experience.  Trial Tr. at 693:5-8. So one would expect that a sales representative with more prior experience would receive a higher starting base salary relative to a sales representative with less prior experience. Trial Tr. at 693:9-13.

104.    New employees may also receive sign-on bonuses, requests for which the Compensation Department reviews at times.   Trial Tr. at 692:15-20.   In reviewing requests for sign-on bonuses, the Compensation Department reviews stock option statements and commission or sales incentive statements from the new hire's former employer.  Trial Tr. at 692:21-25.

105.    One way by which Novartis can increase a sales representative's base salary is through annual merit increases, which are the percentage raises that District Managers may give to their sales representatives after the annual performance review process.  Trial Tr. at 699:12-19.  Annual merit increases are distributed from a pool of money that each District Manager receives.  Trial Tr. at 699:20-23.  District Managers have the discretion to determine the amount of the annual merit increase for each of their sales representatives.  Trial Tr. at 700:2-5.  They are expected to allocate annual merit increases such that the total amount stays within the allotted budget for annual merit increases that year.  Trial Tr. at 699:24-700:1.

106.   Two factors that District Managers may consider when deciding the amount for each sales representative's annual merit increase are the sales representative's position in range and his or her performance rating that year.  Trial Tr. at 701:1-6.

107.   Position in range describes where a sales representative's salary falls in relation to his or her peers in the industry.  Trial Tr. at 701:7-10.  So generally, the higher a sales representative's salary is in relation to his or her peers, the lower an annual merit increase he or she will receive.  Trial Tr. at 701:11-13.

108.   A performance rating is the rating that sales representatives receive from their District Managers on their annual performance review.  Trial Tr. at 701:14-702:3.  So generally, the higher a sales representative's performance rating is compared to his or her peers, the higher an annual merit increase he or she will receive.  Trial Tr. at 702:8-10.

109.   For each given position in range and performance rating, there is a percentage range for the corresponding annual merit increase to be given.  Trial Tr. at 702:15-20.

110.   District Managers exercise their discretion to choose any percentage within the range for each of their sales representatives' annual merit increases.  Trial Tr. at 702:21-24.

111.   District Managers even have the discretion to go beyond the suggested range for a sales representative's annual merit increase.  Trial Tr. at 702:25-703:5.  But to stay within their total budget for annual merit increases, District Managers have the discretion to reduce the amount of the annual merit increases for their other sales representatives.  Trial Tr. at 703:6-9.  District Managers also have the discretion to give

no annual merit increase to particular sales representatives in a given year.  Trial Tr. at 703:10-13.

112.    Stock options are only given to sales representatives who receive at least one 3 rating on their performance rating.  Trial Tr. at 702:4-7.

Domenick DiCindio

113.    A District Manager could view the Value and Behavior, "open communication, respect, and candor," as three separate values as opposed to one value.  Trial Tr. at 733:22-734:3

114.    District Managers have discretion whether to view the Values and Behaviors in the aggregate or in pieces.  Trial Tr. at 734:4-7.

115.    When a District Manager's sales representatives' numbers go down, that would negatively affect that District Manager's bottom line.  Trial Tr. at 735:18-25.

116.    There is no document, training manual, policy manual, or anything else at Novartis about taking information that a District Manager gathered in an initial interview and translating that information into a salary number.  Trial Tr. at 731:12-18.

117.    District Managers exercise some discretion when deciding whether to award a sign-on bonus.  Trial Tr. at 731:19-21.

118.    Human Resources and District Managers had discretion when awarding an equity adjustment and off-cycle merit and salary adjustments.  Trial Tr. at 732:1-14.

119.    There is discretion to award merit increases within a range that is tied to particular performance evaluation ratings.  Trial Tr. at 732:22-733:21.

Maria LaRosa

120.    Managers have to report complaints of gender discrimination, including pay discrimination, to HR.  However, if a female representative complained about a performance rating and further indicated to her manager that a male received a higher rating, by referring to the male using his gendered name; that would not raise a "red flag" dictating that that complaint had to be brought to HR's attention.  Trial Tr. at 2270:4-7, 2271:14-18.

121.    It is not Novartis' policy to automatically remove doctors from a sales representative's call list after she complained of harassment.   If the harassing doctor were left on the representative's call list and the representative stopped calling on the harassing doctor, her actions could have a negative effect on her sales figures, and, therefore, on her compensation.  Trial Tr. at 2285:22-2286:2.

Judy O'Hagan

122.    In instances where there was not a clear policy violation, Human Resources may not override an annual performance review rating administered by management.  Trial Tr. at 328:2-5.

123.    An employee might not know that Human Resources does not have the power to overrule management if a representative appeals her annual performance rating to Human Resources.  Trial Tr. at 328:6-9.

124.    Ms. O'Hagan was not aware of any written materials that explicitly spell out the role of Human Resources in the performance management appeal process.  Trial Tr. at 328:10-13.

125.    Ms. O'Hagan did not understand how sales goals were determined, which pertains to the objective portion of the performance management rating.  Trial Tr. at

333:17-19.

126.    There is no formula for managers to use to quantify the percent of the "Objective" portion of the performance rating that is qualitative/subjective.  As such, the manager has to be subjective with respect to the objective portion of the performance management rating.  Trial Tr. at 334:9-15.

127.    Within the "Objective" portion of the performance management rating, sales representatives are evaluated on "direct field observation," which is a subjective measure.  Trial Tr. at 336:12-14; JX 20.

128.    Within the "Objective" portion of the performance management rating, sales representatives are evaluated on "follow through on Business Development Report ("BDR") assignments."   Trial Tr. at 336:15-23; JX 20.   This measure is largely subjective.  *Id.*

129.    Within the "Objective" portion of the performance management rating, sales representatives are evaluated on "execution of trimester tactics," a measure that has qualitative/subjective elements.  Trial Tr. at 336:24-337:7; JX 20.

130.    Within the "Objective" portion of the performance management rating, sales representatives are evaluated on "teamwork and coordination," which is at least partially subjective.  Trial Tr. at 337:8-10; JX 20.

131.    Ten percent of a sales representative's "Objective" rating is based on a manager's appraisal of how well the representative "strengthens the organization, develops talent, fosters diversity, fosters teamwork, creativity, communication, leadership, aggressively manages performance, attracts strength, and retains top talent"; measuring a representative against those criteria requires some subjectivity.  Trial Tr. at

337:11-20; JX 20.

132.    Within the "Objective" portion of the performance management rating, sales representatives are evaluated on "individual development," which is a qualitative/subjective measure.  Trial Tr. at 337:21-23; JX 20.

133.    Within the "Objective" portion of the performance management rating, sales representatives are evaluated on "volunteering for additional responsibility," which is a qualitative/subjective measure.  Trial Tr. at 337:24-338:1; JX 20.

134.    Within the "Objective" portion of the performance management rating, District Managers are evaluated on having "impactful BDRs," which is a qualitative/subjective measure.  Trial Tr. at 338:2-4; JX 20.

135.    Within the "Objective" portion of the performance management rating, District Managers are evaluated on "development of MD, LDP candidates," which is a qualitative/subjective measure.  Trial Tr. at 338:5-7; JX 20.

136.    Within the "Objective" portion of the performance management rating, class members are evaluated on "mentoring and coaching team peers," which is a qualitative/subjective measure.  Trial Tr. at 338:8-10; JX 20.

137.    Within the "Objective" portion of the performance management rating, District Managers are evaluated on "vacancy management," which is a qualitative/subjective measure.  Trial Tr. at 338:11-13; JX 20.

138.    Within the "Objective" portion of the performance management rating, class members are evaluated on "retention of performance frontier performance," which is a qualitative/subjective measure.  Trial Tr. at 338:17-19; JX 20.

139.    Overall, up to 30 percent of the "Objective" portion of the performance

management rating calls for a manager to make a qualitative/subjective judgment.  Trial Tr. at 339:2-8.

140.    The other component of the performance rating consists of a subjective rating of the Values and Behaviors as dictated by Novartis' policies.  Novartis' Values and Behaviors are: results driven, customer quality focus, innovative, creative, leadership, fast action oriented, initiative, simplicity, empowerment, accountability, commitment, self discipline, mutual respect, candor, trust, integrity, loyalty, open communication, collaboration, and compassion.  Trial Tr. at 339:24-340:12; PX 848.

141.    With respect to the "results driven" Value and Behavior, if one exemplified all the descriptors listed in the policy, one would not be guaranteed a 3 or 2 and could receive a 1 in that category.  Trial Tr. at 343:9-345:24; PX 848.

142.    With regards to the Value and Behavior "customer quality focus," Novartis makes no attempt to conduct doctor surveys to determine how doctors view any particular sales representative.  Trial Tr. at 345:24-348:9; PX 848.  As such, Novartis relies on the District Manager's subjective view in rating a sales representative on this metric.  *Id*.

143.    Novartis relies on a manager's judgment as opposed to seeking input from doctors in evaluating a representative on the "innovative and creative" Value and Behavior.  Trial Tr. at 349:1-18; PX 848.

144.    Ms. O'Hagan did not know whether a representative who displayed all the behaviors listed in the descriptors of the "leadership" Value and Behavior would qualify as meeting minimum expectations at Novartis.  Again, Novartis' relies on a manager's judgment of what constitutes leadership.  Trial Tr. at 349:19-16.

145.    If a sales representative manifested all the characteristics listed in the descriptors for the Value and Behavior "fast, action-oriented, initiative, simplicity," a sales representative could receive a 3, 2, or 1 rating for this metric.  Trial Tr. at 350:17-351:20.

146.    Ms. O'Hagan was not sure how she would define a 3 rating for the "empowerment and accountability" Value and Behavior.  Trial Tr. at 351:15-353:1.

147.    If a sales representative manifested all the descriptors regarding the "commitment and self discipline" Value and Behavior, a sales representative would not necessarily receive a 3.  Trial Tr. at 353:2-16.

*148.*    Each manager only has a certain amount of money each year for annual merit increases. Trial Tr. at 359:25-362:9; PX 853.  This funding and performance ratings must be tied to the overall distribution curve.  *Id.*  Part of the distribution curve dictates that a certain percentage of representatives must receive a 1, 2, or 3 rating.  *Id.*  The calibration sessions that are conducted before the ratings are given to the sales representatives often result in a change to the original rating.  *Id.*

149.    If a manager did not adhere to the distribution curve, the manager could be coached and/or told to change his ratings by Human Resources, in effect enforcing a forced distribution.  Trial Tr. at 365:12-367:11.

150.    The higher the performance rating the higher the bonus.  Trial Tr. at 368:7-19.

151.    Ms. O'Hagan believed that sales representatives should have been informed of the calibration sessions.  Trial Tr. at 372:3-9.

152.    Ms. O'Hagan did not think the use of "multi-rater forms" helped to

increase objectivity in ratings because the forms were discretionary and the manager was not required to keep them; some managers may have thrown them away. Trial Tr. at 372:6-373:7; PX 898.

153.    Managers were evaluated on how well they calibrated their associates' performance and adhered to the distribution curve; however, as policy documents dictated, the managers were not allowed to "blame the system" (meaning the distribution curve) when speaking to associates about the ratings they received. Trial Tr. at 374:13-375:14; PX 898.

154.    The forced distribution's focus on national rank, as opposed to regional rank, forced too many 3s. Trial Tr. at 379:20-25; PX 843. In one instance, a female representative could not receive a 2-3 because of the forced distribution curve. Trial Tr. at 376:14-380:9; PX 843.

Nicole Beale

155.    District Managers have discretion in allocating their budget for annual merit increases. Trial Tr. at 2713:9-11.

156.    The rating on a representative's annual performance review has an effect on that representative's pay. Trial Tr. at 2714:4-6.

Jennifer Blum

157.    Sales results do not entirely dictate whether a representative received a particular rating on the objectives portion of a performance review. Trial Tr. at 2053:2-6.

158.    A District Manager can determine whether or not a representative was pulling as much weight as another representative, which is a subjective observation. Trial Tr. at 2053:11-17.

159.     There are a limited number of 3 ratings that can be given each year on performance reviews.  Trial Tr. at 2053:18-20; 2054:10-11.

160.     Both portions of an Annual Performance Review are based on the bell curve and a subjective determination.  Trial Tr. at 2054:15-24.

161.     District Manager Blum's Regional Director once made her change the rating of a female representative from a 3 to a 2.  Trial Tr. at 2055:16-23.

162.     When Ms. Blum was a District Manager in 2007, she received a pool of money to distribute as annual merit increases, which she disbursed after meeting with her Regional Director and discussing the increases with each representative.  Trial Tr. at 2057:22-2058:4.

163.     If District Manager Blum had a representative who was an average performer and who was underpaid, the pay disparity probably would continue.  Trial Tr. at 2058:23-2059:1.

164.     District Manager Blum did not recall having any training about equal compensation in the employment and nondiscrimination context.  Trial Tr. at 2059:20-2.

Brian Campbell

165.     It is possible that Ms. Waters received less compensation than her similarly situated male employees.  Campbell Trial Dep. Designations at 76:7-12.

166.     There is some discretion in deciding whether to obtain compression adjustments for sales representatives' compensation.  Campbell Trial Dep. Designations at 131:13-15.

167.     Ms. Waters' District Manager, Brian Campbell, and Joe Shupp, Ms. Waters' Regional Director, debated whether or not to give Ms. Waters the compression

salary increase and ultimately decided to do so to keep her motivated.  Campbell Trial Dep. Designations at 80:15-81:3, 131:13-25.

Dan Duhart

168.    Regional Director Duhart testified he has dozens of times exercised his discretion and retroactively increased the salary of a sales rep by a merit raise larger than that recommended by the District Manager.   Duhart Trial Dep. Designations at 112:19-115:18.

169.    Regional Director Duhart did not regularly overrule his district managers' merit raise decisions.  Answer ¶ 290.

170.    There was no "standardized" merit raise amount for all sales representatives with the same annual performance rating.  It was an "art" for the Regional Director to take into account the "subjective" elements in deciding compensation.  There was no formal training for this process; a manager just knew "what good looks like." "The perceptions of what you see [with respect to merit raise decisions] could certainly differ," and there is no "mathematical formula."   Duhart Trial Dep. Designations at 119:17-21; 120:12-121:7; 121:6-15.

James Gaffney

171.    Regional Directors told Mr. Gaffney to change the performance score he wanted to give representatives and in some cases those ratings were lowered because there were not enough threes to go around.  Trial Tr. at 2487:1-11.

172.    Mr. Gaffney did not consider whether female sales representatives whom he supervised, including Ms. Blum, would receive lower incentive compensation if he did

not affirmatively take steps to remove a doctor that was behaving inappropriately from his female representatives' call lists.  Trial Tr. at 2508:16-20.

Kathleen Goetz

173.    In 2006, Ms. Goetz complained to her manager about her annual performance rating and subsequent merit raise.  She challenged her rating of a 2, arguing that she deserved a 3.  Trial Tr. at 3080:14-3081:25.

174.    In 2003, Ms. Goetz was given a big raise to catch her up to the median salary for her position.  This change suggested that she was "substantially" underpaid. Trial Tr. at 3082:9-15.

Sharon Larrison

175.    Sales representatives are rated on a "bell" or "distribution" curve.  That is, an individual is not rated on her own performance.  Instead, an employee's rating is actually a comparison of that employee with her peers, performed by a manager.  Overall, these comparative ratings must fit into the distribution curve.  Trial Tr. at 1511:22-25, 1521:7-12, 1522:3-8.

176.    Once a manager assigns a rating to an employee, the manager has discretion to award a raise to the employee within a range.  Trial Tr. at 1521:13-17.

177.    Larrison testified that she did not receive formal training on whether it was possible to rate an employee a 1 on the objective portion of the review and a 3 on the values and behaviors portion of the review.  Trial Tr. at 1523:22-24.

David Moatazedi

178.    Eighty to ninety percent of the performance rating was based on sales numbers and the remaining ten to twenty percent was subjective.  Trial Tr. at 666:8-18.

179.    MVP awards (which carry a monetary award) are based on sales performance and contribution to the team.  The contribution to the team criterion is a judgment made by the District Manager and is "purely subjective."  Trial Tr. at 662:13-23.

Melissa Parker

180.    There is "of course" a degree of subjectivity in assigning ratings under the bell curve.  Trial Tr. at 2665:14-17.

181.    There is debate about half of the time about what rating to award an individual at calibration meetings.  Trial Tr. at 2665:18-2666:24.

182.    Ratings are adjusted retroactively based on the distribution curve.  Trial Tr. at 2667:25-2668:20.

183.    Some 2 ratings are adjusted down to 1s when there are not enough 2s to go around in a district.  In fact, it is probably a more frequent occurrence that ratings are adjusted down rather than up.  Trial Tr. at 2667:21-2669:1.

Joseph Simmons

184.    A representative who complained about a doctor behaving inappropriately was excused from calling on that doctor but remained responsible for the doctor's prescribing frequency.  Trial Tr. at 1950:2-22.

185.    Mr. Simmons never arranged to have a tier one doctor removed from a representative's call list and has never spoken to anyone at Novartis about a doctor remaining on a representative's goals and targets.  Trial Tr. at 1951:19-25.

186.    There was no obligation under Novartis' policies to take into account that an inappropriate doctor was still included on a representative's call list when administering that representative's year-end review.  Trial Tr. at 1952:4-11.

187.    Mr. Simmons and his Regional Director and Vice President wanted to retain a male representative who received an offer from another company, so Mr. Simmons adjusted that male representative's salary in order to match the offer.  Trial Tr. at 1987:16-23.

188.    It is possible to give a representative a 3 in every individual value and behavior yet give the same representative a 2 on the overall Values and Behaviors rating.  There is some belief in the management force that the Values and Behaviors rating is circumscribed by sales performance.  Trial Tr. at 1963:24-1964:13.

189.    Novartis HR has counseled a District Manager to remove his feelings about a representative's personal difficulties affecting her performance from the representative's performance review.   Trial Tr. at 1934:17-21; PX 1096.

190.    The Values and Behaviors rating is tied to the Sales rating.  Trial Tr. at 1964:14-17.

191.    It is possible to give a representative a lower "selling process" competency rating than was given in the previous year even where sales have improved significantly.  Trial Tr. at 1949:8-13; PX 467; PX 461.

Perry Sternberg

192.    A representative "must" be in the top third in sales to receive a 3 rating in Objectives.  Trial Tr. at 2097:23-2098:1.

193.    A woman's sales quotas may be much higher, and therefore more difficult to reach, than those goals given to her male coworkers.  Trial Tr. at 2111:6-9.

194.    While it is Company policy to keep HR complaints anonymous, upon receiving a complaint of pay discrimination based on gender, an HR representative has contacted the manager accused of pay discrimination and immediately disclosed both the substance of the complaint and the identity of the complainer.  Trial Tr. at 2114:23-2117:6; PX1125.

195.    A Novartis manager who knew or should have known that one of his female subordinates was paid substantially less than similarly situated yet less qualified men refused to grant that female subordinate an equity adjustment.  Trial Tr. at 2121:7-2124:18, 2145:20-2147:15; PX1122; PX1123.

196.    Novartis may deny a higher-paying sales position promotion to the number 1 sales representative in the country in favor of employees who are ranked lower or are external, if that representative is pregnant.  Trial Tr. at 2135:15-2139:6; PX408; DX177.

Brad Willie

197.    Being in the bottom 10 to 15 percent for sales results warrants a 1 rating for the Objectives portion of the Annual Performance Review.  Trial Tr. at 2990:12-17.

198.    There was not an exact rule regarding the distribution of 1 ratings to representatives who ranked in the bottom 15 percent in sales performance.  Trial Tr. at 3028:3-9, 3050:16-19.

199.    A manager may give a representative a 1 rating even where he does not have to do so.  Trial Tr. at 3028:11-14.

200.     A manager may give a representative a 1-1 rating yet still have discretion over whether a representative will be placed on a Performance Improvement Plan.  Trial Tr. at 3029:13-16.

201.     When a manager's sales results fail to meet expectations, that manager's own supervisor may rate him a 2, or "meets expectations."  Trial Tr. at 3013:10-25, 3019:4-18.

202.     Even when a Managing Director or Regional Director has significant criticisms of a District Manager's performance, he may still rate the district manager as "fully meeting expectations."  Trial Tr. at 3027:11-14.

203.     Any leveling or rating needs to be approved by a representative's managing director or Regional Director.  Trial Tr. at 2995:20-24.

## ANECDOTAL EVIDENCE

<u>Tara Blum</u>

204.     Ms. Blum's manager had discretion to rate her according to how he was feeling on her annual performance review.  Trial Tr. at 261:25-262:6.

205.     But for the 2004 forced distribution change from national to regional rank, Ms. Blum would have qualified for and did in fact earn a 3 on her 2004 annual performance review.  Trial Tr. at 2504:21-2505:3; PX 1145.

206.     Ms. Blum's male counterpart received a higher percentage merit increase than she received.  Trial Tr. at 263:3-12.

207.     Ms. Blum's District Manager would have promoted her to management more quickly if she were a man and promotion into management would have resulted in higher overall compensation for Ms. Blum.  Trial Tr. at 263:13-15.

208.    Ms. Blum's District Manager, James Gaffney, did not consider whether female sales representatives that he supervised, including Ms. Blum, would receive lower incentive compensation if he did not affirmatively take steps to remove a doctor who was behaving inappropriately from his female representatives' call lists.  Trial Tr. at 2508:16-20.

Jessica Borsa

209.    Novartis hired Ms. Borsa at a significantly lower salary than her similarly situated male coworker Mike Eberhardt.  Trial Tr. at 1380:8-14.

210.    Although Ms. Borsa and Mr. Eberhardt were hired on the same day, in the same position, by the same hiring manager, Mr. Eberhardt was offered a base salary about $8,000 higher than Ms. Borsa's, and a sign-on bonus, where Ms. Borsa was not offered a sign-on bonus.  Trial Tr. at 1380:12-16, 1382:25-1383:12.

211.    The pay disparity between Ms. Borsa and Mr. Eberhardt continued throughout Ms. Borsa's employment at Novartis, despite the fact that Ms. Borsa had approximately seven years more pharmaceutical sales experience than Mr. Eberhardt did.  Mr. Eberhardt did not have any management experience and the two representatives "always ran neck and neck with each other when it came to sales performance."  Trial Tr. at 1383:21-1384:9, 1380:19-21.

212.    Ms. Borsa complained about this pay disparity to her Area Sales Manager, Brian Aiello, and he simply replied, "I can't make up that kind of difference."  Trial Tr. at 1381:5-16.

213.    Novartis managers have discretion to award salary adjustments.  Trial Tr. at 1381:17-19.

Kelly Corbett

214.    As a District Manager, Ms. Corbett was directed to lower a performance rating by her Regional Director, Dan Duhart, because "there was a ranking system with which we had to give a certain number of ones, which were unsatisfactory, twos, which were meets expectations, fully meets, and threes, which were exceeded [expectations]." Due to the bell curve, she was required to give one of her female representatives a 1 rating.  Trial Tr. at 446:15-447:2.

215.    The female representative whose ranking Ms. Corbett was forced to lower from a 2 to a 1 was "not deserving of a one ranking."  Trial Tr. at 447:6-7.

216.    Regional Director Duhart testified he has dozens of times exercised his discretion and retroactively increased the salary of a sales rep by a merit raise larger than that recommended by the District Manager.  Trial Tr. at 112:19-115:18.

217.    However, NPC admitted that Regional Director Duhart did not regularly overrule his district managers' merit raise decisions. Answer ¶ 290.

218.    Ms. Corbett was rated an overall 1 on her 2004 performance review despite not having received a single 1 rating on any of the subcategories that comprise the subjective and objective sections.  Trial Tr. at 468:17-469:5; PX 72.

219.    Ms. Corbett's actual written 2004 annual review reflects a 2-2 rating, but she ultimately received a 1-2.  The arbitrary change in rating seems to suggest that her 2 was taken down to a 1 after a calibration meeting.  Trial Tr. at 466:20-267:11, 471:11-12; PX 72; PX 89.

220. Ms. Corbett was so outraged by her 2004 annual performance review that she immediately, while sick with pneumonia, put together an appeal of the rating, and presented it to her Regional Director Gus Torres.  Trial Tr. at 473:6-17; PX 118.

221. In appealing her 2004 rating, Ms. Corbett tried to show Mr. Torres that she was ranked eighth out of ten in sales in the region, which was two full levels higher than the two male managers below her who had both received 2-2s.  Trial Tr. at 473:19-23; PX 118.

222. When Ms. Corbett received a 1-2 rating in 2004, her sales rankings were 8 of 10 in her region, and 82 of 86 in the nation. Joey Colonello and Perry Bongiani, male District Managers who received 2-2 ratings that year, had lower sales rankings than Ms. Corbett did.  Mr. Colonello was ranked 9 of 10 regionally, and 83 of 88 nationally.  Mr. Bongiani was ranked 10 of 10 regionally, and 86 of 88 nationally.  Trial Tr. at 479:2-24.

223. As a result of her 1-2 2004 annual performance rating, Ms. Corbett received no raise and no stock options that year.  Trial Tr. at 472:10-14; PX 89.

224. In contrast, Mr. Colonello received a 2.5 percent merit increase in 2004, and Mr. Bongiani received a 1.5 percent merit raise in 2004.  Trial Tr. at 480:21-24; PX 87.

225. When Ms. Corbett resigned from Novartis in early 2005, her base salary was $100,372, as compared to Mr. Colonello's base salary of $135,489 and Mr. Bongiani's base salary of about $102,600.  Trial Tr. at 480:25-481:6; PX 87.

226. Mr. Torres' response to the performance rating appeal was that he spoke to his Vice President.  It was decided that if Corbett's sales continued to increase in 2005,

the Company might consider going back and changing the 2004 rating. Trial Tr. at 482:12-18.

227.    Mr. Torres' proposal was unsatisfactory to Ms. Corbett "because my review, which was tied to my rankings, my merit increase, my stock, was for 2004. And my sales in 2005 needed to reflect 2005. 2004 needed to stand as 2004." Trial Tr. at 482:3-5.

228.    Ms. Corbett's 2004 rating was not changed despite the fact that HR manager Denise Konopka pointed out to Ms. Corbett's then-Regional Director, Dan Duhart, that Corbett was receiving a 1-2 while Mr. Colonello received a 2-2 and that "doesn't look particularly good from a gender discrimination standpoint." Trial Tr. at 483:12-484:17; PX 878.

229.    The unsatisfactory 1 rating also signified that Ms. Corbett had no long-term career prospects at Novartis. A 1 rating meant that the employee with that rating could be "moved out" of the Company. In fact, Mr. Torres told Ms. Corbett it would take her two years to recover in her career, if she could at all. Trial Tr. at 472:15-24.

230.    Ms. Corbett voluntarily resigned from Novartis shortly after learning of her 2004 annual rating because she was no longer eligible for promotion in the Company and she was in a position where she could be managed out. The new job she accepted, a non-managerial sales position with Cyberonics, represented a demotion in title and a $15,000 cut in base salary. Trial Tr. at 487:17-21, 488:8-22.

231.    Mr. Duhart did not make a strong case to raise Kelly Corbett's 1-2 2004 rating, despite her raw sales numbers. Trial Tr. at 177:16-178:8.

Bernice Dezelan

232.    Ms. Dezelan's manager chose not to intervene when Ms. Dezelan reported that her counterparts were excluding her from dinner programs, which represented an important opportunity to spend time with physicians in order to promote products and increase her sales and therefore increase her compensation.  Trial Tr. at 89: 2490:3.

233.    Ms. Dezelan had to work twice as hard to keep her male counterparts' exclusion of her from affecting her sales performance.  Trial Tr. at 95a:14-20; 97a:5-11.

234.    When Ms. Dezelan reported inappropriate comments made by a physician to her manager, her manager responded that the physician was a top prescriber and that Ms. Dezelan might be overreacting.  Trial Tr. at 106:22-107:1.

235.    Ms. Dezelan's District Manager eventually gave Ms. Dezelan permission to stop calling on the harasser doctor but did not remove him from her call list, meaning that she was still responsible for the prescriptions written by that physician and that his prescriptions affected her annual performance review.  Trial Tr. at 107:10-108:1.

236.    Ratings on annual performance reviews determine merit increases and stock options.  Trial Tr. at 117:9-12, 131:6-7.

237.    Ms. Dezelan did not agree with the rating that her District Manager gave her on her 2005 annual performance review.  Trial Tr. at 117:1.

238.    Ms. Dezelan's District Manager gave her a 3 rating on Values and Behaviors on her 2004 annual performance review and a 2 rating on Values and Behaviors on her 2005 annual performance review.  Trial Tr. at 115:23-24, 116:23-24; PX 156; PX 157.

239.    Ms. Dezelan's District Manager told her that she was giving Ms. Dezelan a 2 rating because Ms. Dezelan had not perfected her working relationship with her male counterparts.  Trial Tr. at 117:19-20.

240.    Ms. Dezelan received a lower rating in the year in which she complained to her manager about discrimination and unfair treatment on the part of her male counterparts, which was also the year in which she announced her plan to start a family, announced her pregnancy, and requested a transfer.  Trial Tr. at 117:24-118:10, 140:14-19.

241.    Ms. Dezelan's male counterparts told her that they had received 3s on their 2005 annual performance reviews, whereas she received a 2.  Trial Tr. at 118:14-23.

Adrienne Fudge

242.    Ms. Fudge acted as a senior specialist in HR during part of her tenure at Novartis.  Trial Tr. at 3234:11.

243.    In interactions with HR, management always had the final word. When HR made a recommendation or determination about a certain case, the recommendation was not necessarily implemented. Trial Tr. 3236:1-4, 3253:16-24.

Terri Kelly

244.    Ms. Kelly's testimony was not rebutted at trial.

245.    Ms. Kelly deserved to receive a rating higher than a 2-2 on her 2002 annual performance review because she had thrown herself into her work that year to prove her commitment.  She received ratings of either meets or exceeds expectations in all the subcategories that comprise the values and behaviors, yet her final rating in that section was a 2.  Trial Tr. at 1132:3-1134:22; PX 250.

246.    Ms. Kelly expressed additional concern about her performance review for 2001 because the review rated her on activities that took place during 2002. Trial Tr. at 1125:21-1126:3.

247.    It would be a violation of company policy to take into account that a representative took a maternity leave in 2002 when evaluating that representative's performance in her 2001 year end performance review. Trial Tr. at 735:12-17.

248.    Ms. Kelly was not paid fairly in relation to men, because her husband made substantially more money than Ms. Kelly. Mr. Kelly was also a Novartis sales representative, he was hired around the same time into a similar position and performed comparably to Ms. Kelly. Yet Mr. Kelly enjoyed a yearly salary up to $10,000 higher than Ms. Kelly. Trial Tr. at 1147:4-1149:4.

249.    When Ms. Kelly confronted her Mr. Oswell about this pay disparity, Mr. Oswell admitted that he knew she made less than others in her district. Ms. Kelly asked for a salary adjustment and Mr. Oswell initially agreed, but he then failed to obtain a raise and evaded her continued reminders. Ms. Kelly never received the equity adjustment and was still underpaid in comparison to men in 2007 when Mr. Oswell left the company. Trial Tr. at 1149:5-1151:5.

Christine Macarelli

250.    After taking maternity leave in 2004, Ms. Macarelli received a 2-2 annual performance rating. Before taking maternity leave, Ms. Macarelli had received multiple perfect 3-3 ratings. She received a lower rating after maternity leave despite the fact that she worked just as hard, if not harder, after she had her child than she had before becoming pregnant. Trial Tr. at 193:14-194:8, 204:17-20.

Jennifer Recht

251.    Ms. Recht was paid less than her male counterparts.  Trial Tr. at 877:7-9.

252.    Ms. Recht's rating on her 2003 annual performance review was unfair; her manager acknowledged that it was unfair, and it affected her compensation.  Trial Tr. at 886:12-13, 886:24-887:1, 888:6-7; PX 424.

253.    Ms. Recht was aware of correspondence from her manager in which her manager stated that he felt strongly that she should have received a salary adjustment earlier in the year.  Trial Tr. at 889:14-17; PX 425.

254.    The sales goals that Novatis set for Ms. Recht's performance in 2003 were unrealistic and Ms. Recht's ability to meet those goals affected her compensation.  Trial Tr. at 890:14-15, 890:21-891:4, 896:20-22.

255.    Ms. Recht's sales goals may have been much higher than those given to male coworkers.  Trial Tr. at 2111:6-9.

256.    Novartis did not adjust Ms. Recht's sales goals for 2003 to make them realistic until the end of 2003.  Trial Tr. at 897:23-25.

257.    Novartis credited Ms. Recht's sales results to a different representative and that erroneous accreditation affected her sales results negatively in 2003.  Trial Tr. at 898:9-24.

258.    Ms. Recht learned through conversation at some point in 2002 that she was paid less than men at Novartis by approximately $10,000 to $20,000 annually.  Trial Tr. at 899:2-900:1.

259.    The male sales representatives who made more money than Ms. Recht included Brian Tully, Tim Rogers, Scott Campbell, and Jeff Meloche.  Trial Tr. at 900:8-13.

260.    Ms. Recht's Area Sales Manager confirmed that she was paid less than her male counterparts.  Trial Tr. at 902:20-25.

261.    Vice President of Sales for the Ophthalmic Division Perry Sternberg knew or should have known that Ms. Recht was paid less than at least two male colleagues with less experience.  Trial Tr. at 2121:7-2124:18, 2145:20-2147:15; PX1122; PX1123.

262.    Ms. Recht's Area Sales Manager stated in an email to his supervisor, "We talk a lot about rewarding success and performance, yet penalize our true top performers through a subjective and unexplained forecasting system."  Trial Tr. at 903:30-904:1; PX 424.

263.    Ms. Recht's Area Sales Manager stated in an email to his supervisor, "We have just lost one of our best assets, and one of the best reps we have ever had.  I do not want to lose more talent due to a failure to recognize true performance."  Trial Tr. at 909:5-7; PX 424.

264.    Ms. Recht's Area Sales Manager stated in an email to his supervisor, "I urgently recommend that this top performer [referring to Ms. Recht] be treated like one. She should have her market adjustment put into place immediately, and made retroactive, too."  Trial Tr. at 909:18-20; PX 424.

265.    Ms. Recht's counterparts received salary adjustments in December 2003, but Ms. Recht did not.  Trial Tr. at 909:22-910:1; PX 424.

266.    Ms. Recht's Area Sales Manager told her that he supported her for a raise. Trial Tr. at 911:2-5; PX 400.

267.    Ms. Recht received a special incentive payment of $3,000 on March 1, 2004, but this was not the raise her supervisor had requested.  Trial Tr. at 913:16, 20-22; PX 436.

268.    Ms. Recht did not receive the raise that her manager told her that she would receive.  Trial Tr. at 914:4-6, 916:19-20: PX 436.

269.    When Ms. Recht did not receive the raise, she contacted Mr. Sternberg regarding the status of her raise and he told her that her Regional Director was working on it.  Trial Tr. at 915:23-916:2.

270.    Ms. Recht contacted Mr. Sternberg after not receiving the raise.  He told her that he decided that she would not get the raise because according to a report based on commissions earned, she was a bottom performer.  Trial Tr. at 917:2-4, 918:1-3.

271.    An employee "must" be in the top third in sales to receive a 3 rating in objectives.  Trial Tr. at 2097:23-2098:1.

272.    Ms. Recht contacted HR representative Kevin Graham after Mr. Sternberg denied her the raise, and Mr. Graham told her that Mr. Sternberg had provided her sales numbers that led him to the decision that she would not be getting a raise.  Trial Tr. at 918:13-919:1.

273.    While it is company policy to keep HR complaints anonymous, Mr. Sternberg was not surprised to have received an email from HR representative Kevin Graham alerting him that Ms. Recht had complained to him about her compensation at Novartis and specifically about Mr. Sternberg.  Trial Tr. at 2114:23-2117:6; PX1125.

274.    Nine employees received retention bonuses in April or May 2004, following a restructuring, and only one of the nine was a woman.  Trial Tr. at 968:10-18; DX 177.

Marjorie Salame

275.    Ms. Salame did not agree with the rating that her District Manager, Joseph Simmons, gave her on her 2001 annual performance review.  Trial Tr. at 1663:11-12; PX 461.

276.    Ms. Salame's District Manager rated her as exceeding expectations on all of her core competencies but gave her an overall rating of meeting expectations.  Trial Tr. at 1662:14-17.

277.    Ms. Salame's District Manager told her that he could only give so many 3 ratings and he could not award Salame a 3 rating even though he felt that she exceeded expectations on core competencies.  Trial Tr. at 1667:18-21.

278.    Ms. Salame's District Manager told her that he had to give two male representatives raises and therefore had given them the 3 ratings in 2001.  Trial Tr. at 1730:1-4.

279.    Ms. Salame refused to sign her 2002 Annual Performance Review because her District Manager included numerous false statements in his evaluation of her performance.  Trial Tr. at 1700:13-16; PX 467.

280.    Over 10 percent of Ms. Salame's tier one physicians whom she was required to target were not available for her to see.  Trial Tr. at 1701:24-1702:6; PX 467.

281.    Ms. Salame did not believe that the rating that her District Manager gave her on her 2002 Annual Performance Review was fair.  Trial Tr. at 1703:22-24.

282.    Ms. Salame was downgraded on several of her competencies from her 2001 annual performance review to her 2002 Annual Performance Review because she reported that a doctor had raped her.  Trial Tr. at 1706:5-7.

283.    Mr. Simmons rated Ms. Salame lower for the core competency of "selling process" in 2002 than in 2001 even though her sales results improved significantly from 2001 to 2002 and even though she won the launch award in 2002.  Trial Tr. at 1949:8-13; PX 467; PX 461.

284.    Mr. Simmons gave Ms. Salame a 3 in every Value and Behavior for 2001 but nonetheless gave her a 2 overall for Values and Behaviors that year because of her sales ranking and because he believed that the Values and Behaviors are weighted against sales performance.  Trial Tr. at 1963:24-1964:13

285.    HR Representative Joe Palumbo counseled Mr. Simmons to remove his feelings about Ms. Salame's sexual assault from her performance evaluation.  Trial Tr. at 1934:17-21; PX 1096.

286.    The comments by Ms. Salame's District Manager on her 2002 annual performance review erased her success in that year and left her with no record of her outstanding performance.  Trial Tr. at 1708:3-13.

287.    The unfair rating that Ms. Salame's District Manager gave her on her 2002 annual performance review affected her compensation.  Ms. Salame received a two percent raise, or approximately $2,000, which was far less than the $10,000 raise that her District Manager awarded to her male counterpart.  Trial Tr. at 1708:19-24, 1709:6-10, 1730:5-7.

288.    Ms. Salame sent an email to her contact in HR to dispute the misinformation that her District Manager included in her 2002 annual performance review.  Trial Tr. at 1710:3-13; PX 468.

289.    Ms. Salame's 2002 Annual Performance Review was never changed by her District Manager, HR, or anyone else, even after she provided documentation of the misinformation that her manager included in that review.  Trial Tr. at 1712:2-3.

290.    The decision made by Ms. Salame's Regional Director and HR to transfer her to a different territory forced her to start anew in building relationships with physicians and influencing their prescription level; it therefore affected her compensation. Trial Tr. at 1721:2-10.

291.    Had Ms. Salame received the promotion to management at Novartis that she had been working towards before her rape, she would have earned approximately $20,000 to $30,000 more income per year.  Trial Tr. at 1730:17-19.

292.    Ms. Salame's District Manager did not level her from sales representative to sales consultant after she reported that a physician raped her.  "Leveling" increases compensation.  Trial Tr. at 1735:7-10.

Kelli Shannon

293.    Ms. Shannon's 3-2 rating on her 2003 annual performance review was discriminatory.  Ms. Shannon had won the President's Club Award that year and was never given anything but praise on her values and behaviors; she should have received a 3-3.  Trial Tr. at 1833:5-1834:9, 1836:20-1838:1; PX 532.

294.    When Ms. Shannon asked her District Manager, Barry Hardin, why she did not receive a perfect 3-3 rating in 2003, he replied that there just were not enough 3s

to go around.  Mr. Hardin chose to give Ms. Shannon's equally ranked male counterpart, Phil Elliott, the 3-3.  Trial Tr. at 1838:2-20.

295.    Receiving a 3-3, as opposed to a 3-2, in 2003 would have meant a higher merit raise for Ms. Shannon in 2003.  Trial Tr. at 1838:21-1839:1.

Holly Waters

296.    Ms. Waters was supposed to receive her last incentive check for the trimester prior to her termination.  Trial Tr. at 1287: 20-23.

297.    She was expecting an incentive check of $10,000 for her final trimester at Novartis, the trimester during which she was in the late stages of her first pregnancy and was wrongly terminated for falsifying calls.  Trial Tr. at 1288:7-8.

298.    Ms. Waters did not receive her incentive check.  Trial Tr. at 1288:9-10

299.    Ms. Waters called HR regarding the payment of her incentive check and the HR representative told Ms. Waters that she would not receive her incentive check because the decision was made by the manager not to receive the payment.  Trial Tr. at 1288:21-1289:8.

300.    Ms. Waters learned that a male representative who was terminated on the same day that she was received his incentive check.  Trial Tr. at 1289:17-24.

Catherine White

301.    Ms. White's managers never told her what to do in order to achieve a 3, 2, or 1 in any particular value and behavior on her annual performance review.  Trial Tr. at 611:17-612:1.

302.    Ms. White's District Manager, Mark Gunning, gave the 2001 MVP Award to her male counterpart, David Donner, for helping a doctor build shelves to store samples.  Trial Tr. at 620:10-18.

303.    Ms. White had helped Donner build the same shelves for the same doctor in the same office at the same time.  Yet, she did not receive the MVP Award in 2001, despite having higher sales results than Mr. Donner did.  Trial Tr. at 620:14-21.

304.    MVP awards (which carry a monetary award) are based on sales performance and contribution to the team.  The contribution to the team criteria is a judgment made by the District Manager that is "purely subjective."  Trial Tr. at 662:13-23.

305.    Ms. White never received an MVP Award during her tenure at Novartis.  Trial Tr. at 682:2-5.

306.    Ms. White's sales numbers were better than those of Brian Brown, who won the 2002 MVP Award.  Trial Tr. at 686:1-3.

Amy Zschiesche

307.    Tiger awards, which came with an American Express gift care, were distributed at the discretion of the individual manager.  Trial Tr. at 1087:8-15.

308.    District Manager Brad Willie gave Ms. Zschiesche a 1-1 rating on her 2005 annual performance review because her sales performance was in the bottom fifteen percent and he felt that her values and behaviors were below expectations.  Trial Tr. at 2989:18-22.

309.    There was not an exact rule regarding the distribution of 1 ratings to representatives who ranked in the bottom 15% in sales performance.  Trial Tr. at 3028:3-9; 3050:16-19.

310.    District Manager Willie had the discretion to rate Ms. Zschiesche higher than a 1 on her annual performance review in 2005.  Trial Tr. at 3028:11-14.

311.    Ms. Zschiesche's District Manager denied her a raise in 2005, which affected her earning potential moving forward.  Trial Tr. at 1057:1-2.

312.    District Manager Willie's sales results in 2004 fully met expectations but his manager nonetheless gave him a 2 for objectives on his 2004 annual performance review.  Trial Tr. at 3013:10-25.

313.    District Manager Willie received a 2-2 rating on his 2005 annual performance review despite the fact that he was in last place for his sales results and that he did not consider himself to have fully met expectations.  Trial Tr. at 3019:4-18.

314.    District Manager Willie's own manager had the discretion, which she exercised, to rate him a 2-2 or something lower for his 2005 annual performance review.  Trial Tr. at 3027:5-7.

315.    Even though District Manager Willie's own manager made significant criticisms in Mr. Willie's 2005 annual performance review, she nonetheless ranked him as fully meeting expectations.  Trial Tr. at 3027:11-14.

316.    District Manager Willie and his manager had discretion over whether or not to place Zschiesche on a Performance Improvement Plan after he gave her a 1-1 rating on her 2005 annual performance review.  Trial Tr. at 3029:13-16.

## II.    PROMOTION TO MANAGMENT

A.    **Novartis' Management Development Policies**

317.    Novartis Pharmaceuticals Corporation maintained several policies with respect to the promotion of sales representatives to first line management positions during the class period.

318.    The first policy, <u>Management Development Program: Manager's Guide</u>, outlines different components in the management development process.  According to this policy, the first component in the management development process is the candidate nomination process.  This process includes four steps: the first line manager conducts ongoing in-depth discussions with the potential candidate; the first line manager contacts the Regional Director; the Regional Director meets the potential candidate; and the Regional Director determines if and when the potential candidate will enter the management development process and notifies the first line manager of his decision.  JX 23.

319.    Another component of the management development process, according to <u>Management Development Program: Manager's Guide,</u> is the management development checklist, which includes the following tasks: complete assigned readings; empanel a development team of managers; serve as a breakout leader at sales workshop training; provide feedback to a manager during a ride-along; spend an office day with a first line manager; plan, implement, and present at a district planning meeting; analyze sales data at the district level; participate in a relocation discussion with the first line manager; and spend a field day with the Regional Director.  Once the checklist is completed and submitted, the Regional Director prioritizes placement of management development candidates into management development classes.  The next component of

the process is Management Development 1 ("MD1"), a workshop that provides "exposure to the requirements and demands of a first line manager." JX 23.

320.    Information regarding MD1 is also available through the *Sales Manager Resource Tool*, a tutorial on the Novartis intraweb which includes Manager's Guide to the MDP – Management Development 1. JX 15.

321.    Following MD1, Management Development Program: Manager's Guide dictates that the candidate create and review a development plan with his development team.   The next component is MD2, "an assessment to determine a candidate's proficiency in the communication, people management, and territory management competencies."   Finally, the candidate completes MD3, a workshop to determine a candidate's proficiency in the communication, people management, territory management, leadership, and collaboration competencies.   During MD2 and MD3, candidates are observed and evaluated by external consultants. JX 23.

322.    Additional policies provide more detailed information regarding the components outlined above.   For example, the Pre-Management Development Process Checklist reflects the actual checklist that management development candidates must complete in order to gain eligibility for MD1.   According to this checklist, the first line manager must sign the checklist and send it on behalf of the management development candidate to the Associate Director of Regional Training and to an employee in Management Training and Development. JX 14.

323.    Finally, the Performance Management Resource Guide outlines development planning for first line managers to complete with their sales representatives. According to this document, managers and representatives engage in several

development planning phases: assessment, goal setting, development planning, and implementation.  This document establishes best practices for development planning, including the completion of a development plan form that contains strengths, needs, aspirations, and objectives.  JX 25.

### B.     Novartis' Management Development Practices

324.     The record supports promotional practices at Novartis that differ sharply from the policies outlined above.  Trial testimony demonstrates numerous inconsistencies in how the policies outlined above were communicated and enforced during and after the class period.

325.     The accumulation of record evidence suggests that each manager followed his own practices with respect to promotion of his representatives to first line management positions.   Specifically, managers made individual determinations with respect to whether, when, and how his representatives would move through the management development process.  See Discussion Part II.C: Sharon Larrison, James Outtz, David Moatazedi, Bruce Holstein, James Gaffney, Joseph Simmons.  This ad hoc approach compromised the access to and fairness of management development.

326.     Managers gave inconsistent testimony regarding requirements for expressing interest in management development.  Whereas some managers testified that sales representatives could express their interest orally, one manager told his representative that she was required to read two books, submit summaries on each book, and send a formal communication stating her interest in management.  Trial Tr. at 721:8-11, 721:15-20, 673:14-674:1.

327.    A major inconsistency results from the communication of management development policies and practices to sales representatives.  Witnesses testified that they did not receive training on management development policies during sales workshops; that they were neither provided with nor directed to codified management development policies; that management development policies and practices were not transparent; that their managers avoided providing information and making commitments with respect to the management development process; and that their managers withheld information regarding how to complete the MD1 prerequisites.  Trial Tr. at 1350:3-15, 1362:2-18, 1366:19-1367:7, 246:9-10, 248:2-4, 259:7-9, 248-6-8, 265:6-7, 265:19-21, 289:4-5; PX49; JX34.  Even the Vice President of Training and Development did not know of any materials distributed to the sales force employees regarding the policies on how to complete the prerequisites for MD1.  Trial Tr. at 1194:16-22.

328.    Another inconsistency relates to MD1 sales prerequisites.  Nearly every witness who has testified on the topic of management development has described different prerequisites for management development candidates who wish to enter MD1. For example, several different understandings of sales performance requirements emerge from record evidence.  Whereas some witnesses have maintained that candidates must rank in the top half of the sales force, others have cited cutoffs as high as the top 20 percent of the sales force.  Trial Tr. at 1544:11-1546:11; PX 49.  One manager supported a representative when she ranked in the bottom half of the sales force but withdrew his support when she ranked in the top quarter.  Trial Tr. at 1871:20-23, 1877:18-23. Another manager required his representative to rank in the top half of a percent in the international sales force before he would consider her candidacy for management

development.   Trial Tr. at 616:17-617:1.   Yet other managers made more general statements about the performance requirement, merely stating that results needed to be strong or to improve.  Trial Tr. at 616:11-14, 1661:5-11.

329.    The management development checklist also drew inconsistent testimony. One manager testified that the formal management development checklist did not come into existence until 2006.   Trial Tr. at 2492-2493:1.   However, multiple witnesses testified that they were working toward completing the management development checklist in prior to 2006.  Trial Tr. at 1672:9-11, 1350:19-1356:4, 169:10-17, 170:1-10, 170:21-171-1, 229:1-233:4; PX 43; PX 38; PX 42; PX 44; JX 37; JX 54.  Whereas some witnesses were required to complete every item on the checklist, at least one male employee was excused from such requirements.  Trial Tr. at 617:19-21.

330.    Timing represents another area of inconsistency in management development practices.  The record evidence demonstrates that first line managers and Regional Directors created individual guidelines to determine how quickly their sales representatives entered into and moved through the management development process. Whereas one Regional Director required that a Plaintiff complete at least two and a half years as a sales consultant, another manager completed MD3 within two years of joining the Company.  Trial Tr. at 2499:1-10, 617:15-19; DX 39.  One male employee testified that he was offered entry into the management development program immediately and promised a management position within year.  Trial Tr. at 3167:1-4.

331.    The record evidence demonstrates that no department or officer of Novartis other than the management team monitored an individual management development candidate's progress through the management development process prior to

MD1.  Trial Tr. at 1199:22-24, 1200:7-11, 1200:20-24, 1210:5-9, 726:1-7.  Furthermore, it is not the practice of any department or office of Novartis to track by gender who completes the management development process and who enters the management pool. Trial Tr. at 1206:21-23, 1207:14-16, 1209:24-1210:4.

332.     Lack of oversight coupled with inconsistency created highly subjective management development practices.  The practices described above lend themselves to a "tap on the shoulder" culture in which the overwhelmingly male management force selects the next generation of management at its whim.

### C.     Subjectivity & Discretion

333.     Novartis' Management Development policies and practices allocate complete control and discretion to management officials to decide who may become a manager.  The following discussion summarizes expert evidence, Novartis' admissions regarding excessive subjectivity in its management development policies, as well as anecdotal evidence of excessive subjectivity in decision-making with respect to promotional decisions:

### EXPERT EVIDENCE

<u>Dr. James Outtz</u>

334.     Dr. Outtz was not rebutted at trial.

335.     Entry into the management level jobs at Novartis is completely within the discretion of the individual's manager and constitutes unfettered discretion.  There is no documentation as to what the manager has to do in terms of being held accountable for how the manager determines a person has met the tasks on the checklist.  Further, there is

indication that employees are unaware whether the checklist exists or if what they are doing is part of the checklist.  Trial Tr. at 565:1-566:18.

336.    With respect to management development, there should be more transparent policies at Novartis so that everyone understands the requirements at a minimum in order to ensure that everyone has an equal chance of becoming a manager. Trial Tr. at 566:21-567:5.

Dr. Louis Lanier

337.    The sales force at Novartis was approximately 50percent female and 50 percent male.  However, only 25 percent to 26 percent of the sales manager force is female.  Trial Tr. at 787:22-788:10.

338.    Dr. Lanier built a regression by determining certain minimum eligibility requirements for promotion to management.  Specifically, at least 27 years of age and 1 year of company tenure; he eliminated entry level job groups from the analysis because there were very few promotions to management, if any, from that level of the job market. Trial Tr. at 788:22-790:4.

339.    Dr. Lanier further divided those eligible for promotion into job groups, and controlled for other explanatory factors such as job tenure, the amount of time they had been within a particular job, the amount of time they have been with the company, and total labor workforce time using as a proxy the age of 27.  Trial Tr. at 790:5-24.

340.    Dr. Lanier further allowed the information in the explanatory factors to interact; meaning he allowed there to be different tenure and experience effects for different job categories within the data.  Allowing explanatory factors to interact further

ensures that a comparison of "apples to apples" is accomplished.  Trial Tr. at 790:25-791:14.

341.    The ratio of the male chance of probability of promotion to the female chance is 4.3.  Males have 4.3 times the likelihood of being promoted than their similarly situated female counterparts in the same job groups.  This result is statistically significant at 7.3 standard deviations.  Trial Tr. at 792:8-18; PX 962.

342.    The 7.3 standard deviations are a highly statistically significant result that the observation measured did not occur by random chance.  Trial Tr. at 793:5-10.

343.    Further, the 7.3 standard deviations signify a high confidence level that the observation did not occur by chance; the chance that this observation was random is one in three trillion.  Trial Tr. at 794:13-795:5.

344.    In a "perfect world" a regression would take into account a female's willingness to relocate as an explanatory factor for the gender management disparity; however, that data are not available.  Trial Tr. at 796:4-9.

345.    Dr. Lanier looked at the rates of males to females who were selected to officially start the management development process and attend the management development classes.  Among the sales force of individuals who were 27 years or older, who had at least 1 year of company tenure, and who had been labeled as eligible for the Management Development Program, the ratio of selection of male employees to female employees was 1.7 to 1, or 70 percent higher than one would expect in a gender neutral selection process.  Trial Tr. at 796:14-24.

346.    Thus, if one looks across the number of eligible employees, there were approximately 15 percent more males in that pool than there are females, meaning there

was a 49 percent difference in the number of males versus females among those who were in the Management Development Program.  Trial Tr. at 796:25-797:7.

347.    The selection rate for males was 15.2 percent and the selection rate for females was 9.7 percent; the difference between the two produces the 1.7 ratio between those two selection rates at 6.0 standard deviations.  Trial Tr. at 1797:17-798:9.

348.    Males received a 1 rating on the subjective portion of the performance management rating at the same rate as females; females tended to get more 2s at 6.7 standard deviations, and males tended to get more 3s at 6.9 standard deviations.  Trial Tr. at 799:1-20; PX 456.

349.    Based on this observation, Dr. Lanier did not use performance ratings as an explanatory factor for promotion or pay because the performance management ratings were tainted by discrimination, and to allow this factor to be considered would bias the outcome of the analysis, which seeks to determine whether or not there was a gender effect.  The performance ratings are a "tainted" variable.  Trial Tr. at 799:21-800:14.

350.    Dr. Lanier looked at the extent to which job tenure and age or experience could explain differences in male and female performance ratings.  Dr. Lanier ran a multinomial logit regression, and his analysis was consistent with the observation that males were more likely to receive a 3 on the subjective portion of the performance rating at 6.2 percent at 2 standard deviations.  Trial Tr. at 801:19-802:6.

351.    This additional analysis conducted with respect to performance ratings further reinforced Dr. Lanier's position that performance ratings should not have been used in the regression analysis because they were a tainted variable.  Trial Tr. at 802:13-24.

Dr. Finis Welch

352.    Dr. Welch did not study promotions from the sales representative level to the first-line manager level.  Trial Tr. at 2855:12-14.  He performed no analysis to rebut the promotion analysis of Dr. Lanier.  Trial Tr. at 2855:21-23.  He offered no opinion in this case as to whether or not women were less likely than men to be promoted into management. Trial Tr. at 2856:9-12.

## NOVARTIS' ADMISSIONS REGARDING SUBJECTIVITY

Arlene Adoff

353.    The Specialty Sales Career Levels, know as the "Butterfly Book," states that to be eligible to go into management, an individual should generally have between 3 and 4 years of pharmaceutical experience.  Trial Tr. at 1193:24-1194:4.

354.    Despite being the Vice President of Training and Development,  Ms. Adoff did not know of any materials distributed to the sales force employees regarding policies and the process for determining whether a candidate is eligible for promotion to management positions.  Trial Tr. at 1194:16-22.

355.    To begin the management development process, Ms. Adoff testified that a sales representative may either express an interest in management or may be approached by a District Manager regarding management.  Trial Tr. at 1195:1-6.

356.    District Manager support was necessary for a sales representative to proceed through the management development process.  Trial Tr. at 1210:24-1211:2.

357.    A sales representative could not even begin the management development process without the approval of her District Manager.  Trial Tr. at 1195:11-13, 1210:20-23.

358.    A sales representative must continue to be supported by his or her District Manager in order to progress toward becoming a manager.  Trial Tr. at 1195:7-10.

359.     One of the first steps of the management development process was for candidates to take a behavioral assessment known as the "NEO," for which Adoff did not know what the letters stood.  Trial Tr. at 1195:14-18.  The results of each candidate's NEO were sent to the candidate's District Manager and Regional Director.  Trial Tr. at 1196:2-5.

360.    A District Manager had the discretion not to proceed with management development for a particular candidate based on the results of the NEO.  Trial Tr. at 1196:6-12.  There was no oversight by Ms. Adoff's department with respect to employees whom District Managers reject as not having the qualifications to proceed through the Management Development Program.  Trial Tr. at 1210:5-9.

361.     The Training and Development Department made no attempt to track or monitor what District Managers did with the NEO results after they received them.  Trial Tr. at 1196:13-16.

362.    Other than the Regional Director, no one at Novartis would know if a District Manager denied a candidate entry into the Management Development Program based on her NEO results.  Trial Tr. at 1197:1-5.

363.    It is at the District Manager's discretion to give sales representatives opportunities to complete the items on the checklist.  Trial Tr. at 1197:23-1198:1.  It is within the discretion of the District Manager to deny a sales representative the opportunity to complete one or more items on the checklist.  Trial Tr. at 1198:23-1199:1.  Thus, if the District Manager is not supporting a sales representative for management,

there is no benefit to the sale representative of reading the books on the checklist.  Trial Tr. at 1198:16-19.

364.    In addition to having the discretion to decide whether a sales representative had the opportunity to complete items on the checklist, District Managers also controlled the pace at which a sales representative completes the items on the checklist.  Trial Tr. at 1199:2-5.

365.    After completing the checklist, a management candidate would have to meet with the Regional Director.  Trial Tr. at 1199:6-8.  At that point, the Regional Director had the discretion to determine whether the candidate could proceed through the management program.  Trial Tr. at 1199:9-12, 1199:19-21.  Novartis did not track which candidates proceeded through the Management Development Program versus which candidates were excluded from proceeding.  Trial Tr. at 1199:22-24.

366.    A representative's progress in management development was not tracked until after she entered the management development classes.  Trial Tr. at 1200:7-11.

367.    After completing the items on the checklist, District Managers must enter those sales representatives into the system to allow them to attend management development classes known as MD 1, MD 2, and MD 3.  Trial Tr. at 1200:25-1201:4.

368.    Because there are a limited number of spaces in each of the management development classes, there was often not enough room for everyone who had completed the checklist at a given time.  Trial Tr. at 1203:10-15; 1204:12-15.  The limited number of available spaces in the classes necessitated that Regional Directors prioritize their candidates; however, there was not a policy or procedure encompassing the factors that

Regional Directors should review to prioritize the placement of candidates into the classes.  Trial Tr. at 1203:16-23, 1204:16-19.

369.    During MD2 and MD3, candidates were assessed on various characteristics based on participation in exercises.  Trial Tr. at 1205:3-6.  Although Ms. Adoff knew that managers from her department participated in the discussions during these assessments, she did not know the degree to which the managers participated in those discussions.  Trial Tr. at 1206:6-20.

370.    Novartis did not maintain records by gender regarding entry into MD2 and MD3.  Trial Tr. at 1206:21-23.

371.    Novartis did not any records by gender of those candidates who passed MD 3 and entered the pool of employees eligible to interview for District Manager positions.  Trial Tr. at 1207:10-16.   Ms. Adoff's department stopped tracking candidates once they completed MD3.  Trial Tr. at 1209:4-6.

372.    Novartis' official policy was that all sales representatives must complete all the steps of the Management Development Program before they can become District Managers.  Trial Tr. at 1211:3-6.

373.    This "official policy" is inconsistent with practice.  Five male sales representatives became District Managers or Area Sales Managers without having completed the Management Development Program.  PX 815; Trial Tr. at 1211:19-1212:9. At least one of those males was able to do so based on approval from his Vice President over the recommendations of Ms. Adoff's department.  PX 815; Trial Tr. at 1211:19-1212:9.  Similar approval was denied when a female requested to become an Area Sales

Manager before completing the Management Development Program.  PX 817; Trial Tr. at 1214:1-8.

374.    In September 2005, there were 336 men in the Management Development Program compared with 171 women.  DX 255; Trial Tr. at 1229:8-12.  For the same time period, 53 men had completed the Management Development Program and were eligible to interview for management positions, compared with 13 women.  DX 255; Trial Tr. at 1229:13-22.

Domenick DiCindio

375.    As the Director of Sales Training, Mr. DiCindio was unclear as to the amount of pharmaceutical sales experience that was required for a sales representative to be considered for management.   Trial Tr. at 720:11-721:7.

376.    In order to be considered for management, a representative may orally express her interest in management to her District Manager.   Trial Tr. at 721:8-11, 721:15-20.

377.    A District Manager may also ask a representative if she is interested in management.  Trial Tr. at 721:12-15.

378.    There is no requirement that a representative codify her interest in management in writing.  Trial Tr. at 721:21-24.

379.    There is no exact phraseology that a representative must use in expressing her interest in advancing into management.  Trial Tr. at 721:25-722:4.

380.    It is acceptable for a representative to inform her manager of her interest in management at her interview or even during a ride-along.  Trial Tr. at 722:10-13.

381.    There was no codified "wait period" before a representative could begin working on the management development checklist.  Trial Tr. at 722:23-724:2.

382.    After a representative expressed her interest in management, the District Manager had discretion to inform the Regional Director of that interest.  Trial Tr. at 723:8-12.

383.    A District Manager had discretion to move a representative forward in the management development process if that representative received a rating of 2-2, a 2-3, or a 3-3 on her Annual Performance Review.  Trial Tr. at 724:14-725:9.

384.    A Regional Director had discretion to enter a candidate into the MD1 class.  Trial Tr. at 725:13-18.

385.    A District Manager also had discretion to allow the candidate to enter the MD2 class.  Trial Tr. at 725:19-726:1.

386.    Novartis had no way to track in a quantifiable way the representatives who initially expressed interest in management.  Trial Tr. at 726:1-7.

387.    Novartis did not track representatives' initial interest in management.  Trial Tr. at 726:13-17.

388.    A District Managers has discretion to allow representatives to present at District Planning Meetings.  Trial Tr. at 731:8-11.

389.    Although Vice President DiCindio testified that a representative could work on the checklist outside the supervision of her manager, he acknowledged that a representative needed her manager's permission to present a District Planning Meeting.  Trial Tr. at 747:6-748:2.

390.    Novartis had no way of knowing if a representative was informed of the management development checklist.  Trial Tr. at 748:12-17.

Sharon Larrison

391.    Ms. Larrison was a founder and the chair of the Women in Leadership organization at Novartis.  Women in Leadership conducted participant surveys during its annual conferences during the first three years the group was formed.  Within the surveys, when women were asked, "what some of the barriers to retaining, developing, and/or promoting women to leadership positions."  In response, the participants listed the following: an old boys' club leading to the exclusion of women from activities and lack of respect for women currently in senior positions, lack of women being promoted, and "lack of clearly defined career and succession paths."  Trial Tr. 1454:16-1456:12.

392.    A representative needed her Regional Director's approval in order to attend the management development classes.  Trial Tr. at 1505:18-20.

393.    Active status in the Management Development Program was not necessarily a formal process, meaning a representative could be working on the checklist officially or unofficially.  She further testified that there was no formal process by which management removed a candidate from the Management Development Program.  Trial Tr. at 1506:2-15.

394.    A sales representative could initiate interest in management or a manger could inquire if the sales representative was interested in considering management.  If the representative was in the management development process she could be pulled from the management track if her sales drop below 50 percent.  Trial Tr. at 1580:23-1581:12.

395.    It was the responsibility of a Regional Director to make sure that all employees were held to the same standard with respect to management development. Trial Tr. at 1544:11-1546:11.

Jennifer Blum

396.    Ms. Blum was told that the main qualifications for moving into management were to be with the company for at least two years, and to have good sales performance, and leadership skills.  Trial Tr. at 2021:6-12.

397.    Ms. Blum read the required materials for management development during her maternity leave.  Trial Tr. at 2022:23-2023:3.

398.    Ms. Blum has never seen anything in writing about a two-year employment requirement for management development.  Trial Tr. at 2049:1-4.

399.    Ms. Blum's manager had to assist her in completing the items in the management development checklist.  Trial Tr. at 2050:14-16.

400.    Ms. Blum could not sign up for the management course unless her manager enrolled her.  Trial Tr. at 2050:17-19.

401.    Ms. Blum did not recall any Novartis training regarding promotions and women.  Trial Tr. at 2060:5-6.

Brian Campbell

402.    In order to become a manager, there were projects for the district that sales representatives had to work on with their managers before entering the management development classes.  Campbell Trial Dep. Designations at 17:20-22.

403.    If a representative's sales numbers to be above a certain ranking or percentage for that representative to be eligible for entry into the Management Development Program.  Campbell Trial Dep. Designations at 93:8-18, 94:15-20.

404.    Mr. Campbell clarified that if one's sales were in the bottom 10 percent, the unwritten rule was that that sales representative would not be entered into the Management Development Program until her sales improved.  Campbell Trial Dep. Designations at 93:8-18, 93:23-94:5.

405.    As long as a sales representative was in the top 90 percent, she would be eligible for entrance into the Management Development Program.  Campbell Trial Dep. Designations at 93:23-94:20.

406.    There was no written policy regarding how long a representative had to have been with Novartis before that representative could enter the Management Development Program.  Campbell Trial Dep. Designations at 94:17-20.

Dan Duhart

407.    Duhart testified that Novartis needs more female managers than it has, and that it has not been able to get beyond a 20 percent to 30 percent ratio of female managers.  Trial Tr. at 76:6-7, 79:6-10.

408.    Duhart testified that, of the 12 to 13 District Managers he hired while a Regional Director at Novartis, he could not recall if any were female.  Trial Tr. at 99:14-16, 100:19-102:7.

James Gaffney

409.    The management development process began when a sales representative expressed interest in management.  There was no requirement that a representative express her interest in management in writing.  Trial Tr. at 2489:8-16; 2491:23-2492:5.

410.    Mr. Gaffney testified that it was his understanding that there was no formal checklist for management development that came into existence until approximately 2006.  Trial Tr. at 2492-2493:1.

411.    Mr. Gaffney testified that it was his understanding that he had to wait for approval from the Regional Director before he could move a representative through the management process.  Mr. Gaffney was not privy to the details of how the Regional Director determined whether to accept sales representatives into the management pool.  Trial Tr. at 2493:6-24.

412.    There was no codified two-year rule with respect to management development.  Trial Tr. at 2499:1-10.

Bruce Holstein

413.    A manager can withhold support for a managerial position based on his appraisal of a representative's competencies.  Trial Tr. at 2366:3-7.

414.    At some point, District Manager Holstein supported a female rep for management.   Trial Tr. at 2389:11-14.   However, he never placed her into the Management Development Program.  Trial Tr. at 2424:2-12.

David Moatazedi

415.    Mr. Moatazedi became a District Manager at Novartis within two and a half years of starting at the company.  Trial Tr. at 664:6-665:4.

416.    Determining whether a sales representative is interested in management was a subjective decision and managers at Novartis had the discretion to make it. Trial Tr. at 679:3-19.

Melissa Parker

417.    Ms. Parker stated that there are "so few" female managers at Novartis. Trial Tr. at 2624:7-2627:3; PX1164.

418.    Since 2007, there have been no efforts by Novartis to hire women as managers to balance gender distribution in the management pool. Trial Tr. at 2630:5-2631:9.

419.    Ms. Parker testified that if the District Manager does not communicate a sales representative's managerial aspirations to the Regional Director, the Regional Director does not always know about it. Further, there is no criterion that dictates how a District Manager determines which management development candidates will be discussed with his Regional Director. Trial Tr. at 2631:19-2634:11.

420.    Ms. Parker testified that the DM has some discretion in choosing who to put in to, and pull out of, the Management Development Program. Trial Tr. at 2635:1-3.

Joseph Simmons

421.    Mr. Simmons testified that ranking in the top 50 percent for sales performance was not a requirement to support a representative for management development. Trial Tr. at 1871:24-1872:2.

422.    A representative could complete management development prerequisite tasks without having to rank in the top 50 percent for sales performance. Trial Tr. at 1873:1-4.

423.    The likelihood of a sales representative becoming a manager without her manager's support was almost a nullity.  Trial Tr. at 1877:24-1878:1.

424.    Sales are an important criterion at Novartis in considering whether to move someone into management.  Trial Tr. at 1881:16-22.

## ANECDOTAL EVIDENCE

Tara Blum

425.    Ms. Blum's initial training at Novartis did not cover the management development process.  Trial Tr. at 246:9-10.

426.    Ms. Blum expressed interest in management to her manager during her initial interview.  Her manager committed to her, on the basis of her proven track record and prior experience, that he would move her into management quickly.  Trial Tr. at 241:15-242:5.

427.    Ms. Blum understood her manager to mean that he would begin the management development process with her as soon as she mastered her products and demonstrated her ability to promote her portfolio.  Trial Tr. at 243:13-19.

428.    Ms. Blum's manager was her "gatekeeper" because he controlled her involvement in the management development process.  Trial Tr. at 267:7-8.

429.    James Gaffney, her District Manager, testified that during the time he supervised Ms. Blum, there was not a formalized process for how expressing interest in management development.  There was no requirement that a representative express her interest in management in writing.  Trial Tr. at 2489:8-16, 2491:23-2492:5.

430.    Ms. Blum discussed management with her manager during every field contact.  Trial Tr. at 247:24.

431.    District Manager Gaffney testified that Ms. Blum expressed her interest in management during field ride-alongs and in her 2004 Annual Performance Review. Accordingly, she accomplished the first step towards management development.  Trial Tr. at 2492:6-22.

432.    District Manager Gaffney testified that he was not under an immediate obligation to inform the Regional Director that Ms. Blum had expressed an interest in management.  Trial Tr. at 2494:5-9.  District Manager Gaffney was evasive during their conversations regarding management, particularly with respect to how to begin the process of management development.  Trial Tr. at 248:2-4, 259:7-9.

433.    District Manager Gaffney frequently referred to a checklist, or list of responsibilities, that she needed to complete before beginning the management development classes.  Trial Tr. at 248:4-6.

434.    Ms. Blum frequently requested to see the checklist but District Manager Gaffney never provided her with one.  Trial Tr. at 248:6-8.

435.    Ms. Blum never saw a checklist for management development.  Trial Tr. at 289:4-5.

436.    Ms. Blum renewed her expressed interest in management development during her 2004 Annual Performance Review.  Trial Tr. at 259:22-260:16; JX 28.

437.    District Manager Gaffney wrote in her 2004 Annual Performance Review that she was definite management talent.  Trial Tr. at 261:20-21; JX 28.

438.    Ms. Blum was never informed that Novartis had a two-year waiting period before a representative could begin the Management Development Process.  Trial Tr. at 265:16-18.

439.    There was no two-year waiting period codified in any Novartis policies. Trial Tr. at 265:19-21.

440.    District Manager Gaffney did not tell Ms. Blum that Regional Director Woody Hopkins had a two year rule before a representative could enter management development.  Trial Tr. at 2496:15-17.

441.    Ms.  Blum had no way of knowing when management development would happen or how she could involve herself in the process.  Trial Tr. at 267:3-6.

442.    When Ms. Blum informed District Manager Gaffney that she had accepted an offer at another pharmaceutical sales company, he responded that he could put her into management development immediately.  Trial Tr. at 268:13-17.

443.    District Manager Gaffney had the power to immediately place Ms. Blum into management development.  Nonetheless prevented her from entering management development prior to her resignation, despite his acknowledgement of her qualifications and experience.  Trial Tr. at 268:20-269:7.

444.    The management development process at Novartis was not transparent. Ms. Blum did not know how to get into the Management Development Program.  Trial Tr. at 265:6-7.

445.    Ms. Blum worked at another pharmaceutical company that had clear policies regarding prerequisites for the management program.  Trial Tr. at 265:8-10.

Sean Bogdany

446.    Bogdany's managers told him that they would put him into the management development program the first time it opened up following his hiring and that he would be a manager within a year to year and a half.  Trial Tr. at 3167:1-4.

447.    Bogdany's manager told him that he would be promoted to a manager position within a year of coming to Novartis.  Trial Tr. at 3167:7-8.

448.    Bogdany testified that none of the women on his team have received promotions.  Trial Tr. at 3186:4-7.

Jessica Borsa

449.    The first-line manager (i.e., District Manager or Area Sales Manager) is the "gatekeeper" in the management development process at Novartis. First-line managers make the decision whether a representative moves forward into the Management Development Program or not.  First-line managers hold the promotional fate of representatives in their hands.  Trial Tr. at1344:16-19.

450.    Ms. Borsa never knew of any specific company requirements or guidelines for becoming a manager.  She had heard conflicting information from her Area Sales Manager, Brian Aiello, regarding the requirements for becoming a manager.  The information provided by Mr. Aiello was ambiguous; nothing was clear-cut or definite. Trial Tr. at 1350:3-15, 1362:2-18, 1366:19-1367:7; PX 49; JX 34.

451.    Ms. Borsa informed Area Sales Manager Aiello of her interest in management in 2002, shortly after she started at Novartis.  Trial Tr. at 1345:6-8; JX 33.

452.    Ms. Borsa was not moved forward in the Management Development Program until the summer of 2003, when she was preparing to leave the Senior Care division to pursue a specialty sales position in Novartis' Xolair division.  To retain Ms. Borsa in his district, Mr. Aiello offered to actively move her through the Management Development Program and help her become a manager. Sharon Larrison, Ms. Borsa's Regional Director, also offered her support.  Trial Tr. at 1348:11-1350:2.

453.    With manager approval, Ms. Borsa began working through the management development checklist.  She read the required books, she served as acting manager for three weeks while Mr. Aiello was on vacation, she created highly-praised presentations, she developed an innovative "Round Robin" detailing plan, and she led a district meeting during the third quarter of 2003.   Trial Tr. at 1350:19-1356:4; PX 43; PX 38; PX 42; PX 44.

454.    As Ms. Borsa moved through the checklist, her interest in management increased.  She felt that she was moving closer to becoming a manager.   Trial Tr. at 1356:14-20.

455.    In order to complete the checklist and officially enter MD1, Ms. Borsa had to attend a Breakout Leader class. To complete this outstanding item on her checklist and move forward in the Management Development Program, Ms. Borsa needed Area Sales Manager Aiello to enroll her in MD1.  Trial Tr. at 1356:21-1357:1.

456.    Area Sales Manager Aiello pulled Ms. Borsa out of a February 2004 Breakout Leader class that she was registered to attend after she crossed him during a sales meeting.   During that meeting, Ms. Borsa made a comment that it is hard for women with children to get calls from their managers in the early morning when they are sending their children off to school.  The following business day, Area Sales Manager Aiello called Ms. Borsa, angry, and told her he was pulling her out of the BOL class because of her comments.   Area Sales Manager Aiello said that Ms. Borsa's comment about women and children was not the sort of comment a future manager would make. Trial Tr. at 1357:12-1360:2, 1361:5-11, 1365:3-5; PX 34.

457.    Regional Director Sharon Larrison relied upon the report of Area Sales Manager Brian Aiello that Ms. Borsa did not do well on a presentation to doctors and that her sales numbers had dropped when she approved his decision to withdraw Ms. Borsa from the Breakout Leader class.  Regional Director Larrison did not conduct her own investigation.  Regional Director Larrison testified that Ms. Borsa was a woman who had the qualities, skill, and innovation to be a District Manager.  Trial Tr. at 1530:8-1531:1, 1542:9-13.

458.    Ms. Borsa was devastated when Area Sales Manager Aiello pulled her out of the Breakout Leader class.  Her relationship with Area Sales Manager Aiello became very tense; the work environment became hostile; and the management development process came to a standstill.  Trial Tr. at 1360:20-24, 1367:12-21.

459.    Regional Director Larrison testified that the drop in Ms. Borsa's sales numbers during the third trimester of 2003 was not solely Borsa's fault; rather, a reorganization was a factor in that drop.  Ms. Larrison admitted that Ms. Borsa's sales numbers were above the 50 percent mark in 2004.  Trial Tr. at 1628:2-2630:15.

460.    Regional Director Larrison reviewed a BDR that incorrectly stated that Ms. Borsa needed to rank in the top 20 percent of sales to continue in management development.  She further testified that 20 percent was not the requirement at Novartis to be a part of management development.  Trial Tr. at 1544:11-1546:11; PX 49.

461.    Area Sales Manager Aiello later offered to enroll Ms. Borsa in a July 2004 Breakout Leader class.  He was aware at the time that she had planned an important family vacation during that time.  Due to that preexisting personal commitment, Ms.

Borsa was forced to decline the Breakout Leader class.  Trial Tr. at 1372:25-1373:18, 1375:7-14.

462.    Ms. Borsa stated that although she ranked consistently in the top 50 percent for sales, Area Sales Manager Aiello never put her back into the Breakout Leader class.  As a result, Ms. Borsa never made it to MD1.  Trial Tr. at 1374:20-1375:4, 1375:15-1376:6; PX 26.

463.    In spring 2005, Ms. Borsa reported to her next supervisor at Novartis, Ophthalmics Area Sales Manager David Green, about the obstacles and abuses she faced under Area Sales Manager Aiello.  Mr. Green did nothing in response to her complaint, and Ms. Borsa ultimately did not become a manager at Novartis.  Trial Tr. at 1376:11-1377:5.

Christine Macarelli

464.    Ms. Macarelli stated that there were "no opportunities for women at Novartis" interested in pursuing management.  Trial Tr. at 168:18-21.

465.    Ms. Macarelli expressed interest in management during her job interview for Novartis, and was on track to complete the checklist to get into the management development process in 2002 and 2003.  Everything changed after she became pregnant in 2004.  Trial Tr. at 169:10-17, 170:1-10, 170:21-171:1, 229:1-233:4; JX 37; JX 54.

466.    The Management Development Program was "off the table" when Ms. Macarelli returned from maternity leave.  District Manager Holstein discouraged her from seeking a management position due to her "unfortunate circumstance at home" – her young song, Anthony.  Trial Tr. at 194:8-20.

467.     It was not possible for Ms. Macarelli to enter management at Novartis without Holstein's support, because the District Manager had to "promote" or "sponsor" a sales rep for the Management Development Program.  Trial Tr. at 194:21-195:4.

Marjorie Salame

468.     Ms. Salame expressed interest in management to her manager both on her employment application and during her initial interview.  Trial Tr. at 1660:20-1661:1.

469.     Ms. Salame's manager, District Manager Joseph Simmons, was receptive to her interest in management and he was willing to help her move into the management development process.  Trial Tr. at 1661:4-5.

470.     District Manager Simmons told Ms. Salame that she needed to help him move his territory up in sales ranking so that he could get a promotion to specialty management.  He told her that if she did so, he would help her get into the management development program.  Trial Tr. at 1661:5-11.

471.     District Manager Simmons supported Ms. Salame for management development in 2001 even though she did not rank in the top 50 percent for sales performance that year.  Trial Tr. at 1871:20-23.  District Manager Simmons testified that Ms. Salame was not a formal candidate for management training in 2001 but he was otherwise supporting her management prospects that year.  Trial Tr. at 1939:25-1940:3.

472.     Ms. Salame's sales performance during her first year and a half at Novartis was strong; District Manager Simmons gave her multiple awards for sales performance.  Trial Tr. at 1661:15-1662:9; PX 485; PX 487.

473.     Ms. Salame again expressed interest in management in her 2001 Annual Performance Review.  Trial Tr. at 1668:6-14; PX 461.

474.    Ms. Salame volunteered to complete several activities in addition to responsibilities as a sales representative because she understood those activities to be part of the management development process.  Trial Tr. at 1671:24-1672:6.

475.    Ms. Salame advanced far in the management development process.  She completed all requirements except for a ride-along with her Regional Director.  Trial Tr. at 1672:9-11.

476.    Ms. Salame's progress in the management development process stalled shortly after May 22, 2002.  Trial Tr. at 1672:23-1673:2.

477.    Ms. Salame's male managers, District Manager Simmons and Regional Director Eric Robinson, retaliated against her after she reported that a physician raped her during a Novartis event.  Trial Tr. at 1690:8-9.

478.    Ms. Salame's manager threatened her with disciplinary action in an email following her report of the rape.  Trial Tr. at 1690:1-7; JX 57.

479.    Ms. Salame's manager informed her shortly after she reported that a physician raped her during a Novartis event that he would implement a Territory Coaching Plan ("TCP") for her.  Trial Tr. at 1691:2-4; JX 57.

480.    A TCP is used either to discipline a representative or to provide an opportunity for a representative to improve his or her sales numbers.  Trial Tr. at 1691:7-13.

481.    No one had ever mentioned the possibility of implementing a TCP for Ms. Salame prior to the time she reported the rape, her performance had never been an issue prior to reporting the rape, her manager never discussed why she needed to be on a TCP, and her performance at the time did not justify a TCP.  Trial Tr. at 1691:14-1692:2.

482.    District Manager Simmons tried to cancel a program that she had scheduled during her short-term disability leave in an attempt to prevent her numbers from falling while she was out of the territory.  Trial Tr. at 1695:5-18.

483.    Ms. Salame's working relationship with District Manager Simmons broke down after she reported that she was raped by a physician.  Trial Tr. at 1697:15-23; PX 466.

484.    District Manager Simmons testified that Ms. Salame's sales results in 2002 were better than in 2001.  Trial Tr. at 1881:13-15.

485.    District Manager Simmons testified that he had difficulties dealing with Ms. Salame after she reported that she was raped by a physician.  Trial Tr. at 1933:8-10.

486.    District Manager Simmons no longer supported Ms. Salame's management desires after she reported that she was raped by a physician.  Trial Tr. at 1940:4-6.

487.    District Manager Simmons testified that he did not want Ms. Salame working for him anymore after her sexual assault.  Trial Tr. at 1941:8-10.

488.    Simmons testified that he wanted to "get rid" of Ms. Salame in the sense that he did not want to supervise her anymore.  Trial Tr. at 1920:18-21.

489.    District Manager Simmons was not supportive of Ms. Salame in her goal to move into management in 2002 after she reported to Novartis that she had been raped by a doctor.  Trial Tr. at 1875:7-9.

490.    District Manager Simmons testified that neither he nor Novartis was supportive of Ms. Salame moving into management in 2002.  Trial Tr. at 1877:18-23.

491.    Regional Director Eric Robinson was not supportive of Ms. Salame moving into management in 2002.  Trial Tr. at 1878:2-7.

492.    District Manager Simmons testified that Ms. Salame was "good enough" to train representatives but not "good enough" to manage them.  Trial Tr. at 1883:21-23.

493.    Ms. Salame reiterated her interest in management in the Development Plan on her 2002 Annual Performance Review.  Trial Tr. at 1706:22-24; PX 467.

494.    District Manager Simmons was not supportive of Ms. Salame being employed at Novartis in early 2003, much less her interest in management.  Trial Tr. at 1706:25-1707:3.

495.    Ms. Salame wrote in her 2002 Annual Performance Review, "Since the assault, I have had no support from my immediate management.  In fact, it is my perception that they had made it even more difficult and stressful to work and that the work environment has been hostile at best."  Trial Tr. at 1707:7-10: PX 467.

496.    District Manager Simmons testified that it would be very difficult to have Ms. Salame as a manager in part because of the comments that Salame made about Novartis leadership.  Trial Tr. at 1999:23-2000:7.

497.    District Manager Simmons testified that the likelihood of Ms. Salame becoming a manager without her manager's support was almost a nullity.  Trial Tr. at 1877:24-1878:1.

498.    Ms. Salame was not able to return to the career path that she was on prior to being raped on May 22, 2010.  Trial Tr. at 1708:14-16.

499.    Ms. Salame was desperate to repair her working relationship with her management and any damage to her career after she reported that she was raped by a physician.  Trial Tr. at 1714:1-7; PX 463.

500.    Ms. Salame was not allowed to return to the same path that she was on prior to the time that she reported that she was raped by a physician.  Trial Tr. at 1716:11-14.

501.    Ms. Salame was never able to restore her working relationship with District Manager Simmons after she reported that she was raped by a physician.  Trial Tr. at 1719:2-4.

502.    Ms. Salame made efforts to return to the management track after she reported that she was raped by a physician.  Trial Tr. at 1722:2-4; PX 471.

503.    Ms. Salame sent an email to her new Regional Director, Jeff Sargeant, in August 2003 informing him of her completion of numerous management development checklist tasks.  Trial Tr. at 1772:13-1723:9; PX 471.

504.    At the time Ms. Salame sent this email to Regional Director Sargeant, she did not have a manager or anybody else to speak on her behalf about her qualifications for and interest in management.  Trial Tr. at 1723:11-16; PX 471.

505.    Ms. Salame asked Regional Director Sargeant in that email whether she could return to where she was prior to the time that she reported that she was raped by a physician and be considered again for management development training.  Trial Tr. at 1723:19-1724:4; PX 471.

506.    Ms. Salame did not know whether it would even be possible for her to return to the management track after she reported that she was raped by a physician. Trial Tr. at 1724:8-13; PX 471.

507.    Ms. Salame never received a response from Regional Director Sargeant regarding her request to return to the management track.  Trial Tr. at 1724:14-16.

508.    Ms. Salame was never successful in getting back on the management track after she reported that she was raped by a physician.  Trial Tr. at 1726:17-20.

Catherine White

509.    A representative cannot start the management development process without the support of her manager.  Trial Tr. at 621:2-4.

510.    Ms. White first expressed interest in management to her District Manager, Mark Gunning, when she was hired in 2001.  Trial Tr. at 616:4-8.

511.    District Manager Gunning responded to Ms. White's interest in management by telling her to ensure that her sales results were good in order to move into management.  Trial Tr. at 616:11-14.

512.    Ms. White won the President's Club Award and the International Sales Excellence Award in 2002, which is the highest sales award available to Novartis employees worldwide.  Trial Tr. at 612:6-11, 616:15-16; PX 740.

513.    Ms. White received a 3-3 rating on her 2002 Annual Performance Review. Trial Tr. at 612:12-14.

514.    After winning the International Sales Excellence Award and President's Club, Ms. White again expressed her interest in management to her District Manager,

David Moatazedi, during the discussion of her 2002 Annual Performance Review.  Trial Tr. at 616:9-10.

515.    District Manager Moatazedi testified that Ms. White "certainly had the qualifications to enter into the management development program."  Trial Tr. at 671:14-19.

516.    District Manager Moatazedi stated that Ms. White generally inquired about management.   He made a distinction between an expression of interest versus a general inquiry.  Trial Tr. at 678:3-7.

517.    District Manager Moatazedi responded to Ms. White's interest in management by smirking and saying to her, "Well, let's see if you can do it again," referring to her wining the International Sales Excellence Award again.  Trial Tr. at 616:17-617:1.

518.    According to District Manager Moatazedi, a general inquiry is merely an "early signal" of interest and is not sufficient to indicate interest.  Trial Tr. at 678:8-11; 679:20-680:2.

519.    An expression of interest, on the other hand, was an actual "sign" of interest, which would be sufficient but which District Manager Moatazedi contends Ms. White did not show.  Trial Tr. at 678:11-15, 680:3-8.  To be a "sign" of actual interest, District Manager Moatazedi stated that one would need to read the books, do the summaries, and document the interest in writing.  Trial Tr. at 678:11-15.

520.    According to District Manager Moatazedi, only Brian Brown, a male counterpart of Ms. White, expressed a "sign" of interest in management.  Trial Tr. at 677:12-15, 678:25-679:2.

521.    District Manager Moatazedi also determined that Ms. White was not interested in management because she did not note such an interest on her annual performance evaluations.  Trial Tr. at 674:14-21.

522.    According to Ms. White, it was not a reasonable expectation to win the International Sales Excellence Award twice before entering the Management Development Program because after one wins such a big award, Novartis increases that person's sales goals for the next year.  Trial Tr. at 617:22-25; 625:7-11.

523.    Instead, District Manager Moatazedi boasted that he himself was fast-tracked for management and that he was able to become a District Manager within two years of starting at Novartis.  Trial Tr. at 617:15-19.

524.    District Manager Moatazedi testified that he told Ms. White that if she wanted to get into management, she would have to read two books, submit summaries on each book, and send a formal communication stating her interest in management.  Trial Tr. at 673:14-674:1.

525.    District Manager Moatazedi held Ms. White to a different standard than the one applicable to his rise into management.  Trial Tr. at 617:19-21.

526.    Ms. White knew a male sales representative in her district, Brian Brown, who completed the Management Development Program under District Manager Moatazedi without having to win any sales awards as a prerequisite.  Trial Tr. at 618:1-6.

527.    District Manager Moatazedi recommended another male sales representative, Mr. Donner, for management development, even though his sales numbers were lower than hers.  Trial Tr. at 631:23-632:5.

528.     District Manager Moatazedi recommended Stephen Alberson for management development even though his sales numbers were lower than hers.  Mr. Alberson eventually dropped out of the Management Development Program.  Trial Tr. at 632:6-14.

529.     Ms. White did not know of any male sales representatives under District Manager Moatazedi who wrote "Management Development" or "manager" in the "Individual's Career Aspirations" section of their Annual Performance Reviews.  Trial Tr. at 655:23-25.  In fact, Ms. White knows that the males who were in the Management Development Program would not have made such a notation on their Annual Performance Reviews because they told her they did not want to be in the program in the first place.  Trial Tr. at 656:5-7.

## III.     PREGNANCY DISCRIMINATION

### A.     Novartis' Excessively Subjective Policies & Practices

530.     *Working Mother* Magazine lists Novartis as a top company to work for women with children, because the policies, on their face, seem to accommodate working mothers.  On paper, new mothers are entitled to up to six months of maternity and Family Medical leave, flex-time and other options.  However, a deeper probe reveals that, in practice, pregnant women at Novartis are systematically discriminated against with respect to pay, promotion, leveling, transfers, and all other material considerations requiring manager approval.  Indeed, as Judge Lynch noted in his class certification order, the pay and promotion expert evidence speaks to pregnancy discrimination since pregnant women are captured in the data set.  *See Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 267 (S.D.N.Y. 2007) (holding that "it would be inappropriate to ignore the

statistical evidence adduced in other contexts in this case. Pregnancy discrimination, after all, is a form of discrimination against women, and so the fact that plaintiffs have offered significant statistical evidence of other forms of gender discrimination sheds light on their anecdotal evidence of pregnancy discrimination.")

531.     Female employees that become pregnant are seen as a financial risk to the Company that hurt their managers' bottom lines. Trial Tr. at 1509:9-1510:24; 2397:22-2400:5; 3031:1-3; 3034:17-19; 3039:14-20. When a sales representative takes maternity leave and leaves her territory vacant, the entire district's sales numbers can be negatively impacted. *Id.* Since the sales representatives sales numbers directly feed into her District Manager's sales performance, the manager has a real interest in ensuring that he keeps his territory free of pregnant females. *Id.* Plaintiffs in this case were terminated, retaliated against, and denied promotions and transfers soon after announcing their pregnancy or giving birth. *See infra* Discussion Bernice Dezelan; Jennifer Recht; Holly Waters; Terri Kelly; Christine Macarelli; Tara Blum; Amy Zschiesche. Tellingly, one manager testified at trial that if a manager wanted to terminate a (pregnant) sales representative, it would be fairly easy to build a record of problems and shortcomings that could be used against that representative. Trial Tr. at 3031:7-10. Cognizant of their manager's control over all aspects of the terms and conditions of their employment, some plaintiffs either postponed starting a family or truncated their maternity leave. *See infra* Discussion Tara Blum & Terri Kelly. Instead of protecting its working mothers, the HR department was either negligent, or sided with management, allowing excessively subjective policies and practices to cause an adverse impact on pregnant employees. *See infra* Discussion Terri Kelly & Holly Waters.

**B.    Subjectivity/Discretion & Dysfunctional HR Dept.**

532.    As demonstrated above regarding pay and promotion decisions, Novartis managers control other vital aspects of the terms and conditions of employment.  This control, coupled with a dysfunctional Human Resources Department caused an adverse impact on pregnant employees and women making child rearing decisions with respect to the terms and conditions of their employment, including pay and promotions.   The following discussion summarizes the expert evidence, Novartis' admissions with respect to subjectivity and pregnancy, as well as anecdotal evidence produced at trial that demonstrates that pregnant women and women making child rearing decisions are adversely impacted by Novartis' (excessively) subjective decision-making policies and practices:

## EXPERT EVIDENCE

Dr. Finis Welch

533.    Dr. Welch studied the performance ratings of employees who take leave at Novartis.  Trial Tr. at 2749:4-6.  He analyzed Novartis' subjective ratings called values and behaviors for employees who take leave, and he analyzed Novartis' objective ratings called sales objectives for employees who take leave.  Trial Tr. at 2838:4-10.

534.    In his performance ratings analysis, Dr. Welch controls for an employee's time out of the territory for part of the year in a "yout" variable, which he defines as employees who are new hires or employees who are on leave. Trial Tr. at 2838:4-10; PX 1208.  Dr. Welch's "yout" variable shows that employees who take leave are much less likely than employees who do not take leave to receive the highest rating on their performance evaluations.   His analysis shows a statistically significant result to 24

standard deviations for subjective ratings and a statistically significant result to 35 standard deviations for objective ratings. Trial Tr. at 2839:3-4, 2840:10-15.

535. Dr. Welch's "yout" variable shows that women on leave are less likely to receive the highest subjective and objective ratings. Although the "yout" variable includes new hires, new hires are evenly distributed across men and women, and therefore have no gender effect on the results. PX 1208. Leave employees, however, are disproportionately women. *Id.* Thus, the "yout" variable acts as a proxy for women on leave in Dr. Welch's analysis which shows that women who took leave were much less likely to receive the highest rating than other employees. Trial Tr. at 2838:24-35, 2839: 1-4; 2840:10-15.

536. Dr. Welch also concluded that promotions to management are directly impacted by performance evaluation ratings. Trial Tr. at 2754: 18-25. He testified that: "It's my understanding that all of the leveling promotions as well as the promotion to management require a minimum of a 2.2 performance; that is, in sales objectives as well as in values and behaviors, that an individual must at least meet expectations in both of those criteria. Empirically, a better performance, that is a three, would get you there sooner than a two." Trial Tr. at 2754:25; 2755:1-5. Dr. Welch also concluded that compensation is directly impacted by performance evaluation ratings. Trial Tr. at 2754: 10-11.

Dr. Outtz

537. Dr. Outtz was not rebutted at trial.

538. Dr. Outtz studied the performance management and management development policies at Novartis. As demonstrated above, Dr. Outz utilized the

following general criteria to assess Novartis' performance appraisal systems: Focus on Observable Behaviors Rather than Traits; Provide Specific Written Instructions on How to Complete the Appraisals; Include Training for Appraisers on How to Appraise Performance and How to Conduct the Appraisal; Be Within the Control of the Employee. Trial Tr. at 526:12-527:5; citing Malos, S, "Current Legal Issues in Performance Appraisal." In Performance Appraisal: State of Art Practice, Edited by James W. Smither, Jossey-Bass Publishing, Ch. 2; P. 49-94. 1998; Grote, D. The Complete Guide to Performance Appraisal. AMACOM 1996.

539.    Dr. Outtz concluded that Novartis' performance management system did not meet and does not meet these four criteria; the Novartis performance management system overall is *excessively* subjective and fundamentally unfair to employees, including pregnant employees.  Trial Tr. at 528:5-10.

540.    With respect to management development, Dr. Outtz testified that entry into the management level jobs at Novartis is completely within the discretion of the individual's manager, and in his opinion constitutes unfettered discretion.  Dr. Outtz stated that he did not see any documentation as to what the manager has to do in terms of being held accountable for how the manager determines a person has met the tasks on the checklist.  Further, Dr. Outtz testified that there is indication that employees are unaware whether the checklist exists or if what they are doing is part of the checklist.  Trial Tr. at 565:1-566:18.

541.    Dr. Outtz stated there should be more transparent policies at Novartis so that everyone understands the requirements at a minimum in order to ensure that

everyone, including sales representatives that become pregnant, have an equal chance of becoming a manager.  Trial Tr. at 566:21-567:5.

Dr. Lanier

542.    Dr. Lanier studied performance ratings, pay, and promotions to management.  His performance ratings analysis showed women were less likely than men to receive the highest subjective rating known as values and behaviors.  His results were statistically significant to 6.9 standard deviations.  PX 956.

543.    Dr. Lanier's pay analysis showed women earned $105 per month less than men in the same job.  His results were statistically significant to 7.7 standard deviations.  PX 981.  Dr. Lanier's promotions analysis showed women were 4.3 times less likely than men to be promoted to management.  His results were statistically significant to 7.3 standard deviations.  PX 962.

544.    Dr. Lanier's statistical evidence supports Dr. Welch's findings that women who took leave were much less likely to receive the highest rating than other employees. Trial Tr. at 2838:24-35, 2839:1-4; 2840:10-15.   Pregnancy leave has a negative impact on performance ratings.   Trial Tr. at 2838:24-35, 2839:1-4; 2840:10-15.   Lower performance ratings have a negative impact on your chance for a management promotion or a pay increase. Trial Tr. at 2754:25; 2755:1-5; 2754: 10-11.  Thus, pregnancy leave is directly linked to the statistically significant disparities in pay and management promotions adverse to women that Dr. Lanier found.

**NOVARTIS' ADMISSIONS REGARDING SUBJECTIVTY AND PREGNANCY**

Jennifer Blum

545.    Jennifer Blum did not remember receiving any training specific to

100

pregnancy discrimination.  Trial Tr. at 2060:7-13.

<u>Brian Campbell</u>

546.    No official policy about sick days exists at Novartis.  As such, an employee can take sick time as needed.  Campbell Trial Dep. Designations at 134:15-25, 135:12-15.

547.    Although managers were never trained on what constitutes reasonable versus excessive time out of territory, they used their discretion to decide what is excessive.  Campbell Trial Dep. Designations at 146:18-23, 147:3-9, 147:14-22.

548.    In considering whether to discipline someone for taking excessive sick days, managers did not take into account whether the absences were due to pregnancy complications.  Campbell Trial Dep. Designations at 101:10-16.

549.    Managers have discretion to determine how a representative should reports sick days.  Campbell Trial Dep. Designations at 112:18-22.

<u>Dan Duhart</u>

550.    Regional Director Dan Duhart was not aware of any policy or practice that lists extended maternity leave as a "mitigating factor" to take into account when evaluating a representative's sales numbers for that year.  Duhart Trial Dep. Designations at 85:7-86:4.

<u>Bruce Holstein</u>

551.    When a sales representative goes out for pregnancy leave, her numbers usually go down.  This drop in numbers affects a manager's sales numbers, which, in turn, can lower both his ratings and compensation.  Trial Tr. at 2397:22-2400:5.

<u>Sharon Larrison</u>

552.    District Managers could hold a drop in numbers that occurred during a maternity leave against a representative when evaluating her performance.  A District Manager could note anecdotally on a performance review that the representative was on maternity leave and her territory was open, however, this factor was not used to change the actual performance rating.  A woman returning from maternity leave could be put on a performance improvement plan because her sales numbers dropped while she was on maternity leave.  Trial Tr. at 1509:9-1510:24.

553.    It was a violation of Novartis policy to contact a representative to do business tasks while on leave.  Trial Tr. at 1515:17-19.

554.    Novartis did not always train Regional Directors, District Managers, nor sales representatives on what to do when a female sales representative is expecting a child.  Trial Tr. at 1517:8-12.

David Moatazedi

555.    When a woman went out on maternity leave, it was not considered a mitigating factor with respect to performance management.  Trial Tr. at 680:24-681:2.

Melissa Parker

556.    Work/life balance is a problem at Novartis, and it is difficult for a mother to be a manager at Novartis.  Trial Tr. at 2623:18-24.

Michelle Tsai

557.    Michelle Tsai's position was eliminated while she was out on maternity leave.  Trial Tr. at 2452:8-10.

Brad Willie

558.    When a representative is out of territory, sales results could drop.  Trial Tr. at 3031:1-3

559.    A vacancy in the territory could affect the manager's sales numbers.  Trial Tr. at 3034:17-19

560.    If a manager wants to terminate a sales representative, it is fairly easy for him to build a record of problems and shortcomings against that representative.  Trial Tr. at 3031:7-10

## ANECDOTAL EVIDENCE

<u>Tara Blum</u>

561.    During her initial interview at Novartis, Tara Blum's District Manager, James Gaffney, asked her about her marital status and her family plans and requested that Ms. Blum give him "two good years" before having children.  Trial Tr. at 242:7-17.

562.    Soon after she accepted the job, it became clear to Ms. Blum that it would be difficult for her to both have children and continue to work at Novartis.  Trial Tr. at 242:22-243:2.

563.    Ms. Blum perceived the environment at Novartis as one that did not support employees who wanted to have children.  Therefore, she feared taking time away from work for pregnancy or child-rearing.  Trial Tr. at 246:19-247:4.

564.    Ms. Blum learned that her District Manager was very upset when another sales representative took maternity leave.  Trial Tr. at 248:25-249:2.

565.    Ms. Blum learned from a female counterpart who had announced her pregnancy to their District Manager that the District Manager responded very negatively.  Trial Tr. at 250:20-21.

566.    Ms. Blum observed that her District Manager treated her female counterpart differently after the counterpart announced her pregnancy.    Trial Tr. at 251:15-16.

567.    When Ms. Blum told her District Manager that she had something to tell him, he responded, "You're not pregnant are you, you're not next."  Trial Tr. at 251:16-22.  Ms. Blum did not feel that she could ever tell her District Manager that she was pregnant after he made that comment because she was clear that pregnancy was a negative thing to him.  Trial Tr. at 252:3-6.

568.    Ms. Blum suffered marital stress because, although her husband wanted to have children, she did not feel that she could have children while maintaining her career at Novartis.  Trial Tr. at 252:14-18.  If she had children, her manager would "lose value in her" and, as a result, she would never get into management classes.  Trial Tr. at 266:25-267:2.

569.    Ms. Blum was anxious to start the Management Development Program quickly because she had the impression, based on both comments by her manager and observations during sales training, that she needed to choose between management and children.  Trial Tr. at 248:11-19.

<u>Sean Bogdany</u>

570.    When Sean Bogdany applied for employment with Novartis, management told him that he needed to be patient because they were working on removing a pregnant woman from the territory.  Specifically, management was trying to make the pregnant female employee quit by moving her to another territory.  Trial Tr. at 3168:9-22, 3177:3-12.

571.    Management also told Mr. Bogdany that it planned to terminate a woman on a job share, and that employees on job share would be laid off first should layoffs occur in the future.  Trial Tr. at 3179:6-12.

572.    On another occasion, management implied that a female member of Mr. Bogdany's team was spending too much time with her family and not enough time at work.  Trial Tr. at 3183:3-8.

Bernice Dezelan

573.    Bernice Dezelan's District Manager, Dee Brown, and counterparts became more hostile toward her once she announced that she was pregnant and wanted a transfer. Trial Tr. at 65:20-25; 77:2-9.

574.    When Ms. Dezelan announced her pregnancy to her male counterparts, they peppered her with questions about her commitment to her job and her obligations as a mother.  Among other things, they asked her if she was going to be like other women and stay home to take care of her child as she was supposed to do.  Trial Tr. at 104a:8-15; 103:21-104:6.

575.    Ms. Dezelan's male counterparts told their District Manager that Ms. Dezelan was no longer carrying her workload after she became pregnant.  Trial Tr. at 95:11-12.

576.    Ms. Dezelan had the sense that her District Manager adopted her male counterparts' viewpoint that she was not carrying her workload.  Trial Tr. at 96:3-6.

577.    Ms. Dezelan's District Manager was annoyed that Ms. Dezelan would be out of territory for maternity leave because Ms. Dezelan was a major source of income for her manager.  Trial Tr. at 122:2-10.

578. Ms. Dezelan's District Manager was dismissive when Ms. Dezelan approached her to share her plans to start a family and to request a transfer to a safer territory. Trial Tr. at 98a:25-99a:20.

579. Ms. Dezelan's District Manager refused to help implement a ride-along system to provide protection to her when she expressed concern about her safety in particular areas within her territory once she became pregnant. Trial Tr. at 103a:8-16.

580. Nothing ever came of Ms. Dezelan's District Manager's promise to work on a transfer for her to a safer territory. Trial Tr. at 96:13-15.

Adrienne Fudge

581. Adrienne Fudge, a Human Resources manager, was instructed by management not to investigate certain concerns pertaining to pregnancy discrimination. Trial Tr. at 3248:3-6.

582. In one instance, Ms. Fudge raised concerns about an email a District Manager sent out listing sales representatives taking pregnancy leave as a problem in his district. Ms. Fudge mentioned this issue to her supervisors, Maria LaRosa and Judy O'Hagan, as well as a Regional Director, only to be rebuffed by all of them and told not to investigate the matter. Trial Tr. at 3249:7-15; 3260:2-17.

Terri Kelly

583. Terri Kelly's testimony was not rebutted at trial.

584. Before Terri Kelly went on maternity leave in January 2002, both her male counterpart, Bob Lloyd, and her District Manager, Maurice Oswell, made inappropriate comments to her. Mr. Lloyd would say things like, "Are you going to stay out forever and leave us to do all your work for you in the territory. You know, what an

inconvenience, women are so lucky, you know, you get to – all you have to do is get pregnant, have a baby, and take a long vacation.  You know, it must be nice to be a woman, we don't get breaks like that."  Trial Tr. at 1097:21-1098:2.

585.    In another instance, Ms. Kelly's District Manager asked her if she would be returning from maternity leave, and when she said that she absolutely would, he smirked and said that he never had a woman come back from maternity leave.  Trial Tr. at 1098:25-1099:3.

586.    Ms. Kelly encountered the same type of hostility when she returned from maternity leave in June 2002.  During her first meeting back, Mr. Lloyd expressed his anger and frustration by making comments to the effect of "it was such an inconvenience you were gone; I had to carry all your weight; I had to do your work for you; it was really hard on me; I deserve a vacation."  Trial Tr. at 1100:21-1101:7.

587.    On her first ride-along after returning from maternity leave, Ms. Kelly's District Manager told Ms. Kelly that he would be giving her a 2-1 on her 2001 Annual Performance Review, and that he would not be giving her a raise.  The only explanation he offered Ms. Kelly was that he did not think she was committed to her job because she had taken six months of maternity leave, a week of which was spent on vacation in Florida.  Mr. Oswell characterized his concern with Ms. Kelly's maternity leave as "just the politics of the business," and praised Mr. Lloyd for picking up her slack while she was on leave.  Trial Tr. at 1103:5-1106:3.

588.    Ms. Kelly received 2 ratings from Mr. Oswell on all but one of the subcategories which comprise the Values and Behaviors section of her 2001 review.

However, Mr. Oswell arbitrarily assigned her an overall 1 rating on the Values and Behaviors section of the review.  Trial Tr. at 1108:2-1112:17; PX 244.

589.    In response to Mr. Oswell's criticisms in her 2001 review, Ms. Kelly put together a Performance Enhancement Plan outlining the actions she would take to improve the business.  Ms. Kelly also sent Mr. Oswell and the Regional Director, Gene Martin, a revised version of her 2001 review.  In her revised review, Ms. Kelly contested the unsatisfactory 1 rating Mr. Oswell gave her, complaining that it was influenced by the fact that she had taken maternity leave in 2002.  As Ms. Kelly pointed out, both Novartis policy and the EEOC legally entitled her to take the full six months of maternity leave, without being harassed for doing so.  Trial Tr. at 1107:1108:13, 1113:22-1115:1; PX 244.

590.    Regional Director Martin subsequently instructed Ms. Kelly to remove her complaints about her maternity leave from the comments section of her 2001 review and paste it into a separate email to Human Resources.  Accordingly, Ms. Kelly wrote a new email to Human Resources and her managers in which she stated explicitly that she was not given a merit raise because she took extended maternity leave under the Family Medical Leave Act.  Trial Tr. at 1123:13-1126:12; PX 246; PX 247.

591.    Ms. Kelly received no response from either Human Resources or management about her complaint.  When she contacted Regional Director Martin after a few weeks for an update, he simply told her that Mr. Oswell could have probably "handled the situation better."  Novartis never issued a formal reprimand to Mr. Oswell; never changed Ms. Kelly's 2001 rating; and awarded Ms. Kelly only a nominal 2 percent raise, which amounted to about $880.  Ms. Kelly characterized the reaction to her complaint as a "slap on the wrist" at best.  Trial Tr. at 1126:25-1130:24.

592.    Mr. Lloyd's inappropriate comments generally characterizing maternity leave as a "vacation" reoccurred prior to Ms. Kelly's second maternity leave.  Although Mr. Lloyd would harass her with questions like, "Are you going to take another six-month vacation?  Am I going to have to carry your weight again," Ms. Kelly was told by managers to "make it work" with Mr. Lloyd.  Trial Tr. at 1136:19-1139:7.

593.    As a result of the harassment she encountered after her first maternity leave, Ms. Kelly chose to take a much shorter, six-week leave during her second pregnancy.  Trial Tr. at 1138:2-15.

Christine Macarelli

594.    Christine Macarelli heard her District Manager, Bruce Holstein, say negative things about pregnant women.  Particularly, he had expressed his distress over the fact that two women in his territory were going to be taking maternity leave simultaneously, and about having to treat the pregnant representatives like "real people." Trial Tr. at 178:10-21, 190:6-191:7.

595.    Ms. Macarelli's District Manager Holstein admitted that when a sales representative goes out for pregnancy leave, her numbers usually go down.  This drop in numbers affects a manager's sales numbers, which, in turn, can lower both his ratings and compensation.  Trial Tr. at 2397:22-2400:5.

596.    Ms. Macarelli asked Mr. Holstein for a transfer to the Albany, New York territory to be with her fiancé.  When he resisted, she hesitantly announced to him that she was also pregnant.  Mr. Holstein's reaction to the news was not positive and made her feel uncomfortable.  Mr. Holstein told Ms. Macarelli that no positions were currently open in that territory.  Trial Tr. at 171:17-174:2.

597.     Ms. Macarelli's fiancé, who was a Novartis sales representative in the Albany area, subsequently resigned from his position so that Ms. Macarelli would be granted the transfer as his replacement.  When Mr. Holstein and Ms. Macarelli again discussed her request for a transfer, Mr. Holstein told Ms. Macarelli disturbing things about her fiancé and advised that she should reconsider making the move.  He also said, "…women that find themselves in [her] position, single, unmarried, should consider an abortion."  Trial Tr. at 174:3-10, 175:1-9.

598.     Ms. Macarelli was distraught by her District Manager's recommendation, which gave her doubts about whether she could be both a mother and a career woman at Novartis.  However, she never reported his offensive comment about abortion to Human Resources because she "didn't feel safe going to HR;" a colleague of hers who had complained about Mr. Holstein to Human Resources was fired.  Trial Tr. at 176:4-177:10.

599.     Ms. Macarelli also knew that complaining to Regional Director Cindy Patton could be detrimental, because Ms. Patton had previously said, "If you want to play with the boys, you have to be one of the boys" at a Women in Leadership conference.  Trial Tr. at 177:11-178:9.

600.     When Mr. Holstein became Ms. Macarelli's District Manager again after she had returned from maternity leave, he was hypercritical of her performance.  Mr. Holstein also implied that Ms. Macarelli's job with the company was not secure by constantly reminding her of the difficulties of the job now that she was a mother with a child.  Mr. Holstein told Ms. Macarelli that it was not possible for her to "pull it off" the same way as she had before she had a child.  Trial Tr. at 193:1-10, 198:12-23.

601.    After taking maternity leave in 2004, Ms. Macarelli received a 2-2 annual performance rating.  Before taking maternity leave, Ms. Macarelli had only received perfect 3-3 ratings.  This was despite the fact that she worked just as hard, if not harder, after she had her child.  Trial Tr. at 193:14-194:8, 204:17-20.

602.    Mr. Holstein also precluded Ms. Macarelli's advancement post-pregnancy by telling her he would block her from interviewing for a specialty sales position in the Oncology division.  Ms. Macarelli called Regional Director Patton twice to complain, but received no response.  Trial Tr. at 195:5-198:7.

603.    After another of his female sales representatives became pregnant, Mr. Holstein decided to deny that representative his support for a promotion to Oncology.  In that year, the female sales representative's sales ranking was in the top half of the region. Trial Tr. at 2353:18-21, 2363:11.

604.    Ms. Macarelli did not bother reporting the discrimination to Human Resources, because she had previously reported an incident concerning management to Human Resources in July of 2004 and received no response.  Trial Tr. at 198:24-200:3.

605.    As a result of the discrimination she experienced at Novartis, Ms. Macarelli went on stress leave in 2006, and accepted a $6,000 cut in base salary when she resigned from the Company shortly thereafter.  Trial Tr. at 201:18-202:1, 204:4-7, 225:17-25.

Kelli Shannon

606.    When Kelli Shannon asked for a transfer to the Louisville, Kentucky territory, her District Manager, Barry Hardin asked her for personal information, instead

of inquiring about her sales performance or professional qualifications.  Trial Tr. at 1799:11-18.

607.    Ms. Shannon's District Manager told Ms. Shannon that before he could approve her request for a transfer, Regional Director Steve Webb needed specific information about her private life, such as, how she was planning to manage her travel; where her kids were going to go to school; who was going to take care of her children; and if she was going to sell her house.  Trial Tr. at 1799:17-1800:2.

608.    Although Ms. Shannon's District Manager acknowledged that he was not allowed to ask Ms. Shannon for this information, she obliged because she needed the transfer.  Trial Tr. at 1800:18-1805:6; PX 531.

609.    Ms. Shannon was ultimately granted the transfer, but she felt discriminated against on the basis of her gender, because when men would ask for transfers, the only information required of them was their resume.  Trial Tr. at 1806:2-1807:8.

610.    Ms. Shannon again experienced differential treatment when she interviewed for an Oncology position at Novartis in October 2008.  During her interview with the hiring manager, Bobby Lepper, Ms. Shannon was asked about her marital status, her children, her divorce, and her ex-husband.  Mr. Lepper dismissed Ms. Shannon's professional accomplishments at Novartis, focusing instead on her personal life.  Trial Tr. at 1810:23-1815:9.

611.    Ms. Shannon immediately reported the discriminatory Oncology interview to her Associate Director, Steven Camiolo, and Maria Barone in Human Resources.  Trial Tr. at 1817:15-1820:2; PX 537.

612.    Because she received no response to her complaint, Ms. Shannon sent a follow-up email to Human Resources and her District Manager a week later to get "some type of confirmation from HR of the action that is being taken to address [her] concern." Trial Tr. at 1820:9-1821:16; PX 537.

613.    Ms. Shannon was not contacted by Human Resources about her complaint until late November, after she had contacted the department several times and received no response.    In late November, Human Resources representative Barbara Brown finally called Ms. Shannon and told her that Human Resources would be conducting an investigation about her allegations against Mr. Lepper.    Ms. Brown offered no explanation for the delay in her response.    Trial Tr. at 1823:9-1824:13.

614.    Ms. Shannon did not hear from Human Resources again until February 2009, when Ms. Brown called to tell her that the investigation was complete.    Ms. Shannon learned that, not only was Mr. Lepper still employed by Novartis in the same position, but the male candidate he had selected for the position remained in the job. Trial Tr. at 1825:6-1826:8.


Jennifer Recht

615.    Ms. Recht sought a promotion after a realignment in September 2004 when she was eight months pregnant.    Trial Tr. at 925:5-8.

616.    The promotion Ms. Recht sought was a senior level position, or layer two position, as a management liaison selling Visudyne.    Trial Tr. at 925:17-22.

617.    Ms. Recht was discriminated against in receiving that promotion because she was pregnant.    Trial Tr. at 877:6-7.

618.    At the time she applied for the promotion, in September 2004, Ms. Recht was ranked first in the country for retina sales representatives.  Trial Tr. at 926:5-8; PX 408.

619.    When Ms. Recht interviewed with multiple male employees for the layer two position, she felt that she was not being taken seriously.  Trial Tr. at 935:1-3.

620.    Ms. Recht went on maternity leave at the end of September 2004.  Trial Tr. at 875:10-16.

621.    When Ms. Recht returned from maternity leave, she was placed in the demoted position.  Trial Tr. at 876:5-12.

622.    Ms. Recht was subsequently told by the Vice President of sales for the Ophthalmics division, Perry Sternberg, that she did not receive the layer two position because she had not demonstrated that she could grow the business and because he questioned her abilities with respect to leadership and administrative tasks.  Trial Tr. at 935:17-20.

623.    However, Mr. Sternberg had presented Ms. Recht with an award recognizing her ability to innovate and inspire. Specifically, the award recognized Ms. Recht's innovative business strategy to open up a new market for Novartis drugs, i.e. veteran's hospitals.  Trial Tr. at 885:7-13; PX 420.

624.    However, all of the positions that would result from the realignment in September 2004 were predetermined and preselected by a group of managers.  Trial Tr. at 956:13-21; DX 177.

625.    Eight of the eleven layer two positions were given to male candidates. Trial Tr. at 964:15.

626. None of the employees on either the preselected list or the final list for the layer two positions had more experience than Ms. Recht in promoting Visudyne. Trial Tr. at 959:3-6; DX 177.

627. Later, Ms. Recht filed a complaint with Human Resources regarding the selection process for the layer two position, but Human Resources determined that there was no finding of discrimination in the selection process. Trial Tr. at 939:9-25; DX 177.

Raelene Ryan

628. Raelene Ryan's testimony was not rebutted at trial.

629. Raelene Ryan announced her pregnancy to her District Manager, Jim Hansen, in December 2002. In March 2003, she informed her District Manager that she would be taking maternity leave later than year. Trial Tr. at 2552:3-8, 2552:11-13.

630. Shortly after announcing her pregnancy, Ms. Ryan learned that her District Manager began compiling a list about her activities and calls. Trial Tr. at 2552:24-2553:2.

631. Before Ms. Ryan went on maternity leave, her District Manager never gave her any indication that he had any issues with her performance that could warrant termination. Trial Tr. at 2553:10-13.

632. While Ms. Ryan was on maternity leave, her District Manager devised a plan to terminate her and fill her vacant territory. Trial Tr. at 2554:2-5.

633. Ms. Ryan's District Manager fabricated reasons to terminate her because he did not want Ms. Ryan's territory vacant for the entire period of time that she had requested for maternity leave. Trial Tr. at 2583:21-2584:5.

634.    At one point, Ms. Ryan saw an email in which District Manager Hansen asked Human Resources how many falsified calls he needed to provide before he could fire her while informing Human Resources that Ms. Ryan was six months pregnant.  Trial Tr. at 2596:3-6; PX 1088.

635.    Ms. Ryan saw another email in which her District Manager asked Sample Operations, a department within Novartis, whether failure to mail sample signature forms on a weekly basis constitutes a "firing offense."  Trial Tr. at 2597:12-13; PX 1089.

636.    Ms. Ryan saw another email in which her District Manager asked the Regional Director how he could terminate Ms. Ryan approximately ten days prior to the start of her maternity leave.  Trial Tr. at 2599:6; PX 1090.

637.    Ms. Ryan also saw an email in which her District Manager asked Human Resources for advice on how to terminate her so that he could fill Ms. Ryan's position.  Trial Tr. at 2600:20-21; PX 1091.

638.    Ms. Ryan saw another email in which her District Manager referenced the length of time that Ms. Ryan planned to take for maternity leave and stated, "We have to settle this problem.  It is getting out of hand."  Trial Tr. at 2606:3-9; PX 1094.

639.    The "clarification meeting" that was called before Ms. Ryan was fired was "just a dog and pony show to have an excuse to fire [her]."  Her District Manager had already received permission to do so.  Trial Tr. at 2604:14-20; PX 1093.

640.    Ms. Ryan was fired from Novartis for falsifying records, which she did not do.  Trial Tr. at 2535:13.

Holly Waters

641.    Ms. Waters was reluctant to tell her District Manager, Brian Campbell, that she was pregnant because of negative comments he made in front of the entire district team about pregnant sales representatives taking maternity leave.  Trial Tr. at 1241:20-1242:5; 1241:9-13.

642.    When Ms. Waters took four sick days due to health issues related to her pregnancy, her District Manager issued her a conduct memo for not appropriately reporting them.  Trial Tr. at 1249:17-21; 1250:6-7; JX 67.

643.    After her District Manager issued the conduct memo, Ms. Waters received a letter from Human Resources stating that it was "up to the manager's discretion to ascertain what seems to be a reasonable amount of time out of territory versus what is excessive or above the district norm."  Trial Tr. at 1263:17-1264:4; JX 68. Mr. Campbell testified that this was his understanding as well.  Campbell Trial Dep. Designations at 134:10-134:25.

644.    Ms. Waters' District Manager said that having no official policy regarding sick days meant that sick days were unlimited at Novartis.  Campbell Trial Dep. Designations at 134:15-25, 135:12-15.

645.    Ms. Waters' District Manager determined whether time out of territory was "excessive" by using common sense.  He "knew it when he saw it," even though he had never been trained on what reasonable versus excessive time out of territory was. Campbell Trial Dep. Designations at 146:18-23, 147:3-9, 147:14-22.

646.    Ms. Waters' District Manager said that, in considering whether to discipline a sales representative for taking excessive sick days, it did not matter to him

whether the absences were due to pregnancy complications. Campbell Trial Dep. Designations at 101:10-16.

647.    Ms. Waters' District Manager said he exercised his discretion by choosing to issue Ms. Waters a conduct memo for being above the district average in time out of territory, even though he did not do the same for other sales representatives who were above the district average in time out of territory. Campbell Trial Dep. Designations at 155:19-158:3.

648.    Ms. Waters' District Manager said that how a representative reports sick days is also at the manager's discretion. Campbell Trial Dep. Designations at 112:18-22.

649.    Ms. Waters' District Manager used his discretion to determine that Ms. Waters had not contacted him "as soon as possible" about her sick days even though he does not recall asking Ms. Waters whether her illness had prevented her from contacting him any sooner. Campbell Trial Dep. Designations at 145:16-146:11.

650.    Ms. Waters' District Manager could not specifically recall ever having expressed concern to Ms. Waters regarding her time out of territory prior to issuing her a conduct memo. Campbell Trial Dep. Designations at 106:18-107:25.

651.    Ms. Waters' District Manager admitted that he noted in the conduct memo to Ms. Waters even those absences from work that he had directed Ms. Waters to undertake – i.e. an absence due to a doctor's appointment he himself had suggested. Campbell Trial Dep. Designations at 116:20-117:20; 118:7-119:14, 123:11-19.

652.    A few weeks before she was scheduled to begin her pregnancy leave, Ms. Waters' District Manager accused her of falsifying calls and terminated her employment. Trial Tr. at 1267:17-1268:3.

653.    Ms. Waters' District Manager changed his definition of a sales call to exclude dropping off literature.  Trial Tr. at 1275:8-10.

654.    Yet, all of her Waters' managers, including the manager who ultimately terminated her for falsification of calls, had allowed Waters to record literature drops as sales calls.  Trial Tr. at 1322:22-1323:5.

655.    Ms. Waters' District Manager exercised his discretion in terminating Ms. Waters for falsifying a sales call to Dr. Barry Smith, even though Ms. Waters obtained a letter from Dr. Smith and had a Sample Signature Form signed by Dr. Smith on the day in question, by concluding that the doctor had lied for Ms. Waters.  Campbell Trial Dep. Designations at 190:11-19, 192:13-194:2, 195:8-14, 197:23-200:10.

Amy Zschiesche

656.    Amy Zschiesche had a negative experience at Novartis after she announced her pregnancy.  Trial Tr. at 1013:22-23.

657.    Before she became pregnant, Ms. Zschiesche's District Manager, Brad Willie, gave her a 2-2 rating on her 2004 Annual Performance Review.  Trial Tr. at 1016:17-19; PX 780.

658.    Ms. Zschiesche's District Manager told her that her sales were good when they met to discuss her 2004 Annual Performance Review.  Trial Tr. at 1017:4-5.

659.    When Ms. Zschiesche's District Manager overheard a conversation that she was having with another representative about Ms. Zschiesche's future family plans, he interjected, "I think you need to take care of the kids that you already have."  Trial Tr. at 1018:11-19.

660.    As a result of this comment, Ms. Zschiesche was reluctant to tell her District Manager that she was pregnant.  Trial Tr. at 1020:23-25.

661.    When Ms. Zschiesche told her District Manager that she was pregnant in February of 2005, he responded very coldly.  He would not make eye contact, his whole demeanor changed, and he did not congratulate her when she told him that she was expecting.  Trial Tr. at 1023:7-8, 14-17.

662.    After Ms. Zschiesche made this announcement, her District Manager became hypercritical of her sales performance.  He told her that he did not think the job was right for her.  Trial Tr. at 1023:25-1024:3.

663.    Ms. Zschiesche's District Manager never told her that being a sales representative was not the job for her until she announced her pregnancy.  Trial Tr. at 1027:11-13, 1028:5-11.

664.    Ms. Zschiesche's District Manager suggested that she should resign from Novartis after she announced her pregnancy.  Trial Tr. at 1027:5-7; 1027:18-22.

665.    Ms. Zschiesche's District Manager berated her every time they interacted after she announced her pregnancy.  As a result, she doubted herself and her ability to do her job.  Trial Tr. at 1026:12-14.

666.    Ms. Zschiesche's District Manager made negative and inaccurate statements in a Business Development Report ("BDR") after a ride-along while Ms. Zschiesche was pregnant.  Trial Tr. at 1055:13-1056:8; JX 77.

667.    At one point, Ms. Zschiesche's District Manager told her he had a "challenge" for her before she went on maternity leave.  He assigned her a speaker program with a notoriously difficult-to-schedule doctor.  Trial Tr. at 1031:8-13.  Ms.

Zschiesche's District Manager unrealistic parameters on this assignment that led Ms. Zschiesche to believe that he was setting her up to fail. Trial Tr. at 1032:9-13. However, Ms. Zschieschie successfully secured the doctor for a speaker event prior to going on maternity leave. Nevertheless, Ms. Zschiesche's District manager made negative comments about her execution of the additional speaker program in her 2005 annual performance review. Trial Tr. at 1036:12; JX 75.

668.    When Ms. Zschiesche confronted her District Manager about changes in how he treated her after she announced her pregnancy, he became irate and instructed her not to use the "pregnancy card" with him. Trial Tr. at 1028:23-1029:6.

669.    The comments Ms. Zschiesche's District Manager made to her after she announced her pregnancy made her fearful for her job and created anxiety and stress. Trial Tr. at 1028:14-15.

670.    Ms. Zschiesche's District Manager admitted that when he found out Ms. Zschiesche would be out of the territory for maternity leave, he was concerned about how her absence would affect his sales numbers. Trial Tr. at 3039:14-20.

671.    Ms. Zschiesche's District Manager admitted that being away from the territory could potentially cause sales results to drop. Trial Tr. at 3031:1-3

672.    Ms. Zschiesche's District Manager admitted that a vacancy in his territory would affect his sales numbers. Trial Tr. at 3034:17-19.

673.    Ms. Zschiesche's District Manager told her that if she took off the full twelve weeks that she was requesting for maternity leave, he might not be able to give her a good review when she returned to work. Trial Tr. at 1038:15-20; 1039:5-6.

674.    Ms. Zschiesche's District Manager never indicated that her performance would warrant a 1-1 rating prior to the finalization of her 2005 Annual Performance Review.  Trial Tr. at 1026:22-25.

675.    Ms. Zschiesche's District Manager admitted that he decreased Ms. Zschiesche's Annual Performance Review rating to 1-1 in the year she announced her pregnancy.  Trial Tr. at 3040:8-10.

676.    Ms. Zschiesche's District Manager did not implement a Performance Improvement Plan (PIP) for Ms. Zschiesche in 2005 because her sales numbers were not low enough to justify a PIP.  Trial Tr. at 1047:11-15.

677.    Ms. Zschiesche's District Manager admitted that if a manager wanted to terminate a sales representative, it would be fairly easy to build a record of problems and shortcomings that could be used against that representative.  Trial Tr. at 3031:7-10

678.    As a result of her District Manager's comments, Ms. Zschiesche took less maternity leave than she had originally requested.  Trial Tr. at 1040:9-12.

679.    After she returned from maternity leave, Ms. Zschiesche's District Manager asked her about her childcare arrangements and told her that he felt for her because she had three small children at home.  Trial Tr. at 1041:1-6.

680.    Ms. Zschiesche's District Manager also peppered her with questions regarding pumping breast milk in the field and how long and how often she was doing so.  Trial Tr. at 1042:1-4.

681.    Ms. Zschiesche stopped pumping and breast feeding earlier than her physician had advised because she felt that her District Manager was using it against her.  Trial Tr. at 1042:20-23; 1043:2-11.

682.    The 1-1 rating that Ms. Zschiesche's District manager gave her on her 2005 Annual Performance Review jeopardized her career with Novartis and was her "ticket out the door."  Trial Tr. at 1049: 3-6; 1086:18-19.

683.    Ms. Zschiesche decided to leave the company because she knew her manager would always hold the fact that she had three young children against her.  Trial Tr. at 1049:24-1050:2.

684.    District Manager Willie's sales results in 2004 did not fully meet expectations but his manager nonetheless gave him a 2 for objectives on his 2004 annual performance review.  Trial Tr. at 3013:10-25.

685.    District Manager Willie received a 2-2 rating on his 2005 annual performance review despite the fact that he was in last place for his sales results and that he did not consider himself to have fully met expectations.  Trial Tr. at 3019:4-18.

686.    District Manager Willie's own manager had the discretion, which she exercised, to rate him a 2-2 or something lower for his 2005 annual performance review.  Trial Tr. at 3027:5-7.

687.    Even though District Manager Willie's own manager made significant criticisms in Mr. Willie's 2005 annual performance review, she nonetheless ranked him as fully meeting expectations.  Trial Tr. at 3027:11-14.

## CONCLUSIONS OF LAW ON PLAINTIFFS' DISPARATE IMPACT CLAIMS

### IV.    LEGAL ANALYSIS

#### A.    <u>The Legal Elements of a Disparate Impact Cause of Action</u>

688.    Even though District Manager Willie's own manager made significant criticisms in Mr. Willie's 2005 annual performance review, she nonetheless ranked him as fully meeting expectations.  Trial Tr. at 3027:11-14

689.    Under Title VII of the Civil Rights Act, an employer may not discriminate "against any individual" in the terms and conditions of employment "because of such individual's sex."  42 U.S.C. § 2000(e)(k).  Title VII proscribes more than just intentional discrimination in employment, it also takes aim at the discriminatory effects of an employer's practices on women and minorities. A Title VII "disparate impact" claim seeks to protect employees against such discriminatory effects by challenging even those employment practices neutral on their face that nonetheless cause an imbalance in opportunities available to protected groups, such as women. 42 U.S.C. § 2000e-2(k)(1)(A)(i). *See also New York City Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979) (defining "disparate impact" as when "an employment practice has the effect of denying the members of one race equal access to employment opportunities."); *Smith v. Xerox Corp.*, 196 F.3d 358, 364 (2d Cir. 1999)("A Plaintiff establishes a…case of disparate impact by identifying a specific employment practice which, although facially neutral, has an adverse impact on her as a member of the protected class."), overruled on other grounds *Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 140 (2d Cir. 2006).

690.    Disparate **impact** "attack[s]…the systemic results of employment practices" by "aim[ing] at discovery and elimination of facially neutral employment

practices that adversely affect minorities and cannot be justified as necessary to an employer's business." *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984). It focuses on whether employment policies that are **neutral** on their face and were **not intended** to discriminate nevertheless have a **disparate effect** on the protected group. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) (stating that an employer's "good intent" is irrelevant to a disparate impact allegation). "The doctrine seeks the removal of employment obstacles, not required by business necessity, which create built-in headwinds and freeze out protected groups from job opportunities and advancement." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (internal quotation marks omitted). Under "disparate impact," employment procedures – neutral on their face – may violate Title VII if they negatively impact female employees with respect to pay and promotion. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002).

691. The disparate impact theory of gender discrimination also applies to pregnancy discrimination. Numerous courts have held or implied that disparate impact is a viable claim under Title VII and the Pregnancy Discrimination Act ("PDA"). *See*, *e.g.*, 42 U.S.C. § 2000e-2(k) ("disparate impact on the basis of… sex"); 42 U.S.C. § 2000e(k) ("on the basis of sex" includes pregnancy and childbirth); *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305 (2d Cir. 1981) (recognizing disparate impact theory on Title VII pregnancy claim); *Dimino v. New York City Transit Auth.*, 64 F. Supp 2d 136, 157-58 (E.D.N.Y. 1999) (recognizing possible applicability of Title VII disparate impact analysis to a claim under the PDA). *See also Lang v. Star Herald*, 107 F.3d 1308, 1314 (8th Cir. 1997); *Garcia v. Woman's Hospital of Texas*, 97 F.3d 810, 813

(5th Cir. 1996); *Scherr v. Woodland School Community Consolidated Dist. No. 50*, 867 F.2d 974, 979 (7th Cir. 1988). *See also* 29 C.F.R. § 1604.10(c) ("Where the termination of an employee who is temporarily disabled is caused by an employment policy under which insufficient…leave is available…such a termination violates [the PDA] if it has a **disparate impact on employees of one sex**…").

### (i)    Plaintiffs' Prima Facie Case

692.    A disparate impact allegation "requires plaintiffs to establish by a preponderance of the evidence that the employer 'uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Robinson v. Metro-North Commuter R.R. Co*., 267 F.3d 147, 160 (2d Cir. 2001) (*quoting* 42 U.S.C. § 2000e-2(k)(1)(A)(i)).

693.    Disparate impact claims involve three stages of proof. The **first** stage is Plaintiff's *prima facie* demonstration of disparate impact. Plaintiffs must establish by a preponderance of the evidence that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). To succeed at the *prima facie* stage, a plaintiff should (1) point to a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the practice and disparity. *Robinson*, 267 F.3d at 160.

### a.    Subjectivity in Personnel Decisions

694.    As an essential part of a *prima facie* case, a plaintiff must show that the employer uses a particular employment practice that causes a disparate impact. *Gulino v. New York State Dept. of Ed*., 460 F.3d 361, 382 (2d Cir. 2006).

695.    In *General Tel. & Tel. Southwest v. Falcon*, 457 U.S. 147, 159 & n.15 (1982), the Supreme Court observed that "an entirely **subjective** [employment] decision making process" could be a mechanism for class-wide discrimination. Subsequently, in *Watson v. Fort Worth Bank of Trust Co.*, 87 U.S. 977, 990-91 (1988) the Supreme Court reaffirmed that subjective decision-making constitutes an identifiable and measurable employment practice that a plaintiff may attack with a Title VII disparate-impact cause of action.  As the Court noted:

696.    If an employer's undisciplined system of subjective decisions making has precisely the same effect as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discrimination should not apply. *Id.*

697.    While some subjectivity in a decision-making process is not *per se* illegal, courts view such processes as highly suspect. *See McReynolds v. Sodexho Marriot Servs. Inc.,* 349 F. Supp. 2d 1, 20 (D.D.C. 2004) (subjective decision making processes should not "be condemned as unlawful per se" but they "are highly suspect and must be closely scrutinized"); *see also Cook v. Billington,* Civ. A. No. 82-0400, 1992 WL 276936 at *5 (D.D.C. Aug 14, 1992) ("[E]xcessive subjectivity in employment decisions is traditionally viewed with skepticism by courts."); *Wright v. Stern*, 450 F. Supp. 2d 335, 365 (S.D.N.Y. 2006) ("Greater possibilities for abuse…are inherent in subjective definitions of employment selection and promotion criteria.") (citation omitted)).

698.    Second Circuit precedent establishes that "the subjective components of company-wide employment practices" such as "the grant of discretionary authority to supervisory employees [may]…affect one class of employees more harshly that others."

*Caridad v. Metro North Commuter Railroad,* 191 F. 3d 283, 291-92 (2d Cir. 1999); *see also Meacham v. Knoll's Atomic Power Lab*, 381 F.3d 56, 75 (2d Cir. 2004); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1016 (2d Cir. 1989) (recognizing that subjective employment methods may be "suspect" because of "propensity for masking…bias"). Thus, "it is beyond dispute that disparate impact analysis may be applied to subjective, as well as objective, employment practices." *Caridad* at 292; *Duling v. Gristedes Oper. Corp.*, No. 06 Civ. 10197(LTS)(HBP), 2010 WL 768869, *12 (S.D.N.Y. Mar. 8, 2010).

699.    Such recognition that subjective criteria which adversely impact protected classes violate Title VII is consistent with rulings from other jurisdictions. *See*, *e.g.*, *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002) ("[S]tatistical conclusions about the large disparities in salary and lack of women in upper management, as well as the anecdotal testimony by multiple witnesses about the subjective promotion process and award of salary and benefits is sufficient to support….that…Plaintiffs established a case of disparate impact discrimination."); *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 908-909 (6th Cir. 1991) (affirming finding of gender discrimination because employer used highly subjective factors when promoting employees to position of Broker Representative); *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 826-27 n. 40 (5th Cir. 1982) (statistics revealing a concentration of blacks in the lower paid positions in employer's plant led court to affirm finding of discrimination in promotions); *Jordan v. Wilson*, 649 F. Supp. 1038, 1049-51 (M.D.Ala. 1986) (finding that the underrepresentation of women in the rank of sergeant or above "indicate[s] that female officers are concentrated at the lowest level and thus reflects that the promotion system is discriminatory.").

700.    It is not always necessary for a disparate impact-plaintiff to demonstrate which aspects of an employer's pay and promotional practices are infiltrated with subjectivity. As the court held in *Port Authority Asian Jade Society of New York v. Port Authority of N.Y. & N.J.*, 681 F.Supp.2d 456, 464 (S.D.N.Y. 2010) (Cedarbaum, J.) (emphasis added):

701.    The [defendant] Port Authority makes the…argument **that the plaintiffs failed to identify which element of [its] promotion practices caused a discriminatory impact**. Section 2000e-2(K)(1)(B)(i) [of Title VII] provides that "if the complaining party can demonstrate to the court that the elements of [an employer's] decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

702.    Consequently, the *Port Authority* court ruled that the defendant-employer's "decision making process…**as a whole**, caused a disparate impact on the opportunities of Asian American officers to be promoted to Sergeant." *Id* at 464 (emphasis added); *see also Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (reversing summary judgment for defendant-employer in disparate impact case: "Furthermore…a decisionmaking process may be analyzed as a single employment practice if the complaining party can demonstrate to the court that elements of the employer's decisionmaking process are not capable of separation for analysis.").

### b.    Statistical Proof of Employment Disparities

703.    "Statistical proof almost always occupies center stage in a *prima facie* showing of a disparate impact claim." *Robinson,* 267 F.3d at 160.  *See also Malave v. Potter*, 320 F.3d at 325-27 (2d Cir. 2003); *Smith*, 196 F.3d at 365; *Hill v. Miss. State*

*Employment Serv.*, 918 F.2d 1233, 1238 (5th Cir. 1990) (per curiam); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990). The statistics must reveal that the "disparity [in pay or promotion] is 'substantial' or 'significant.'" *Robinson*, 267 F.3d at 160; *see also EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 117 (2d Cir. 1999).

### (i)      Measuring Disparities via a Regression Analysis

704.    In discrimination cases, courts have for over two decades relied upon regression analyses to measure whether a disparate impact exists. *Bazemore v. Friday*, 478 U.S. 385, 400-401 (1986), *Lavin-McEleney v. Marist College*, 239 F.3d 476, 482 (2d Cir. 2001).    The purpose of the methodology is to estimate the extent to which a particular independent variable – for example, gender – influenced the dependent variable – for example, pay); the goal is to determine, in short, whether discrimination or other factors caused a pay or promotion disparity. *Sobel v. Yeshiva University*, 839 F.2d 18, 22 (2d Cir. 1989); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 n.9 (9th Cir. 2002), *cert. den.*, 537 U.S. 1110 (2003).

### (ii)     When is a Disparity "Significant"? – Standard Deviation Analyses

705.    In a regression analysis, one widely recognized gauge of disparate impact is statistical significance or standard deviation. *Castaneda v. Parida*, 430 U.S. 482, 496 n.17 (1977).

706.    Courts have relied upon standard deviation analyses to decide whether there has been an actionable disparate impact. "Standard deviation…measures the probability that a result is a random deviation from the predicted result--**the more standard deviations the lower the probability the result is a random one.**" *Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370, 1376 (2d Cir. 1991)(citing

*Ottaviani v. State Univ. of New York*, 875 F.2d 365 (2d Cir. 1989)). *See also* Barbara Lindemann & Paul Grossman, EMPLOYMENT DISCRIMINATION LAW 94 (3d ed. 1996) ("Tests of statistical significance are commonly used in the social sciences to rule out chance as the cause of observed disparities."). "Basically…at standard deviations indicates how far an obtained result varies from an expected result." *Smith v. Xerox Corp.*, 196 F.3d at 365 (2d Cir. 1999).

707.     The Second Circuit has "looked to whether the plaintiff can show a statistically significant disparity **of two standard deviations**". *Smith,* 196 F.3d at 365; *Waisome v. Port Authority*, 948 F.2d 1370, 1376 (2d Cir. 1994) (statistical disparity of "two or three standard deviations . . . is generally highly probative of discriminatory treatment")

708.     Standard deviations of more than 2 or 3 units give rise to a *prima facie* case of disparate impact because there is a low likelihood that such large disparities have resulted from chance. *See Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) ("courts 'generally consider this level of significance [i.e,. two standard deviations] sufficient to warrant an inference of discrimination.'") (*quoting Smith*, 196 F.3d at 365); *Waisome*, 948 F.2d at 1376 ("[a] finding of two or three standard deviations (one in 384 chance the result is random) is generally highly probative…"); *Ottaviani v. State Univ. of New York*, 875 F.2d 365, 372 (2d Cir. 1989); *Guardians Assoc. of New York City Police Dep't, Inc. v. Civil Serv. Comm.*, 630 F.2d 79, 86 (2d Cir. 1980) ("*Guardians*") ("[I]n cases involving large samples, 'if the difference between the expected value (from a random selection) and the observed number is greater than two or three standard deviations,' a *prima facie* case is established.") (*quoting Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977)).

(c)    **Causation – The Challenged Practice Adversely Impacts the Protected Class**

709.    The Supreme Court has ruled that **significant statistical disparities alone** can show a causal relationship between the challenged practice and the disparity.  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-96 (1988).  The Second Circuit has echoed this ruling, explaining that

710.    a plaintiff may establish a *prima facie* case of disparate impact discrimination by proffering statistical evidence which reveals a disparity substantial enough to raise an inference of causation.  That is, a plaintiff's statistical evidence must reflect a disparity so great that it cannot be accounted for by chance.

711.    *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 117 (2d Cir. 1999). *Cf.*, *Grant v. Bethlehem Steel*, *supra*, 635 F.2d 1007, 1018 ("a *prima facie* case can be made by showing that blacks are concentrated in lower-paying, less desirable jobs…"); s*ee also Robinson*, 267 F.3d at 160.  Thus, in order to show causation, "[t]he statistics must reveal that the disparity is *substantial* or *significant*." *Id*. at 160.  The "kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity" are those that result from a regression analysis and yield a standard deviation of 2 or greater.  *Malave v. Potter*, *supra*, 320 F.3d at 326.

712.    As part of her *prima facie* case, however, a plaintiff need not present perfect evidence of adverse impact, nor must she exclude every possible reason why a statistically significant disparity exists between protected and non-protected classes. *Bazemore v. Friday*, 478 U.S. 285, 400-401 (1986); *EEOC v. General Tel. Co.*, 885 F.2d 575, 582 (9th Cir. 1989), cert den. 498 U.S. 950 (1990)

713.    In addition, a specific causal link is not required where the defendant's pay or promotion processes are not capable of separation for analysis. 42 U.S.C. §2000e-2(K)(1)(B)(i); *Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005) ("If the employee challenges the employer's promotion process as a whole, however-as is the case here-then the disparate impact and causation elements merge. The magistrate judge addressed causation in a separate section from disparate impact, when in fact both sections address the same question: whether the evidence in the record supported a finding that African-American employees were promoted at a lower rate than white employees."). *See also Port Authority Asian Jade Society of New York v. Port Authority*, No. 05 Civ 3835, 2010 U.S. Dist. LEXIS 2900, at * 15 (S.D.N.Y. Jan. 14, 2010)(holding that employer's "decision making process **as a whole** caused a disparate impact.").

### 2.    Defendant's Rebuttal Burden

714.    If the plaintiffs succeed in their *prima facie* case, the burden of persuasion then shifts to the employer to demonstrate one of two things. The first option is to challenge the plaintiffs' statistical proof; the second option is to demonstrate a business necessity for the practice.

715.    A challenge to Plaintiffs' proof may be mounted in one of two ways: first, by introducing evidence to show that either no statistically significant disparity actually exists or that the challenged practice did not cause the disparity. *Robinson*, 267 F.3d at 161. *See also In re Employment Discrimination Litig.*, 198 F.3d 1305, 1313 (11th Cir. 1999). To effectively contest the plaintiffs' statistical evidence, the employer must convince the fact finder that its "numerical picture is more accurate, valid, or reliable than the plaintiff[s'] evidence." 2 Arthur Larson, et al. Employment Discrimination § 23.02 at

23-3. However, a defendant does ***not*** defeat plaintiffs' statistical proof merely by pointing out possible flaws in plaintiffs' data. Instead, defendant ***must*** "produce credible evidence that curing the alleged flaws would also cure the statistical disparity." *EEOC v. General Tel. Co.*, 885 F.2d 575, 582 (9th Cir 1989), cert den. 498 U.S. 950 (1990).

716.    Assuming the employer is unable to successfully contest the plaintiff-employee's statistics, a second route is for the employer to demonstrate that the challenged practice or policy is "job related for the position in question and consistent with business necessity." 42 U.S.C. §2000e-2(k)(1)(A)(i).  For example, "[i]n order to sustain a subjective [promotion] practice" that disparately affects a protected group, the defendant-employer would have to establish that "something about the [particular] position ***requires*** the selector to make a subjective evaluation of the applicant's abilities." *Mozee v. American Commercial Marine Service,* 940 F.2d 1036, 1050 (7th Cir. 1991) (emphasis added); *see also Zahorik v. Cornell Univ.*, 729 F.2d 85, 96 (2d Cir. 1984).

### 3.    Plaintiffs' Proof of a Less Discriminatory Alternative Policy

717.    If the employer fails to demonstrate a business justification for the policy or practice, *see* 42 U.S.C. §§2000e-2(k)(1)(A)(i), 2000e(m), then the plaintiffs prevail. But if the employer succeeds in establishing a business justification, the disparate impact claim proceeds to a third stage.  Then the burden of persuasion shifts back to the plaintiffs to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect. *See* 42 U.S.C. §2000e-2(k)(1)(A)(ii), (C); *Joe's Stone Crab, Inc.*, 220 F.3d at 1275. *See generally* Larson, supra, § 9.03 at 9-23 to 9-24.

### C.    THE COURT'S CONCLUSIONS OF LAW – APPLICATION OF THE LAW TO THE PROOF PRSENTED AT TRIAL

(i)     **Plaintiffs Have Successfully Proven a *Prima Facie* Case of Disparate Impact with Respect to Pay, Promotion and Pregnancy Status**

718.    Plaintiffs, the Class of Novartis' female sales force employees, have demonstrated a *prima facie* case of disparate impact. They have identified a specific employment practice which Novartis uses to make in personnel decisions – specifically: excessive subjectivity and managers' discretionary authority in performance evaluations, pay and promotion decisions and terms and conditions of employment (e.g. disciplinary decisions, short-term disability decisions, etc.). That excessive subjectivity and authority is vested in a mainly male managerial force. *See supra* Discussion of Outtz.

719.    Plaintiffs have also demonstrated that a statistically significant disparity exists among male and female Novartis Sales Reps with regard to pay and promotions. And, by a statistically significant number Plaintiffs have proven that pregnant Reps are promoted less often than female reps who are not pregnant. Finally, Plaintiffs have established a causal relationship between Novartis' subjective employment practices and (i) the pay and promotional disparities negatively impacting the class of female sales employees, and (ii) the promotional inequalities affecting pregnant sales reps. *See Robinson*, 267 F.3d at 160.

(ii)    **Plaintiffs Have Proven by a Preponderance of the Evidence that Novartis Employs an Excessively Subjective Process for Personnel Decisions Involving Pay for the Company's Sales Reps**

a)      **Subjectivity Regarding Pay**

720.    Trial testimony established and the Court concludes that Novartis' performance system was excessively subjective and acted as a conduit through which a mainly male managerial core used unbridled discretion to make evaluations which

adversely impact the female class with regard to pay. Novartis employed excessively subjective factors in evaluating sales reps' performance, and that managers possessed broad authority to determine class members' pay. No Novartis witness contested Plaintiffs' demonstration that the Novartis rating system was permeated with subjectivity, or that the Company's managers had wide discretion to set an employee's compensation. Several high ranking Novartis personnel confirmed that managers possessed untrammeled discretion to evaluate the performance of the class members.

721.    Plaintiffs' expert, Dr. James Outtz, offered persuasive testimony that Novartis' performance rating system focused excessively on ill-defined "descriptors" for "values and behaviors" and concentrated disproportionately on general traits, as opposed to actual behavior. (TT 526:12-527:5; 528:11-20). Novartis managers were given insufficient written guidance on how to evaluate performance and how to accurately complete appraisals. *Id*. at 528:22-529:12. Outtz noted that "the system calls for the utilization of traits" and therefore one manager may define the trait one way and another manager could define it another way. (*Id.* at 536:7-537:5-20 ).

722.    For example, among the traits Novartis listed in its performance management system were "enthusiasm," "motivation," and "energy." But these can be measured in different ways by different managers. (*Id.* at 534:13-535:10). Dr. Outtz testified that these definitional inconsistencies and the final ratings awarded to class members affected employee compensation.  (*Id.* at 539:9-19).

723.    Dr. Outtz reviewed 180 performance appraisals of Plaintiffs and discovered inconsistencies across managers. (*Id.* at 543:30). He testified that in its performance ratings, Novartis uses descriptors such as "works sensitively with people of

different backgrounds," "draws out of a range of perspectives when communicating with others." **The Court concludes that these are ill defined and permit a manager to rate an employee in different ways, on different things, and basically any way he chooses. (*Id.* at 542:7-14).**

724.    Dr. Outtz emphasized that Novartis awards compensation to the class by drawing directly from its excessively subjective ratings system. He also pointed to the testimony of managers that showed they were confused as to whether to give Reps a 3-1 or 1-3 rating, which are some of the possible ratings on the grid of ratings Novartis uses.

**Novartis did not present its own expert to controvert Dr. Outtz's opinion.**

725.    The Court bases its conclusion that Novartis' performance ratings were excessively subjective not only on Plaintiffs' evidence but also on testimony from Novartis' personnel. Judy O'Hagan was head of Novartis' HR Department during the Class Period. Ms. O'Hagan admitted that 50% of Novartis' performance evaluation system was subjective and 50% objective. But O'Hagan went further. She acknowledged that even for the "objective" section of the ratings system, approximately 30% was subjective. (O'Hagan 339:28) Consequently, Novartis has admitted that its performance evaluations of the Plaintiff class were bottomed on mainly subjective factors, and that the evaluators making the judgments were a managerial group that is approximately 75% male. (*Id.* at 334:9-15). **O'Hagan also admitted that identical performances could produce differing evaluation or competency scores, with one rep earning a "3", another a "2" score, and another a "1".**

726.    The subjective nature of Novartis' performance evaluation system is compounded by an additional element: Novartis employs a forced distribution curve

which limits the number of overall "3's" a district manager can award in his territory. This means that male managers can exercise unguided discretion to award different scores to two equally proficient sales representatives, one male, one female.

*    *    *

727.    Anecdotal evidence from many of the plaintiff-sales representatives corroborates just how deeply subjectivity dominated Novartis' performance ratings system and, also, that Novartis managers wield unbridled discretion in rating the plaintiff class. Plaintiff Jennifer Waxman Recht testified that her manager stated in an email to his supervisor – "We talk a lot about rewarding success and performance, yet we penalize our top performers through a subjective system." (*Id.* at 903:30-904:1). That subjectivity enabled Recht's male counterparts to earn approximately $10,000-$20,000 more per year than she did. (*Id.* at 899:2-100:1).

728.    Plaintiff Tara Blum testified that her manager had broad discretion with respect to the annual performance review to rate her based on how he was feeling (*Id.* at 261:21-262:6). Sales representative Bernice Dezelan confirmed that ratings on the annual performance reviews determined merit increases and stock options. Plaintiff Amy Zschiesche related that Tiger Awards, which came with an American Express gift card, were distributed at the discretion of the individual manager. (*Id.* at 1057:1-2). She testified that her manager denied her a raise in 2005, which affected her earnings potential moving forward. Similarly, sales representative Raelene Ryan told how her manager was responsible for determining her salary increase in 2002. (*Id*. at 2580:21-23).

**<u>Plaintiffs' Statistical Expert Confirms that to a Statistically Significant Degree,<br>Women Sales Representatives Receive Fewer "3's" than Men</u>**

729.    Plaintiffs' statistical expert Dr. Louis Lanier, testified that male sales representatives were more likely than females to receive a 3 (the highest grade) on the subjective portion of the performance rating, and this differential was statistically significant. Dr. Lanier also confirmed that, to a statistically significant extent, more women than men received low-scoring "2's" as opposed to "3's". The Court accepts Dr. Lanier's conclusion that with respect to performance ratings, the system adversely affected female sales reps and depressed the amount of pay they received.

730.    The Court concludes that lower grades for female sales reps translated into lower compensation and also limited class members' changes for promotion.

731.    The Court finds that to a statistically significant extent, the predominantly male managerial force favored its own gender and graded male sales reps higher than the female class.

### (iii)    Plaintiffs Have Proven that a Statistically Significant Disparity Differentiates Female from Male Reps, with Males Earning Higher Compensation

732.    Based on the testimony of Plaintiffs' statistical expert Dr. Louis Lanier, the Court finds that female sales representatives are paid less than males on an average of $105 a month, which amounts to $1,260 a year. Dr. Lanier testified that this disparity was significant to 7.7 standard deviations. As a matter of law, this is a statistically significant disparity and raises an inference of discrimination which Defendant Novartis failed to rebut.

733.    Dr. Lanier's conclusions that – to a statistically significant degree – Novartis paid class members less than men were not refuted by Novartis.    The company's statistical expert, Dr. Welch, offered no statistical analysis of total

compensation between male and female sales employees. Instead, Novartis offered flawed and unreliable evidence in an attempt to rebut Dr. Lanier's findings.

734. As indicated in this Court's findings of fact, *supra*, Dr. Welch improperly calculated women's hourly rates at a rate well above their actual rate of pay. Even when Dr. Welch reevaluated his conclusions ("the trim analysis") he still significantly overstated female earnings by repeating the mistakes that marred his original analysis. Despite this, Dr. Welch's own reevaluation showed a 1.88 standard deviation between higher male compensation and lower female earnings. The Court finds Dr. Welch's opinion not credible. He has failed to offer a believable analysis that would nullify the significant pay disparities proven by Plaintiffs. *EEOC v. General Tel. Co.*, 885 F. 2d at 582.

> **(iv)** **Plaintiffs Have Demonstrated a Direct Causal Connection between Novartis' Subjective Employment Practices and the Statistically Significant Pay Disparities between Class Members and Male Sales Representatives**

735. The evidence establishes – and the Court finds – that Novartis' performance rating system was ill-defined, vague and confusing and highly subjective. Novartis endowed managers with an "anything goes" power to award salaries, merit increases and incentive compensation. The disparities between male and class member compensation are very wide and statistically significant to above 7 standard deviations. The Court therefore concludes that Plaintiffs have demonstrated a causal link between Novartis subjective-discretionary pay policies and the lower compensation of class members. And the evidence shows just as strongly that the Novartis rating system did not have clear standards for evaluating sales representatives' work performance. The system relied instead on open-ended and plastic traits such as "enthusiasm." These are

amorphous guidelines that allowed male managers at Novartis to use their subjectivity and discretion to disadvantage women employees so that female sales represent were paid less than their male counterparts.

> **(v)    Plaintiffs Have Proven by a Preponderance of the Evidence that Novartis Uses a Highly Subjective Regime for Personnel Decisions Involving the Promotion of Sales Representatives.**

> **(a)    Subjectivity Regarding Promotion**

736.    The Court finds that a Novartis sales representative's path to promotion and a management position rested largely in the unfettered discretion of her district manager. Novartis failed to provide either managers or representatives with any materials explaining the procedures and processes for determining whether a representative is eligible for promotion to a management position.

737.    Arlene Adoff, Novartis' Vice President of Training and Development, testified that a district manager possesses the discretion to deny a sales representative the opportunity for promotion. Ms. Adoff stated that the support of the district manager is a necessary requirement for a sales representative to proceed in the management development process. (*Id.* at 1198-99). Similarly, the regional director is vested with discretion to fill the limited spaces available for Management Development classes.

738.    Ms. Adoff further testified that Novartis does not monitor which individuals the regional director decided to allow to advance or preclude from progressing in the management development process. Nor does Novartis track whether district managers permit individuals to progress through the initial stages of management

development before entering management development classes. (*Id.* at 1199:13-1200:7-11).

739.    Novartis Regional Director Dominick DiCindio echoed Adoff and corroborated that a district manager had discretion whether to move a representative forward in the management development process. Again corroborating Adoff, DiCindio testified that Novartis had no way to track in a quantifiable way which representatives expressed interest in management.

740.    Sharon Larrison was the founder and the chair of the Women in Leadership group at Novartis. The group conducted participant surveys during its annual conference within the first three years of the group's formation. In response to surveys regarding impediments to promoting women to leadership positions in Novartis, the participants listed an old boys' club atmosphere, a lack of respect for women currently in senior position, a lack of women being promoted and a lack of clearly defined career and succession paths.

741.    The Court finds that Novartis' standards for promotion to management are highly subjective and further, Novartis gave district managers free reign to decide whether sales reps are promoted to management. Ms. Larrison confirmed that a sales representative needs her regional director's approval in order to attend management development classes.

742.    Dr. James Outtz, Plaintiffs' personnel expert, testified that there were no documents instructing the manager what to do to pave the way for a representative to enter management. He noted that entry into management level jobs at Novartis is

completely within the discretion of the sales representative's manager and his subjective opinion controls a representative's advancement.

743.    Dr. Outtz stated that, with respect to management development, there should be more transparent policies so that everyone understands the requirements and has an equal chance of becoming a manager.

744.    Testimony from Novartis Plaintiff-sales representatives also strengthened the proof that the Novartis management development process was highly subjective and non-transparent, and the class of female sales reps was largely dependent on the subjective approval of their predominantly male managers to advance into higher positions.

745.    Plaintiff Tara Blum testified that she believed the management development process at Novartis was not transparent and she did not know how to get into the program. Blum further testified that her manager was her gatekeeper because he controlled her involvement in the management development process. Blum recounted that her manager had the power to snap his fingers and put her into management development but nonetheless he prevented her from entering any program even though he acknowledged her qualifications and experience. When Blum told her manager that she had accepted an offer at another pharmaceutical company, he responded that he could put her into management development immediately.

746.    Plaintiff Margerie Salame testified that her manager was initially very receptive to her interest in management and was willing to help her move into the management development program. However, Salame was raped by a doctor during an

NPC event. When she informed her manager of this, he retaliated against her and blocked any possibility of her advancement into management.

      **(b)     Disparate Impact in Promotions**

           **(i)     A Statistically Significant Disparity Exists Between Male and Female Managerial Employees.**

747.    The underrepresentation of women at the first-level management level compared to their representation in the non-management sales force as a whole is evident. While the sales force at Novartis was approximately 50% female and 50% male, only 25% to 26% of sales **managers** were female. TT 774:11-20.  These statistics indicate that female sales employees are concentrated at non-management levels and thus reflects that the promotion system is discriminatory. *See Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1016 (2d Cir. 1989).

           **(ii)    Male Sales Employees Are Promoted at Higher Rates to First-Level Manager Than Female Sales Employees.**

748.    Plaintiffs' statistically expert, Dr. Lanier, concluded that males have 4.3 times the likelihood of being promoted to a managerial position than their similarly situated female counterparts in the same job groups. This result is statistically significant to 7.3 standard deviations. According to Dr. Lanier, 7.3 standard deviations signify that this male-female promotional imbalance is a highly significant result and that the observation measured did not occur by random chance. Lanier further noted that the chance that this observation was random is 1 in 3 trillion.

749.    Dr. Lanier's conclusions were not refuted by Novartis.   Novartis offered no statistical analysis of promotions to first-level manager.  Instead, Novartis defended the extreme disparity between males and females in managerial slots by contending that

women are less interested in becoming managers and therefore are promoted at a lower rate than men. But Novartis offered no convincing proof to support this position.

750.    The Court therefore finds that a statistically significant disparity exists favoring men over the female Class with respect to promotions for Novartis managerial positions.

> **(iii)    There is a Causal Relationship between Novartis' Subjective Personnel Processes, with its Unbridled Managerial Discretion and the Lower Promotional Rate for Female Class Members**

751.    Plaintiffs have successfully proven that Novartis' subjective personnel decisionmaking along with the vast discretion accorded to the predominantly male managerial force directly causes women to be promoted at significantly lower rates than men.

## V.    Plaintiffs Have Successfully Proven that Pregnant Class Members are Adversely Affected by Novartis' Employment Policies.

752.    The evidence at trial established that women who took short-term disability leave almost never received the highest ("3") rating. Novartis' own expert, Dr. Welch, conceded that the vast majority of those who took such leave were women. He also acknowledged that pregnant women who took short-term leave comprised the majority of all Novartis personnel on leave.

753.    Consequently, it is clear to the Court that women who take pregnancy leave are penalized because their managers will not award such women the higher performance rating.

754.    Trial evidence also confirmed that there is a direct connection between higher performance ratings and promotion to a managerial position. Based on this evidence, the Court concludes that Novartis' subjective and discretionary employment

practices cause a statistically significant diminished chance for pregnant class members to be promoted to the company's managerial ranks.


Dated this ___ day of May 2010



_____

HON. COLLEEN MCMAHAON

UNITED STATES DISTRICT JUDGE



Presented By,


_____/s/_____

David W. Sanford, D.C. Bar No. 457933
Katherine M. Kimpel, DC Bar No. 493028
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Ave. NW, Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile:  (202) 742-7776

Jeremy Heisler, (JH-0145)
Steven Wittels, (SLW-8110)
**SANFORD WITTELS & HEISLER, LLP**
1350 Avenue of the Americas
31st Floor
New York, NY 10019
Telephone: (646) 723-2947
Facsimile: (646) 723-2948

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave. NW, Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7783
Facsimile:  (202) 742-7776

*Attorneys for Plaintiffs*

**SO ORDERED:**

Dated:

_____

United States District Judge Colleen McMahon

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing was filed electronically and served on the following Counsel of Record via United States mail, with proper first-class postage prepaid on May 13, 2010:

> Richard H. Schnadig, Esq.
> **VEDDER PRICE, P.C.**
> 222 North LaSalle St.
> Chicago, IL 60601
> (312) 609-7500

> ***Attorneys for Novartis Pharmaceuticals Corporation***

_____/s/_____

Sarah E. Siegel