**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| AMY VELEZ, PENNI ZELINKOFF, MINEL HIDER TOBERTGA, MICHELLE WILLIAMS, JENNIFER WAXMAN-RECHT, KAREN LIGGINS, LORI HORTON, HOLLY WATERS, WENDY PINSON, ROBERTA VONLINTEL, CATHERINE WHITE, KELLY CORBETT, JAMIE HOLLAND, JOAN DURKIN, SIMONA LOPES, MARYANNE JACOBY, and MARTA DEYNE, | ) ) ) ) ) ) ) ) ) ) ) | |
| Individually and on Behalf of Others Similarly Situated, | ) ) | 04 Civ. 09194 (CM) |
| PLAINTIFFS, | ) ) ) | |
| v. | ) ) | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | ) ) ) | |
| DEFENDANT. | ) ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**WITH RESPECT TO ADVERSE IMPACT**

# TABLE OF CONTENTS

**Page**

I.  FINDINGS OF FACT ................................................................................................... 1

    A.  Background ................................................................................................... 1

    B.  Promotion to Manager ................................................................................ 1

    C.  Pay Discrimination ..................................................................................... 8

    D.  Performance Evaluation Analyses ........................................................... 13

II.  CONCLUSIONS OF LAW ....................................................................................... 20

    A.  Prima Facie Case of Adverse Impact ..................................................... 20

    B.  Promotion to Manager Claims ................................................................. 21

    C.  Pay Claims ................................................................................................ 25

    D.  Performance Evaluation Claims .............................................................. 27

    E.  Anecdotal Evidence ................................................................................. 30

CHICAGO/#2065053.15

Defendant, Novartis Pharmaceuticals Corporation ("NPC"), submits the following proposed findings of fact and conclusions of law with respect to Plaintiffs' class adverse impact claims.

## I.     Findings of Fact

### A.     Background

1.     Both parties' experts, Dr. Louis Lanier for Plaintiffs and Dr. Finis Welch for Novartis, used the statistical technique of regression analyses to perform analyses of performance evaluations, pay and promotions to first line managers.

2.     Both experts applied the two standard deviation standards in assessing the statistical significance of the results of their regression analyses. (Tr. 4/19/10 at 784:8-14.)

### B.     Promotion to Manager

### Statistical Evidence

1.     In support of their claims of promotion discrimination, Plaintiffs presented the testimony of Dr. Louis Lanier.

2.     He testified that he performed a comparison of the percentage representation of women in a hypothetical pool of sales representatives "eligible" for promotion to manager compared to the percentage of promotions to first line manager. (Tr. 4/19/10 at 788:23-797:15; 828:25-829:25.)

3.     The hypothetical pool of eligible sales representatives constructed by Dr. Lanier consists of all sales representatives who were at least 27 years old with one or more years of Novartis seniority and who were not in certain entry level positions from which few, if any, promotions to first line management occurred. (Tr. 4/19/10 at 830:9-12; DX 253.) His regression compared the representation of women in this pool (expressed as "employee-years in the relevant" pool) to the representation of women among those promoted to first line manager

during the class period. The regression controlled for age, tenure and job group. (Tr. 4/19/10 at 830:1-20; PX 955.)

4. On the basis of these analyses, Dr. Lanier testified that men had 4.3 times the likelihood of being promoted to a first line manager position than similarly situated women and that this disparity was highly statistically significant. (Tr. 4/19/10 at 792:9-18.)

5. Novartis' Human Resources professionals and sales force managers testified that under Novartis' policy only sales representatives eligible for promotion to first line manager are those employees who have successfully completed the Management Development Program ("MDP"). (*See, e.g.*, Tr. 4/21/10 at 1207:10-13; 1229:16-22.)

6. The former Executive Director of Training and Development, Arlene Adoff, testified that there were four documented exceptions to this policy in the period 2001 to 2004 where non-sales representative employees were placed into sales manager positions without first completing MDP. Ms. Adoff testified these four individuals were non-sales representatives who were being rotated through a sales manager position on a developmental assignment. In addition, one other employee was placed into a management position without completing MDP. (Tr. 4/21/10 at 1211:7-1213:11; 1217:11-1218:5; PX 815.)

7. Dr. Lanier did not compare the promotion rates of men and women who had successfully completed the MDP. (Tr. 4/19/10 at 828:9-12; 835:1-14.)

8. The only testimony comparing the female percentage representation in the pool of employees who had completed MDP and their representation in promotions to first line management is that of Dr. Lanier on cross-examination. (Tr. 4/19/10 at 823:6-824:17; 825:16-826:14.)

9.    Based on data from September, 2005, women made up 20 percent of those employees in the promotion eligible pool at that time.  (Tr. 4/19/10 at 824:11-17; 826:20-827:2; DX 255.)  In comparison, women received 36 out of 134 or 27.7 percent of the promotions to first line manager positions from January 2002 through June 2005.  (Tr. 4/19/10 at 825:16-827:10; DX 253.)  Dr. Lanier testified that, based on data from his own analyses, the percentage of promotions to first line managers that went to women during the class period through June, 2005 was slightly higher than their percentage representation in the pool of employees who had completed MDP as of September, 2005.  (*Id.*)

10.    Dr. Lanier also performed an analysis comparing the female representation in a hypothetical pool of sales representatives potentially eligible for participation in MDP with their representation among the participants in MDP as of September, 2005.  Dr. Lanier based this hypothetical pool on the same assumptions as in his analysis of promotions to first line manager, except that he did not exclude sales representatives in entry level positions.  (Tr. 4/19/10 at 830:5-831:23.)

11.    Plaintiffs' other expert, Dr. James Outtz, and Novartis Human Resources and sales manager witnesses testified that three to four years of pharmaceutical sales experience and a minimum performance evaluation rating ("2-2") were required for entrance into the MDP. (Tr. 4/14/10 at 600:6-21; Tr. 4/15/10 at 737:3-10; Tr. 4/19/10 at 830:21-834:25; Tr. 4/21/10 at 1211:3-6, 1229:16-22; Tr. 5/4/10 at 2766:14-2767:5; PX 956; DX 254.)

12.    In addition, a number of Novartis female and male sales managers testified that the sales manager job was in many important respects different from the sales representative position in travel requirements, administrative and managerial responsibilities and the potential need to relocate to take an offered management position (Tr. 4/22/10 at 1566:10-1567:24; Tr.

CHICAGO/#2065053.15

4/27/10 at 2028:11-2029:11; Tr. 5/3/10 at 2617:18-2618:6; Tr. 5/4/10 at 2767:15-2768:8.) and that, for at least some female sales representatives, these considerations might dissuade them from seeking a management position. (Tr. 4/29/10 at 2441:4-2442:8; Tr. 5/5/10 at 3067:15-19.) The record also shows that, although there was no formal application process for MDP, employees were expected to make known their interest in pursuing a managerial position and permission to begin the pre-MDP checklist of developmental projects. The record also includes both testimony by various witnesses, as well as, data produced by Dr. Welch tending to demonstrate that women, as a whole, may have been less willing to relocate. (Tr. 5/4/10 at 2768:9-2769:16.)

13.     In constructing his hypothetical pool, Dr. Lanier did not restrict it to sales representatives who met the stated requirements for participation in MDP. Nor did he take employee interest in a management position or willingness to relocate into account. Instead, he assumed men and women, on average, to be equally qualified and interested. (Tr. 4/19/10 at 836:1-18.)

14.     Dr. Lanier stated that he had no idea whether the employees he included in his "potentially eligible" pool in fact met the eligibility requirements for entrance into MDP; nor did he know who among those he included were interested in participating in MDP or becoming a first line manager. (Tr. 4/19/10 at 836:6-18.)

15.     Dr. Lanier agreed that if his hypothetical "potentially eligible" pool had not been soundly estimated, then his calculation of statistical deviations and, hence, his finding of a statistically significant difference in the promotion rates of men and women to first line manager are open to question. (Tr. 4/19/10 at 836:19-837:7.)

CHICAGO/#2065053.15

16.     Dr. Finis Welch, Novartis' expert, testified that Dr. Lanier's analyses were insufficient to demonstrate a gender disparity in promotion to first line manager because of his failure to take into account the requirements for participation in MDP and interest in seeking a management job.  Consequently, in Dr. Welch's opinion, the reported statistical significance of Dr. Lanier's regression analysis comparing the female representation in his hypothetical "potentially eligible" pool to the percentage of promotions received by women was inflated because of his failure to restrict his promotion analysis to those in the pool of employees who had completed MDP and to take into account established qualifications for entrance into MDP in fashioning his hypothetical eligible pool.  (Tr. 5/4/10 at 2769:24-2771:12.)

**Anecdotal Evidence**

1.     Plaintiffs also produced the testimony of five witnesses claiming individual discrimination because of their non-selection into the MDP program.

**Tara Blum**

2.     Tara Blum testified that she expressed her interest in becoming a manager in her initial employment interview but that, in almost two years at the Company, she was not selected for the MDP Program.  (Tr. 4/12/10 at 241:1-9; PX 4.)

3.     Ms. Blum's Manager Gaffney testified that his boss, Regional Director Hopkins, had a "two year" rule for sales reps who wanted to enter the Management Development Program, meaning that Hopkins wanted to see two years of sales performance before formally entering an employee into the Program.  (Tr. 4/29/10 at 2463:10-20.)  There was no testimony that Hopkins did not apply this rule the same for men or women.

4.     Gaffney supported and encouraged Ms. Blum's interest, writing in her 2004 Annual Performance Review, delivered on February 23, 2005, that she was his "most trusted and reliable rep, a definite management talent."  (Tr. 4/29/10 at 2461:1-14; JX 28.)

5

5.      After Ms. Blum wrote shortly after her 2004 performance evaluations that she "would like to continue to explore management options." (Tr. 4/12/10 at 259:17-260:16; JX 28 at page 3039471.), Gaffney replied the next day: "Let's start testing the management development waters." (Tr. 4/12/10 at 265:22-266:6; JX 30.)

6.      On March 3, 2005, Gaffney took steps to further Ms. Blum's development, e-mailing Regional Trainer Phil Apostolico, and explaining that he and RD Hopkins agreed that Ms. Blum would enter the Program at the end of the year. DM Gaffney then asked Apostolico if he could use Ms. Blum as a Breakout Leader at an upcoming training session. Serving as a BOL is one of the required steps on the pre-MDP checklist that candidates must complete. (Tr. 4/29/10 at 2462:24-2463:24; 2465:19-2466:2; DX 39.)

7.      Ms. Blum submitted a resignation letter on June 15, 2005, less than two years after she started work with Novartis. (Tr. 4/29/10 at 2471:9-20; JX 32.)

### Jessica Borsa

8.      Ms. Borsa discussed her interest in pursuing a managerial position with Brian Aiello in February 2003. (Tr. 4/21/10 at 1347:24-1348:3.) By the summer of 2003, Mr. Aiello had done nothing to work with her toward management, and she said she was going to transfer to another position. (Tr. 4/21/10 at 1348:5-10, 1348:17-25.) Mr. Aiello told her that he would enroll her in the MDP to keep her. (Tr. 4/21/10 at 1349:5-14.)

9.      Ms. Borsa did not transfer and worked on various checklist items but never completed the checklist. (Tr. 4/21/10 at 1351:1-4, 1351:10-12, 1356:11-13.)

10.      Mr. Aiello also advised Ms. Borsa of a Break Out Leader course that she could attend in July 2004; however, she chose to skip the course and to take a family vacation instead. (Tr. 4/21/10 at 1372:8-9, 1372:18-1373:14.)

6

11.     Ms. Borsa admitted that she had not completed all the items on the checklist (Tr. 4/21/10 at 1410:21-1411:25, 1419:4-7; PX 35), and understood that she needed to finish the checklist before she could enter the MDP (Tr. 4/21/10 at 1410:16-20.)

**Christine Macarelli**

12.     Ms. Macarelli testified that early in her career (2002 and 2003), she was working on the management development checklist.  (Tr. 4/8/10 at 170:23-171:12.)  However, she never formally began the MDP checklist during her time at the Company, and her manager denies she ever worked on it.  (Tr. 4/12/10 at 217:15-20 (Macarelli); Tr. 4/28/10 at 2360:4-7 (Holstein).)

13.     Manager Holstein confirmed that he did not support Ms. Macarelli for management in 2005 because she was not meeting expectations for Diovan sales, call plan attainment, sampling, budget spending or for conducting sales goals (Tr. 4/28/10 at 2334:20-10; 2337:8-2342:16 (re: JX 47); 2341:17-2342:19 (re: JX 51); 2342:23-2344:19; 2345:3-8; 2347:3-2349:23; 2349:24-2350:25; 2351:10-2352:6; 2362:18-2363:19; JX 47; JX 51.), but was willing to continue to permit her to explore management, and referenced in her 2005 performance review seven leadership activities she could undertake during the following year.  (Tr. 4/28/10 at 2363:20-2365:8; JX 54.)

**Marjorie Salame**

14.     Salame expressed interest in becoming a manager during her interview with DM Joe Simmons.  She reiterated her interest in the Development Plan portion of her 2001 Annual Performance Review.  (Tr. 4/26/10 at 1660:18-1661:11; 1668:4-14.)  She testified that Simmons promised to start her in MDP if she improved the sales performance of her territory.

7

15.    Salame further testified that Simmons ceased to support her movement into MDP after she reported her rape by non-customer Dr. Edwin Colon. (Tr. 4/26/10 at 1690:1-9; 1700:3-1701:19; PX 467.)

**Cathy White**

16.    White testified that she expressed interest in management from the start, first to her DM Mark Gunning, and then to his replacement, DM David Moatazedi. (Tr. 4/14/10 at 615:7-12; 616:4-10.)

17.    For three consecutive years (2001, 2002 and 2003), White failed to make any mention in her Self Assessments or Development Plans of her supposed interest in MDP. (PX 733; PX 739; PX 744.)   The Development Plan portion of White's 2001 Annual Performance Review shows her career aspiration as promotion to Sales Consultant. (PX 733.) White indicated in her 2003 Evaluation a desire to be promoted to Senior Sales Consultant or into a Specialty position. (PX 744.)

C.    **Pay Discrimination**

**Statistical Evidence**

1.    Dr. Lanier performed an analysis of total annual compensation covering 2002 through November, 2007 comparing the year-end total compensation for men and women for each year in the class period.   Each employee would have a year-end pay record (or observation) for each year in which the individual was employed by Novartis.   Dr. Lanier controlled for an employee's age, tenure at NPC and job held. (Tr. 4/19/10 at 807:19-809:6; 813:10-22; 842:15-843:15.)   He also controlled for time on paid leave. (DX 275, p. 1.)

2.    Dr. Lanier's measure of total annual compensation included base salary, incentive pay and miscellaneous payments such as tuition assistance, reallocation allowances and medical reimbursements. (Tr. 4/19/10 at 841:9-14.)

8

3.      Dr. Lanier's analysis of pay excludes all class members who were hired or who had taken a leave of absence in the year being analyzed in his pay analyses.  (Tr. 4/19/10 at 843:5-20; 855:14-21; 857:7-13.)  This amounts to the exclusion of approximately 30 percent of the annual total compensation records for class members.  (Tr. 4/19/10 at 843:5-20; 855:9-21; 856:7-12.)  He performed no statistical analysis comparing the pay of these excluded class members to their excluded male counterparts.  More specifically, he did not perform an analysis of the total compensation of class members who were on leave during a given year with male sales representatives who were excluded from his analysis for the same year because they worked less than a full year.  (Tr. 4/19/10 at 843:16-20; 844:4-15; 857:7-12.)

4.      Within the group of class members included in Dr. Lanier's analyses, he found that the average monthly total compensation for women was $105.05 less than for men and that this difference was statistically significant.  (Tr. 4/19/10 at 808:17-809:6.)

5.      Although Dr. Lanier testified that the miscellaneous payments made up 2.5 percent of total compensation, he said he could not opine on what portion, if any, of his estimated male/female pay differential was attributable to differences between men and women in their receipt of these miscellaneous payments.  (Tr. 4/19/10 at 841:9-842:19.)

6.      Dr. Lanier also calculated an estimated average male/female monthly earnings disparities, using the same regression analysis, for each of the various job groups in the field sales forces.  (Tr. 4/19/10 at 852:6-10.)

7.      He found no statistically significant (at the two standard deviation level) pay disparities to the disfavor of women in four job categories and found a disparity in favor of women in one category.  (Tr. 4/19/10 at 852:6-855:8; DX 275.)  Dr. Lanier also testified that he

did not know from his analyses "whether or not the majority of women in the class did or did not earn more than or the same as their male counterparts in the same job."  (Tr. 4/19/10 at 843:5-9.)

8.    Dr. Lanier did not analyze starting salaries of new hires or the annual merit pay increases received by the men and women during the class period.  (Tr. 4/19/10 at 857:19-858:17.)

9.    Dr. Welch testified that an employee's current salary is a function of the employee's starting salary and the salary increases the employee receives while employed by the Novartis.  (Tr. 5/4/10 at 2763:23-2764:12.)

10.    Dr. Welch analyzed both starting salaries and annual salary increases and found that, over the class period, men and women received virtually identical starting salaries and annual merit increases and that any differences (slightly to the favor of women) between men and women were statistically insignificant.   (Tr. 5/4/10 at 2755:22-2757:22; 2764:14-2765:9.)

11.    Dr. Lanier did not look at either starting salaries or salary increases.  (Tr. 4/19/10 at 839:2-11; 857:19-24.)

12.    Neither Dr. Lanier nor Dr. Welch performed a separate analysis of incentive pay received by men or women.  (Tr. 4/19/10 at 842:6-12; Tr. 5/5/10 at 2844:6-9.)

13.    Dr. Welch also performed a replication, using Dr. Lanier's data, of Dr. Lanier's total compensation analysis.  He testified that he was able to replicate Dr. Lanier's results within a penny.  (Tr. 5/4/10 at 2760:17-2761:19.)

14.    Dr. Welch then used Dr. Lanier's data and, with one important exception, used Dr. Lanier's same regression and control variables to compare the total compensation of all

10

sales representatives employed during the class period, including those excluded by Dr. Lanier. (Tr. 5/4/10 at 2760:17-2762:24.)

15.     To include sales representatives who had worked less than a full year in any given year, Dr. Welch converted Dr. Lanier's annual total compensation measure into an hourly rate using the total hours worked by the employee as reflected in Novartis' database. Dr. Welch then multiplied the computed hourly rate by a standard number of hours worked per month to calculate the average monthly rate. (Tr. 5/4/10 at 2794:23-2795:14.)

16.     On the basis of this analysis, Dr. Welch found that female sales reps in the excluded group earned, on average, $288 more per month than their male counterparts in the excluded group but that the estimated difference was not statistically significant. (Tr. 5/4/10 at 2760:17-2762:4.)

17.     Dr. Welch found, for the entire group including those excluded by Dr. Lanier, that women earned, on average, $29 more per month than men but, again, the result was not statistically significant. (Tr. 5/4/10 at 2762:5-15.)

18.     Cross-examination of Dr. Welch disclosed a number of instances (out of a database of 32,975) where his calculation of an hourly rate yielded an unreasonably high number. (Tr. 5/4/10 at 2805:9-2806:17; 2812:2-2813:4; 2813:19-2814:6; 2817:15-2818:1; Tr. 5/6/10 at 3099:1-13.) The testimony further showed that, in at least many of these instances, this unreasonable number was the result of a female being on paid leave for a substantial period of a year and that time spent on leave was not counted as hours worked in the Novartis data. Consequently, in these instances, an employee received approximately a full year of earnings but

CHICAGO/#2065053.15

had far less of a year's worth of hours worked recorded in the data, thereby resulting in a high estimated hourly pay rate.[1] (Tr. 5/6/10 at 3101:21-3102:7; Tr. 5/4/10 at 2823:15-19.)

19.    In response to this cross-examination, Dr. Welch performed a so-called "trim" analysis in which he dropped from his analysis both the highest 1 percent of the computed hourly wage rates and the lowest 1 percent of such rates.  He also performed another trim analysis that dropped the highest and lowest 5 percent of the computed hourly rates.  The purpose of these "trim analyses" was to assess the sensitivity of his reported results to these "outlier" hourly compensation values.  (Tr. 5/6/10 at 3098:5-3100:18.)

20.    Dr. Welch's reported result of the "1 percent trim" (which drops two percent of all the observations) showed that, across all field sales representatives, men were estimated to earn $10 more per month than women.  The "5 percent trim" (which drops 10 percent of all observations) estimated a $29 average monthly pay difference in favor of men.  Both estimated differences were statistically insignificant.  (Tr. 5/6/10 at 3098:5-3102:7.)

21.    Additional examination of Dr. Welch showed that, even after the "5 percent trim," there remained examples where Dr. Welch's computed monthly rate was substantially higher than the monthly rate computed by Dr. Lanier and that these examples were women on paid leave.

22.    Dr. Welch also testified that there also remained many instances where his estimated monthly rate for men was substantially higher than Dr. Lanier's computed monthly rate for these individuals.  (Tr. 5/6/10 at 3144:12-3150:9.)

---

[1] The databases that formed the basis for the cross-examination of Dr. Welch on May 4 and 5, 2010 were databases for attempts to replicate Dr. Lanier from his earlier reports and were not used by Dr. Welch in the report to which he testified at trial.  (Tr. 5/4/10 at 2894:20-2895:24; Tr. 5/6/10 at 3110:22-3115:12.)

CHICAGO/#2065053.15

23.     In total, Dr. Welch found, of the 25 individuals remaining in the data after the "5 percent trim" with the lowest recorded hours worked, 10 were men and 15 were women and that the average computed salary for these men was $7,000 per month and it was $6,300 for women.  (Tr. 5/6/10 at 3101:21-3102:7.)  Based on this review, Dr. Welch concluded that the remaining outliers did not affect his reported results in the "5 percent trim."  (Tr. 5/6/10 at 3102:14-18.)

24.     Dr. Welch also testified that Dr. Lanier made errors in approximately 82 percent of his computations of individual employee annual monthly compensation and that Dr. Lanier's estimation of an employee's annual monthly total compensation was not accurate.  (Tr. 5/6/10 at 3147:3-9; 3147:12-3150:9.)

25.     In response to vigorous cross-examination, Dr. Welch testified that, in his opinion, the remaining outliers in his data, even after the "5 percent" trim, identified by Plaintiffs did not affect his conclusion that the difference in average monthly earnings was statistically insignificant.  (Tr. 5/6/10 at 3100:14-18; 3151:16-19.)  Plaintiffs offered no analyses of their own correcting for the alleged remaining errors in Dr. Welch's analysis and no showing that the removal of all the alleged errors yields a statistically significant difference in average male and female earnings to the disadvantage of women across the entire class.

D.     **Performance Evaluation Analyses**

       **Statistical Evidence**

1.      Sales representatives are annually evaluated by their District/Area Sales Managers on two dimensions:  (1) sales performance and effort (the "Objectives" portion of the evaluation); and (2) sales related "Competencies" or "Values and Behaviors" that NPC has identified as necessary to succeed in sales.  (Tr. 4/12/10 at 324:8-11.)  The manager assigns a numerical rating (from 1 to 3, with 1 being the lowest) to each dimension to form an overall

13

rating such as 2-2, 2-3, 3-2 (the first number reflecting the "Objectives" rating and the second number the rating for "Competencies"). (Tr. 4/12/10 at 328:18-330:7; PX 848.) A 2-2 reflects a good, solid performer, while a "1" on either part indicates that the representative did not meet expectations on that dimension. (*Id.*) The manager uses these ratings to determine annual salary merit increases and eligibility for progressions promotions. (Tr. 4/15/10 at 700:9-702:14.)

2.      Sales representatives receive both a mid-year and a year-end performance appraisal on the established goals. These evaluations include the representative's self-appraisal, as well as the manager's ratings. A representative who is dissatisfied with or disagrees with his/her rating has the opportunity to add his/her comments to the manager's evaluation and may appeal the matter to HR or the Regional Director. (Tr. 4/12/10 at 324:23-325:21; 327:12-21; PX 848.)

3.      The Objectives portion of the evaluation is based on the above-discussed quantitative measures of sales performance and effort such as overall sales rank (within one's region or the entire nation), sales rank for individual products, percent attainment of goals set and the "key performance indicators" such as call activity. Each sub-category receives a separate rating between 1 and 3. Overall sales ranking is typically the most significant and heavily weighted factor in determining the Objectives rating. (Tr. 4/12/10 at 333:24-338:19; JX 20.)

4.      The Values and Behaviors portion of the evaluation is divided into nine competencies determined and validated to be germane to successful job performance. To aid managers in evaluating these competencies, NPC provides them with detailed guidelines and performance evaluation grids which tie the values and behaviors criteria to observable actions

14

and functional sales competencies with descriptors of various levels of expected proficiency in each of the values and behaviors.  (Tr. 4/12/10 at 339:16-340:18; PX 848.)

5.      Plaintiffs' expert, Dr. James Outtz, testified at some length about what he considered to be excessive subjectivity in the exercise of managers' discretion in the implementation of Novartis' performance evaluation and compensation systems and in the selection of participants in MDP.

6.      Dr. Outtz acknowledged that there is bound to be some subjectivity and managerial discretion in any performance evaluation system and that there is no clear cut standard for what constitutes excessive subjectivity.  (Tr. 4/14/10 at 576:6-577:25.)

7.      In addition, Dr. Outtz agreed that Novartis' performance evaluation system incorporates the characteristics he has identified as minimizing subjectivity, including: linking performance ratings to important job behaviors or performance objectives, providing written instruction on how to make performance ratings, provide a second level of review of ratings and providing an appeal procedure for disputes over ratings.  (Tr. 4/14/10 at 576:6-577:25.)

8.      Dr. Outtz also criticized Novartis' use of a performance rating distribution (or "forced distribution" as he characterized it) as part of its "calibration process," that is its second level review of performance ratings.  But Dr. Outtz acknowledges that the calibration process seeks, at least in part, to achieve consistency of performance ratings across the various district managers and that this is good.  (Tr. 4/14/10 at 591:6-592:10-; 594:6-12.)

9.      Dr. Outtz did not know how often a manager's rating of an employee was changed as the result of the calibration process.  There was some anecdotal evidence about an employee not receiving a rating the manager might otherwise give the employee because of the

15

distribution guidelines.  But neither Dr. Outtz nor Dr. Lanier offered any analysis studying whether the calibration process or the rating distribution curve adversely affected women, in general, in the ratings they received.

10.     Both sides presented expert analyses of performance evaluation ratings that focused on the rate at which male and female sales representatives received the highest rating or "3" on the values and behaviors dimension of the evaluation.  (Tr. 4/19/10 at 801:17-802:6; Tr. 5/4/10 at 2749:8-2750:19; DX 209.)

11.     Dr. Lanier performed a statistical analysis of predicted performance evaluations, controlling for tenure and age, that shows that males have a 6.2 percent greater probability of receiving a "3" rating.  (Tr. 4/19/10 at 801:17-802:6.)

12.     Dr. Welch testified, without contradiction, that Dr. Lanier's study included employees who held non-class managerial and other non-sales representative jobs and that one could not predict from Dr. Lanier's analysis what the estimated probabilities of receiving a "3" rating would be for only sales representatives.  (Tr. 5/4/10 at 2745:7-19.)

13.     Dr. Welch also testified that Dr. Lanier's analysis did not compare similarly situated women and men because he failed to compare women and men in the same job group.  (Tr. 5/4/10 at 2746:3-6; 2749:8-2750:19; DX 209.)

14.     Dr. Welch testified that an analysis of performance evaluations should control for the job held by the employee so that the analyses compared men and women in the same type of jobs because employees in higher-level jobs have a greater likelihood of receiving a "3" rating.  (Tr. 5/4/10 at 2746:11-2747:13.)

16

15.     Failure to control for job held, according to Dr. Welch, results in comparing, say, executive sales consultants to sales representatives as if they are similarly situated regarding their chances of receiving a "3" when they are not.  (Tr. 5/4/10 at 2748:10-15.)

16.     Dr. Welch analyzed the ratings received by both men and women in the various Novartis job groups and demonstrated that, in fact, employees in higher rated jobs received "3s" at a higher rates.  (Tr. 5/4/10 at 2746:25-2748:2.)

17.     Dr. Lanier's analysis of performance evaluations also covers only 2002-04 and Dr. Welch testified that you could not predict the pattern of performance ratings received by male and female sales representatives over the entire class period from this truncated analysis. (Tr. 5/4/10 at 2748:16-2749:3.)

18.     Dr. Welch did analyze performance ratings across the entire class period. He found that, whether one controls for job held or not, over the entire class period there was no statistically significant difference between men and women in the likelihood of receiving a "3" rating.  (Tr. 5/4/10 at 2749:4-2751:18.)

19.     Dr. Welch's analysis included a control variable "yout" that accounted for the time an employee was not working during a year, either because the employee was a new hire or had been on leave sometime after the start of the year.  Dr. Welch explained that he included the "yout" because, if an employee is not working for the full year, a manager has less exposure to the employee's performance and, therefore, is less likely to rate it either very high or low and because he understood that it was Novartis' policy that a person hired during the year would likely receive a "2-2" evaluation.  (Tr. 5/5/10 at 2886:15-2887:12).  District Manager Brad Willie confirmed that new hires are likely to be given a "2-2" rating for the reason Dr. Welch articulated.  (Tr. 5/5/10 at 2960:23-2961:10.)

20.     Plaintiffs (but not Dr. Lanier) criticized Dr. Welch's use of the "yout" variable in his performance analysis pointing to its high "Z" statistic in the regression analysis and suggesting that it biased Dr. Welch's finding of no statistically significant difference in the likelihood of men and women receiving a "3" rating on values and behaviors.[2] (Tr. 5/4/10 at 2837:3-2842:6.)

21.     Dr. Welch testified that of those employees who worked less than a full year, more than 78 percent were new hires and less than 22 percent had been on a leave of absence.  (Tr. 5/6/10 at 3103:9-3104:7).

22.     Dr. Welch further stated that, consistent with his hypothesis, employees, both men and women, who worked less than a full year were less likely to receive a "3" but that the fact that the "yout" variable was highly significant did not affect his estimated likelihood of men and women receiving a "3" rating.   (Tr. 5/4/10 at 2840:16-21; Tr. 5/5/10 at 2888:6-2890:10).

23.     Performance ratings are used by Novartis in determining the annual merit pay increases to an employee's salary and in making promotions.  (Tr. 5/4/10 at 2754:18-2755:14.)

24.     Dr. Welch analyzed both the merit pay increases and progression (or leveling) promotions (from entry level to higher level non-managerial sales positions) received by sales representatives during the class period.  He found that there was no statistically significant difference in the annual merit pay increases or progression promotions received by

---

[2] Dr. Lanier also used a form of control variable that accounted for time on paid leave in his total compensation analysis.  (See DX 275, p. 1).

CHICAGO/#2065053.15

similarly situated male and female sales representatives during the class period. (Tr. 5/4/10 at 2755:22-2757:17.)

25.    Based on these analyses, Dr. Welch found that the performance ratings received by women during the class period did not disadvantage them in merit pay increases or progressions promotions. (Tr. 5/4/10 at 2757:18-22.)

26.    Dr. Lanier did not perform any analyses of merit pay increases or progression promotions and could not render an opinion on what effect, if any, his estimated difference in the probability of females and males receiving a "3" rating had on merit pay increases or progression promotions. (Tr. 4/19/10 at 839:21-840:8; 858:7-17.)

**Anecdotal Evidence**

27.    Plaintiffs offered the testimony of several witnesses who claimed that they were discriminated against in compensation.

28.    Holly Waters complained that she did not receive her last incentive bonus paycheck after she was terminated for cause. (Tr. 4/21/10 at 1287:18-23; 1288:6-8.)

29.    Cathy White testified that she was discriminatorily denied an MVP award that provides a monetary bonus. (Tr. 4/14/10 at 619:14-21; 620:5-621:1; 651:5-652:9.)

30.    Tara Blum testified that a male counterpart, Mark McLaughlin, received a higher percentage annual merit increase in 2004. However, she had no personal knowledge of the actual amount he received. (Tr. 4/12/10 at 263:1-18.)

31.    Terri Kelly complained that she received a lower salary than her husband, also a Novartis sales representative. Ms. Kelly's husband started at Novartis six months before her, worked in a different field force with a different manager and, unlike Ms. Kelly, won the International Sales Excellence award. (Tr. 4/20/10 at 1176:23-1178:21).

CHICAGO/#2065053.15

## II.    Conclusions of Law

### A.    Prima Facie Case of Adverse Impact

1.    To meet their burden of establishing a *prima facie* case of disparate impact in pay and promotion to manager, plaintiffs must establish by a preponderance of the evidence that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  42 U.S.C. § 2000e2(k)(1)(A)(I).  *Robinson v. Metro N. Commuter R.R.*, 267 F.3d 147, 160 (2d Cir. 2001); *see also Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006).

2.    To make this showing, plaintiffs "must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a casual relationship between the two."  *Robinson*, 267 F.3d at 160; *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 292 (2d Cir. 1999).

3.    To establish a pattern or practice of adverse impact by statistical proof, statistical disparities must be significant and be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity.  *Robinson*, 267 F.3d at 160.

4.    Because it cannot be ruled out that statistically estimated differences of less then two standard deviations occurred by chance, *see Reference Guide on Multiple Regression in Reference Manual on Scientific Evidence* 214 (2d ed. 2000), under well-settled Second Circuit law, only a statistically significant difference of at least two standard deviations is sufficient to warrant an inference of discrimination.  *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003); *Smith v. Xerox*, 196 F.3d 358, 366 (2d Cir. 1998), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006); *Ottavani v. State Univ. of N.Y.*, 875 F.2d 365, 371-72 (2d Cir. 1989); *Murphy v. Gen. Elec. Co.*, 245 F. Supp. 2d 459, 479 (N.D.N.Y. 2003).

20

5.    To establish a causal connection between a specific employment practice and the alleged discriminatory effect, plaintiffs must do more "than rely on bottom line numbers in an employer's workforce." *Smith*, 196 F.3d at 365.

6.    The employment practice Plaintiffs identify as the agent for adverse impact against women in pay and promotions to manager is the subjective discretion exercised by Novartis managers in performance evaluations, award of merit pay increases and selection into MDP. Subjectivity in and of itself is not unlawful. As the Supreme Court stated in *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 990 (1988), "an employee's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct." Although the Second Circuit has held that managerial subjectivity can constitute a common employment practice for Rule 23 purposes, no decision has addressed the necessary degree of subjectivity necessary to consider it a vehicle for discrimination. To what extent, if any, Novartis' employment policies permit more managerial discretion than is optimal in Dr. Outtz's opinion or otherwise need not be decided because, as explained below, Plaintiffs have failed to establish a causal connection between the exercise of managerial discretion and a pattern or practice of adverse impact against the class in pay or promotions.

## B.    Promotion to Manager Claims

1.    To establish a *prima facie* case of discrimination in promotions to first line managers, Plaintiffs must demonstrate a statistically significant disparity in the promotion rates of female sales representatives compared to similarly situated male sales representatives from a pool of qualified and interested employees. *See Watson,* 487 U.S. at 994; *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340-42 (1977); *Robinson*, 267 F.3d at 160; *Ottaviani*, 875 F.2d at 367.

21

2.     In addition to establishing the necessary causal relationship, plaintiffs must present statistical proof showing a significant disparity "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  *Watson*, 487 U.S. at 994; *Sackey v. City of New York*, No. 04 Civ. 2775 WHP, 2006 WL 337355, at * 5 (S.D.N.Y. Feb. 15, 2006).

3.     Absent the identification of a pool of qualified and interested women for promotions, no inference of discrimination in promotion decisions can be drawn from the simple comparison of the percentage representation of women in managerial versus non-managerial positions.  *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 650-58 (1989); *Malave*, 320 F.3d at 326; *Beers v. NYNEX Mat. Enters Co.*, No. 88 Civ. 0305 (MBM), 1992 WL 8299, at *8 (S.D.N.Y. Jan. 13, 1992); *Coser v. Moore*, 587 F. Supp. 572, 584 (E.D.N.Y. 1983), *aff'd*, 739 F.2d 746 (2d Cir. 1984); *see Carpenter v. Boeing Co.*, 456 F.3d 1183, 1197 (10th Cir. 2006); *Luciano v. Olsten Corp.*, 110 F.3d 210, 218 (2d Cir. 1997).

4.     Here, the record establishes that it was Novartis' policy that only sales representatives who had successfully completed MDP were eligible for promotion to first line manager positions.

5.     Plaintiffs pointed to five exceptions to his policy in the period 2001 to 2004.  However, Novartis' former head of management training testified that four of these individuals were non-sales representatives placed in a sales manager position on a developmental assignment.  The treatment of these employees has no bearing on the treatment of female sales representatives compared to similarly situated male sales representatives.  The one remaining exception in four years is insufficient to call into question Novartis' enforcement of its stated

policy. Accordingly, Dr. Lanier did not restrict his analysis to the pool of employees established by the record as eligible for promotion.

6.     A comparison of the percentage representation of women as of September, 2005 in the pool of employees who successfully had completed MDP with their representation in the promotions made during the class period through June, 2005 shows that women promoted at a slightly higher rate than their representation in the pool through that time period. Plaintiffs failed to present any analysis of promotions for the last two and one-half years of the class period.

7.     Plaintiffs assert that Dr. Lanier nevertheless properly based his analysis on his hypothetical pool of eligible employees because Novartis allegedly denies female sales representatives the same opportunities to participate in MDP as is afforded males sales representatives through the subjective discretion exercised by sales managers in their selection of employees to participate in MDP.

8.     However, the anecdotal testimony of those witnesses who claim to have been denied an opportunity to participate in MDP fail to establish a pattern of discriminatory denial of MDP opportunities to class members for the threshold reason that their testimony fails to identify similarly situated male sales representatives who were provided by their managers the opportunity to participate in MDP. *See, e.g.*, *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

9.     Further, Dr. Lanier's comparison of the female percentage representation of employees participating in MDP as of September, 2005 with the female representation in his hypothetical pool of sales representatives eligible to participate in MDP fails to demonstrate that

23

the subjectivity exercised by the managers caused a pattern or practice of adverse impact against women in the selection of sales representatives for the MDP program.

10.     Dr. Lanier did not restrict the definition of his hypothetical pool to those sales representatives who met the established MDP eligibility criteria of having three to four years of pharmaceutical sales experience and at least a "2/2" performance rating. True, data on prior experience was not available for the entire class and Dr. Lanier used an employee's age as a proxy for potential prior experience. But Dr. Welch did perform an analysis of applications for a sample of sales representatives from which he collected information on pre-Novartis work experience. This analysis showed that men in the sample tended to have greater pharmaceutical sales experience than women. Although not directly relevant to analyzing promotions to first line managers, Dr. Welch's sample analysis highlights the fact that Dr. Lanier could have made a similar analysis of a representable sample of his hypothetical eligible pool to test whether, in his professional opinion, his use of a 27 years of age minimum requirement for inclusion in his potentially eligible pool was a sufficient substitute for controlling for actual sales experience. He did not. To be of probative value, an expert's analysis must be consistent with the established evidence in the case. *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004); *Colon v. Abbott Lab.*, 397 F. Supp. 2d 405, 416 (E.D.N.Y. 2005). Here, by his own admission, Dr. Lanier used assumptions in his analyses that are directly contradicted by the established evidence with respect to who is eligible for promotion to first line manager positions.

11.     In addition, there was testimony from many witnesses in the record that, for various reasons, at least some women may not have been interested in pursuing managerial positions. Dr. Lanier did not do anything to examine whether his assumption that men and women were equally interested in seeking manager positions was sound.

12.     It was Plaintiffs' burden to establish a pattern or practice of adverse impact against women in the promotion to manager from an appropriately defined eligible pool and Dr. Lanier's analysis fails to satisfy Plaintiffs' burden of proof.

### C.     Pay Claims

1.     To establish a pattern or practice of adverse impact against women in pay, Plaintiffs were required to establish both a statistically significant pay disparity against the class and identify the particular employment practice, policy or action that caused the disparity.

2.     Dr. Lanier's analyses identifies a statistically significant pay disparity. However, there are several aspects of his analyses that undercut its sufficiency to establish adverse impact against the class as a whole.  First, he excludes 30 percent of the class members' annual pay records.  (Tr. 4/19/10 at 843:10-14, 855:9-21, 856:6-12.)  Therefore, he presented no statistical evidence regarding any pay comparisons for these excluded class members and cannot draw any conclusions about the treatment of the excluded class members in compensation.  In particular, Dr. Lanier excluded from his analysis women who took paid leave, including maternity leave.  Therefore, Dr. Lanier's analysis provided no information on whether there was any adverse impact in pay against pregnant women.

3.     Second, even within the group of class members included in his analyses, he found no statistically significant (at the two standard deviation level) pay disparities to the disfavor of women in many job categories and, in fact, found a disparity in favor of women in one category.  Accordingly, Dr. Lanier's testimony fails to establish a pattern or practice of pay disparities to the disfavor of women across the entire class.  *See Malave*, 320 F.3d at 327; *Arnold v. Cargill, Inc.*, No. 01-2086 (DWF/AJB), 2006 WL 1716221, at *16 (D. Minn. June 20, 2006) (slip copy); *Anderson v. Boeing Co.*, No. 02-CV-0196-CVE-FHM, 2006 U.S. Dist. LEXIS 76964, at *13-14 (N.D. Okla. Oct. 18, 2006).

4.    Even crediting Dr. Lanier's analysis as establishing the necessary statistically significant disparity in pay for the portion of the class he did study, Plaintiffs fail to identify a practice and demonstrate that caused the disparity.

5.    Plaintiffs contend that manager subjectivity in conducting performance evaluations results in the pay disparities reported by Dr. Lanier and he produced a statistical analysis of predicted performance evaluations based on tenure and age that purports to show that males have a 6.2 percent greater probability of receiving a "3" rating.  As discussed below, there is substantial doubt as to the reliability of Dr. Lanier's results.

6.    However, even crediting Dr. Lanier's performance rating analysis, he testified that he had no idea what effect, if any, such a slight difference in the distribution of ratings on "Values and Behaviors" between men and women might have on compensation.  (Tr. 4/19/10 at 839:21-840:8, 858:7-17.)

7.    As Dr. Welch testified, an individual's current salary results from the combination of starting salary at hire and the annual salary increases over the individual's employment at the Company.  (Tr. 5/4/10 at 2763:23-2764:12).  Testimony also establishes that Novartis uses performance evaluations in determining how large an annual merit pay increase, if any, an employee receives and progression promotions (with attendant pay increases).  But Dr. Lanier conducted no analyses and presented no statistical evidence of disparities in annual merit pay increases or promotion decisions adverse to the class.  Dr. Welch did analyze starting salaries and annual salary increases (including merit) and found no statistically significant differences between men and women.  Therefore, Dr. Lanier's analysis of performance evaluations, even if otherwise probative, is insufficient to demonstrate the necessary causal connection between the alleged excessive subjectivity in performance evaluations and a pattern

26

or practice of adverse impact against women in pay. Plaintiffs criticized Dr. Welch for performing his analyses on only salary and not total compensation. However, Plaintiffs' claim about the discriminatory effect of excessive subjectivity relates to practices that affect salary and not the other components of total compensation, including incentive pay. Moreover, Dr. Lanier did not analyze incentive pay separately and Plaintiffs; presented no evidence of adverse impact against women in the award of incentive pay.

8.      Plaintiffs also presented evidence that, in addition to the discretion managers exercise in preparing performance evaluations, they also have discretion in determining the amount of annual merit increases to award employees given their performance evaluation ratings.

9.      However, Plaintiffs also fail to establish that this exercise of managerial discretion adversely impacted women because, as above discussed, Dr. Lanier did not analyze the annual merit pay increases received by men and women. Nor did he analyze the merit pay increases received by men and women with the same performance ratings.

### D.      <u>Performance Evaluation Claims</u>

1.      The parties' performance evaluation analyses are relevant to the determination as to whether there is a pattern or practice of adverse impact against the class in pay or promotions only insofar as Plaintiffs can link disparities in performance ratings of men and women to disparities in pay and promotions to the disfavor of the class members.

2.      Here, Plaintiffs offered the testimony of their two experts, in addition to eliciting testimony from Novartis Sales and Human Resources managers, regarding the asserted subjectivity of Novartis' performance evaluation system and the disparities between men and women in receiving a "3" rating on values and behaviors.

3.     For the reasons set out in the findings of fact, there are substantial shortcomings in Dr. Lanier's performance evaluation analyses, chiefly his inclusion of non-class jobs, failure to control for jobs held by employees or analysis of performance ratings for the entire class period.  These shortcomings severely limit, if not completely negate, Dr. Lanier's ability to draw a reliable estimate of differences in performance ratings between men and women for the class as a whole.

4.     Dr. Welch did perform an analysis of performance ratings for the entire class period and restricted to only sales representatives.  He found, whether including job held as a control variable or not, no statistically significant difference in the likelihood of men or women receiving a "3" rating on values and behaviors.

5.     Plaintiffs criticize Dr. Welch's inclusion of the "yout" variable in his analyses of performance evaluations and argue that his analysis actually provides evidence of discrimination in performance ratings on the basis of pregnancy.  Specifically, Plaintiffs (but not Dr. Lanier) assert that women take far more leaves of absence than do men and Dr. Welch testified that the highly significant "yout" "Z" statistic demonstrates that employees on a leave of absence are less likely to receive a "3' rating.  However, this is not the same thing as proving that women who take maternity leave are discriminated against because of their pregnancy in performance evaluations.  As an initial matter, over 78 percent of the employees who worked less than a full year and whose performance evaluation rankings are, therefore, reflected in the "yout" variable are new hires.  More fundamentally, to constitute evidence of discrimination, Plaintiffs would have had to demonstrate that male new hires received higher ratings than female new hires and that women on pregnancy leave receive lower ratings than men on a leave of absence.  As Judge Lynch ruled in his opinion certifying the class herein, for Plaintiffs to

CHICAGO/#2065053.15

demonstrate discrimination in performance evaluations, pay or promotions, in violation of Title VII, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), Plaintiffs must show that women who took maternity leave were treated less favorably than employees on other types of leaves. *Velez, et al. v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 263-265 (S.D.N.Y. 2007). In so ruling, Judge Lynch specifically rejected Plaintiffs' argument that, because women took significantly more leaves of absence than did men, women were discriminated against on the basis of pregnancy so long as men and women on leave generally were treated similarly. *Id.* at 264-265. Here, there is no evidence that the variable "yout" had a differential effect on the predicted probability of men and women receiving a "3" rating in Dr. Welch's analyses. Further, Dr. Lanier did not undertake such an analysis and, therefore, Plaintiffs have failed to demonstrate any discrimination in performance reviews on account of women taking maternity leaves.

6.    Furthermore, Dr. Lanier's analysis of performance evaluations, even if accurate, is insufficient to establish adverse impact against the class in pay or promotions because he performed *absolutely no* statistical analyses which link the use of performance ratings to a pattern or practice of discrimination in setting merit pay increases or in determining eligibility for promotions. *See Watson*, 487 U.S. at 994; *Teamsters*, 431 U.S. at 340-42; *Robinson*, 267 F.3d at 160; *Smith*, 196 F.3d at 365.

7.    On the other hand, as discussed above, Dr. Welch did analyze both annual merit pay increases and progressions promotions and found that male and female new hires received essentially the same annual merit pay increases and progression promotions as men and such differences as existed were statistically insignificant.

8.    Accordingly, even if Dr. Lanier's performance evaluation analyses were credited to demonstrate that women were 6.2 percent less likely to receive a "3" rating than men

29

on values and behaviors for the entire class period, Dr. Lanier failed to provide any evidence that women were adversely affected in either pay or promotions by this small estimated difference in the likelihood of receiving a "3" rating. Because Plaintiffs presented no statistical analysis of the effect of the distribution curve or the calibration process on the ratings received by men and women, Plaintiffs also have not shown that these practices caused an adverse impact against women.

### E.    <u>Anecdotal Evidence</u>

1.    The anecdotal testimony of Plaintiffs' witnesses regarding their claims of discrimination in pay or promotion to manager also does not suffice to compensate for the lack of statistical proof of a pattern or practice of adverse impact.

2.    The claims of each witness are highly individualized and are not sufficient in quantity or representativeness to suffice to prove a systemic pattern of discrimination. *See Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 405-07 (2d Cir. 1981); *EEOC v. Carrols Corp.*, No. 5:98 CV 1772, 2005 WL 928634, at *4-5 (N.D.N.Y. Apr. 20, 2005) (holding that complaints from approximately 1 percent of the female workforce fell well short of what is needed to establish a pattern or practice of sexual harassment); *N. Shore Concrete & Ass'n., Inc. v. City of N.Y.*, No. 94 CV 4017, 1998 WL 273027, at *4 (E.D.N.Y. Apr. 12, 1998) (citation omitted); *see also Ottaviani*, 875 F.2d at 376 (upholding trial court's finding that, without significant statistical evidence, anecdotal evidence failed to show class-wide discrimination); *Carter v. Newsday, Inc.*, 528 F. Supp. 1187, 1193-98 (E.D.N.Y. 1981) (the proffered anecdotal evidence, without statistical evidence, was insufficient to establish a *prima facie* case); *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1085-87 (W.D.N.Y. 1994) (same); *Ross v. Nikko Sec. Co. Int'l, Inc.*, 133 F.R.D. 96, 98 (S.D.N.Y. 1990); *King v. Gen. Elec. Co.*, 960 F.2d 617, 626 (7th Cir. 1992).

3.      None of the individual witnesses who claimed discrimination in selection for MDP were absolutely rejected.   Rather, the thrust of their testimony was that they were delayed in completing the checklist process to be eligible for participation in the MDP.

4.      The claims of most of the witnesses with respect to compensation also are highly individualized.

5.      Furthermore, almost all of the witnesses' testimony did not provide any examples of similarly situated male employees being more favorably treated in either pay or selection into MDP and, therefore, is not sufficient to establish a pattern or practice of adverse impact.

31

NOVARTIS PHARMACEUTICALS
CORPORATION


By: /s/ Richard H. Schnadig
    One of Its Attorneys


Richard H. Schnadig                 Jonathan A. Wexler
Thomas G. Abram                     Vedder Price P.C.
Aaron R. Gelb                       1633 Broadway
Amy L. Bess                         47th Floor
Elizabeth N. Hall                   New York, New York  10019
Vedder Price P.C.                   Telephone:  (212) 407-7700
222 North LaSalle Street, Suite 2600   Fax:  (212) 407-7799
Chicago, Illinois 60601-1003
312-609-7500
312-609-5005 (facsimile)


Amy L. Bess
Vedder Price P.C.
875 15th Street NW
Suite 725
Washington, D.C. 20005
202.312.3320
202.312.3322 (facsimile)


Dated:  May 13, 2010

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that a true and correct copy of the foregoing FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO ADVERSE IMPACT was filed electronically and served on the following by electronic means on May 13, 2010:

David Sanford
Katherine Kimpel
Katherine Leong
Felicia Medina
Sharon Eubanks
**SANFORD, WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 310
Washington, DC 20009

Steven Wittels
Jeremy Heisler
**SANFORD, WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10022

Grant Morris
**LAW OFFICES OF GRANT E. MORRIS, ESQ.**
1666 Connecticut Avenue, N.W., Suite 310
Washington D.C. 20009


_____/s/ Richard H. Schnadig_____
Richard H. Schnadig