## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMY VELEZ, PENNI ZELINKOFF, )
MINEL HIDER TOBERTGA, )
MICHELLE WILLIAMS, JENNIFER )
WAXMAN-RECHT, KAREN LIGGINS, )
LORI HORTON, HOLLY WATERS, )
WENDY PINSON, ROBERTA )
VONLINTEL, CATHERINE WHITE, )
KELLY CORBETT, JAMIE HOLLAND, )
JOAN DURKIN, SIMONA LOPES, )       04 Civ. 09194 (CM)
MARYANNE JACOBY, and MARTA )
DEYNE, )
)
**Individually and on Behalf of Others** )
**Similarly Situated,** )
)
**PLAINTIFFS,** )
)
    v. )
)
**NOVARTIS PHARMACEUTICALS** )
**CORPORATION,** )
)
**DEFENDANT.** )

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/30/10

### DECISION APPROVING CLASS ACTION SETTLEMENT

**McMahon, J.**

## I.     INTRODUCTION

The class action gender discrimination matter before this Court has been pending since 2004. At the close of more than seven years of litigation, this Court presided over a seven-week trial. After a verdict was returned for each Testifying Plaintiff and the Class of over **5,600** female sales force employees, the Parties entered into arm's length settlement discussions and ultimately reached a Settlement Agreement ("SA") affording significant nonmonetary and monetary relief. The Settlement Class expands beyond the initial certified Class Period of five years to include a total of **6,206** female sales employees who worked at Novartis at any point in an eight-year period, running from the start of the Class Period (July 15, 2002) to the preliminary approval date (July 14, 2010).

Plaintiffs sought to obtain equitable relief that would substantially improve Novartis Pharmaceutical Corporation's ("Novartis" or "NPC") employment practices in order to ensure that all members of its sales force are treated fairly. As described in the Joint Declaration of Class Counsel filed in support of this motion, the Settlement fulfills the primary purpose of the litigation by setting forth substantial programmatic relief. This relief includes, but is not limited to, requirements that NPC (1) strengthen its complaint process to ensure employees can safely raise concerns and that their concerns will be addressed in a timely and thorough fashion; (2) retain, with the input of Class Counsel, an external specialist to design an annual adverse impact analysis of its performance ratings to determine if there are any significant gender disparities, to share the results of such analyses with Class Counsel, and to institute remedies where appropriate; (3) retain, with the input of Class Counsel, an external Compensation and Benefits specialist to design a base salary pay-in-range analysis and annual adverse impact analysis of rate of pay to determine if there are any significant gender disparities, to share the results of those

1

analyses with Class Counsel, and to make adjustments to that compensation system in the next pay cycle where necessary; (4) retain, with the input of Class Counsel, an external specialist to design an adverse impact analysis pertaining to promotions to first-line managers to determine if there are any significant gender disparities, to share the results of such analyses with Class Counsel, and to institute remedies where appropriate; (5) adopt and circulate a sexual harassment policy that covers coworker and customer harassment and include in its bi-annual employee survey questions about work-life balance, sharing with Class Counsel a summary of any remedial action taken by NPC in response to the bi-annual survey results; and (6) be monitored in its compliance with the programmatic relief terms by a Court-appointed Compliance Master. (SA ¶¶7.1-7.45). The Settlement Agreement dictates that Class Counsel—for three years—must actively track the implementation of the programmatic relief provisions in the Settlement and aid the Compliance Master in assuring compliance with its terms. (SA ¶¶7.2, 7.39-7.41).

In addition, Plaintiffs and the Class have also achieved a resolution of the monetary dispute regarding pay, promotion and pregnancy. Specifically, Class Members will receive the entire back pay award calculated by Plaintiffs' expert labor economist, and they will have the opportunity to receive additional awards based on their claims for compensatory damages, up to the full $300,000.00 provided for by law.

On July 14, 2010, this Court preliminarily approved the entire Settlement Agreement as fair, reasonable and adequate. The Court also approved as to form and content the proposed Notice and Claim Form materials; directed the mailing of these materials; certified the Settlement Class; and scheduled a Final Fairness Hearing to be held on November 19, 2010 on the question of whether the proposed Settlement should be finally approved as fair, reasonable and adequate as to the Settlement Class Members.

2

Plaintiffs now move for: (1) final certification of the Settlement Class; and (2) final approval of the Settlement, including the award of (a) service payments for the 26 Named Plaintiffs and Testifying Witnesses and 20 Deponents, all of whom significantly contributed to the success of this action; and (b) attorneys' fees and expenses as detailed herein.

The motion is granted.


## II.   SUMMARY AND FACTUAL BACKGROUND

### A.   FILING OF THE COMPLAINT AND EXTENSIVE CLASS, MERITS, AND DAMAGES DISCOVERY

This class litigation ("Class Matter") began in 2003, when the lead Named Plaintiff, Amy Velez, filed her original charge of discrimination against Novartis with the District of Columbia EEOC, alleging discriminatory conduct relating to pay, promotion and pregnancy. In late 2004, several individual complaints, including Ms. Velez's, were consolidated into a single Class Complaint and filed in the Southern District of New York on behalf of five of the Named Plaintiffs. Joint Declaration of David W. Sanford and Katherine M. Kimpel at ¶7 (hereinafter "Joint Dec."). An Amended Complaint, adding seven more Named Plaintiffs, was filed on February 23, 2005. The Complaint was amended two additional times, with the final, Fourth Amended Complaint ("Class Complaint") filed on March 13, 2006. Joint Dec. ¶8. Prior to the filing of the Class Complaint in 2006, the Parties had fully briefed the Defendant's first motion for summary judgment, although it was ultimately withdrawn. Joint Dec. ¶9.

The Parties proceeded to a lengthy class certification discovery process, including depositions of 11 Novartis corporate designees. In addition, Class Counsel prepared the declarations of 87 female Novartis employees from 31 states. During the certification discovery phase, the Plaintiffs produced more than 28,000 pages of documents, and Novartis deposed two

experts and 17 class representatives nationwide. Joint Dec. ¶10.

Class Counsel filed their Motion for Class Certification on January 16, 2007, and the extensive briefing by both Parties was complete on April 16, 2007. The Court granted Plaintiffs' Class Motion, certified the Class, and appointed the current Class Counsel (who theretofore represented all the Plaintiffs jointly) on July 31, 2007. Joint Dec. ¶11. Defendant Novartis then filed a Petition for Permission to Appeal Class Certification Order with the United States Court of Appeals for the Second Circuit. The Plaintiffs filed a brief opposing the Petition, and the Petition was denied. Joint Dec. ¶12.

After the Class was certified, the Parties engaged in extensive merits, expert and damages discovery, which included scores of fact and expert depositions throughout the United States. Joint Dec. ¶13. Novartis filed two more motions for summary judgment, which the Plaintiffs vigorously opposed and which were ultimately unsuccessful. The Parties also engaged in extensive pretrial motions practice. Joint Dec. ¶14.

In all, over the past seven years, Plaintiffs: produced 109 declarations in support of class certification; took and defended approximately 107 depositions from coast to coast; reviewed and produced approximately 40,000 pages of documents to Novartis; reviewed and catalogued approximately 3.7 million pages of documents produced by Novartis; engaged two testifying expert witnesses, four consulting experts and four trial consultants; produced eight expert reports; drafted and filed voluminous briefing, including, but not limited to, class certification briefs, interlocutory appeals, summary judgment briefing, and pre-trial filings, including ten motions *in limine* (as well as oppositions to 11 motions *in limine* filed by Novartis); identified over 1,300 trial exhibits, most of which were admitted during a full-day conference with the Court; prepared and presented 17 witnesses and called eight hostile witnesses at trial; and filed

4

with the Court over 750 proposed findings of fact and conclusions of law.  Joint Dec. ¶15.  In furtherance of these efforts, to date, Class Counsel has spent $1,891,098.31 in out-of-pocket expenses and dedicated 36,996.77 hours to this Class Matter, drawn from the efforts of no fewer than 68 attorneys and staff members.

### B.   TRIAL

After the seven years of litigation and the seven weeks of trial, a nine-member jury returned a verdict for Plaintiffs on each of the three class claims, awarded $250 million in punitive damages to the Class as a whole, and awarded a total of $3.36 million in compensatory damages to 12 Testifying Witnesses.

The jury found that Novartis discriminated against female sales representatives, district managers and area sales managers ("Class Members") in decisions regarding pay and promotion to first-level manager positions from July 15, 2002 through November 30, 2007.  In addition, the jury found Novartis discriminated against pregnant Class Members with respect to the terms and conditions of their employment.  Both the fact and scale of the verdict and resulting awards garnered significant national and international attention.

Under this schedule, following the jury verdict, this Court was supposed to order the appropriate back pay award in light of the verdict; to decide the disparate impact claims, which the Parties previously argued to the Court; to order what affirmative, programmatic relief was required; and to appoint Special Masters to hold individual hearings for Class Members who wanted to assert claims for compensatory damages.  However, these actions all were held in abeyance after the Parties informed the Court that they would embark on serious settlement negotiations.

Nonetheless, this Class Matter significantly engaged the resources of the Court and its

staff in the past year alone.  Having taken over the case when my colleague Judge Lynch was

confirmed to a seat on the United States Court of Appeals for the Second Circuit, the Court had

to resolve numerous disputes between the Parties during the final eight months of discovery, rule

on the summary judgment motion, manage the pre-trial activity, and then preside daily over the

lengthy trial.

The Class Members and Class Representatives who attended the trial came from across

the United States.  For many of those Testifying Witnesses (and non-testifying witnesses who

were Class Representatives), their testimony was the culmination of involvement in this lawsuit

that began years ago—in some instances, as long ago as 2003.  These individuals exposed

themselves to professional risk and emotional upheaval, overcoming fears of possible scorn of

friends and colleagues and, in some cases, the displeasure of family members.    Each

courageously came forward and told her story on paper, in depositions, and (for some) at trial.

Joint Dec. ¶40.

### C.    SETTLEMENT NEGOTIATIONS

Soon after the jury verdict, the Parties entered into arm's length, hard-fought, labor-

intensive negotiations.  In addition to Class Counsel and Defendant's Counsel, Cravath Swaine

& Moore, LLP (including Cravath's Managing Partner, Evan Chesler), both Novartis's In-House

Counsel and various Corporate Executives took part.  Those negotiations culminated on July 14,

2010, when the Parties entered into a 66-page Settlement Agreement.

### D.    SETTLEMENT AGREEMENT

That Settlement Agreement provides for robust, class-wide nonmonetary and monetary

relief valued at up to $175 million, including, *inter alia*, the following:

1.  Novartis will implement proactive equal employment opportunity measures detailed

6

in the Settlement Agreement.

2. Novartis will increase the size of the Human Resources Business Partners staff and the Employee Relations Group.

3. Novartis will revise its policies and processes for investigating discrimination claims.

4. Novartis will revise the timing and function of the "clarification meeting."

5. Novartis will train its staff on the changes as detailed in the Settlement Agreement.

6. Novartis will implement specified changes to its performance evaluation system and provide mandatory training for all managers regarding that system.

7. Novartis will retain an external specialist to design and carry out an annual adverse impact analysis of ratings.

8. Novartis will create an appeals process for employees who disagree with their performance ratings.

9. Novartis will work with an external Compensation and Benefits specialist to design a base salary pay-in-range analysis and subsequent adverse impact analysis of annual rates of pay.

10. Novartis will implement changes to its promotional policies.

11. Novartis will implement changes to its Management Development Program ("MDP") training.

12. Novartis will implement changes to its tracking and monitoring of promotional opportunities.

13. Novartis will retain an external specialist to design and carry out an adverse impact analysis with respect to the pool of employees qualified for and interested in promotions to first-line manager.

14. Novartis will work with two outside consultants to improve the overall culture of the company.

15. The Court will appoint a Compliance Master to monitor the company's implementation of the terms of Section VII of the Settlement Agreement.

16. Novartis will report annually to Class Counsel detailing its compliance with Section VII of the Settlement Agreement.  Novartis and Class Counsel will thereafter submit a report to the Compliance Master.

17. Novartis will pay $152.5 million into a Settlement Fund to satisfy (a) back pay, (b) compensatory damage claims, (c) attorneys' fees and costs associated with this litigation, and (d) administrative fees, costs and expenses incurred in connection with administering the Settlement Fund.  The $152.5 million is earmarked as follows: $60 million is committed to back pay for the class, which represents full value according to analysis by Plaintiffs' expert; approximately $40 million is allocated to a compensatory damages fund, which can be accessed by Class Members who submit claim forms; approximately $10 million is committed to Testifying Witnesses, Class Representatives, and Deponents, and includes $164,500.00 committed to *cy pres* awards outlined below; $38,125,000.00 is committed to attorneys' fees; approximately $2.375 million is committed to payment of administrative settlement costs; and up to $2 million is committed to reimbursement of litigation expenses. Any portion of the compensatory damages fund that is not awarded as a result of the claims process will revert back to Novartis.

18. Novartis will distribute a total of $164,500.00 in seven equal portions to the following organizations as a *cy pres* award, in accord with the Settlement Agreement at paragraph 8.8.

    a. The **American Association of University Women**, a 501(c)(3) with a long history of working for the interests of girls and women across the United States and with programs that include the funding of $3.2 million in graduate grants and the publishing of reports such as Behind the Pay Gap, an analysis of gender-related pay disparities.

    b. The **Employee Rights Advocacy Institute for Law and Policy**, a 501(c)(3) that uses a multidisciplinary approach in combination with innovative legal strategies, policy development, grassroots advocacy, and public education to help ensure that American workplaces are free of discrimination, harassment and retaliation.

    c. The **Impact Fund**, a 501(c)(3) dedicated to seeking civil rights and environmental and economic justice that provides (i) counseling, advice and assistance on procedural and substantive issues that arise in complex litigation, and (ii) high-quality training programs on various aspects of class action and impact litigation to these ends.

    d. The **Institute for Women's Policy Research**, a 501(c)(3) that employs economists and other social scientists to conduct research on issues related to women in the workplace, including studies on paid parental leave, work flexibility, and breastfeeding in the workplace.

    e. The **National Partnership for Women and Families Employment Project**, a 501(c)(3) that focuses on the Family Medical Leave Act and work and family-

related issues, often partnering with corporations and other employer groups to find creative solutions to work-life balance issues.

f.   The **National Women's Law Employment Project**, a 501(c)(3) that educates the public and the legislature regarding the needs of women in the workplace, including a "Stop Discounting Women" campaign to address pay disparities.

g.   **Workplace Fairness**, a 501(c)(3) that provides information, education, and assistance to individual workers and their advocates nationwide and promotes public policies that advance employee rights through efforts to make information about workers' rights more readily accessible and by sharing the employee perspective in publications, policy debates, and public discussion.

19. This Court has appointed Rust Consulting ("Rust") as the Claims Administrator, in accord with paragraph 10.2 of the Settlement Agreement.

20. This Court will appoint at least one Claims Adjudicator, in accord with paragraph 10.3 of the Settlement Agreement. (The parties have been advised that, in connection with final approval of the settlement, the Court intends to appoint The Hon. William B. Wetzel, retired Judge of the New York Court of Claims, as the first Claims Adjudicator; additional Claims Adjudicators will be appointed if the burden on Judge Wetzel becomes too great).

E.   **NOTICE TO THE CLASS, EXCLUSIONS, OBJECTIONS AND CLAIM FORMS**

The following facts are distilled from the Declaration of Stacy L. Roe, Senior Project Administrator for Rust (hereinafter "Rust Dec.").

On September 8, 2010, Rust Consulting, as Settlement Administrator, sent Notice of the Proposed Class Action Settlement to 6,212 Settlement Class Members.  Rust Dec. ¶9.

The deadline for requests for exclusion was 35 calendar days after the mailing date, or Wednesday, October 13, 2010. Only six Class Members, which represents approximately one-tenth of one percent (0.001) of the Class, have timely excluded themselves from the Settlement. Rust Dec. ¶13.

The deadline for objections to the Settlement was 45 calendar days after the mailing date, or Saturday, October 23, 2010 (SA ¶10.25). **None of the 6,206 Class Members objected.** Rust Dec. ¶16. The absence of objections underscores both the extraordinary nature of the relief obtained for the Class and the fairness of the Settlement as a whole.

As a result, **all 6,206 Settlement Class Members will receive an automatic payment of their back pay award** from the \$60 million fund per the terms of the Settlement. as of November 12, 2010, Rust received 444 Claim Forms and 151 Riders to Claim Form, seeking additional compensation from the \$40 million compensatory fund. Rust has seen a steady return of approximately 40 forms per week. Rust Dec. ¶13. Based on this history – along with the confidential communications in which Class Counsel continues to engage with interested claimants – Plaintiffs' Counsel anticipates significantly more compensatory claim forms to be filed prior to the final deadline of December 11, 2010.

The Claim Forms and Riders to Claim Form allow Class Members to seek compensatory damages under the Settlement Agreement. Class Members who submit a Claim Form may receive compensatory damages based on the number of months they worked at Novartis during the Settlement Class Period. These awards are distributed from the Maximum Class Award for Compensatory Damages, which totals approximately \$40 million. The Claim Form asks for a reasonably detailed description of (1) the circumstances giving rise to the contention that gender

11

discrimination caused physical and/or emotional pain and suffering, and (2) the nature of the claimant's physical and/or emotional pain and suffering.

Class Members who believe that the pain and suffering they experienced as a result of Novartis' discriminatory treatment was particularly severe may choose to complete an additional form, the Rider to Claim Form, which may entitle them to an increase in compensatory damages up to a total of $300,000.00. The Rider requires Class Members to identify a medical professional who provided treatment during the Settlement Class Period for pain and suffering resulting from gender discrimination. Medical professionals must describe in writing, under penalty of perjury, the treatment provided during the relevant time period and attest that the treatment was for physical and/or emotional pain and suffering resulting from gender discrimination. The Claims Adjudicator will review the Claim Forms and Riders to evaluate eligibility and make final determinations regarding entitlement to compensatory awards. The Settlement Agreement sets aside $5 million from which the Claims Adjudicator may award compensatory damages based on submitted Riders. Any portion of the compensatory damages fund that is not awarded as a result of the claims process will revert back to Novartis.

### F.    POST-SETTLEMENT

Since Rust sent Notice to Class Members two months ago, approximately 400 individuals have contacted Class Counsel's Washington, D.C. office. Call intakes range from two to 20 minutes, with the average lasting about 10 minutes. Joint Dec. ¶30. These calls continue and will likely continue for some time. Class Counsel's staff assists with the substance of the Claim Forms; clarifies terms of the Settlement; explains what each Class Member must do in order to participate in the Settlement; and, in general, assists with the overall Settlement process. Id. In addition, Class Counsel has spent significant time working with Rust to handle anomalous

claimants and other issues that arise in this process.  Joint Dec. ¶31.

Class Counsel will remain (1) directly involved throughout the three-year course of the Settlement Agreement; (2) communicate with Class Members as needed; (3) address any issues regarding concerns of retaliation; (4) communicate with Novartis Counsel; and (5) in general, oversee the Settlement to ensure strict compliance with the terms of the Settlement Agreement. Joint Dec. ¶¶29, 33, 34.  In addition, as set forth above and the Settlement Agreement, many of the terms of the Programmatic Relief call for the involvement of Class Counsel.  Class Counsel likely will need to enlist additional consultants to help carry out the attendant responsibilities. Joint Dec. ¶34.

Class Counsel also will be available to provide the Court-appointed Claims Adjudicator with any necessary additional information and assistance during the one-time, 20-day remedial period for correcting incomplete submissions.  Joint Dec. ¶32.

### G.    PROPOSED SERVICE AWARDS AND ATTORNEYS' FEES AND EXPENSES

Plaintiffs propose that service awards be granted to those individuals who significantly contributed to the litigation during the past seven years.  Twenty deponents seek an award of $25,000.00 each.  Twenty-five Named Plaintiffs and Testifying Witnesses seek an award of $125,000.00 each.  And one Named Plaintiff, Amy Velez, who filed the initial EEOC class-wide Charge of Discrimination in 2003 and who has championed this matter ever since, seeks a service award of $150,000.00.  Plaintiffs seek, therefore, a total of $3,775,000.00 in service award payments, which represents only approximately 2.4 percent of the entire monetary award of $152.5 million (or approximately 2.1 percent of the entire value of the settlement of $175 million).

Plaintiffs also seek attorneys' fees in the amount of $38,125,000.00, which represents 25

percent of the entire monetary award and less than 22 percent of the Settlement value. Plaintiffs'

Counsel staffed 25 attorneys and 43 law clerks and legal assistants (a total of 68 individuals) on

this matter since 2003. Plaintiffs had six full-time attorneys (five of whom work in SWH's

Washington, D.C. office) and three full-time legal assistants (all of whom work in SWH's

Washington, D.C. office) on the trial team, complemented by an additional team of three

attorneys and one legal assistant. In addition, Plaintiffs engaged four trial consultants from

DOAR Consulting, who assisted Class Counsel full-time throughout the trial with jury selection

and trial presentation.

In all, Plaintiffs' Counsel spent 36,996.77 hours prosecuting this matter, which amounts

to $16,320,113.25 in lodestar fees. Granting Plaintiffs' fee request would amount to granting

Plaintiffs' Counsel a multiplier of approximately 2.4, which is well within the range of

acceptability in the Second Circuit. Likewise, Plaintiffs' request for $2 million in expenses (1.1

percent of total recovery) is well below the average ratio of expense to litigation time and hours,

which would predict expenses of approximately 2.8 percent of the total recovery.

## III.   ARGUMENT

### A.   THE COURT SHOULD CERTIFY AS FINAL FOR SETTLEMENT PURPOSES A CLASS OF NOVARTIS FEMALE SALES FORCE EMPLOYEES

In its preliminary approval order dated July 14, 2010, this Court preliminarily certified a

settlement class. Plaintiffs now request **final** certification of the following Class for settlement

purposes:

> *All women who are currently holding, or have held, a sales-related position with*
> *Novartis Pharmaceuticals Corporation, including those who have held positions*
> *as Sales Representatives, Sales Consultants, Senior Sales Consultants, Executive*
> *Sales Consultants, Sales Associates, Sales Specialists, Senior Sales Specialists*

*and District Managers I, from the start of the class period, July 15, 2002, through the Preliminary Approval date (July 14, 2010) and excluding individuals who opt out of the settlement on a timely basis.*

The Court certifies the Settlement Class, because the Plaintiffs meet all of the requirements for settlement class certification under Federal Rule of Civil Procedure 23.

As the initial and fundamental principle, it is important to remember that when considering certification in the context of a proposed settlement, "courts must take a liberal rather than a restrictive approach." Cohen v. J.P. Morgan Chase & Co., 262 F.R.D. 153, 157-58 (E.D.N.Y. 2009). In other words, many of the restrictions or considerations that come into play in the standard certification analysis do not receive the same treatment at the settlement stage.

For example, although considerations of manageability weigh heavily in class certification determinations *before* trial, manageability carries no weight at all in the settlement context, where the purpose is to have no trial. See Amchem Products, Inc., v. Windsor, 521 U.S. 591, 619-29 (1997). By the same token, manageability has little bearing in a case like this one, which has already gone to trial, and where settlement avoids the prospect of further trials and appeals.

Based on the remaining factors, the Novartis Class easily satisfies the low threshold for certification of a settlement class.

- The Novartis Settlement Class meets Rule 23(a)(1)'s **numerosity** requirement. There are more than 6,000 Class Members and, consequently, joinder is impractical. See, e.g., Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) ("Numerosity is presumed at a level of 40 members."); In re Sony Corp. Litig., No. 09-MD-2102, 2010 U.S. Dist. LEXIS 87643, at *5 (S.D.N.Y. Aug. 24, 2010) ("The proper inquiry is whether such joinder is impracticable, not whether it is impossible.") (citing

15

Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)); In re Marsh & McLennan Companies, Inc. Secs. Litig., No. 04 Civ. 8144, 2009 U.S. Dist. LEXIS 120953, at *28 (S.D.N.Y. Dec. 23, 2009).

- The Novartis Settlement Class also meets Rule 23(a)(2)'s **commonality** requirement. All Class Members bring the common claim that Novartis discriminated against female sales employees with respect to wages, promotion and pregnancy. See, e.g., Bellifemine v. Sanofi-Aventis, No. 07 Civ. 2207, 2010 U.S. Dist. LEXIS 79679, at *3-4 (S.D.N.Y. Aug. 5, 2010) ("The commonality requirement is met because the Named Plaintiffs' claims involve allegations of common pay and promotion claim arising from the same alleged policies and practices of the company.").

- The Novartis Settlement Class satisfies Rule 23(a)(3)'s **typicality** mandate. All of the Class Members' allegations, including those of the Named Plaintiffs, arise from the same factual and legal circumstances. Specifically, the Class and the Named Plaintiffs are all female Novartis sales employees alleging that Novartis discriminated against them on the basis of their gender. See, e.g., In re Telik Secs. Litig., 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) ("Typicality is satisfied if 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'") (internal citations omitted); Lenahan v. Sears, Roebuck & Co., Civ. No. 02-45, 2006 U.S. Dist. LEXIS 60307, at *25-26 (D.N.J. July 10, 2006) ("Here, the same allegedly unlawful conduct affected both the named Plaintiffs and the . . . class members . . . Accordingly, this Court finds that a typicality requirement . . . is also satisfied.").

- The Novartis Settlement Class Representatives are **adequate representatives** under Rule

16

23(a)(4) because their interests are congruent with those of Class Members. See Toure v. Cent. Parking Sys. of N.Y., No. 05 Civ. 5237, 2007 U.S. Dist. LEXIS 740456, at *18-19 (S.D.N.Y. Sept. 28, 2007) (noting that the "adequacy requirement exists to ensure that the named representatives will 'have an interest in vigorously pursuing the claims of the class, and have no interests antagonistic to the interests of other class members'") (citing Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006)). In this, what it telling is that not a single member of the class objected in any way to the terms negotiated and approved by the Settlement Class Representatives.

- **Adequacy** is further established where Class Counsel has "an established record of competent and successful prosecution of large . . . class actions . . . ." Reyes v. Buddha-Bar NYC, No. 08 Civ. 2494, 2009 U.S. Dist. LEXIS 45277, at *11-12 (S.D.N.Y. May 28, 2009). Here, Class Counsel, Sanford Wittels & Heisler LLP, has just the sort of established record contemplated by the Rules. See, e.g., Bellifemine, at *4 (approving a nation-wide gender discrimination settlement and affirming specifically that attorney David Sanford and the law firm of Sanford Wittels & Heisler have such record).

Finally, the Settlement Class also meets Rule 23(b)(3)'s requirement that common factual allegations and a common legal theory **predominate** over any factual or legal variations among Class Members and that class adjudication of this case is plainly **superior** to individual adjudication. See Mohney v. Shelley's Prime Steak, No. 06 Civ. 4270, 2009 U.S. Dist. LEXIS 27899, at *11 (S.D.N.Y. Mar. 31, 2009).

- All members of the Class are unified by common factual allegations. See Bellifemine, at *4-5; Hnot v. Willis Group Holdings Ltd., 228 F.R.D. 476, 483 (S.D.N.Y. 2005). Here, those allegations are: that Novartis favored male sales

force employees over females in compensation and promotion and that Novartis

favored non-pregnant sales force employees over pregnant sales force employees

in the terms and conditions of their employment.

o       Class resolution will conserve judicial resources because it is more efficient for

Class Members to resolve this suit on a Class-wide basis than to bring their claims

piecemeal. <u>Mohney</u>, at *12.

o       This case has already been adjudicated for nearly seven years, through the trial

stage on behalf of the Class.  To divide this Class of over 6,000 women would

risk scores of repetitive individual lawsuits and would fracture what would

certainly become the appellate stage of that litigation.  <u>See deMunecas v. Bold</u>

<u>Food, LLC</u>, No. 09 Civ. 440, 2010 U.S. Dist. LEXIS 87644, at *9 (S.D.N.Y. Aug.

23, 2010) (noting that class certification would "not only achieve economies of

scale for putative class members but will also conserve the resources of the

judicial system and . . . prevent inconsistent adjudications of similar issues and

claims").

For all these reasons,  the Settlement Class is approved.

**B.       THE SETTLEMENT IS APPROVED**

       **1.       The Law Favors Class Action Settlements.**

Courts generally favor the resolution of civil actions, particularly class actions, through

settlement.  In <u>In re EVCI Career Colleges Holding Corp. Secs. Litig.</u>, this Court reaffirmed the

well-established "general judicial policy favoring settlement."  No. 05 Civ. 10240, 2007 U.S.

Dist. LEXIS 57918, at *10 (S.D.N.Y. July 27, 2007) (internal citation omitted).  <u>See also</u>

<u>McReynolds v. Richards-Cantave</u>, 588 F.3d 790, 804 (2d Cir. 2009) (<u>citing Wal-Mart Stores,</u>

Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005)); In re Paine Webber Ltd. Partnerships Litig., 147 F.3d 132, 138 (2d Cir. 1998); In re Telik Sec. Litig., 576 F. Supp. 2d at 575; Clark v. Ecolab, Inc., Nos. 07 Civ. 8623, 06 Civ. 5672, 04 Civ. 4488, 2010 U.S. Dist. LEXIS 47036, at *17-18 (S.D.N.Y. May 11, 2010) ("public policy favors settlement, especially in the case of class actions"); Dupler v. Costco Wholesale Corp., 705 F. Supp. 2d 231 (E.D.N.Y. 2010); Khait v. Whirlpool Corp., No. 06-6381, 2010 U.S. Dist. LEXIS 4067, at *12 (E.D.N.Y. Jan. 20, 2010); Mohney, at *12-13.

### 2. The Settlement Agreement Meets the Second Circuit's Standard for Approval under Rule 23(e).

In order to approve a class action settlement, a district court "must determine whether the settlement, taken as a whole, is fair, reasonable, and adequate." In re EVCI Career Colls., at *10; see also McReynolds, 588 F.3d at 800; Joel A. v. Giuliani, 218 F. 3d 132, 138 (2d Cir. 2000); Grant v. Bethlehem Steel Corp., 823 F.2d 20, 22 (2d Cir. 1987); In re Veeco Instruments Secs. Litig., No. 05 MDL 1695, 2007 U.S. Dist. LEXIS 85629, at *17 (S.D.N.Y. Nov. 7, 2007). Federal courts within this Circuit make the fairness determination based upon "two types of evidence:" (1) substantive and (2) procedural. Wal-Mart Stores, 396 F.3d at 116 ("A court determines a settlement's fairness by looking at both the settlement **terms** [substantive] and the **negotiating** process leading to settlement [procedural]") (emphasis added); see also In re Telik, 576 F. Supp. at 575; Hertzberg v. Asia Pulp & Paper Co., 197 Fed. Appx. 38, 40 (2d Cir. 2006). Substantive evidence includes a comparison of the substantive terms of the settlement with the likely rewards of litigation. Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 370 U.S. 414, 434-25 (1968); see also Mba v. World Airways, Inc., 369 Fed. Appx. 194, 197 (2d Cir. 2010); Clark, at *17; deMunecas, at *10. Procedural evidence includes whether the settlement is the product of arm's length negotiations between experienced counsel

19

and is untainted by collusion.  D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001); see also In re Sony Corp., at *10-11; deMunecas, at *10; Taft v. Ackermans, No. 02 Civ. 7951, 2007 U.S. Dist. LEXIS 9144, at *14-15 (S.D.N.Y. Jan. 31, 2007).

Given the prevailing policy in favor of settlement, there is a strong, bedrock presumption that a negotiated settlement is "fair and reasonable."  Absent a substantial number of objectors or "evidence of fraud or overreaching, courts have consistently refused to act as Monday morning quarterbacks in evaluating the judgment of counsel."  Strougo ex rel Brazilian Equity Fund, Inc. v. Bassini, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003) (citations omitted); see also Wal-Mart Stores, 396 F.3d at 116 ("A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery"); In re Telik, Inc., Secs. Litig., 576 F. Supp. 2d at 576; McMahon v. Olivier Cheng Catering and Events, LLC, No. 08 Civ. 8713, 2010 U.S. Dist. LEXIS 18913, at *11 (S.D.N.Y. Mar. 2, 2010); In re Marsh & McLennan, at *25-26.

### 3.    The Substantive Terms of the Settlement Meet the **Grinnell** Test for Fairness, Reasonableness, and Adequacy.

More than three decades ago, the Second Circuit erected the analytical framework for evaluating the substantive fairness of a class action settlement in City of Detroit v. Grinnell Corp. 495 F.2d 448 (2d Cir. 1974), abrogated on other grds. by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).  Under Grinnell, a district court, in determining whether to approve a proposed settlement, should consider the following nine factors:

(1) the complexity, expense, and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement in light of the best possible recovery; and

(9) the range of reasonableness of the settlement in light of all attendant risks of litigation.

Id. at 462-63. Each of these factors will be discussed below.

### (a)   The Complexity, Expense and Likely Duration of this Litigation Favor Final Approval.

The first factor—the complexity, expense, and likely duration of this case—favors final settlement approval here. Class actions are generally complex. See, e.g., In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), aff'd, 236 F.3d 78 (2d Cir. 2001). This particular case has involved both complex legal issues and an extensive litigation process – even when compared to average class action durations.

The conduct underlying this lawsuit dates back to 2001 and continued throughout the seven-year litigation process.  Resolution required years of extensive investigations, in which Plaintiffs produced 109 declarations and over 40,000 pages of documents, took and defended 107 depositions, reviewed over 3.7 million pages of documents produced by Novartis, and engaged two testifying expert witnesses, four consulting experts and four trial consultants.  The Parties have already engaged in vigorous litigation before this Court, concluding in a jury trial that resulted in a verdict in favor of the Plaintiffs on all counts.

Not only is the issue of equitable damages still pending before the Court, but without this Settlement, there would undoubtedly be a lengthy appeals process that would greatly delay any payout to the Class Members. "Delay not just at the trial stage, but through post-trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value." Maley v. Del Global Techs., 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002)

21

(citing Grinnell, 495 F.2d at 467).  Although the Parties have incurred great expenses and burdens in this litigation already, they would likely incur much more going forward. This fact strongly militates in favor of the Settlement.  In sum: "Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay" of post-trial motions and appeals.  In re EVCI Career Colls., at \*6 (internal citations omitted).

### (b)  The Reaction of the Class to the Settlement Favors Final Approval.

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy . . . **In fact, the lack of objections may well evidence the fairness of the settlement**."  Maley, 186 F. Supp. 2d at 362-363 (citing In re American Bank Note Holographics, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) (emphasis added). See also Wal-Mart Stores, at 118 ("[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement"); In re Metlife Demutualization Litig., 689 F. Supp. 2d 297, 333 (E.D.N.Y. 2010) (same); In re Luxottica Group S.p.A. Secs. Litig., 233 F.R.D. 306, 311 (E.D.N.Y. 2006) ("lack of objection is strong evidence of the settlement's fairness"); In re Painewebber Ltd. Partnerships Litig., 171 F.R.D. 104, 126 (S.D.N.Y. 1997).

Here, over 6,200 full-form notices were sent to the Class and not a single member objected to the Settlement.  No one objected to the settlement and only six individuals (a negligible .001) timely requested exclusion.  See Rust Dec. ¶14.  This overwhelming lack of objection argues strongly for judicial approval.  See, e.g., Maley, 186 F. Supp. 2d at 362-363; Collins v. Olin Corp., No. 3:03-cv-945, 2010 U.S. Dist. LEXIS 39862, at \*13 (D. Conn. Apr. 21, 2010); In re Host Am. Corp. Secs. Litig., No. 3:05-cv-1250, 2008 U.S. Dist. LEXIS 17405, at \*7 (D. Conn. Mar. 7, 2008).

22

(c)   **The Stage of the Proceedings and the Amount of Discovery Completed Favor Final Approval.**

Under the third <u>Grinnell</u> factor, settlement is especially favored when the litigation is at an "advanced stage" and an "extensive amount of discovery [has been] completed." <u>In re Marsh</u> <u>& McLennan</u>, at *20. This is because such development of the class claims allows the Parties to be "clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and . . . the fairness of the proposed Settlement." <u>Id.</u> <u>See also</u> <u>Parker v. Time Warner Entertainment</u> <u>Co.</u>, 631 F. Supp. 2d 242, 259 (E.D.N.Y. 2009) ("This factor relates to whether the Plaintiffs had sufficient information on the merits of the case and to enter into a settlement."); <u>Frank v.</u> <u>Eastman Kodak Co.</u>, 228 F.R.D. 174, 185 (W.D.N.Y. 2005) (settlement at a late stage affords the court an opportunity to "intelligently make . . . an appraisal of the Settlement"); <u>In re Michael</u> <u>Milken & Assocs. Secs. Litig.</u>, 150 F.R.D. 46, 55-56 (S.D.N.Y. 1993) ("the stage of the proceedings and the amount of discovery completed is another factor which the Courts consider in approving a settlement") (<u>citing</u> <u>Grinnell</u> at 463).

Significantly, both Parties tested their cases at trial and had the benefit of a jury verdict to evaluate their positions. Having won a decisive victory before the jury, Class Counsel was well able to evaluate its position and assess the risks to the Class from further litigation.

(d)   **The Remaining Risks of Litigation All Also Favor** <u>Final</u> <u>Approval.</u>

As federal courts in this Circuit have consistently recognized, litigation inherently involves risks, and the purpose of settlement is to avoid uncertainty. <u>See</u>, <u>e.g.</u>, <u>deMunecas</u>, at *23 ("[T]he risk of establishing liability and damages further weighs in favor of final approval."); <u>Clark</u>, at *22; <u>Banyai v. Mazur</u>, No. 00 Civ. 9806, 2007 U.S. Dist. LEXIS 22342 (S.D.N.Y. Mar. 27, 2007). Although this case has been tried, real risks remain for the Plaintiffs. In the absence of settlement, the Plaintiffs would face a long road to recovery, including post-

trial motions, the adjudication of Class Members' individual claims (a process that could drag on for years), and the inevitable appeal from the jury verdict.  See In re Marsh & McLennan, at *18 (noting the additional expense and uncertainty of "inevitable appeals" and the benefit of Settlement, which "provides certain and substantial recompense to the Class members now"). This is in addition to the significant risks Plaintiffs have already shouldered over the past seven years.  The Settlement resolves this significant and cumulative uncertainty in a manner favorable for all.

### (e)      The Net Settlement Amount Is Reasonable in Light of the Best Possible Recovery and All Attendant Risks of Litigation.

Under the Settlement, each of the Class Members will receive an award that is more than reasonable given the risks and time attendant to the post-trial motion and appeals process.  "The determination of a reasonable settlement is not susceptible of a mathematical equation yielding a particular sum but turns on whether the settlement falls within a range of reasonableness.  This 'range of reasonableness' recognizes the uncertainties . . . in any particular case . . . ."  In re Metlife Demutualization Litig., 698 F. Supp. 2d at 340.  As discussed above, many uncertainties remain.  For example, as this Court recognized in reviewing the range of reasonableness in Maley, "[s]ettling avoids delay as well as uncertain outcome . . . on appeal" and "the appellate process . . ., with the risk of reversal, make the fairness of this substantial settlement readily apparent." 186 F. Supp. 2d at 366.

Because settlement can provide certain and immediate recovery, courts often approve settlements even where the benefits obtained are less than those originally sought.  As the Second Circuit stated in Grinnell: "There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery."  495 F.2d at 455, n.2.  See also In re Marsh ERISA Litig., 265 F.R.D. 128,

141 (S.D.N.Y. 2010) (McMahon, J.).  In fact, courts often approve class settlements even where the benefits represent "only a fraction of the potential recovery."  See, e.g., In re Initial Public Offering Secs. Litig, 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009) (approving settlement which provided only "miniscule" 2 percent of defendants' maximum possible liability, observing that "the Second Circuit has held that even a fraction of the potential recovery does not render a proposed settlement inadequate"); Hall v. Children's Place Retail Stores, Inc., 669 F. Supp. 2d 399, 402 n.30 (S.D.N.Y. 2009) (approving a settlement that amounted to 5-12 percent of provable damages); In re Prudential Inc. Secs. Ltd. Partnerships Litig., MDL No. 1005, M-21-67, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6 percent and 5 percent of claimed damages); In re Crazy Eddie Secs. Litig., 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (approving settlement that awarded class members between six cents and ten cents for every $1.00 lost); Behrens v. Wometco Enters., 118 F.R.D. 534, 542 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990) ("The mere fact that the proposed settlement of $.20 cents a share is a small fraction of $3.50 a share is not indicative of an inadequate compromise").

Here, the value of the settlement is no small fraction of the relief originally sought, and in fact greatly exceeds the norm. First, Plaintiffs' obtained significant, extensive, and long-lasting programmatic relief, detailed over 23 pages of the Settlement Agreement.  This substantial programmatic relief—a primary focus of the litigation—will provide just the sort of significant benefit for Novartis' employees for years to come that Plaintiffs sought all along.  See Bellifemine, at *12-13 (recognizing the value of substantial programmatic relief provisions). The initial value of implementing these reforms is set at approximately $22.5 million, although the agreement also contemplates that additional monies may be necessary pending the results of various statistical studies prescribed by the agreement.

In addition, the Settlement Class will receive up to $152.5 million in monetary relief from the Settlement, and the monies will be distributed in a matter of months.  The Settlement makes these awards for the Class a certainty.  In contrast, punitive damages remain a hotly debated subject in the legal community; where -- as here -- the jury awarded particularly high punitive damages, the appellate process could entail great risk to monetary awards made in conjunction with the verdict.

Nonetheless, Plaintiffs negotiated a settlement that dictates that the Settlement Class will receive **100 percent** of the potential recovery for Back Pay ($60 million) as calculated by Plaintiffs' expert.  Dr. Louis R. Lanier, PhD, a labor economist with extensive experience in the analysis of labor markets and gender differentials in the workforce, analyzed the data in the present case and estimated that Back Pay damages accruing from underpayment of Class Members was $42.8 million.  See Lanier Damages Report ¶9; Joint Dec. ¶19.  He also estimated that Back Pay damages from the under-promotion of Class Members were $12.1 million.  Id. Therefore, total damages for Back Pay, for both underpayment and under-promotion from the period of 2002 until 2009 were estimated at $54.9 million. The instant $60 million in payments and compensation to the Class Members for Back Pay represents **over 100 percent** of this estimate.  Even assuming that damages continued to accrue through half of 2010, the $60 million set aside for Back Pay would still reach at least **100 percent** of Dr. Lanier's estimate of the Defendant's highest possible exposure.

Furthermore, each Settlement Class Member has the opportunity to seek up to the statutory maximum in compensatory damages or chose a lower, pro-rata payout.  Accordingly, the Settlement provides each Settlement Class Member the opportunity to seek damages at **100 percent** of the possible relief.

26

Given the length and difficulty of the process needed to reach this result, it is Class Counsel's informed judgment that "there is little reason to believe that further settlement negotiations would result in any additional settlement funds." Wright v. Stern, 553 F. Supp. 2d 337, 347 (S.D.N.Y. 2008). Moreover, "There is simply no assurance that more years of litigation would result in any greater recovery." Id. at 339. For these reasons, the Settlement Agreement is reasonable in light of the maximum possible recovery.

### 4.    The Arm's Length Negotiations between Experienced Counsel Ensures that the Settlement Is Procedurally Fair.

After the district court has analyzed the substantive fairness of a proposed settlement, it turns to the procedural fairness, which examines "the negotiating process by which the settlement was reached." McReynolds, 588 F.3d at 804; see also Clark, at *18-20. As the Second Circuit has instructed, when a district court examines a proposed settlement's procedural fairness, the court must "pay close attention to the negotiating process, to ensure that the settlement resulted from arm's length negotiations and that plaintiff's counsel possessed the necessary experience and ability" to effectively vindicate the interests of the class. McReynolds, 588 F.3d at 804. In other words, "a settlement is procedurally fair if: (1) the settlement is the product of 'arms-length negotiations'; (2) during negotiation, both sides were represented by 'experienced, capable counsel'; and (3) it was reached after conducting 'meaningful discovery.'" In re Sony Corp., at *12 (quoting Wal-Mart Stores. Inc., at 116).

The proper focus of this inquiry is on "the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1982) (citing Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)); see also D'Amato, 236 F.3d at 85 (citing Malchman for same proposition). To that end, "a strong presumption of fairness attaches to a class action

settlement reached in arm's-length negotiations among able counsel." In re Telik, 576 F. Supp. 2d. at 576 (citing Wal-Mart, at 116). Accordingly, "so long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." Maley, 186 F. Supp. 2d at 366 (quoting In re Painewebber Ltd. Partnerships Litig., 171 F.R.D. at 132); Banyai, at *11.

(a)     <strong><u>Experienced Counsel Represented Both Parties in This Case.</u></strong>

Both Parties were represented by experienced counsel with substantial experience in employment class action litigation. Class Counsel has been recognized by numerous courts for their work in securing similar class action settlements. See, e.g., Hernandez v. C&S Wholesale Grocers, Inc., No. 06 CV 2675 (CLB)(MDF), slip op. (S.D.N.Y. July 31, 2008) (in approving a wage and hour settlement, Judge Karas described SWH as "exceptionally able and experienced" and praised "the work that counsel have put in, not just in terms of the quantity, but what it was that counsel did, with obviously the tremendous amount of work…" and acknowledged a highly favorable result in "obviously a very complex dispute, both in terms of the law and in terms of the facts"); Bellifemine, at *16-17 (in approving a gender discrimination class action settlement, Judge Koetl noted that the "action was litigated zealously by counsel" and recognized the "substantial programmatic relief provisions throughout the settlement," and the role that Class Counsel would play "in ensuring compliance with the settlement and facilitating the claims form process"). Novartis was represented in these negotiations by the firm of Cravath, Swaine and Moore, veterans of hundreds of high stakes commercial lawsuits, a firm that enjoys as fine a reputation for corporate litigation as any in the United States.

In such circumstances, Courts accord "great weight" to the recommendations of Counsel,

who are in the best position to evaluate the strengths and weaknesses of their cases. Maley, 186 F. Supp. 2d at 366; In re Telik, 576 F. Supp. 2d at 576; Chatelain v. Prudential-Bache Secs., 805 F. Supp. 209, 212 (S.D.N.Y. 1992); In re EVCI Secs. Litig., at *10; In re Global Crossing Secs. and ERISA Litig., 225 F.R.D. 436, 461 (S.D.N.Y. 2004).

**(b)    The Settlement was Negotiated by Experienced Counsel Over Several Weeks.**

The protracted settlement discussions in this case were conducted over approximately two months.   During negotiations, the Parties conducted multiple full-day, face-to-face mediations, which were followed by lengthy telephone conferences and exchanges of multiple drafts and related materials.  Joint Dec. ¶18.  These exchanges then shifted to focus on similar lengthy, arms-length negotiations regarding the preparation and drafting of the voluminous settlement documentation now on file with the Court.  Joint Dec. ¶20.  In sum, the arduous process leading to the Settlement was procedurally sound and fair.  See, e.g., In re Telik, 576 F. Supp. 2d at 576 (appropriate negotiations included face-to-face meetings, an unsuccessful mediation, numerous telephone conferences, and substantial concessions by both sides); In re EVCI Secs. Litig., at *10 (negotiations took place over several weeks by capable counsel); Chatelain, 805 F. Supp. at 212 (relies on counsels' description of "arms-length" negotiations);  In re AOL Time Warner ERISA Litig., No. 02 Civ. 8853, 2006 U.S. Dist. LEXIS 70474, at *16-17 (S.D.N.Y. Sept. 27, 2006) (negotiations conducted by counsel well-informed of the merits of the claims at that stage of litigation).

**C.    ADEQUATE NOTICE HAS BEEN PROVIDED TO THE CLASS.**

The Notice approved by the Court in this case plainly informed each Class Member of the terms of Settlement.  Courts deem a notice sufficient when, as here, it "may be understood by the average class member."  Wal-Mart Stores, 396 F.3d at 114; see also In re Marsh ERISA

Litig., 265 F.R.D. at 145.  Under that test, the notice here satisfied due process and Rule 23.

### D.   PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS APPROVED.

#### 1.   An Award of Attorneys' Fees and Expenses Is Standard.

Federal courts have long recognized that a lawyer whose efforts create a common fund may recover a reasonable fee from the fund as a whole.  See Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 249 (2d Cir. 2007) (citing Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) ("under the 'equitable fund' doctrine, attorneys for the successful party may petition for a portion of the fund as compensation for their efforts")); Banyai, at *9 ("The common or equitable fund doctrine . . . allows an attorney whose actions have conferred a benefit upon a given group or class of litigants [to] file a claim for reasonable compensation for his efforts") (internal quotations omitted); In re American Bank Note, 127 F. Supp. 2d at 430.  Moreover, it is well-established that "An agreed upon award of attorneys' fees and expenses is proper in a class action settlement, so long as the amount of the fee is reasonable under the circumstances."  Bellifemine, at *14-15.

To decide an appropriate amount of attorneys' fees in class actions, the courts have adopted the principles articulated by the Second Circuit in Grinnell:

> We are not under the illusion that a "just and adequate fee" can necessarily be ascertained by merely multiplying attorney's hours and typical hourly fees... [L]ess objective factors can be introduced into the calculus. Perhaps the foremost of these factors is the attorney's "risk of litigation" *i.e.* the fact that despite the most vigorous and competent of efforts success is never guaranteed.

495 F.2d 448, 471.  Other generally accepted factors as stated in Grinnell include: (1) the standing of counsel at the bar – both counsel receiving award and opposing counsel; (2) time and

labor spent; (3) magnitude and complexity of the litigation; (4) responsibility undertaken; (5) the amount recovered; and (6) what it would be reasonable for counsel to charge a victorious plaintiff. Id. at 470.

###    2.    The Terms Negotiated in the Settlement Agreement Comport with the Standard.

The Settlement Agreement provides that, subject to Court approval, Class Counsel will receive $38.125 million in attorneys' fees—which equals 21.8 percent of the $175 million total gross value of the settlement, including the attorneys' fee provision.  Given the extraordinary results of the Settlement, the time-consuming and diligent efforts of Class Counsel to effectuate it, and Class Counsel's continuing supervision responsibilities, the Court grants Plaintiffs' application for these fees, as well as their application for $2 million for costs and expenses.  As shown below, this application is fair, reasonable and should be approved under either method of evaluating class counsel fees.

Based on the "percentage of the fund" approach for evaluating class action fees, the amount of attorneys' fees in question is compared to the overall settlement value, including any portion earmarked for said fees.  Here, the requested fees represent approximately **21.8** percent of the total relief available through the settlement.  Even if calculated in the more conservative and less-accepted methodology of percent against monetary fund (rather than overall value), the requested fees represent approximately **25** percent of the monetary relief available through settlement. As such, the fee falls well within the mainstream of percentage of awards granted by courts in the Second Circuit in class suits of similar size and complexity – and is less, percentage-wise, than many.

Under the alternative "lodestar" measure, Plaintiffs have to date expended 36,996.77 hours in attorney time and expect to devote further, substantial hours overseeing the Settlement.

31

Plaintiffs therefore seek approximately a **2.4** multiplier, an enhancement routinely approved as part of the spectrum for multipliers in Second Circuit class fee cases.

### 3. The Fees Are Justified by the Relevant Factors.

#### (a) The "Risk of Litigation" Was Substantial.

The most significant factor in determining the reasonableness of attorneys' fees, the risk of litigation, weighs heavily in favor of an award of fees in this case. Success for the Plaintiff-Class was never guaranteed. The fact that the case proceeded to trial, a risky proposition in and of itself, also serves as strong evidence that the two, sophisticated Parties nonetheless widely disagreed about the strength of the Plaintiffs' case. Accordingly, Class Counsel took a great risk in litigating this action – a risk ultimately paid off with a great reward for the Settlement Class Members.

#### (b) Counsel for Both Parties Have a High Standing at the Bar.

David Sanford and SWH are AV rated, which is the highest rating given to a lawyer and law firm through a peer-review rating process monitored by Lexis Nexis.

Class Counsel has previously been recognized by this jurisdiction for having "an established record of competent and successful prosecution of large . . . class actions." Bellifemine, at *4. In addition, Class Counsel has ushered several class actions to settlement, including two recent matters: Bellifemine v. Sanofi, No. 07 Civ. 2207, 2010 U.S. Dist. LEXIS 79679 (S.D.N.Y. Aug. 5, 2010); and Wooten v. Smith & Nephew, No. 2:06-cv-2571, slip op. (W.D. Tenn. Nov. 25, 2009).

Novartis was represented for six years through trial by the law firm of Vedder Price, a nationally recognized firm whose reputation for zealous representation of its clients is well

32

known – and was repeatedly demonstrated to the court.  Novartis is now represented by the law firm of Cravath, Swaine and Moore, also nationally recognized and arguably the preeminent defense firm in the United States.

### (c)   Lead Counsel's Dedicated Significant Time and Labor.

Class Counsel devoted 36,996.77 hours from 68 attorneys and staff members to the successful prosecution of this matter.  That time, effort and dedication of resources brought this complex litigation to a successful resolution.  The work involved investigating both the legal and factual allegations of gender bias at Novartis; drafting of pleadings and other motion practice; obtaining and interpreting statistical analysis of jobs data; conducting extensive deposition and document discovery; briefing and arguing pretrial motions; preparing and conducting a nearly seven-week trial; arguing the disparate impact claims; and, ultimately, negotiating and then drafting the drafting the Settlement Agreement.  Furthermore, as noted above, significant additional post-settlement work remains to be done.  Joint Dec. ¶¶29-34.

### (d)   This Litigation was Extremely Complex, Requiring Significant Efforts.

The prosecution of this action required a high level of experience and expertise in complex class action litigation, as well as the ability to provide such service under challenging circumstances.  In addition, many of the issues or particular challenges of taking this matter to trial involved issues of first-impression or matters that otherwise had little development in the law.  While the full extent and nature of the efforts of Class Counsel are described in detail in the Joint Declaration, proof that Class Counsel has litigated this action vigorously and will continue to take its obligations seriously in the post-settlement stage can be seen throughout the construction of the Settlement Agreement itself.

(e)     **The Litigation Has Bestowed Substantial Benefits on the Class.**

The benefits of the Settlement to Plaintiffs and the Class are substantial.  The Settlement

provides $175 million in relief, of which approximately $134.875 million is dedicated to the

direct betterment of the Settlement Class.  In addition, the Back Pay award -- $60 million of that

sum -- represents 100 percent of what the total valuation of back pay damages by Plaintiffs' own

expert.  Joint Dec. ¶19.  Moreover, the Programmatic Relief awarded is of a scope and standard

that both Parties expect it to position Novartis "to occupy a leadership position for gender equity

in the industry." (See Joint Dec. Ex. B).

The relief Class Counsel has obtained required great effort over a number of years, along

with a successful outcome at trial.  Moreover, the benefits of the Settlement will be ongoing.

Novartis has agreed to several significant gender-equalizing programmatic reforms that will

benefit members of the Class far into the future.  This Settlement is an impressive achievement.

4.     **The Fees Requested Are Reasonable and Appropriate under Both The Percentage of Fund and the Lodestar Approaches.**

The Second Circuit has authorized district courts, in the exercise of their informed

discretion, to calculate class action counsel fees either on a "percentage of the fund" basis or by

fashioning a "lodestar" when awarding fees in a common fund case.  See Central States, 504

F.3d at 249.

However, as this Court has recently recognized, "the district court has discretion to use

either method, although the trend in this Circuit is toward the percentage method." In re Marsh

ERISA Litig., 265 F.R.D. at 146.  See also Wal-Mart Stores, 396 F.3d at 121 ("The trend …

toward the percentage method … directly aligns the interests of the class and its counsel and

provides a powerful incentive for the efficient prosecution and early resolution of litigation")

(citations omitted); Dupler, 705 F. Supp. 2d 242 (same).  This Court endorsed this shift two years

earlier in In re Telik, noting "the administrative problems associated with the lodestar method, and the advantages presented by the percentage of recovery approach," which "led most district courts in this Circuit to adopt the percentage of recovery methodology." 576 F. Supp. 2d at 586.

The percentage method calculates the fee award as some percentage of the settlement fund created for the class. Id. The lodestar method multiplies the number of hours each attorney has expended by the hourly rate attorneys of similar skill charge in the area; then it applies to that figure a multiplier which factors in the litigation risks and other considerations. Id. (citing Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999)). In combination, the documentation of hours submitted by counsel can be used as a "cross check" on the reasonableness of the requested percentage of the fund. Goldberger, 209 F.3d at 55.

Under either a "percentage-of-the-fund" analysis or a "lodestar" approach, the $38.125 million fee sought herein is amply justified.

        (a)      **A 22 Percent of Gross Settlement Benefit Is Well Within the Range of Reasonableness.**

As noted above, the Second Circuit favors awarding fees according to the "percentage-of-the-fund" over the "lodestar" method in common fund cases. Moreover, this Circuit has ruled that "[a]n allocation of fees by percentage should therefore be awarded on the basis of total funds made available **whether claimed or not**". Masters v. Wilhelmina Model Agency, Inc., 473 F. 3d 423, 437 (2d Cir. 2007) (emphasis added).

The federal courts have established that a standard fee in complex class action cases like this one, where plaintiffs counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit. See, e.g., Maywalt v. Parker & Parsley Petroleum, 963 F. Supp. 310, 313 (S.D.N.Y. 1997) (citing In re Warner Communications Secs. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985), aff'd 798 F.2d 35 (2d Cir. 1986)); Brown v. Steinberg, Nos. 84

Civ. 464, 84 Civ. 4665, 84 Civ. 8001, 1990 U.S. Dist. LEXIS 12516, at *6 (S.D.N.Y. Oct. 12, 1990) (citing Blum v. Stenson, 465 U.S. 886, 903 (1984), in which the Supreme Court, in dicta, approved this fee award method); In re Marsh ERISA Litig., 265 F.R.D. at 149 (noting trend of awarding 20-50 percent of recovery to attorneys and finding fee of over $11M, or one-third of the recovery, "fair and reasonable in relation to the recovery and compares favorably to fee awards in other risky common fund cases in this Circuit and elsewhere.").

District courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater. See, e.g., In re Priceline.com, Inc. Secs. Litig., No. 3:00-CV-1884, 2007 U.S. Dist. LEXIS 52538 (D. Conn. July 20, 2007) (awarding **30 percent** of $80 million fund); Frank, 228 F.R.D. at 189 (awarding attorneys' fees of **38.26 percent** of $125,000.00 settlement fund); In re Oxford Health Plans, Inc., Secs. Litig., MDL Dkt. No. 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding **28 percent** of $300 million fund); Maley, 186 F. Supp. 2d at 369 (approving attorneys' fees of **33.3 percent** of a $11.5 million settlement fund); Strougo, 258 F. Supp. 2d at 262 (**33.33** percent); In re Lloyd's American Trust Fund Litig., No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663, at *76 (S.D.N.Y. Nov. 26, 2002) ("In this district alone, there are scores of . . . cases where fees . . . were awarded in the range of **33.3 percent** of the settlement fund."); In re Veeco, at *13-14 (same); deMunecas, at *19 ("Class Counsel's request for **33 percent** of the Fund is reasonable under the circumstances of this case and is consistent with the norms of class litigation in this circuit."); Becher v. Long Island Light Co., 64 F. Supp. 2d 174, 182 (E.D.N.Y. 1999) (**33.33** percent).

The percentage of the settlement fund sought here is consistent with awards made in other class actions. A recent study surveying the award of attorneys' fees in class action settlements reviewed data on cases nationwide and found that the mean fee award for

employment class action settlements is 27 percent of the recovery, and the median is 25 percent of the recovery. Theodore Eisenberg and Geoffrey P. Miller, *Attorneys Fees and Expenses in Class Action Settlements: 1993-2008*, NYU Center for Law, Economics and Organization, Working Paper No. 09-50 (November 2009), *available at* http://ssrn.com/abstract=1497224. The study notes, however, that those percentages do not account for an important indicator of the fee award—risk. Fee awards for class action in cases that are "low/medium" risk average 26.2 percent of total recovery, and in cases that are "high" risk average 35.1 percent of total recovery. Id. at Table 8. (The study coded for risk based largely on whether the court deciding the case mentioned risk as a significant factor in the opinion or, in some cases, if the risk level was evident from the facts and procedural history of the case.) Id. at 5-6. For the reasons explained above, this was clearly a high-risk case, whose outcome was extraordinary. Accordingly, the fee requested by Class Counsel falls well below the average award for this type of case – on a percentage basis.

However, there is no denying that the requested fee is extremely high as an absolute dollar amount – so high that I cannot possibly say, as plaintiffs have asked me to say, that it is "substantially less than awards routinely granted by many courts in the Second Circuit." It is, in fact, substantially more than this Court has awarded in any case. The number (in excess of $38 million) represents a "kicker" of more than double an already high post-trial litigation fee. This is substantially more than the "success fees" that are paid by private (generally corporate) clients in civil litigation (at least, any of the success fees that have been called to this court's attention) – only it is being paid out of a fund created to compensate victims of discrimination. Plaintiffs' lawyers are obviously entitled to significant compensation (including a substantial bonus over and above their hourly rates). They have well and truly earned it; they prepared and tried a

37

brilliant case against a dogged opponent. The problem is that the size of the settlement fund is so outsized that applying the usual factors results in a number that is stratospheric – and bound to make headlines. It may be that, when the dollar amount of the settlement is as high as it is here, even a percentage of the fund as low as the one to which the parties have agreed strains the bounds of reasonableness.

### (b)     The Lodestar Sought is Well within the Range of Reasonableness.

As a cross-check, the court looks to the lodestar calculation – specifically, to what the "lodestar" factor is.   Although lodestar analysis is no longer the preferred method of calculating attorneys' fees in connection with class action settlements, if a percentage of fund figure compares favorably with a lodestar that uses reasonable hourly rates and a reasonable multiplier, it tends to validate the percentage of funds figure.

As set forth in the Joint Declaration, Class Counsel and staff devoted 36,996.77 hours to prosecute this litigation.  The current hourly rates for Co-Lead Trial Class Counsel are $750.00 for David Sanford, Esq. and $600.00 for Katherine Kimpel, Esq.  Other Trial Counsel's rates are $750.00 for Steven Wittels, Esq., $700.00 for Sharon Eubanks, Esq., $500.00 for Katherine Leong, and $400.00 for Felicia Medina, Esq.  See Joint Dec. ¶50 (setting forth hourly rates of other attorneys and staff who worked on the Matter over the course of the litigation).  The firm's hourly rates are below the rates charged by firms of this caliber (principally defense firms) that litigate regularly in this district; they have also been approved in other matters in this district. For example, in Bellifemine, Judge Koeltl approved a fee application by Plaintiffs' counsel, the law firm of Sanford Wittels & Heisler, LLP, which was based on similar work on another class action employment discrimination case.  See also  Thomas v. Citifinancial Auto Ltd., No. 07 Civ. 00721, slip op. (D. Md. Aug. 20, 2009) (Motts, J.) (also approving similar work of

Plaintiffs' counsel, Sanford Wittels & Heisler, LLP); <u>Rosenberg v. IKON</u>, No. 05-cv-09131, slip

op. (S.D.N.Y. Jan. 22, 2008) (Crotty, J.); <u>Binetti v. Washington Mutual Bank</u>, No. 06 Civ. 1732,

slip op. (S.D.N.Y. Apr. 15, 2008) (Karas, J.).

      This Court approved attorneys' fees based on similar rates in <u>In re Marsh ERISA Litig.</u>,

265 F.R.D. at 146 (rates ranging from $125.00 for administrative personnel to $775.00 for senior

lawyers) – a case where I did not have the benefit of seeing plaintiffs' counsel try (and win) their

case.

      The fact that the fee award is calculated at current billing rates, whereas the hours were

worked over many years, including some when billing rates were lower, is of no moment. As this

court held in <u>In re Veeco Secs. Litig.</u>:

> The use of current rates to calculate the lodestar figure has been repeatedly
> endorsed by courts as a means of accounting for the delay in payment inherent in
> class actions and for inflation . . .

2007 U.S. Dist. LEXIS 16922, at *9 n.7.

      Class Counsel has requested a multiplier of 2.4 times the hourly fees already incurred.

That multiplier falls well within (indeed, at the lower end) of the range of multipliers accepted

within the Second Circuit. <u>See Roberts v. Texaco, Inc.</u>, 979 F. Supp. 185, 198 (S.D.N.Y. 1997)

(<i>rev'd on diff., grounds by</i> <u>Kaplan v. Rand</u>, 192 F.3d 60 (2d Cir. 1999)) (awarding a 5.5

multiplier in race discrimination class action); <u>Wal-Mart Stores</u>, 396 F. 3d 96 (2d Cir. 2005)

(multiplier of 3.5 in antitrust class action); <u>Maley</u>, 186 F. Supp. 2d at 369-71 (approving "modest

multiplier" of 4.65 in securities fraud class action); <u>In re Interpublic Secs. Litig.</u>, No. Civ. 6527

Class Action, 03 Civ. 1194 Derivative Action, 2004 U.S. Dist. LEXIS 21429, at *36-37

(S.D.N.Y. Oct. 26, 2004) (multiplier of 3.96); <u>In re Lloyd's Am. Trust Fund Litig.</u>, at *27

(multiplier of "just" 2.09 is "at the lower end of the range of multipliers awarded by courts in the

Second Circuit.").

Moreover, courts in this Circuit have recognized that where "class counsel will be required to spend significant additional time on this litigation in connection with implementing and monitoring the settlement, the multiplier will actually be significantly lower." Bellifemine, at *19; see also Parker v. Jekyll & Hyde Entm't Holdings, L.L.C., No. 08 Civ. 7670, 2010 U.S. Dist. LEXIS 12762, at *7-8 (S.D.N.Y. Feb. 9, 2010) (noting that, "as class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time"). In this case, class counsel will continue working with the Class and monitoring the company's compliance with the settlement for three years. So the multiplier in this case is actually less than 2.4.

Of course, the lodestar calculation is subject to the same criticism as the percentage of fund number – it is a very, very big number. However, the fact that a low multiplier lodestar calculation yields a number approximating the percentage of fund number persuades the court that it is appropriate to award the full requested fee award to plaintiffs' counsel.

### E.   PLAINTIFFS' APPLICATION FOR REIMBURSMENT OF $2 MILLION IN LITIGATION EXPENSES IS GRANTED

Plaintiffs have expended $1,891,098.31 to date in expenses, and anticipate spending significant additional dollars in the next three years, both on enforcing the terms of the settlement agreement and in maintaining and fulfilling its duties to the Class Members through regular communication and general availability.

Chief amongst these expenses will be the retention and consultation fees for an expert to aid Plaintiffs' Counsel in the supervision and response to the various statistical analyses called for as a part of the programmatic relief. No fewer that four different statistical models will be

reviewed by Plaintiffs (studies of the performance evaluation system, the management promotions rates, the pay-in-range distributions, and the base pay gender variance); and some analyses are conducted on an annual – rather than one time – basis.  As a result, Class Counsel will likely expend far greater than the $2 million negotiated as a part of the settlement agreement.  Joint Dec. ¶¶29, 32-34.

"It is well-established that counsel who create a common fund . . . are entitled to the reimbursement of [all reasonable] litigation costs and expenses . . . ."  In re Marsh ERISA Litig., at *56; see also In re Marsh & McLennan, at *59.  In class action settlements nationwide, litigation costs and expenses average about 2.8 percent of the total recovery.  Eisenberg and Miller, *Attorneys Fees and Expenses in Class Action Settlements: 1993-2008*, at 26.  Here, Class Counsel has incurred far less than the $4.9 million in expenses than the average percentage predicted.  The $2 million in expenditures, over more than seven years of litigation and three additional years of settlement enforcement, are modest in comparison.  Accordingly, the Court grants Plaintiffs' request for recoupment of these expenses.

## F.     SERVICE PAYMENTS

As the parties know, the single aspect of the settlement that has given the court the greatest pause is a relatively insignificant one in the great scheme of things: the special or "service" payments to individual members of the class who have participated in this lawsuit in some manner, whether by serving as named plaintiffs or as witnesses during the pre-trial and trial phases. Unquestionably, this historic settlement would not and could not have been achieved without the assistance of these women, all of whom are class members. However, the payment of special bonuses to participating members of the class is not without its downside, and the court feels constrained to announce what that downside is.

41

1.    **Courts Have Awarded Award Service Payments to Class Representatives Who Provide Substantial Assistance.**

Incentive awards have been awarded to individual class members in a variety of contexts, including employment discrimination suits, antitrust cases and consumer fraud suits.  See Roberts, 979 F. Supp. 185 (awarding $50,000.00 and $85,000.00 to two of the named plaintiffs in a racial discrimination employment class action); Wright, 553 F. Supp. 2d at 345 (approving $50,000.00 awards to each of 11 named plaintiffs in employment discrimination action); Beck v. Boeing Co., No. C00-301P, 2004 U.S. Dist. LEXIS 27622, at *4 (W.D. Wash. Apr. 9, 2004) (approving $100,000.00 awards to each of 12 plaintiffs); Ingram, 200 F.R.D. 685 (four representative plaintiffs awarded $300,000.00 each); Brotherton v. Cleveland, 141 F. Supp. 2d 907, 913-14 (S.D. Ohio 2001) (approving incentive awards ranging of $50,000.00); Van Vranken, 901 F. Supp. at 299-300 ($50,000.00 incentive award); Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 250 (S.D. Ohio 1991) (six class representatives granted incentive awards of $50,000.00 each); Liberte, at *15 ($95,172.47 to class plaintiff).

In Roberts v. Texaco, Inc., my colleague the late Hon. Charles L. Brieant, Jr. announced why it could be particularly appropriate to award incentive or service payments to certain class members in an employment discrimination class action:

> [T]here is a fundamental distinction between litigation based on claims of racial, gender or other discrimination, and securities-based litigation . . . or antitrust suits—the primary reported instances in which incentive awards have been sought . . . . In discrimination-based litigation, the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril.

Roberts, 979 F. Supp. at 201; see also Parker v. Jekyll & Hyde, at *4-6 (incentive award

particularly appropriate given risks facing current and former employees suing employer); Frank., 228 F.R.D. at 187 (finding incentive awards "particularly appropriate in the employment context"); Nantiya Ruan, Bringing Sense to Incentives: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions, 10 Employment Rights and Employment Policy Journal 395, 410-411 (2006) (which emphasizes the special risks an employee-plaintiff confronts for racial or gender discrimination). See also Velez v. MaJik Cleaning Serv., Inc., No. 03 Civ. 8698, 2007 U.S. Dist. LEXIS 46223, at *21-22 (S.D.N.Y. June 22, 2007) (approving incentive award equal to twice that provided to class members on ground that "[t]he risks to which [class representatives] allowed themselves to be exposed . . . and the effort they expended on behalf of all class members, justifies their receipt of an incentive award."); RMED Int'l, Inc., v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239, at *2 (S.D.N.Y. May 15, 2003) (Leisure, J.); Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2005 U.S. Dist. LEXIS 7961, at *9-10 (S.D.N.Y. May 5, 2005); Liberte Capital Group v. Capwill, No. 5:99 CV 818, 2007 U.S. Dist. LEXIS 64869, at *10-15 (N.D. Ohio Aug. 29, 2007); Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 687 (N.D. Ga. 2001); Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 298 (N.D. Cal. 1995).

This Court has recognized that service awards are an important way of "reimbursing class representatives who 'take on a variety of risks and tasks when they commence representative actions, such as complying with discovery requests and often must appear as witnesses in the action.'" In re Marsh ERISA Litig., 265 F.R.D. at 58 (quoting Strougo, 258 F. Supp. 2d at 264); see also Bellifemine, at *20-21 (approving service payments to unnamed class members "for their assistance in the prosecution of this action… in light of the time and energy that they have devoted to [the] case, and the benefit conferred on the Class. However, Plaintiffs seek incentive

awards, not just for Named Plaintiffs, but also for other members of the class who have lent substantial assistance to the litigation, as testifying witnesses at trial, and even simply as deponents during the pre-trial phase. That presents a novel issue for this court.

Plaintiffs argue that the Testifying Witnesses and Deponents gave a significant amount of time and effort to the prosecution of this case, which made it possible to prevail at trial and, ultimately, reach settlement. Moreover, like the Named Plaintiffs, the Testifying Witnesses and Deponents (1) risked economic harm, and/or (2) contributed significantly to prosecuting this action. Joint Dec. at ¶¶35-40. Plaintiffs argue that the pharmaceutical sales field is small and tightly knit, and that within that small community, each of the Testifying Witnesses and Deponents in effect "lent their names" to the prosecution of this suit at great personal sacrifice – even if they were not named as representative plaintiffs in the caption -- and were instrumental in achieving this settlement.

The Court grants Plaintiffs' motion for awards of compensatory damages and service awards to the 26 Named Plaintiffs. The damages and awards to the Named Plaintiffs range in amount from $175,000.00 to $425,000.00. These amounts are far greater than the usual amount awarded to Named Plaintiffs. In part this is because the case was not settled before trial, and some (though not all) of the Named Plaintiffs actually had to testify in court, exposing herself to a second round of cross-examination by Novartis' counsel and to the scrutiny of the industry and the press. And in part this is because the settlement amounts encompass not just a "service fee" for the Named Plaintiffs, but also an amount in compromise of each Named Plaintiff's claim for non-economic (pain and suffering) damages. The court grants these awards on the understanding that 70% or more of the amount awarded to each Named Plaintiff represents the compromise of the Named Plaintiffs' compensatory damages claims (which had not yet been resolved), rather

44

than an incentive fee. In this case each Named Plaintiff possess a claim for compensatory damages that could entitle her to as much as $300,000 in a proceeding before the Claims Adjudicator. So assuming (as I do) that the awards to the Named Plaintiffs are substantially justified by a compromise of those claims reduces the amount of each incentive award to a reasonable figure.

The Testifying Witnesses who are members of the class have also settled their compensatory damages claims and applied to the court for incentive payments. The court has the benefit of having heard these women testify about the pain and suffering they experienced as a result of their treatment by certain managers at Novartis. Assuming that the awards to be paid to each Testifying Witness includes a substantial sum (at least 70%) in compromise of her non-economic damages claim, I conclude that the incentive awards (i.e., the rest of payment) are reasonable in amount. The Testifying Witnesses, like the Named Plaintiffs, incurred significant personal expenses, measured in both time and money, in preparing for their depositions and their trial testimony and in being present at the trial. While the court has not been presented with documentation of the fair market value of their lost time and expenses, I am willing to accept that at least 20% of each Testifying Witness' award represents a good faith estimate of the value of lost time and expense actually incurred by each of these witnesses during the pre-trial and trial phases of the case. Furthermore, because they testified publicly in this high profile trial, which was covered extensively in the press, the Testifying Witnesses have been publicly identified as parties who sued their employer for gender-based discrimination in the pharmaceutical industry, which presents a risk for their future careers. I thus grant their compensatory damages *cum* service payments as requested.

The class member deponents who are neither Named Plaintiffs nor Testifying Witnesses

present a somewhat different – and as I told counsel prior to the settlement hearing, troubling –

situation.  Plaintiffs ask that I authorize the payment of $25,000.00 to each of the 20 class

member deponents who were neither Named Plaintiffs nor testified at trial.  Yes, these class

members contributed to the success of this lawsuit in a way that wholly absent class members did

not.  Yes, there are a few cases that have authorized compensation for class members who were

deposed (although the compensation awarded in those cases appears to approximate what I

would expect are the time and expense reimbursements for a single day's deposition, and

$25,000 vastly exceeds that amount).  Yes, the amount of money involved is a drop in the bucket

of this settlement.  And yes, the court's failure to approve these negotiated payments will result in

further litigation over the fate of that money – litigation that has the potential (albeit only a slight

potential) to upset the entire apple cart that is this settlement.

   However, the court is concerned that making a regular practice of paying testifying class

members a flat fee – really a bonus – that is not expressly tied to the *actual* value of whatever

time and expenses they incurred in appearing for a deposition  smacks of paying witnesses for

their testimony.  The fact that these women are members of the class makes not the slightest bit of

difference.  In our system of litigation, we do not ordinarily give plaintiffs a "tip" for testifying –

plaintiffs *have* to testify in order to prevail on their claims.  Giving testimony that was adverse to

Novartis was a brave thing to do, but in most cases we do not compensate witnesses for their

courage;  instead, such witnesses possess an independent right of action if they suffered

retaliation as a result of their participation in this lawsuit (and no one has suggested that any of

these class member deponents suffered any such retaliation).  If these plaintiffs suffered

emotional distress appurtenant to testifying, they can include that in their claim for compensatory

damages.  But unlike the Named Plaintiffs and the Testifying Witnesses, these twenty class

members are not compromising their claims for compensatory damages – they are simply being given \$25,000, a not insignificant sum, for having inconvenienced themselves to give deposition testimony; and they are to receive this sum without presenting any evidence that ties the chosen figure to whatever actual out-of-pocket expense they incurred in giving that testimony.

I have already apologized to counsel for not flagging this issue months ago, when I signed the preliminary approval order. Frankly, the potential problem did not occur to me until 48 hours before the final settlement hearing. Counsel have called my attention to a few cases in which witnesses who did nothing more than give a deposition were given "service awards," and counsel were obviously relying on these when, in good faith, they negotiated this aspect of the settlement. The amounts may seem significant to me, but in the overall context of the settlement here achieved, they are but a pittance.

Given the existence of the cases cited to me in  Class Counsel's letter of November 22 -- as well as the fact that not a single absent class member has objected to making these payments to the class member deponents -- I will approve the negotiated amounts *in this case*. However, this opinion should not be cited as precedent for approving the concept of paying service awards to witnesses who do no more than testify in a case – and certainly not for the proposition that any such service awards can be in an amount other than one that approximates the out of pocket cost to the deponent of attending her deposition.

## CONCLUSION

The road to this Settlement was long, arduous, risky and expensive.  The Settlement is, by all measures, excellent.

For the reasons set forth in this opinion, the Court certifies the Settlement Class as final; approve the Settlement; awards the requested compensatory damages and service fees to the

Named Plaintiffs, Testifying Witnesses and Class Member Deponents, and grants the application for attorneys' fees and expenses. I am also appointing The Hon. William B. Wetzel (ret.) as the Claims Adjudicator, and Dr. Neal A. Gelfand as the Court Monitor.

Judgment is being entered simultaneously with the dissemination of this opinion (1) dismissing this action with prejudice; and (2) requiring that all materials marked as containing Confidential or Highly Confidential Information pursuant to the Protective Order entered in the Civil Action be returned to the producing party or destroyed.

Dated:  November 30, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL